**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 3-08-CV-2050-D (SAF) |
| | : | |
| **MARK CUBAN**, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMMISSION'S MEMORADUM OF
LAW IN OPPOSITION TO DEFENDANT MARK CUBAN'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ....................................................................................................1

FACTS ALLEGED IN THE COMPLAINT .............................................................2

ARGUMENT ...........................................................................................................4

I.      Standard Of Review ....................................................................................4

II.     An Agreement Establishes A Duty ..............................................................5

        A.      Under Rule 10b5-2, an Agreement Establishes a Duty .........................6

                1.      Rule 10b5-2 Applies to Both Business and Non-Business
                        Relationships ................................................................................6

                2.      Rule 10b5-2 was Properly Promulgated and
                        is Entitled to Deference ...............................................................11

        B.      Misappropriation Case Law Developed Under Section 10(b) of the
                Exchange Act Has Established that an Agreement of Confidentiality
                Creates a Duty .......................................................................................14

III.    The Commission Has More Than Sufficiently Alleged An Agreement
        Of Confidentiality That Was Violated ........................................................20

IV.     Cuban's Argument Regarding Application Of State Law Fails .....................22

V.      Amici Curiae Repeat Cuban's Misstatement Of The Law ...........................25

CONCLUSION .......................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

Bell Atl. Corp. v. Twombly,
      550 U.S. 544 (2007)..................................................................................5, 24

Bragdon v. Abbott,
      524 U.S. 624 (1998)................................................................................11, 12

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
      467 U.S. 837 (1984)........................................................................................11

Chiarella v. United States,
      445 U.S. 222 (1980)........................................................................................19

CompuDyne Corp. v. Shane,
      453 F. Supp. 2d 807 (2006) ............................................................................19

Dirks v. SEC,
      463 U.S. 646 (1983)........................................................................................15

Doe v. Hillsboro Indep. Sch. Dist.,
      81 F.3d 1395 (5th Cir. 1996) ............................................................................4

In re Abbot Labs.,
      51 F.3d 524, 528 (5th Cir. 1995) ......................................................................7

In re Enron Corp. Sec., Derivative & ERISA Litig.,
      235 F. Supp. 2d 549 (S.D. Tex. 2002) ........................................................4, 11

In re Katrina Canal Breaches Litig.,
      495 F.3d 191 (5th Cir. 2007) ............................................................................4

Lowrey v. Tex. A&M Univ. Sys.,
      117 F.3d 242 (5th Cir. 1997) ............................................................................4

Melder v. Morris,
      27 F.3d 1097 (5th Cir. 1994) ............................................................................5

National Cable & Telecomm. Ass'n v. Brand X Internet Servs.,
      545 U.S. 967 (2005)........................................................................................13

Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,
      482 F.3d 372 (5th Cir. 2007) ..........................................................................19

Scheuer v. Rhodes,
    416 U.S. 232 (1974)..............................................................................................4

SEC v. Brady,
    Civil Action No. 3:05-CV-1416-D, 2006 WL 1310320 (N.D. Tex. May 12, 2006)..........5

SEC v. Dorozhko,
    No. 07 Civ. 9606(NRB), 2008 WL 126612 (S.D.N.Y. Jan. 8, 2008)................................17

SEC v. Kirch,
    263 F. Supp. 2d 1144 (N.D. Ill. 2003) ..........................................................................9, 18

SEC v. Kornman,
    391 F. Supp. 2d 477 (N.D. Tex. 2005) .................................................................... *passim*

SEC v. Lenfest,
    949 F. Supp. 341 (E.D. Pa. 1996) ....................................................................................20

SEC v. Lyon,
    529 F. Supp. 2d 444 (S.D.N.Y. 2008)........................................................................ 17-18

SEC v. Mayhew,
    916 F. Supp. 123 (D. Conn. 1995)....................................................................................22

SEC v. Monarch Funding Corp.,
    192 F.3d 295 (2d Cir. 1999)................................................................................................1

SEC v. Nothern,
    Civil Action No. 05-10983 (NMG), --- F. Supp. 2d ---, 2009 WL 467535
    (D. Mass. Feb. 20, 2009)............................................................................................8, 17

SEC v. Sargent,
    229 F.3d 68 (1st Cir. 2000)........................................................................................ 16-17

SEC v. Talbot,
    430 F. Supp. 2d 1029 (C.D. Cal. 2006), rev'd, 530 F.3d 1085 (9th Cir. 2008)......... *passim*

SEC v. Yun,
    327 F.3d 1263 (11th Cir. 2003) .......................................................................................16

SEC v. Zandford,
    535 U.S. 813 (2002)..........................................................................................................12

Southwest Realty, Ltd. v. Daseke,
    No. CA3-89-3055-D, 1992 WL 373166 (N.D. Tex. May 21, 1992)..................................23

SR Int'l Bus. Ins. Co. Ltd. v. Energy Future Holdings Corp.,
    539 F. Supp. 2d 871 (N.D. Tex. 2008) ..............................................................................4

Steiner v. Southmark Corp.,
    734 F. Supp. 269 (N.D. Tex. 1990) .................................................................................5

United States v. Cassese,
    273 F. Supp. 2d 481 (S.D.N.Y. 2003)...................................................................... 19-20

United States v. Chestman,
    947 F.2d 551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992) ............. *passim*

United States v. Falcone,
    257 F.3d 226 (2d Cir. 2001)...................................................................................... *passim*

United States v. Kim,
    184 F. Supp. 2d 1006 (N.D. Cal. 2002) ................................................................. 9-10, 18

United States v. O'Hagan,
    521 U.S. 642 (1997)................................................................................................. *passim*

United States v. Reed,
    601 F. Supp. 685 (S.D.N.Y.),
    rev'd on other grounds, 773 F.2d 477 (2d Cir. 1985) .................................................12, 15

Verizon Employee Benefits Comm. v. Fitzgerald,
    Civil Action No. 3:06-CV-0482-D, 2007 WL 2080004 (N.D. Tex. July 12, 2007)...........4

Walton v. Morgan Stanley & Co.,
    623 F.2d 796 (2d Cir. 1980)........................................................................................22

Zagami v. Natural Health Trends Corp.,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) ........................................................................ 4-5

**FEDERAL STATUTES AND REGULATORY MATERIALS**

15 U.S.C. § 77q(a) .........................................................................................................1
15 U.S.C. § 78j(b)......................................................................................................1, 11
17 C.F.R. § 240.10b5-2.....................................................................................................6
17 C.F.R. § 240.10b5-2(a).................................................................................................6
17 C.F.R. § 240.10b5-2(b)(1) ............................................................................................7
17 C.F.R. § 243.100(b)(2)..................................................................................................7

Adopting Release, Selective Disclosure and Insider Trading,
    Exchange Act Release No. 34-43154, 65 Fed. Reg. 51716 (Aug. 15, 2000) ...............7, 12

Proposing Release, Selective Disclosure and Insider Trading,
Exchange Act Release No. 34-42259, 64 Fed. Reg. 72590 (Dec. 20, 1999)................7, 12

**MISCELLANEOUS**

Barbara Balder Aldave, Misappropriation: A General Theory of Liability
for Trading on Nonpublic Information, 13 Hofstra L. Rev. 101 (1984)...................... 15-16

John C. Coffee, Insider Trading: Expansion and Contraction,
N.Y.L.J., Jan. 19, 2006, at 5..........................................................................................7

Ralph C. Ferrara, et al., Ferrara on Insider Trading
and The Wall § 2.02[6] (2008) ..............................................................................16, 24

Dallas Morning News, Feb. 3, 2009, at 1D .................................................................16

William K.S. Wang & Mark I. Steinberg,
Insider Trading § 5:4.2 (2d ed. 2005 & 2008 Supp.).......................................................24

**PLAINTIFF SECURITIES AND EXCHANGE COMMMISSION'S MEMORADUM OF LAW IN OPPOSITION TO DEFENDANT MARK CUBAN'S MOTION TO DISMISS**

## INTRODUCTION

This case involves the application of well-settled insider trading principles to straightforward allegations of fraud. As alleged in the Complaint, Mamma.com Inc. ("Mamma.com") contacted defendant Mark Cuban, the company's then-largest known shareholder, to ask — confidentially — if he wished to participate in a private offering. Cuban agreed to keep the offering information confidential. In reliance on Cuban's acceptance of a duty of confidentiality, the company conveyed material, nonpublic offering information to the defendant. Upset and angry that Mamma.com was conducting the offering, Cuban breached his agreement of confidentiality and promptly sold his entire 600,000 share Mamma.com position before the offering was publicly announced. In so doing, defendant fraudulently avoided losses in excess of $750,000 when Mamma.com's stock price declined after the public announcement. Cuban's trading in Mamma.com took advantage of precisely the type of informational advantage stemming from contrivance, as opposed to research or skill, with which the Supreme Court was concerned when it adopted the misappropriation theory of insider trading under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), in United States v. O'Hagan, 521 U.S. 642, 658-59 (1997).[1]

Cuban mischaracterizes this case as a "test case" attempting to "impermissibly expand the scope" of misappropriation law. Yet, the reality is that Cuban's agreement to keep the offering information confidential and his immediate and bold breach of that agreement is a

---

[1] The Complaint also charges Cuban with violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), by the same conduct. Section 17(a) of the Securities Act applies to fraud in the offer or sale of a security. The facts that support a showing of a Section 10(b) and Rule 10b-5 violation will also support a showing of a Section 17(a) violation. See SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (the standard for a Section 17(a)(1) violation is "essentially the same" as the standard for a violation of Section 10(b) and Rule 10b-5).

textbook example of unlawful misappropriation.  This case involves no new theory of liability or expansion of existing law; the Court need only apply black letter law and an unambiguous rule consistent with that law.  Indeed, defendant's motion — by inappropriately focusing primarily on irrelevant state law fiduciary principles, choice of law, and agency rule promulgation — essentially concedes the impossibility of his task under well-settled misappropriation law.

As demonstrated conclusively herein, under that well-settled law and a clear Commission rule, a confidentiality agreement establishes a duty under the misappropriation theory.

## FACTS ALLEGED IN THE COMPLAINT

In March 2004, Cuban purchased 600,000 shares of Mamma.com, a 6.3% stake in the company.  Compl. ¶ 10.[2]  In Spring 2004, Mamma.com, at the suggestion of investment bank Merriman Curhan Ford & Co. ("Merriman"), decided to raise capital through a private placement know as a PIPE ("private investment in public equity").  Compl. ¶ 11.  Mamma.com engaged Merriman to serve as the placement agent for the offering.  Id.

At the end of June 2004 and as the PIPE progressed toward closing, Mamma.com decided to invite defendant Cuban to participate in the PIPE.  Compl. ¶ 12.  On June 28, 2004, Mamma.com's CEO spoke with Cuban by telephone for eight minutes and thirty-five seconds.  Compl. ¶ 13.  The CEO prefaced the call by informing defendant Cuban that he had confidential information to convey to him.  Compl. ¶ 14.  Cuban agreed that he would keep whatever information the CEO intended to share with him confidential.  Id.  In reliance on Cuban's agreement, the CEO informed defendant about the PIPE offering.  Id.  Defendant Cuban became upset and angry during the conversation saying, among other things, that he disliked PIPEs

---

[2]      Defendant Cuban has filed a motion requesting judicial notice of certain publicly filed documents that may be related to this case.  The Commission does not object to Cuban's motion, but notes that the documents primarily raise factual issues that are inappropriate at this stage of the proceedings and add nothing in support of Cuban's motion to dismiss.

because they dilute stock value for existing shareholders.  Id.  At the end of the conversation, Cuban told the CEO, "Well, now I'm screwed.  I can't sell."  Id.

Shortly thereafter, Mamma.com's executive chairman sent an email to other Mamma.com board members updating them on PIPE-related items, including the CEO's conversation with Cuban, and stating that "[a]s anticipated [defendant] initially 'flew off the handle' and said he would sell his shares (recognizing that he was not able to do anything until we announce the equity) but then asked to see the terms and conditions . . . ."  Compl. ¶ 15.

Later that same day, in reliance on Cuban's acceptance of a duty of confidentiality and acknowledgment that he could not sell his shares until after the public announcement, the CEO sent defendant a follow-up email stating "[i]f you want more details about the private placement please contact . . . [Merriman]" and provided the telephone number of the Merriman sales representative.  Compl. ¶ 16.  Cuban called the Merriman sales representative that afternoon and spoke with him for eight minutes about the PIPE.  Compl. ¶ 17.  During that call, the salesman provided additional confidential details about the PIPE, and, in response to defendant's questions, told him that the PIPE was being sold at a discount to the market price and offered other incentives for the PIPE investors.  Id.

One minute after hanging up with the sales representative, Cuban called his broker and told him to liquidate his entire 600,000 share position in Mamma.com.  Compl. ¶ 18.

On June 29, 2004, Mamma.com's executive chairman wrote an email to the board that said "we did speak to Mark Cuban ([the CEO] and, subsequently, our investment banker) to find out if he had any interest in participating to the extent of maintaining his interest.  His answers were: he would not invest, he does not want the company to make acquisitions, he will sell his shares which he can not do until after we announce."  Compl. ¶ 20.

At 6:00 p.m. on June 29, after the markets had closed, Mamma.com publicly announced the PIPE offering.  Compl. ¶ 22.  Defendant Cuban avoided losses in excess of $750,000 by selling his Mamma.com shares prior to the public announcement.  Compl. ¶ 24.  Cuban never disclosed to Mamma.com that he was going to sell his shares prior to the public announcement of the PIPE, but later publicly stated that he had sold his shares because the company was conducting a PIPE.  Compl. ¶ 25.[3]

## ARGUMENT

## I.   STANDARD OF REVIEW

When "reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), . . . the district court's task is limited."  In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 563 n.3 (S.D. Tex. 2002) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Motions to dismiss are viewed with disfavor and rarely granted.  See Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997); SR Int'l Bus. Ins. Co. Ltd. v. Energy Future Holdings Corp., 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008) (citation omitted).  "The issue is not whether a plaintiff will ultimately prevail on the merits but whether he is entitled to offer evidence to support his claims."  Doe v. Hillsboro Indep. Sch. Dist., 81 F.3d 1395, 1401 (5th Cir. 1996); see also Verizon Employee Benefits Comm. v. Fitzgerald, Civil Action No. 3:06-CV-0482-D, 2007 WL 2080004, at *2 (N.D. Tex. July 12, 2007).  Accordingly, dismissal is inappropriate unless a complaint, construed with all well-pleaded facts viewed in the light most favorable to the plaintiff, see In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007); Zagami v. Natural Health Trends

---

[3]   Cuban suggests that disclosure of his sales and the reasons for them — after the PIPE had been publicly announced — somehow diminishes his breach of his duty of confidentiality to Mamma.com.  See Cuban's Memorandum in Support ("Memo.") at 4-5.  As an initial matter, this kind of factual argument is inappropriate in a motion to dismiss.  In addition, Cuban failed to disclose that he had breached a confidentiality agreement, and, thereby, avoided losses in excess of $750,000.

Corp., 540 F. Supp. 2d 705, 709 (N.D. Tex. 2008), fails "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Rule 9(b) requires allegations of fraud to be pleaded with particularity, but "is not intended . . . 'to procure punctilious pleading detail.'" SEC v. Brady, Civil Action No. 3:05-CV-1416-D, 2006 WL 1310320, at *3 (N.D. Tex. May 12, 2006) (quoting Steiner v. Southmark Corp., 734 F. Supp. 269, 273 (N.D. Tex. 1990)).  Rather, Rule 9(b), "read in conjunction with Rule 8, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," Brady, 2006 WL 1310320, at *3 (internal citations and quotations omitted), merely requires a plaintiff to plead facts "analogous to the first paragraph of a newspaper story, 'namely the who, what, when, where, and how.'" Id. (quoting Melder v. Morris, 27 F.3d 1097, 1100 n.5 (5th cir. 1994)).

The Complaint, containing specific allegations of an agreement of confidentiality, breach of that agreement, and losses avoided in securities transactions by that breach, easily meets the standard to survive a motion to dismiss.

## II.    AN AGREEMENT ESTABLISHES A DUTY

Defendant's argument that a confidentiality agreement is insufficient to establish a duty in a misappropriation insider trading case fundamentally misconstrues black letter law.  Under both an express Commission rule and long-established case law, an agreement to keep information confidential establishes a duty.  If that were not the case, business partners would be free to surreptitiously violate their written and oral promises of confidentiality and flagrantly defraud their transaction partners through the purchase or sale of securities for their personal benefit, sowing distrust in the financial markets and in the business community.

### A.     Under Rule 10b5-2, an Agreement Establishes a Duty

Cuban argues that Exchange Act Rule 10b5-2 (titled "Duties of Trust or Confidence in Misappropriation Insider Trading Cases") does not apply to business relationships or, if it does apply to business relationships, it is invalid.  Because the plain language of the rule contains no limitations and because the Commission was within its authority to promulgate the rule — and thus is entitled to Chevron deference — the Court should reject defendant's arguments.

### 1.     Rule 10b5-2 Applies to Both Business and Non-Business Relationships

In arguing that Rule 10b5-2 does not apply to business relationships, Cuban (i) disregards the plain language of the rule, and (ii) glosses over a case from this district that is directly on point, SEC v. Kornman, 391 F. Supp. 2d 477 (N.D. Tex. 2005) (Lindsay, J.), which specifically applied Rule 10b5-2 in a business context.

Rule 10b5-2, which took effect on October 23, 2000, provides that a duty of trust or confidence for purposes of the misappropriation theory exists in certain delineated but "non-exclusive" circumstances.  17 C.F.R. § 240.10b5-2 (Preliminary Note).[4]  The rule applies to "any violation" of Section 10(b).  Id. § 240.10b5-2(a).[5]

---

[4]      The rule's Preliminary Note states: "This section provides a non-exclusive definition of the circumstances in which a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of insider trading under Section 10(b) of the [Securities Exchange] Act [of 1934] and Rule 10b-5 [thereunder].  The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-2 does not modify the scope of insider trading law in any other respect."  The full text of the rule states:

(a)  *Scope of Rule.*  This section shall apply to any violation of Section 10(b) of the [Securities Exchange] Act [of 1934] (15 U.S.C. 78j(b)) and Rule 10b-5 thereunder that is based on the purchase or sale of securities on the basis of, or the communication of, material nonpublic information misappropriated in breach of a duty of trust or confidence.

(b)  *Enumerated "duties of trust or confidence."*  For purposes of this rule, a "duty of trust or confidence" exists in the following circumstances, among others:

(1)  Whenever a person agrees to maintain information in confidence;

(2)  Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the

The plain language of subsection (b)(1) of the rule states that a duty of trust or confidence exists, among other circumstances, "[w]henever a person agrees to maintain information in confidence . . . ."  Id. § 240.10b5-2(b)(1) (emphasis added).  Unlike other subsections of the rule that are expressly confined to the family context, subsection (b)(1) contains no limitations or qualifications.[6]  The Court should decline Cuban's improper invitation to re-write the rule, which securities law experts agree applies to the facts alleged in the Complaint.  See, e.g., John C. Coffee, Insider Trading: Expansion and Contraction, N.Y.L.J., Jan. 19, 2006, at 5 ("[I]f the investor executed a confidentiality agreement specifying that it would not trade in the stock prior to the public announcement of the PIPE transaction, then Rule 10b5-2 should apply, and liability could arise.").[7]

---

information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or

(3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

[5]     Cuban's argument flatly contradicts Rule 10b5-2(a), titled "Scope of Rule," which states that the rule applies "to any violation of Section 10(b)" and Rule 10b-5 under the misappropriation theory (emphasis added).  Because the rule's text is plain and unambiguous, the Court need not inquire into the rulemaking releases.  Cf. In re Abbott Labs., 51 F.3d 524, 528 (5th Cir. 1995) (courts do not look to legislative history where language of statute is clear and unambiguous).  Rule 10b5-2's applicability to all misappropriation cases requires denial of Cuban's motion.

[6]     Defendant quotes selectively from Commission releases, see Memo. at 21, but ignores that the Commission explicitly contemplated that Rule 10b5-2(b)(1) would apply to business contexts.  See Proposing Release, Selective Disclosure and Insider Trading, Exchange Act Release No. 34-42259, 64 Fed. Reg. 72590, 72603 (Dec. 20, 1999) ("Although sometimes, most commonly in a business context, the parties will sign an express, written confidentiality agreement, the Rule does not require either a written or express confidentiality agreement." (emphasis added)).

[7]     Regulation FD (Fair Disclosure), adopted as part of the same final rule as Rule 10b5-2, further confirms that the rule makes no distinction between business and non-business relationships.  See Adopting Release, Selective Disclosure and Insider Trading, Exchange Act Release No. 34-43154, 65 Fed. Reg. 51716 (Aug. 15, 2000) ("Adopting Release").  Regulation FD recognizes that issuers may disclose material, nonpublic information to outsiders for legitimate business purposes only if those outsiders are subject to confidentiality agreements.  See 17

In an opinion issued last week denying a defendant's motion for summary judgment, a court rejected as "untenable" and contrary to "persuasive caselaw" the very arguments that Cuban is attempting here:  that a violation of an agreement — in that case, an agreement to comply with an embargo on use of confidential news until the official release time — cannot constitute misappropriation and that Rule 10b5-2(b) impermissibly expanded the scope of Section 10(b) and does not apply to business relationships.  See SEC v. Nothern, Civil Action No. 05-10983 (NMG), --- F. Supp. 2d ---, 2009 WL 467535 (D. Mass. Feb. 20, 2009).  Citing this district's decision in Kornman, 391 F. Supp. 2d at 489-90, the court noted that, as to Rule 10b5-2, the defendant's "novel" argument that an agreement cannot establish a duty and that the Commission lacked the authority to promulgate the rule "contradict[s] persuasive caselaw holding that Rule 10b5-2(b) properly defines those circumstances under which misappropriation liability can arise . . . [and] [t]hus . . . is untenable."  Nothern, 2009 WL 467535, at *6.  The court also noted that "[n]either the SEC release describing the then-proposed Rule 10b5-2 nor the text of the Rule itself indicates . . . that its scope is limited to only non-business relationships."  Id.

Cuban cites inapposite cases from other jurisdictions to support his argument that Rule 10b5-2(b)(1) does not apply in a business context while virtually ignoring a case from this district that is directly on point.  Despite its obvious relevance, Defendant relegates Kornman to a "cf." citation.  In Kornman, a case involving conduct that occurred, as here, in the course of a business relationship, Judge Lindsay held that the Commission adequately stated a claim within Rule 10b5-2(b)(1).  See 391 F. Supp. 2d at 489-90.  The Commission alleged that a tax and estate planning adviser misappropriated confidential information obtained from two executives who were considering retaining him.  Judge Lindsay rejected the defendant's argument that Rule

C.F.R. § 243.100(b)(2).  The Adopting Release expressly recognizes that "misuse of the information for trading [by a person who agreed to keep the information confidential] would . . . be covered under . . . the misappropriation theory of insider trading."  Adopting Release at 51720 (emphasis added).

10b5-2(b)(1) did not apply to business relationships and denied the adviser's motion to dismiss. Id. at 490 (holding that "[t]he complaint adequately alleges that [the adviser] agreed to safeguard the confidential information he obtained from the executives" and that the allegations "bring this case within Rule 10b5-2(b)(1)") (emphasis added).[8]  Accordingly, the established law in this district is that Rule 10b5-2(b)(1) applies in the context of business relationships, and, under the rule, Cuban's agreement to keep the offering information confidential established a duty in the context of a business relationship.

United States v. Kim, 184 F. Supp. 2d 1006 (N.D. Cal. 2002), and SEC v. Talbot, 430 F. Supp. 2d 1029 (C.D. Cal. 2006), rev'd, 530 F.3d 1085 (9th Cir. 2008), the cases Cuban cites in arguing that Rule 10b5-2 does not apply to business relationships, are not useful authority.  Kim did not concern the applicability of the rule in the context of a business relationship, and Talbot was overturned by the Ninth Circuit.

It is unclear why defendant cites Kim, a case involving a social relationship, to support his argument concerning the application of Rule 10b5-2 to business relationships.  In Kim, a criminal case involving conduct that pre-dated the adoption of the rule, the court concluded that a generic confidentiality agreement signed by members of a social club, where there was no need for the club members to exchange material, nonpublic information, was insufficient to establish a duty.  See 184 F. Supp. 2d at 1015.[9]  However, the court explicitly stated that, had Rule 10b5-2

---

[8]	In finding a sufficiently stated cause of action under Rule 10b5-2, Judge Lindsay quoted and cited with approval the holdings in United States v. Falcone, 257 F.3d 226 (2d Cir. 2001), and SEC v. Kirch, 263 F. Supp. 2d 1144 (N.D. Ill. 2003), discussed infra at 16, 18, thus confirming that Rule 10b5-2 and case law duty analysis are consistent.

[9]	The communications between Cuban and the company CEO concerning the offering were not in the context of being social acquaintances or fellow members of a social club.  Cuban owned 6.3% of the company. Compl. ¶ 10.  The CEO of the company was Cuban's primary point of contact at the company.  Id.  The CEO contacted Cuban and, after he agreed to keep it confidential, provided Cuban with the information about the offering for the legitimate business purpose of soliciting him to participate in the offering.  Compl. ¶ 12.

been in effect at the time of the defendant's conduct, the rule would have applied.  Id. at 1014.

Because Kim does not address the applicability of Rule 10b5-2 to a business relationship, Kim

provides no support for Cuban.

In Talbot, the district court granted the defendant's motion for summary judgment,

holding in relevant part that he was not liable for insider trading under the misappropriation

theory because neither he nor the issuer (Fidelity) on whose board of directors he sat owed a duty

to the "originating source" (LendingTree) of the information.  430 F. Supp. 2d at 1049.  The

court first concluded that Fidelity had not expressly agreed to keep the LendingTree information

confidential.  Id. at 1061.[10]  Because there was no evidence of an agreement, the court then

examined whether, under federal law, there was other evidence of a relationship of trust and

confidence such that a duty might be implied.  Id.  Though the court, in footnoted dicta and

without analysis, stated that Rule 10b5-2 did not apply to "purely business relationships," it

noted that the result would be unchanged even if the rule did apply because there was no

evidence that Fidelity had agreed to keep the information confidential.  Id. at 1061 n.91.

The Commission appealed, arguing that the defendant had breached a duty he owed to

Fidelity.  The Ninth Circuit agreed and reversed.  Talbot, 530 F.3d at 1092-97.  Even though the

Commission did not appeal the portion of the district court opinion containing the dicta that Rule

10b5-2 did not apply to business relationships, the Ninth Circuit sua sponte stated that, contrary

to the district court's conclusion, "[i]t is unclear from the record before us whether Fidelity and,

by extension, [the defendant] owed a fiduciary duty arising from a relationship of trust and

---

[10]     The court in Talbot stated that "the SEC can survive summary judgment on the breach of duty element only
if it has adduced evidence that would permit a reasonable factfinder to conclude that Fidelity either (a) explicitly
undertook to maintain LendingTree's acquisition information confidentially, or (b) implicitly accepted such a duty
because it had a relationship of trust and confidence with LendingTree."  Id. at 1055 (emphasis added).  See
discussion infra, at 20.  While the district court erroneously focused on the questions of whether Fidelity owed a
duty to Lending Tree — and as noted in the text, the Ninth Circuit reversed on this ground — it is notable that even
the district court recognized that an explicit acceptance of confidentiality would have been sufficient.

confidence to LendingTree."  Id. at 1092 n.2.  Thus, in sum, the district court's decision in Talbot provides no support for Cuban.  The lower court's footnoted dicta concerning Rule 10b5-2 is of no precedential value, is inconsistent with Kornman from this district, and contradicts the plain language of the rule, which contains no limitations or qualifications.

       2.        Rule 10b5-2 was Properly Promulgated and is Entitled to Deference

The Commission's promulgation of Rule 10b5-2 through notice-and-comment rulemaking was a routine and appropriate exercise of the authority delegated to it by Congress. Cuban's claim to the contrary must fail because it ignores the fundamental — and dispositive — principle of administrative deference and relies on his mistaken exposition of insider trading law.

In the Securities Exchange Act of 1934 establishing the Commission, Congress expressly delegated to the Commission the authority to adopt rules and regulations to effectuate the antifraud provisions of Section 10(b) of that Act.  See 15 U.S.C. § 78j(b).  Since then, the Commission has exercised its delegated authority to issue "such rules and regulations" as it deems "necessary or appropriate in the public interest or for the protection of investors."  Id.

When the Commission exercises this delegated rulemaking authority, courts "accord[] considerable weight to the SEC's construction of the statute" as expressed in the rule, provided that the Commission's construction is not "arbitrary, capricious or manifestly contrary to [Section 10(b)]."  In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d at 588 (citing Bragdon v. Abbott, 524 U.S. 624, 642 (1998) ("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance")); see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984) (reasonable statutory construction given by executive department is given great deference).

The Commission, drawing on its "body of experience and informed judgment," <u>Bragdon</u>, 524 U.S. at 642 (internal citations and quotations omitted), exercised the authority delegated to it by Congress to promulgate Rule 10b5-2(b)(1).  On December 20, 1999, the Commission issued a release proposing, among other things, the adoption of a rule codifying the "common-sense notion, acknowledged in <u>Reed</u>[11] and <u>Chestman</u>,[12] that reasonable expectations of confidentiality, and corresponding duties, can be created by an agreement between two parties."  Proposing Release at 72603.  Following a period for public comment and Commission consideration of the comments received, the Commission promulgated Rule 10b5-2(b)(1) as proposed.  <u>See</u> Adopting Release at 51730.

The Commission's interpretation of Section 10(b) as expressed in Rule 10b5-2(b)(1) — <u>i.e.</u>, an express confidentiality agreement creates a duty of trust or confidence — is the result of an application of the Commission's expertise and judgment informed by its consideration of public comment and insider trading law.  Rule 10b5-2(b)(1), the result of the administrative exercise of expressly delegated rulemaking powers to interpret Section 10(b), is neither arbitrary, capricious, nor contrary to the statute it interprets.  Therefore, it is entitled to deference by the Court.  <u>See</u> <u>SEC v. Zandford</u>, 535 U.S. 813, 819-20 (2002) (Commission's interpretation of text of Section 10(b) is "entitled to deference if it is reasonable").

Cuban does not mention — let alone question — that the Commission's interpretation of Rule 10b5-2(b)(1) is entitled to deference under <u>Chevron</u> and its progeny.  Instead, Cuban argues that the Commission has exceeded its statutorily delegated rulemaking authority by purportedly broadly crafting Rule 10b5-2(b)(1) to exceed the scope of conduct that has been judicially recognized to be within the ambit of Section 10(b) of the Exchange Act.  <u>See</u> Memo. at 22-25.

---

[11] <u>United States v. Reed</u>, 601 F. Supp. 685, 715 (S.D.N.Y), <u>rev'd on other grounds</u>, 773 F.2d 477 (2d Cir. 1985).

[12] <u>United States v. Chestman</u>, 947 F.2d 551, 571 (2d Cir. 1991) (en banc), <u>cert. denied</u>, 503 U.S. 1004 (1992).

Cuban's argument is meritless:  Courts have consistently concluded — in the context of evaluating violations of Section 10(b) — that a confidentiality agreement creates a duty sufficient to give rise to liability under insider trading law.[13]

Cuban's argument that the Commission lacked authority to promulgate Rule 10b5-2(b)(1) is a thinly-veiled rehashing of his primary argument that "[u]nder the applicable common law, a confidentiality agreement alone cannot create an obligation to act loyally to the other party . . . .", or, in short, that his conduct was not fraudulent.  See Memo. at 24.  As described fully in Section II.B., infra, Cuban misstates the applicable law.  Indeed, none of the cases defendant cites support his erroneous articulation of insider trading law because none of them analyze whether a duty exists in the context of an express confidentiality agreement.  In each case Cuban relies on, the court was required to analyze whether a fiduciary duty existed only because there was no confidentiality agreement.  As the courts that have considered the question have repeatedly held, see Section II.B., infra, if there is a confidentiality agreement, a duty of trust and confidence exists.  There is no need to engage in a fiduciary duty analysis.

Rule 10b5-2, when properly accorded deference as an appropriate exercise of the Commission's rulemaking authority, is dispositive of Cuban's motion.  Cuban's challenge to the Commission's rulemaking authority invites the Court to reject the deference accorded the Commission's interpretation of Rule 10b5-2(b)(1) and the body of case law that has held, consistent with the rule, that a duty of trust and confidence arises from a confidentiality agreement.  The Court should decline to do so.  Cuban's motion offers no grounds for dismissal

---

[13]      Even if it were true that the Commission's interpretation of the statute and the rule were contrary to the courts' prior interpretation — which it is not — the Court should still defer to the Commission's interpretation.  See National Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982-85 (2005) (holding that, in case of ambiguous statute delegated to administrative agency for enforcement, agency's interpretation is entitled to Chevron deference even where courts have previously interpreted statute differently from agency).  Here, as described in Section II.B., the rule and the case law are entirely consistent, and the Court should defer to the Commission's reasoned interpretation.

other than the lack of a duty of trust and confidence.  Because the Complaint alleges an

agreement that, under validly promulgated Rule 10b5-2(b)(1), creates such a duty, defendant's

motion should be denied.

### B. Misappropriation Case Law Developed Under Section 10(b) of the Exchange Act Has Established that an Agreement of Confidentiality Creates a Duty

Rule 10b5-2(b)(1) comports with the long line of misappropriation cases — both

preceding and succeeding the Supreme Court's express endorsement of misappropriation theory

under Section 10(b) and Rule 10b-5 in O'Hagan — uniformly holding that a duty can established

either (i) by an acceptance of a duty of confidentiality or (ii) through the pre-existence of a

fiduciary relationship (whether express or implied).  Because an acceptance of a duty of

confidentiality typically is easily determined, published cases primarily grapple with the more

difficult issue of when, in the absence of an acceptance of a duty by agreement, acceptance can

be implied from the relationship between the information provider and recipient.  While this

more involved analysis is not necessary here — the Complaint alleges that defendant accepted a

duty of confidentiality — even these more difficult implied-relationship cases make clear that a

confidentiality agreement establishes a duty.

The seminal pre-O'Hagan misappropriation case, United States v. Chestman, 947 F.2d

551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992), held that a duty can be

established either way — by acceptance of a duty or through a fiduciary relationship.  In

Chestman, a wife told her husband about a pending tender offer for her family's company but —

unlike here — neither sought nor received her husband's agreement to keep the information

confidential.  Id. at 555-56, 571.  The court observed that fiduciary status could be established

through either of two black letter law positions: "a pre-existing fiduciary relation or an express

agreement of confidentiality . . . .'"  Id. at 571 (emphasis added).  Noting the "absence of

14

evidence of an explicit acceptance by [the husband] of a duty of confidentiality," the court then proceeded to conduct the more difficult analysis:  whether, based on factors such as "reliance, and de facto control and dominance," a fiduciary-like relationship sufficient to imply a duty existed between the husband and wife.  Id. at 568-71.  Had the husband explicitly accepted a duty of confidentiality, the court would never have analyzed whether a duty could be implied from their pre-existing relationship; the agreement would have sufficed.  Here, the Complaint alleges that Cuban accepted a duty of confidentiality.  No further analysis is necessary.[14]

Six years after Chestman, the Supreme Court expressly embraced the misappropriation theory in O'Hagan, holding that, while "[t]here is no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information,'" 521 U.S. at 663 (quoting Dirks v. SEC, 463 U.S. 646, 655 (1983)), a person who gains nonpublic information through misappropriation in breach of a duty and trades on that information faces Section 10(b) liability.  See 521 U.S. at 665-66.  As in Chestman, there was no allegation of an express confidentiality agreement in O'Hagan.  Thus, the Supreme Court and the government were required to analyze whether a duty could be implied from a fiduciary relationship.  Nonetheless, the Court was reluctant to circumscribe the types of situations that might give rise to a duty.  In fact, it specifically recognized that a contractual — not fiduciary — duty, like the contractual duty alleged in the instant case, could create insider trading liability under the misappropriation theory.  Id. at 663 (quoting Barbara Bader Aldave, Misappropriation: A General Theory of Liability for Trading on Nonpublic Information, 13 Hofstra L. Rev. 101, 122 (1984), as stating that the misappropriation theory bars "'trading on the basis of information that the wrongdoer

---

[14]     Prior to Chestman, a district court had likewise noted the sufficiency of a confidentiality agreement to create a duty: "[E]ven in the absence of an express agreement, it may properly be determined that a confidential relationship existed where the evidence reveals that conclusion to be in accord with the expectations and behavior of the parties."  Reed, 601 F. Supp. at 717 (emphasis added).

converted to his own use in violation of some fiduciary, <u>contractual</u>, or similar obligation to the owner or rightful possessor of the information'") (emphasis added).[15]

Post-<u>O'Hagan</u>, the Second Circuit again recognized that a confidentiality agreement alone establishes a duty: "a fiduciary relationship, or its functional equivalent, exists only <u>where there is explicit acceptance of a duty of confidentiality</u> or where such acceptance may be implied from a similar relationship of trust and confidence between the parties." <u>United States v. Falcone</u>, 257 F.3d 226, 234 (2d Cir. 2001) (emphasis added).

Unsurprisingly, other courts have also recognized that a confidentiality agreement establishes a duty. In <u>SEC v. Yun</u>, 327 F.3d 1263 (11th Cir. 2003), the court held that duty can be established either by confidentiality agreement or a pre-existing fiduciary relationship. <u>Id.</u> at 1273 (holding that the Commission could establish a duty under the misappropriation theory by "present[ing] evidence that [the defendant] had <u>agreed</u> in this particular instance to keep the information confidential" and stating that "[o]f course, a breach of an <u>agreement</u> to maintain business confidences would . . . suffice" to yield insider trading liability) (emphasis added). The <u>Yun</u> court noted that its conclusion was "bolstered" by Rule 10b5-2, which became effective after the conduct at issue. <u>Id.</u> at 1273 n.23.[16]

---

[15]     A treatise co-authored by Cuban's counsel likewise recognizes that a confidentiality agreement would establish the duty: "[T]he [<u>O'Hagan</u>] Court appeared somewhat reluctant to limit the scope of the duty to relationships that may be characterized as strictly 'fiduciary.' . . . Presumably, a 'recognized duty' would include the duties flowing from a fiduciary relationship, <u>but could also include contractual duties and duties arising at common law.</u>" Ralph C. Ferrara et al., <u>Ferrara on Insider Trading & The Wall</u> § 2.02[6][e][i], at 2-50 (2008) (emphasis added); <u>see also</u> Dallas Morning News, Feb. 3, 2009, at 1D (quoting Professor John C. Coffee as stating: "The understanding of the bar has always been that if someone signs a confidentiality agreement and later trades on it, they may be breaching a duty and may have committed insider trading.").

[16]     Defendant's parenthetical concerning <u>SEC v. Sargent</u>, 229 F.3d 68 (1st Cir. 2000), <u>see</u> Memo. at 17, is misleading. In <u>Sargent</u>, the court held, in relevant part, that a jury could reasonably find that the defendants expected confidential business matters to be held in trust and that the alleged misappropriator therefore owed a fiduciary duty to keep material, nonpublic information confidential. <u>See</u> 229 F.3d at 76. Contrary to Cuban's parenthetical, the court did not hold that both a confidentiality agreement and a pre-existing relationship were necessary. Rather, the court simply noted that the Commission had presented evidence of both an agreement ("a

District courts that have considered this issue — including several very recently and on strikingly similar facts and arguments — likewise have concluded that acceptance of a duty of confidentiality suffices to establish a misappropriation duty.[17]  Last week's Nothern opinion expressly rejected the argument that, under common law, a confidentiality agreement cannot give rise to a duty for purposes of misappropriation liability.  See 2009 WL 467535, at *7-8.  The Nothern court canvassed the misappropriation caselaw and concluded, as the Commission argues here, that a confidentiality agreement establishes the duty.  Id.

Similarly, in SEC v. Lyon, 529 F. Supp. 2d 444 (S.D.N.Y. 2008), the Commission alleged that, in three instances, defendants received offering documents containing confidentiality language, and in a fourth instance agreed to be bound by the confidentiality provision in a purchase agreement.  Id. at 451-52.  The court denied defendants' motion to dismiss and concluded that the Commission had alleged sufficient facts to state a misappropriation claim.  Id. at 453.[18]  In Lyon, the court noted that in discovery the Commission might "uncover[] communications showing that defendants explicitly accepted the relevant confidentiality conditions . . . ."  Id. at 452.  Here, the Complaint already alleges what the Lyon

---

jury could reasonably infer that [the source] relied [on the alleged misappropriator's promise not to divulge the information]"), and of a pre-existing fiduciary relationship.  Id.

[17]     Cuban's citation to SEC v. Dorozhko, No. 07 Civ. 9606(NRB), 2008 WL 126612 (S.D.N.Y. Jan. 8, 2008), see Memo. at 6-7, 24, is unavailing.  In Dorozhko, now on appeal to the Second Circuit, the court held that the defendant, who allegedly hacked into a computer network and stole material, nonpublic information on the basis of which he traded, was a "true outsider[] who owed no duties of disclosure to either market participants or to the source of his information."  2008 WL 126612, at *14.  Not surprisingly, there were no allegations that the defendant in Dorozhko, unlike here, accepted a duty of confidentiality as to the hacked information.  Under earlier Second Circuit authority, the duty of disclosure about which the court in Dorozhko was speaking included an "acceptance of a duty of confidentiality."  See Falcone, 257 F.3d at 234.  The only alleged fraud in Dorozhko arose from the hacker's acquisition of information through affirmatively deceptive means.  No breach of duty is required when the defendant engages in affirmatively deceptive conduct, such as lying, acting deceptively, or telling half-truths.

[18]     The Lyon defendants (represented by Cuban's current counsel) argued in their motion to dismiss that, "with respect to the relevant PIPE transactions, the SEC has not alleged facts showing that [defendants] either consented to be bound by a duty of confidentiality or entered into a 'relationship of trust and confidence' that would imply such a duty."  Id. at 451 (emphasis added).

court held would establish the duty if learned during discovery — that Cuban accepted the relevant confidentiality conditions during his conversation with Mamma.com's CEO.  Compl. ¶ 14.  Nothing more is required.

In <u>SEC v. Kirch</u>, 263 F. Supp. 2d 1144 (N.D. Ill. 2003), the CEO of a computer software company belonged to a business organization called the CEO Roundtable, a group whose "fundamental purpose" was "business-oriented" and that had an express policy that matters discussed by the group be kept confidential.  <u>Id.</u> at 1147.  During one of the group's meetings, a member gave a presentation — with, as in the instant case, the preface that the information he was about to share was confidential — disclosing that his company would not meet its earnings estimates.  <u>Id.</u> at 1147-48.  Approximately ninety minutes after the presentation, the defendant sold his shares in that company to avoid potential losses.  <u>Id.</u> at 1148.  The court granted the Commission's motion for summary judgment, holding that the defendant, because he attended the meeting in which he was told that the information was confidential and because the group had a confidentiality policy, had unlawfully misappropriated the presenting CEO's material, nonpublic information.  <u>Id.</u> at 1149-51 (holding "that the 'duty of loyalty and confidentiality' owed by [the defendant] to the [presenting CEO] who shared confidential information with him . . . is <u>not</u> limited to fiduciary relationships . . . .").[19]

In an effort to distinguish the instant case from the well-settled law, Cuban

_____

[19]      <u>Kirch</u> can be read as a contrast to <u>Kim</u>, 184 F. Supp. 2d at 1008, discussed <u>supra</u>, at 9-10.  While trading on gratuitously conveyed confidential information in violation of a social club's generic "Confidentiality Commitment" was held to be insufficient to create criminal liability in <u>Kim</u>, 184 F. Supp. 2d at 1012-15, <u>Kirch</u> held that civil liability could be created by trading in violation of an express confidentiality policy when information was conveyed in a fundamentally "business-oriented" setting.  263 F. Supp. 2d at 1147, 1149-51.  The allegations in the instant case go well beyond those in <u>Kim</u>, indeed, beyond those in <u>Kirch</u>, and are sufficient to plead the existence of a duty.  Unlike in <u>Kim</u>, the Complaint here alleges that Cuban explicitly agreed to keep the PIPE information — the very information that predicated his trading and information that Mamma.com needed to convey to him to solicit his participation in the offering — confidential.  Compl. ¶ 14.  Moreover, as discussed <u>supra</u>, the court in <u>Kim</u> acknowledged that had Rule 10b5-2 been effective at the time of the relevant conduct, "the first [prong re: agreement] . . . would apply to defendant's conduct."  184 F. Supp. 2d at 1014.

inappropriately cites to several cases.  Cuban's reliance on <u>Chiarella v. United States</u>, 445 U.S.

222 (1980), <u>see</u> Memo. at 5-6, 22-23, is misplaced.  While <u>Chiarella</u> was brought under the

classical theory of insider trading, not the misappropriation theory, the holding in <u>Chiarella</u> —

that there is no fraud absent a "duty to speak" — is nonetheless entirely satisfied by the

Commission's Complaint in the present case.  Cuban's agreement of confidentiality established a

duty of trust and confidence, with the resulting duty to abstain from trading unless he first made

a disclosure to the source of the information.[20]

Defendant also obscures black letter law by citing <u>United States v. Cassese</u>, 273 F. Supp.

2d 481 (S.D.N.Y. 2003) as support for his assertion that "a single phone call can[not] create the

necessary pre-existing fiduciary relationship."  Memo. at 18-19.  First, as discussed above,

Cuban fundamentally misstates the law:  A fiduciary relationship, while sufficient, is not

necessary to establish a duty.  <u>See, e.g.</u>, <u>Falcone</u>, 257 F.3d at 234.  Second, defendant

mischaracterizes <u>Cassese</u>.  In <u>Cassese</u>, a potential acquirer sent an acquisition target and its CEO,

Cassese, a confidentiality agreement in connection with merger negotiations, but no one at the

target, including Cassese, signed it.  <u>See</u> 273 F. Supp. 2d at 483.  The court first determined that

there was no agreement creating a duty, and then analyzed whether there was a relationship

sufficient to imply a duty.  <u>Id.</u> at 485-87 (quotations omitted).  The court concluded that Cassese

and his counterpart at the potential acquirer did not have a "history, pattern, or practice of

sharing confidences" because they "took part in only a single telephone conversation."  <u>Id.</u> at 487

(citing Rule 10b-5-2(b)(2)).  The court did not, as defendant argues, reject the notion that a

---

[20]      Cuban also cites <u>Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.</u>, 482 F. 3d 372, 389
(5th Cir. 2007), for the proposition that "deception" must involve a breach of a duty of disclosure.  <u>See</u> Memo. at 8.
Consistent with <u>Regents</u>, a duty of disclosure was an essential part of Cuban's duty of trust and confidence.  <u>See</u>
<u>CompuDyne Corp. v. Shane</u>, 453 F. Supp. 2d 807, 819 (S.D.N.Y. 2006) (citing <u>O'Hagan</u>, denying motion to dismiss
as to misrepresentation claim based on defendant's agreement to keep PIPE information confidential, and noting that
"[i]t is antithetical to the concept of keeping information private…that the information be used by the person
receiving [it] for their own personal benefit without obtaining the express approval to so use it").  As alleged in the
Complaint, Cuban violated that duty.

telephone call could create a duty; rather, it held that where, unlike here, a defendant does not accept a duty, one phone call does not create a "history, pattern, or practice of sharing confidences" such that acceptance of the duty may be implied.  Id.

Defendant similarly tries — unsuccessfully — to read Talbot as support for his argument. See Memo. at 16.  In Talbot, the court again conducted a two-prong analysis, concluding that "the SEC can survive summary judgment on the breach of duty element only if . . . a reasonable factfinder [could] conclude that [an information recipient] either (a) explicitly undertook to maintain [an information provider's] acquisition information confidentially, or (b) implicitly accepted such a duty because it had a relationship of trust and confidence with [the information provider]."  430 F. Supp. 2d at 1054-55 (emphasis added).  The court held that "[t]he existence of an express confidentiality agreement covering the information at issue [would be] persuasive evidence that the parties had a relationship of trust and confidence."  Id. at 1055 (citations omitted).  Thus, Talbot offers no support for Cuban's argument that a confidentiality agreement alone cannot create a duty for purposes of an insider trading claim.[21]

## III. THE COMMISSION HAS MORE THAN SUFFICIENTLY ALLEGED AN AGREEMENT OF CONFIDENTIALITY THAT WAS VIOLATED

As alleged in the Complaint, Mamma.com's CEO contacted Cuban and, after Cuban agreed to keep the information confidential, informed him about the offering for the legitimate business purpose of soliciting Cuban to participate.  At the end of their telephone call, Cuban

---

[21]    At the end of his brief, Cuban attempts to spin an argument based on a purported difference between a duty of "trust and confidence" and a duty of "trust or confidence."  See Memo. at 24-25.  Courts, however, have used both formulations to discuss the duty.  See, e.g., SEC v. Lenfest, 949 F. Supp. 341, 344 (E.D. Pa. 1996) (noting that "the use of the information need not arise from a breach of fiduciary duty, only a relationship of trust or confidence is necessary") (emphasis added).  Some courts have just referred to a "duty of confidentiality."  See, e.g., Falcone, 257 F.3d at 234 ("acceptance of a duty of confidentiality").  Cuban's attempt to elevate a connector into the difference between lawful and unlawful insider trading should be disregarded since the claimed distinction is not meaningful here.  Cuban's trading after promising to keep that information confidential, and after returning for a second helping of confidential information, violated and was fundamentally antithetical to a "duty of trust or confidence" and a "duty of trust and confidence."

told the CEO "Well, now I'm screwed.  I can't sell."  Cuban thus reiterated that he had agreed to treat the information as confidential and that he could not trade.  Based on Cuban's agreement to treat the information confidentially and not sell until after the public announcement, the company was induced to convey even more detailed nonpublic confidential information to Cuban.

Under the cloak of his agreement of confidentiality and acknowledgement that he could not sell, in an act of brazen subterfuge, Cuban used the access provided by the CEO to obtain even more material, nonpublic information about the offering from the placement agent.  In response to Cuban's questions, the placement agent provided Cuban additional confidential details about the offering, including that the offering was being sold at a discount to the market price and that it included other incentives for investors.  Having actively induced the company to provide the additional confidential information by his agreement of confidentiality, and within a minute of hanging up the telephone with the placement agent, Cuban called his broker and told him to sell his entire 600,000 share position in Mamma.com.  Cuban never disclosed to Mamma.com that he was going to sell his shares prior to the public announcement of the PIPE.

Cuban's alleged actions were out-and-out deception.  He agreed to keep the information about the offering confidential.  Cuban feigned loyalty, while obtaining and secretly converting the information for his personal benefit without providing any disclosure to the source of the information, thereby defrauding the company that had entrusted him with the confidential information.  Cuban's argument that a person can promise confidentiality and then deliberately and furtively break that promise by trading on the confidential information is shameless.  Cuban accepted a duty of trust and confidence to the source of the information and was therefore legally obligated to abstain from trading or first disclose his plan to trade.

Cuban only once even acknowledges the allegation that he told the CEO "now I'm screwed. I can't sell." See Memo. at 18 n.12. Cuban argues that the company's reliance on this statement imposed no responsibility or obligation on him.[22] To the contrary, the "screwed . . . can't sell" statement by Cuban both reiterated and itself constituted an explicit acceptance of a duty of confidentiality, including a prohibition on trading until the offering was publicly announced.

As the Commission has demonstrated, both factually and legally, Cuban's alleged breach of his agreement of confidentiality amply alleges a violation of the established misappropriation law and the clear and properly promulgated Rule 10b5-2. This case is straight down the middle of established insider trading jurisprudence, equally applicable to all.

## IV.   CUBAN'S ARGUMENT REGARDING APPLICATION OF STATE LAW FAILS

Because the well-developed case law addressing the misappropriation theory of insider trading is against him, Cuban devotes half of his brief to knocking down a straw man state law fiduciary duty argument. Cuban argues that, in deciding a misappropriation insider trading claim under the federal securities laws, courts must look to a specific jurisdiction's state law — and

---

[22]     This argument by Cuban is precisely the type of factual argument that would be inappropriate for the Court to consider at this stage of the proceedings. Moreover, Cuban's argument is exactly backward. Rather than the unilateral imposition of a duty by Mamma.com, Cuban's "screwed . . . can't sell" statement indicates his acknowledgement of a duty of confidentiality.

The two cases cited by Cuban on this issue provide no support for his argument. Cuban cites Walton v. Morgan Stanley & Co., 623 F.2d 796, 799 (2d Cir.1980), for the proposition that an "expectation on part of source that party receiving nonpublic information will not trade cannot impose duty of confidentiality." Memo. at 18 n.12. However, the Second Circuit's decision in Walton hardly provides support for Cuban since the opinion turned on the fact that there was neither an allegation of an "agreement or understanding" of confidentiality, nor an allegation that the provider of the confidential information was induced to provide the information by deception. 623 F.2d at 799 & n.5. Cuban also cites SEC v. Mayhew, 916 F. Supp. 123, 130 (D. Conn. 1995), see Memo. at 18 n.12, for the proposition that the fact that an insider expected the recipient of information to keep a lunch conversation confidential did not give rise to a fiduciary duty. Again, however, in Mayhew, there was neither an agreement of confidentiality nor inducement based on deception.

only to that state law — to determine whether a defendant has a duty.[23]  Cuban does not,

however, cite any misappropriation insider trading cases that have relied exclusively on a

specific state's law to evaluate the existence of a duty.

In fact, courts addressing the misappropriation theory in Commission enforcement cases

typically do not apply specific state law to determine the existence of a duty.[24]  Most notably,

when assessing the existence of a duty in O'Hagan, the Supreme Court did not rely on the state

law of the specific jurisdiction.  In O'Hagan, the Court, referencing federal fraud cases arising in

other contexts, synthesized strands of jurisprudence to define misappropriators as those who

"deal in deception" or "dupe[]" by "feigning loyalty to [a] principal while secretly converting the

principal's information for personal gain."  521 U.S. at 653-54.  Other federal misappropriation

cases have similarly declined to rely exclusively on the law of a specific state in evaluating a

misappropriation insider trading claim.  See, e.g., Chestman, 947 F.2d at 568 ("We take our cues

as to what is required to create the requisite relationship from the securities fraud precedents and

the common law.").  Instead, various sources of law and legal developments — such as state

laws generally, historical common law, or statutes and regulations — have informed federal

court decisions establishing the scope of Section 10(b) and Rule 10b-5.

The courts' decision not to limit their analysis to the law of a specific state is for good

reason:  Application of specific state law would Balkanize the misappropriation theory and

---

[23]    This Court's decision in Southwest Realty, Ltd. v. Daseke, Civ. A. No. CA3-89-3055-D, 1992 WL 373166 (N.D. Tex. May 21, 1992), is not to the contrary.  Southwest Realty was not decided in the context of insider trading law and it preceded the Supreme Court decision in O'Hagan and the Commission's promulgation of Rule 10b5-2. The case did not concern an alleged violation of an agreement of confidentiality and deceptive conduct.  Most importantly, this Court in Southwest Realty did not hold that Texas or other specific state law had to be applied, just that a duty to speak had to be established, and on the facts of that case had not been.  Southwest Realty, 1992 WL 373166, at *10 ("The agreement to purchase an interest in a limited partnership, which will in turn purchase regulated securities, cannot be said to create a duty to speak.")

[24]    Tellingly, even the amici curiae brief filed by the five law professors enlisted by Cuban did not endorse his argument that state fiduciary duty law should apply to determine the existence of a duty under federal insider trading law.

invariably lead to inconsistent outcomes.  Under Cuban's formulation of insider trading law, liability would depend on whether one was located in, for example, Texas or Tennessee or Iowa or Idaho.  Commentators have recognized the uncertainty and inefficiency that the application of state law to the duty question would inject into insider trading law.  See, e.g., William K.S. Wang & Mark I. Steinberg, Insider Trading § 5:4.2, at 5-181 (2d ed. 2005 & 2008 Supp.) (application of state law would result in a "quagmire" of uncertainty); Ferrara et al., Ferrara on Insider Trading & The Wall § 2.02[6][e][i][D], at 2-57 ("[applying state law] would inevitably lead to different results when the very same conduct occurs in different states").  Cuban's argument that specific state law must be applied is both bad policy and contrary to established insider trading law.  The Court should reject it.

As described herein, the scope of a duty of trust and confidence has been set by O'Hagan, subsequent federal cases alleging misappropriation insider trading, and the Commission's properly promulgated rule.  A duty premised on a confidentiality agreement is squarely within the scope of the case law and the rule.  In the context of this well-settled case law, Cuban's analysis of fiduciary duties under Texas state law is a red herring that distracts from the simple facts alleged in the Complaint and the well-settled case law and a properly promulgated Commission rule applicable to those facts.  Put simply, the Complaint alleges that Cuban promised Mamma.com to keep information confidential and deceived Mamma.com by obtaining even more confidential information and then using all the confidential information for his own benefit in securities transactions.  Viewing these allegations, as particularized in the Complaint, in the light most favorable to the Commission and applying established insider trading law and Rule 10b5-2(b)(1), the Complaint easily "state[s] a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.  The motion should be denied.

V.   **AMICI CURIAE REPEAT CUBAN'S MISSTATEMENT OF THE LAW**

Despite the 49 pages of attached credentials, the amici curiae's three-page brief in support of Cuban's motion adds nothing for the Court's consideration in this case.  The brief is merely a conclusory reiteration of Cuban's erroneous central argument that an agreement to maintain information in confidence is insufficient to create a duty.  The amici cite no new authority and offer no new analysis beyond that found in Cuban's motion.  As established herein, Cuban and the amici misstate the law when they assert that a confidentiality agreement is insufficient to create a duty.  The amici's unsupported parroting of Cuban's argument, citing no treatise, case law, law review article, or other authority beyond that cited in Cuban's motion, only underscores the lack of authority for the inaccurate position they advocate.  Because the amici simply restate, rather than amplify, expand, or explain, Cuban's argument, the Court should give their brief no weight in deciding Cuban's motion.

<u>**CONCLUSION**</u>

For the above stated reasons, the Court should deny defendant's motion to dismiss.

Dated: February 27, 2009                         Respectfully submitted,


                                                          s/ Kevin P. O'Rourke

Toby M. Galloway                              Kevin P. O'Rourke (D.C. Bar No. 254920)
Texas Bar No. 00790733                    Julie M. Riewe (D.C. Bar No. 472470)
Securities and Exchange Commission    Adam S. Aderton (D.C. Bar No. 496247)
Burnett Plaza, Suite 1900                    Securities and Exchange Commission
801 Cherry Street, Unit 18                   100 F Street, N.E.
Fort Worth, TX  76102                        Washington, D.C.  20549
(817) 978-6447                                  (202) 551-4442 (O'Rourke)
(817) 978-2700 (fax)                          (202) 772-9246 (fax) (O'Rourke)
                                                          orourkek@sec.gov

                                                          *Attorneys for Plaintiff*
                                                          *Securities and Exchange Commission*

25