**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
            Plaintiff,           )
                                 )
    v.                           )      **Civil Action No. 3:08-cv-02050 (SAF)**
                                 )
MARK CUBAN,                      )
                                 )
            Defendant.           )
_____)


# MEMORANDUM OF LAW OF MARK CUBAN
# IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND EXPENSES

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

RELEVANT FACTS ...............................................................................................................3

A.  Testimony Obtained by SEC Showed There Was No Confidentiality Agreement
between Mamma.com's CEO and Mr. Cuban ..................................................................3

B.  Evidence of SEC Bias ......................................................................................................5

C.  SEC's Improper Use of Wells Notice Process ................................................................6

D.  Investigation by Mr. Cuban's Counsel Confirmed There Was No Confidentiality
Agreement between Mamma.com and Mr. Cuban ...........................................................8

    (1)  The Mamma.com Board did not instruct Mr. Fauré to enter into a
confidentiality agreement with Mr. Cuban ............................................................8

    (2)  Mr. Fauré did not enter into a confidentiality agreement with Mr. Cuban .............8

    (3)  Mr. Fauré did not tell Mr. Goldman that Mr. Cuban had entered into a
confidentiality agreement..........................................................................................9

    (4)  Mr. Owen did not enter into a confidentiality agreement with Mr. Cuban ..........10

E.  SEC Staff's Inappropriate Reaction to New Wells Submission ......................................11

F.  SEC Took Testimony of Mr. Fauré For Second Time In An Attempt To Change
His Prior Statements ......................................................................................................13

G.  SEC's Unfounded Complaint .........................................................................................16

H.  OIG Investigation of SEC Staff's Misconduct ..............................................................16

ARGUMENT .........................................................................................................................17

A.  Court Can Award Attorneys' Fees and Expenses under Either Inherent Power to
Sanction or 28 U.S.C. § 2412(b).....................................................................................17

B.  SEC Acted In Bad Faith In Bringing Its Case Against Mr. Cuban..................................19

C.  Attorneys' Fees and Out-of-Pocket Litigation Expenses Are an Appropriate
Sanction in this Case......................................................................................................21

CONCLUSION.......................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Barton v. Drummond Co.*,
   636 F.2d 978 (5th Cir. 1981) ................................................................... 17

*Bowden v. United States,*
   106 F.3d 433 (D.C. Cir. 1997) ................................................................ 20

*Bradley v. United States*,
   866 F.2d 120 (5th Cir. 1989) ................................................................... 18

*Chambers v. Nasco*,
   501 U.S. 32 (1991) ................................................................................... 17

*Davis v. Veslan Enters.*,
   765 F.2d 494 (5th Cir. 1985) ................................................................... 21

*FDIC v. Maxxam*,
   523 F.3d 566 (5th Cir. 2008) ....................................................... 17, 18, 19

*Interfederal Capital, Inc. v. Flagstar Bank, FSB*,
   No. CIV.A. 399CV2318P, 2001 WL 1645480 (N.D. Tex. Dec. 19, 2001) ............................ 20

*Merriman v. Security Ins. Co.*,
   100 F.3d 1187 (5th Cir. 1996) ................................................................. 21

*Nemeroff v. Abelson*,
   704 F.2d 652 (2d Cir. 1983) .................................................................... 18

*Official Airlines Schedule Information Services, Inc. v. Eastern Air Lines, Inc.*,
   333 F.2d 672 (5th Cir. 1964) ................................................................... 21

*Perales v. Casillas*,
   950 F.2d 1066, 1071 (5th Cir. 1992) ....................................................... 18

*Roadway Express, Inc. v. Piper*,
   447 U.S. 752 (1980) ........................................................................... 17, 18

*Ryan v. Hatfield*,
   578 F.2d 275 (10th Cir. 1978) ................................................................. 18

*Sanchez v. Rowe*,
   870 F.2d 291 (5th Cir. 1989) ................................................................... 17

*SEC v. Berlacher*,
   No. 07-cv-3800 (ER) (E.D. Pa. Feb. 5, 2008) .......................................... 22

*SEC v. Blinder, Robinson & Co., Inc.*,
  126 F.R.D. 61 (D. Colo. 1989) ........................................................................ 21

*SEC v. Cuban*,
  No. 3-08-cv-2050-D (SAF), 2009 WL 2096166 (N.D. Tex. July 17, 2009) .................... 20, 21

*SEC v. Kluesner*,
  834 F.2d 1438 (8th Cir. 1987) ....................................................................... 21

SEC v. Lyon,
  529 F. Supp. 2d 444 (S.D.N.Y. 2008) ............................................................. 22

*SEC v. Mangan*,
  No. 3:06-cv-531 (GCM) (W.D.N.C. Oct. 25, 2007) ............................................. 22

*SEC v. Maydew*,
  916 F. Supp. 123 (D. Conn. 1995) ................................................................. 21

*SEC v. Morelli*,
  No. 91 Civ. 3874 (LAP), 1995 WL 9387 (S.D.N.Y. Jan. 11, 1995) .......................... 21

*SEC v. Zahareas*,
  374 F.3d 624 (8th Cir. 2004) ................................................................... 12, 21

*Tedeschi v. Smith Barney, Harris Upham & Co*.,
  579 F. Supp. 657 (S.D.N.Y. 1983), *affd*, 757 F.2d 465 (2d Cir. 1985) .................... 19

*Turner v. American Fed'n of Teachers Local 1565,*
  138 F.3d 878 (11th Cir. 1998) ..................................................................... 20

*Walton v. Morgan Stanley & Co.*,
  623 F.2d 796 (2d Cir. 1980) ........................................................................ 21

*Willy v. Coastal Corp*.,
  915 F.2d 965 (5th Cir. 1990) ....................................................................... 21

**Statutes**

17 C.F.R. § 202.5(c) ................................................................................... 12

28 U.S.C. § 2412(b) ............................................................................... 17, 18

Fed. R. Civ. P. 54(d)(2)(C) ......................................................................... 22

**Other Authorities**

14 Tex. Jur.3d Contracts § 13 (2009) ............................................................. 20

**INTRODUCTION**

On August 13, 2009, the Court dismissed with prejudice the Securities and Exchange Commission's ("SEC") complaint against Mr. Cuban for insider trading. Mr. Cuban now seeks the attorneys' fees and out-of-pocket litigation expenses he has incurred in this case – not because the Court rejected the SEC's claims, but because Mr. Cuban and the Court never should have been forced to address this suit. The SEC's insider trading claim against Mr. Cuban is wholly unsupported by the facts.

According to the SEC's complaint, Mr. Cuban engaged in insider trading when he agreed to keep confidential certain information on a pending stock offering provided to him by Mamma.com's CEO (Guy Fauré ) in a June 28, 2004 phone call, but then sold his Mamma.com shares before the information was publicly disclosed. In direct contrast to the allegation in its complaint, however, the SEC knew prior to filing the complaint that Mr. Cuban did not enter into an agreement to keep the information confidential. *Accordingly, the SEC could not have had a good faith basis for its insider trading claim.* Even if the SEC's legal theory of insider trading had not been rejected by the Court in its ruling on Mr. Cuban's motion to dismiss, the SEC could not have succeeded in proving its case. The SEC apparently gambled that Mr. Cuban would be pressured into an early settlement.

The SEC's misconduct in this case appears to have been the product of the SEC's desire to bring "high profile insider trading cases," as discussed by SEC Director of Enforcement Linda Thomsen in a November 2008 speech, and was not limited to the filing of the complaint against Mr. Cuban. Indeed, the complaint was the end result of an investigative process during which the SEC repeatedly violated its own rules and regulations. It is clear that the SEC staff was bent upon pursuing Mr. Cuban no matter what facts its investigation actually revealed. The highlights of the SEC's investigative misconduct include:

**Ignoring of Contrary Facts** – The SEC knew, *virtually at the outset of its investigation,* that Mr. Cuban had not entered into a confidentiality agreement. Nevertheless, the SEC continued to pursue for many months its investigation into Mr. Cuban's trading.

1

**Misuse of the Wells Process** – The SEC initiated the Wells process in May 2007 – pursuant to which the SEC staff informed Mr. Cuban that it planned to recommend that the Commission bring an action and offered Mr. Cuban the opportunity to respond – when, unbeknownst to Mr. Cuban, Mamma.com's CEO had already indicated to the SEC that Mr. Cuban had *not* entered into a confidentiality agreement. In other words, the SEC had evidence establishing that Mr. Cuban did not engage in insider trading even as it threatened Mr. Cuban with legal action and sought Mr. Cuban's "response" to what the staff should have known were baseless claims.

**Misconduct Relating to Key Witness** – Just four days after Mr. Cuban sent his Wells Submission to the SEC on September 21, 2007, Mamma.com announced that the SEC had closed its separate investigation of the company and would be taking no action. Later that same week, the SEC took Mr. Fauré's testimony *a second time*. The SEC's apparent purpose was to get Mr. Fauré to change his earlier testimony. The deposition transcript shows the SEC attempting to force feed Mr. Fauré the "right" answers concerning his June 28, 2004 conversation with Mr. Cuban, although Mr. Fauré's new testimony ultimately confirmed that Mr. Cuban did not enter into a confidentiality agreement.

The SEC's investigative misconduct (further detailed below), combined with its unfounded complaint, firmly establish that the Commission has engaged in this litigation in bad faith. Not only have the SEC's actions caused Mr. Cuban to incur considerable public embarrassment, lost business opportunities, and significant defense costs, but the Court has been forced to expend its time and resources on a frivolous case. Based on the SEC's bad faith conduct, Mr. Cuban respectfully requests that the SEC be ordered to pay his attorneys' fees and out-of-pocket litigation expenses.

**RELEVANT FACTS**

**A.      Testimony Obtained by SEC Showed There Was No Confidentiality Agreement
           between Mamma.com's CEO and Mr. Cuban**

On April 6, 2004, Mamma.com issued a press release announcing an informal SEC
inquiry into "intense" trading activity and a sharp rise in the price of Mamma.com's stock.  *See*
Mamma.com Inc. Discloses Informal SEC Inquiry, *available at* http://www.copernic.com/en/
company/press/pressrelease.html?pr=2004-4-6&year=2004.   When Mr. Cuban was approached by
the SEC, on June 30, 2004 – one day after he sold the bulk of his shares in Mamma.com – the
staff said they were speaking with him in connection with the ongoing Mamma.com
investigation.  *See* Exhibit ("Ex.") A, SEC-MC-E0006714-6715.[1]   Alton Turner, an SEC staff
attorney, sent a follow-up document request to Mr. Cuban on July 1, 2004 stating: "[a]s you are
aware based upon our conversation yesterday, the Division of Enforcement … is conducting a
non-public investigation into Mamma.com, Inc.   Per our discussion, you have agreed to
voluntarily provide us with certain documents and information."  *Id.*, SEC-MC-E0006714.  Mr.
Cuban proceeded to forward to Mr. Turner copies of the requested documents in his possession,
including his brokerage statements and trading records related to his investment.  *Id.*, SEC-MC-
E0006724-6725, 6744.  Within three weeks of being contacted by the SEC, Mr. Cuban – eager to
help assist in the investigation of a company about which he had serious concerns – had
produced to the SEC every document he could locate that was responsive to Mr. Turner's July 1,
2004 requests.  *Id.*[2]

After a two and a half-year delay, the SEC contacted Mr. Cuban again in December 2006
concerning his trading in Mamma.com securities.  The following month, on January 11, 2007,

---

[1]  "Ex." references herein refer to exhibits to the Affidavit of Stephen M. Ryan, attached as Exhibit 1.  "SEC-MC" is
the Bates-numbering prefix used by the SEC for the documents it produced during the case.

[2]  Mr. Cuban was concerned that Irving Kott, a well-known stock swindler, was involved in the running of the
company.   *See* Ex. B (Cuban Deposition Transcript Excerpts), SEC-MC0002902-2903, 2911 at 40:11-24.
Mamma.com's investors subsequently sued the company over allegations concerning Mr. Kott's hidden
management role.  *See* Ex. C (Consolidated Class Action Complaint filed in *Montoya v. Mamma.com Inc.*, Case No.
1:05-cv-02313 (HB) (S.D.N.Y. filed Feb. 22, 2005)).   That case settled for $3,150,000.   *See* Court Preliminarily
Approves Settlement of Class Action, *available at* http://www.copernic.com/en/company/press/pressrelease.html?
pr=2007-3-8&year=2007.

3

the SEC took the sworn testimony of Guy Fauré, the CEO of Mamma.com. Ex. D (Fauré Deposition Transcript Excerpts), SEC-MC0002885-2887. According to Mr. Fauré, Mamma.com had decided in 2004 to raise capital through a private equity financing known as a "PIPE" (private investment in public equity) (the "PIPE transaction"). *Id.*, SEC-MC0002888 at 11:4-20. Just prior to the closing of the PIPE transaction, Mamma.com's Board had "some informal discussions about inviting Mr. Cuban to participate in the private placement." *Id.*, SEC-MC0002889 at 13:19-23. Mr. Fauré was instructed "to contact Mr. Cuban, tell him that obviously, that we had confidential information to convey to him, and just invite him to participate in this private placement. . . ." *Id.* at 14:18-23. Mr. Fauré subsequently had a phone conversation with Mr. Cuban on July 28, 2004 concerning the PIPE transaction.

The exact questions and answers regarding the content of that June 28, 2004 call were as follows:

> Q: When Mr. Cuban called you that day, June 28, 2004, in the Mamma.com lobby, what did you talk about with him?
>
> A: To the best of my recollection, when he called, I mentioned to him that I had confidential information to convey to him. I told him that we were finalizing a private placement, and asked him if he was interested in participating in the private placement.
>
> Q: And did Mr. Cuban say anything during the call to indicate that he understood that the information you were conveying was to be kept confidential?
>
> A: Yes. Because at the end of the call, or near the end of the call, he said, "Well, now, I'm screwed. I can't sell."

*Id.*, SEC-MC0002890 at 19:4-19. The transcript contains no other discussion of the issue of "confidentiality" in connection with the PIPE transaction. Mr. Fauré did not testify that he sought to enter into a confidentiality agreement with Mr. Cuban prior to providing him with the information about the PIPE transaction nor that Mr. Cuban entered into any such agreement.

On April 3, 2007, the SEC took Mr. Cuban's testimony about these same events and he said nothing to the contrary. *See* Ex. B, SEC-MC0002913-2914 at 47:19-50:20, 2916 at 60:1-11. Mr. Cuban did not specifically recall the conversation with Mr. Fauré and the SEC did not ask

him whether, on that phone call, he had agreed to keep the information about the PIPE transaction confidential. *Id.* As to a separate, later phone conversation on June 28, 2004 between Mr. Cuban and Arnold Owen, a representative of Mamma.com's placement agent for the PIPE transaction, Mr. Cuban denied that he was asked to keep any information confidential or even that the placement agent had ever used the word "confidential" during the conversation. *Id.*, SEC-MC0002912 at 42:2-7.

In sum, the testimony of the only possible witnesses to the June 28, 2004 phone conversation between Mr. Fauré and Mr. Cuban established: (a) Mr. Fauré was not instructed to ask Mr. Cuban to enter into a confidentiality agreement; (b) Mr. Fauré did not ask Mr. Cuban to enter into a confidentiality agreement; and (c) Mr. Cuban never entered into a confidentiality agreement. Moreover, contemporaneous documents fully supported Mr. Fauré's version of events. Four separate e-mails sent by David Goldman, the Chairman of Mamma.com's Board of Directors, to the company's Board members (including Mr. Fauré) on June 28, 2004 and June 29, 2004, discussed the conversations between Mr. Fauré, Mr. Owen, and Mr. Cuban, but made no mention of Mr. Cuban entering into a confidentiality agreement. Ex. E, SEC-MC-E0000287-290, 473. Nor did Mr. Cuban enter into a confidentiality agreement in his subsequent conversation about the PIPE transaction with Mr. Owen, from whom the SEC did not even bother to obtain testimony until October 2007. *See* Ex. F. (Owen Deposition Transcript Excerpts), SEC-MC0002949-2950.

**B.      Evidence of SEC Bias**

At the same time the SEC was investigating Mr. Cuban, a senior SEC enforcement attorney in the SEC's Ft. Worth office subjected Mr. Cuban to a series of astonishing and harassing e-mails, some of which the attorney shared directly with SEC Chairman Christopher Cox. Ex. G, SEC-MC0000383-402. The attorney, Jeffrey Norris, used his SEC e-mail account to repeatedly harangue Mr. Cuban over rumors that one of Mr. Cuban's companies was considering distributing a movie about the 9/11 terrorist attacks. In particular, Mr. Norris

questioned Mr. Cuban's patriotism and accused him of unfairly attacking the Bush administration. Mr. Norris' statements included:

> March 28, 2007 – ". . . you have chosen to promote opinions that slander our country and our President."

> March 28, 2007 – "Either you are really an anti-American ideologue or your allegiance to making money is significantly greater than your dedication to your country."

> March 28, 2007 – ". . . you have chosen to use your wealth and influence to promote terrible lies."

> March 29, 2007 – "People in this area love America and are offended by vicious attacks on President Bush."

> May 5, 2007 (cc'ing Chairman Cox) – "I assume that Mr. Cox would view your involvement with 'Loose Change' much as I do."

> May 5, 2007 (cc'ing Chairman Cox) – ". . . you defend your right to participate in smearing the good name of a patriot like President Bush."

Although these e-mails were sent (a) by an SEC enforcement attorney, (b) the majority during working hours, (c) from an SEC e-mail account, (d) to the target of an SEC investigation, and (e) with the knowledge of Chairman Cox, the SEC apparently took no steps to discipline Mr. Norris at that time and Mr. Cuban was never contacted by the agency about the e-mails.[3]

## C. SEC's Improper Use of Wells Notice Process

Less than three weeks after Mr. Norris' final e-mail, and despite the complete absence of any evidence of a confidentiality agreement, the SEC sent a Wells Notice to Mr. Cuban's counsel, Fish & Richardson P.C. In the May 23, 2007 Wells Notice, the staff stated that it intended "to recommend that the Commission bring an enforcement action against your client, Mark Cuban" based on his "trading in the securities of Mamma.com Inc." Ex. A, SEC-MC0000931-932. The staff then invited Mr. Cuban's counsel to make a Wells Submission

---

[3] The e-mails had at least one direct effect on the SEC's decisionmaking in this case. According to a report in the Wall Street Journal, due to Mr. Norris' emails, Chairman Cox recused himself from the Commission's vote on whether to bring an action against Mr. Cuban. *See* Kara Scannell, Leslie Eaton and Stephanie Simon, *SEC Calls a Foul on NBA's Cuban, Alleges Insider Trades in Web Firm*, WALL ST. J., Nov. 18, 2008 at A1.

setting forth "any reasons of law, policy, or fact why they believe enforcement action should not be brought, or bring[] any facts to the Commission's attention in connection with its consideration of this matter. . . ." *Id.* At this time, of course, the SEC already knew that there was no factual basis for its proposed claims, but only the agency had access to Mr. Fauré's testimony. Without the benefit of this factual record, Fish & Richardson prepared a Wells Submission and submitted it to the staff on June 29, 2007.

Fish & Richardson met with the staff on July 19, 2007. Following this meeting, having become increasingly concerned about the scope and tenor of the SEC's investigation, Mr. Cuban's counsel (now led by Dewey & LeBoeuf LLP) began in August 2007 to compile its own full factual record of the matter, which necessitated arranging interviews with key personnel of Mamma.com and Merriman Curhan Ford & Co. ("MCF") (Mamma.com's placement agent). These witnesses included Mr. Fauré, Mr. Goldman, Mr. Owen, and Daniel Bertrand, Mamma.com's CFO. Dewey & LeBoeuf sought to obtain either transcripts or affidavits that would truthfully and unambiguously detail the witnesses' relevant knowledge.

It is the SEC's policy, set forth in the Enforcement Manual of the Commission's Division of Enforcement (October 6, 2008) ("Enforcement Manual"), that a Wells Notice be provided to an individual, if at all, only when the staff's investigation as to that individual is "substantially complete." Enforcement Manual, Section 2.4 at p. 23, *available at* http://www.sec.gov/divisions /enforce/enforcementmanual.pdf. Until the staff's investigation is "substantially complete," the staff presumably is not yet in a position to formulate its "charges and proposed enforcement recommendation" for the Commission. *See id.* at p. 26. In the course of contacting witnesses, however, Dewey & LeBoeuf was surprised to discover that the SEC staff was scheduling *initial interviews* with these same key personnel (other than Mr. Fauré) in September 2007. The staff's conduct in this regard raised concerns as to whether the staff, in violation of SEC policy, had requested Mr. Cuban's initial Wells Submission in May 2007 simply as a tactical device to be used to preview substantial problems with the case in advance of the staff completing its actual investigation.

**D.**   **Investigation by Mr. Cuban's Counsel Confirmed There Was No Confidentiality Agreement between Mamma.com and Mr. Cuban**

The facts that emerged from Dewey & LeBoeuf's interviews with the witnesses and the relevant documents made it clear why the SEC staff did not welcome the prospect of Mr. Cuban's counsel engaging in its own investigation.

**(1)   The Mamma.com Board did not instruct Mr. Fauré to enter into a confidentiality agreement with Mr. Cuban**

On or around June 28, 2004, members of Mamma.com's Board had discussions regarding the PIPE transaction and Mr. Cuban. Ex. H (Fauré Transcript Excerpts), SEC-MC0000405-408, 464-466 at 60:16-62:1. Mr. Fauré was asked to call Mr. Cuban and give him nonpublic information regarding the PIPE transaction. *Id.*, SECMC0000466 at 62:3-6. None of the Board members suggested, much less directed, that Mr. Cuban be asked to sign a confidentiality agreement or non-disclosure agreement, and none of the Board members asked or told Mr. Fauré to make sure Mr. Cuban agreed to keep information regarding the PIPE transaction confidential.[4] *Id.*, SEC-MC0000472-474 at 68:11-70:1.

**(2)   Mr. Fauré did not enter into a confidentiality agreement with Mr. Cuban**

At 11:56 am on June 28, 2004, Mr. Fauré sent Mr. Cuban an e-mail that he "would like to speak to [Mr. Cuban] ASAP." Ex. I, SEC-MC0000761. On June 28, 2004, some time after Mr. Fauré's 11:56 am e-mail to Mr. Cuban, Mr. Fauré had a telephone call with Mr. Cuban regarding the PIPE transaction. Ex. H, SEC-MC0000482-484 at 78:6-80:1. Mr. Fauré admitted that at the time of the call, he knew that the PIPE transaction was fully subscribed. *Id.*, SEC-MC0000434 at 30:8-12, 466 at 62:7-15. He also knew that Mr. Cuban had previously expressed negative views of PIPE transactions. *Id.*, SEC-MC0000468 at 64:16-20, 482 at 78:10-16.

Mr. Fauré claimed that in his call with Mr. Cuban, he told Mr. Cuban that he had confidential information for him, and then told him that Mamma.com was proceeding with a

---

[4]   Moreover, Mr. Fauré was not involved in any discussions with MCF regarding whether MCF would obtain or eventually did obtain any confidentiality agreements or non-disclosure agreements from investors it solicited to invest in Mamma.com. *Id.*, SEC-MC0000422 at 18:5-11.

PIPE transaction and that Mamma.com wanted to invite Mr. Cuban to participate in the transaction. *Id.*, SEC-MC0000486 at 82:5-10. Mr. Fauré stated that Mr. Cuban did not say anything in response to Mr. Fauré's statement that he had confidential information for Mr. Cuban. *Id.* at 82:13-19. Rather, according to Mr. Fauré, Mr. Cuban said that he did not like PIPE transactions and that Mamma.com should not be engaging in one. *Id.*, SEC-MC0000486-488 at 82:20-84:16. Mr. Cuban thereafter said, according to Mr. Fauré, "now I am screwed, I cannot sell." *Id.*, SEC-MC0000488 at 84:11-17, 492-494 at 88:19-90:8. Mr. Fauré also stated that Mr. Cuban told him that "he wanted out" – that is, Mr. Cuban made it clear to Mr. Fauré that he wanted to sell his shares in Mamma.com. *Id.*, SEC-MC0000517 at 114:14-17.

### (3) Mr. Fauré did not tell Mr. Goldman that Mr. Cuban had entered into a confidentiality agreement

Mr. Fauré maintained that some time after his June 28 telephone call with Mr. Cuban, he talked to Mr. Goldman, Mamma.com's Chairman, about the call. *Id.*, SEC-MC0000500 at 96:9-13. He did not, however, give any notes or other written document to Mr. Goldman regarding the call. *Id.*, SEC-MC0000521 at 118:6-12. Indeed, Mr. Fauré did not indicate that he had memorialized any part of his conversation with Mr. Cuban. *Id.*

Mr. Goldman had no recollection of Mr. Fauré communicating to him that Mr. Fauré told Mr. Cuban that information regarding the PIPE transaction was confidential, or that Mr. Cuban had agreed to keep the information "confidential" (or "privileged, secret, or private"). Ex. J (Goldman Transcript Excerpts), SEC-MC0000658-661, 732-733 at 75:15-76:4.

On June 28, 2004, at 3:51 pm, Mr. Goldman sent an e-mail to Mamma.com's Board summarizing the status of the PIPE transaction and purporting to report on Mr. Fauré's telephone call with Mr. Cuban. *Id.*, SEC-MC0000735-737 at 78:22-80:16; Ex. E, SEC-MC-E0000287. The e-mail stated that when Mr. Fauré called Mr. Cuban, "[a]s anticipated he [Mr. Cuban] initially 'flew off the handle' and said he would sell his shares (recognizing that he was not able to do anything until we announce the equity). . . ." Ex. E, SEC-MC-E0000287; *see also* Ex. J, SEC-MC0000738 at 81:10-20. Mr. Goldman stated that Mr. Fauré had an opportunity to review

the e-mail before it was circulated, and that if he had any corrections, they would have been reflected in the e-mail. *Id.*, SEC-MC0000742 at 85:16-21.

On June 29, 2004, Mr. Goldman sent members of Mamma.com's Board three further e-mails concerning Mr. Fauré's telephone call on June 28 (and Mr. Owen's call on the same day, *see* below) with Mr. Cuban. *Id.*, SEC-MC0000744-752 at 87:10-95:7; Ex. E, SEC-MC-E0000289-290, 473. None of these e-mails stated that Mr. Cuban had agreed to keep any information regarding the PIPE transaction confidential. *Id.*

**(4)      Mr. Owen did not enter into a confidentiality agreement with Mr. Cuban**

On June 28, 2004, Mr. Goldman telephoned the placement agent's representative, Arnold Owen, and asked him to make a courtesy call to Mr. Cuban to inform him of the PIPE transaction.[5] Ex. K (Owen Declaration), SEC-MC0000871 at ¶ 4. Mr. Goldman did not ask Mr. Owen to solicit Mr. Cuban's participation as an investor in the PIPE transaction. *Id.* Pursuant to the request from Mr. Goldman, Mr. Owen called Mr. Cuban on June 28. *Id.*, SEC-MC0000872 at ¶ 6. This call took place after the close of the market that day. *Id.* Mr. Owen states that he placed the call as a courtesy to Mr. Cuban. *Id.* at ¶ 7. Mr. Owen made "courtesy calls" like this in the past. *Id.* The purpose of these calls was to inform investors about a transaction "*and not restrict them.*" *Id.* (emphasis added).

During his call with Mr. Cuban, Mr. Owen informed Mr. Cuban of Mamma.com's pending PIPE transaction. *Id.* at ¶ 8. Mr. Cuban did not offer or agree to maintain information about the impending PIPE transaction in confidence. *Id.*, SEC-MC0000871, 873 at ¶¶ 4, 13. At no time during the call did Mr. Owen ask Mr. Cuban to hold the information conveyed to him regarding the PIPE transaction in confidence. *Id.* at ¶¶ 4, 12. When Mr. Owen spoke with Mr. Cuban on June 28, it was Mr. Owen's understanding that the press release announcing Mamma.com's PIPE transaction would be made public before the opening of trading on June 29.

---

[5] In addition, at 1:51 pm on June 28, 2004, Mr. Fauré sent an e-mail to Mr. Cuban that if he wanted "more details about the private placement please contact…Arnie Owen. Arnie is with Merriman Curhan Ford & Co." Ex. I, SEC-MC0001275. Significantly, Mr. Fauré's e-mail does not mention anything about the information being subject to a confidentiality agreement.

*Id.*, SEC-MC0000872 at ¶ 9. In fact, Mamma.com's press release describing the PIPE transaction was not issued until 5:00 pm CST on June 29, 2004 (*id.*), and the transaction did not close until June 30. *See* Copernic Inc. August 18, 2004 Form 6-K, *available at* http://www.sec.gov/Archives/edgar/data/839435/000119439604000072/mamma6k_83469.htm. Because Mr. Owen believed that the PIPE transaction was to be disclosed before trading began the following morning, he had no reason to inform Mr. Cuban that the information conveyed to him was to be held in confidence. Ex. K, SEC-MC0000873 at ¶ 12. Mr. Cuban told Mr. Owen that "these guys were crooked," he would not participate in the PIPE transaction, and he intended to liquidate his Mamma.com investment. Ex. B, SEC-MC0002911-2912 at 40:10-41:1, 2916 at 57:1-5.

Other than the information that Mr. Owen orally conveyed to Mr. Cuban during their call on June 28, Mr. Owen never provided Mr. Cuban with any information about the PIPE transaction. Ex. K, SEC-MC0000873 at ¶ 15. Mr. Owen never sent Mr. Cuban a confidential memorandum or any other documentation describing the PIPE transaction. *Id.* Mr. Owen also never sent Mr. Cuban a non-disclosure agreement. *Id.* at ¶ 14.

**E.      SEC Staff's Inappropriate Reaction to New Wells Submission**

On September 21, 2007, Dewey & LeBoeuf provided the Commission with a new Wells Submission accompanied by the complete transcripts of its interviews of senior executives of Mamma.com and the affidavit testimony of Mr. Owen. As shown above, these witnesses' statements demonstrated conclusively that Mr. Cuban had never agreed to keep any information about the PIPE transaction confidential and, as a result, could not have engaged in insider trading. In the case of Mr. Fauré, it also is important to note that his statements were entirely consistent with his earlier testimony to the SEC (which Mr. Cuban's counsel had not seen). The new Wells Submission also set forth the legal analysis of why the facts could not support an insider trading claim. Finally, the new Wells Submission was accompanied by a separate letter to the SEC from Mr. Cuban's counsel describing the investigative misconduct that appeared to have taken place to date. The staff's reaction to all of this information was astonishing.

First, just one business day later, Scott Friestad, the senior enforcement official on the case, wrote Dewey & LeBoeuf a cursory *one-paragraph* letter noting summarily that Mr. Norris, the SEC enforcement attorney in the Ft. Worth office who had sent Mr. Cuban harassing e-mails, had played no role in the investigation. Ex. A, SEC-MC0000347. There was no suggestion in the letter that any meaningful investigation of the matter had been conducted – nor could there have been, giving the quickness of the response.[6]

Second, the SEC staff indicated that there could be no assurances that the new Wells Submission and its accompanying exhibits would be given to the Commission when it met to consider the staff's recommendation to bring an action against Mr. Cuban. It had taken Mr. Cuban's counsel longer than expected to conduct the factual investigation – and, in turn, to prepare the new Wells Submission – in large part because of difficulties in scheduling interviews of the key witnesses. On the ground that the new Wells Submission was not submitted on the date agreed upon between Mr. Cuban's counsel and the staff, however, Mr. Friestad informed Dewey & LeBoeuf that it "should no longer assume" that the new Wells submission "will be considered by the Commission." Ex. A, SEC-MC-E0000702-704. Once again, however, this was in violation of governing regulations – an individual subject to an SEC investigation may submit at any time a written statement to the Commission "setting forth their interests and position in regard to the subject matter of the investigation." 17 C.F.R. § 202.5(c) (2008). The regulation goes on to note that "*any submissions* by interested persons will be forwarded to the Commission in conjunction with the staff memorandum." *Id.* (emphasis added); *see also SEC v. Zahareas*, 374 F.3d 624, 629 (8th Cir. 2004) ("Pursuant to 17 C.F.R. § 202.5(c), persons involved in an SEC investigation may submit a written statement to the SEC before its staff seeks approval for an action from the Commission."). As of September 21, 2007, the staff was still conducting witness interviews and clearly had not yet submitted its memorandum to the

---

[6] The fact that no investigation took place at that time appears to be confirmed by a press report. Over a year later, on the same day the Commission filed its insider trading case against Mr. Cuban, the Commission disclosed that Mr. Norris was purportedly being "reviewed for possible disciplinary actions." *See* Kara Scannell, Leslie Eaton and Stephanie Simon, *SEC Calls a Foul on NBA's Cuban, Alleges Insider Trades in Web Firm*, WALL ST. J., Nov. 18, 2008 at A1.

Commission. Nevertheless, Mr. Cuban has never received any assurance from the staff that the new Wells Submission was passed along to the Commission and taken into consideration.

Finally, just four days later, on September 25, 2007, at the same time the staff was scheduled to engage in additional interviews and depositions with key witnesses (despite supposedly having "substantially completed" the Cuban investigation), the Commission abruptly closed its separate investigation of Mamma.com, which at that time had been ongoing for over three years. *See* SEC Closes its Investigation of Copernic Inc., Formerly Mamma.com Inc., With a Recommendation of no Enforcement Action, *available at* http://www.copernic.com/en/company /press/pressrelease.html?pr=2007-9-26&year=2007. That the staff would suddenly choose to end a long-standing investigation of Mamma.com only a few days after receiving Mr. Cuban's new Wells Submission, and just when the staff was seeking additional interviews and depositions from the company's senior executives, gives rise to the reasonable suspicion that the staff used the closure of the investigation to attempt to induce Mamma.com's executives to cooperate with the staff and perhaps even to depart from the testimony and statements they had previously provided. That suspicion is enhanced by an examination of the transcript of Mr. Fauré's second deposition.

**F.     SEC Took Testimony of Mr. Fauré For Second Time In An Attempt To Change His Prior Statements**

On September 27, 2007, just two days after the announced closing of the separate Mamma.com investigation, the SEC took Mr. Fauré's testimony for a second time. Ex. L (Fauré Transcript Excerpts), SEC-MC0002928-2929. A review of the deposition transcript reveals that the staff's clear purpose was to somehow get Mr. Fauré to say that Mr. Cuban had agreed to keep the information about the PIPE transaction confidential, despite the fact that Mr. Fauré had already stated, in unequivocal terms, that Mr. Cuban had entered into no such agreement. To assist them in this effort, the SEC staff had a transcript of Mr. Fauré's recorded statement to Mr. Cuban's counsel, which it appears to have improperly used as a "roadmap" to try to shape Mr. Fauré's new testimony.

At his second deposition, Mr. Fauré again testified that he had been "instructed . . . to give a call to Mr. Cuban, inform him that we had confidential information for him, and then proceed to invite him to participate in this PIPE transaction." *Id.*, SEC-MC0002930 at 8:7-10. What follows, however, is an extraordinary series of leading questions from the SEC designed to create a confidentiality agreement that never existed.

Q: Would it be fair to say, even if you don't recall the specific Board discussion at that informal meeting, that the point of discussion about inviting Mr. Cuban to participate under confidentiality was to make sure that he understood you had to keep the PIPE information confidential before you told it to him?

A: Right. Yes.

Q: And would it be fair to say that the reason there was no specific discussion about what exactly you should say to Mr. Cuban was because everyone would assume that you would tell him the information was confidential and that you would not proceed to tell him about the PIPE unless he indicated in some way that he understood the information was to be kept confidential?

A: It was not discussed, but that was my instructions and that's what I understood. Yes.

* * * *

Q: Do you recall exactly what Mr. Cuban said in response when you told him you had confidential information to convey to him?

A: I don't remember exact words. But there was some type of acknowledgment. If not, I wouldn't have proceeded. So it might have been "uh-hmm", "yes", "go ahead".

Q: So is it fair to say to summarize what you just said that you would not have conveyed the PIPE information to Mr. Cuban if he had not said something, even though you don't recall what the exact words were, at the beginning of the call to indicate that he would keep the information confidential?

A: Right.

Q: So after you told Mr. Cuban you had confidential information to convey to him, you said something – again, not recalling the exact words that you used – to acknowledge that he would keep the information you were going to convey to him confidential?

A: Well again, I don't remember the exact words. But there was certainly an acceptance which said okay, yeah; go ahead. *I understand you're going to give me confidential information.*

*Id.*, SEC-MC0002930-2931 at 8:15-10:14 (emphasis added). Nothing about this exchange, of course, establishes that Mr. Cuban, at any point, agreed to keep the information about the PIPE transaction confidential. At most, according to Mr. Fauré's speculation, Mr. Cuban merely acknowledged that the information he was about to receive was confidential.

Apparently recognizing that Mr. Fauré's testimony so far had been inadequate for its purposes, the staff then proceeded to ask another series of leading questions about whether Mr. Fauré *believed* Mr. Cuban would keep the information about the PIPE transaction confidential. *Id.*, SEC-MC0002931 at 11:1-20. Mr. Fauré concluded that he did, but not because Mr. Cuban had actually agreed to do so. Instead, Mr. Fauré's belief was based entirely on Mr. Cuban's supposed "acknowledge that, yes, you have confidential information." *Id.* at 11:19-20. Finally, the staff asked about Mr. Cuban's alleged statement at the end of the call: "Well now I'm screwed, I can't sell." *Id.* at 11:22-24. In particular, the staff asked if it was Mr. Fauré's "understanding that the reason Mr. Cuban said something along those lines during the call was because he was acknowledging at the beginning of the call he had agreed to keep the information confidential?" *Id.* at 12:1-4. Mr. Fauré's response to this leading invitation to assert the existence of an "agreement" was a flat denial: "*In my mind I didn't make that direct link*, but I certainly understood that he understood that now he had confidential information he could not sell the stock." *Id.* at 12:5-7 (emphasis added).

Despite the SEC's decision to close the investigation of Mamma.com and then retake Mr. Fauré's testimony just two days later in the hope of resurrecting its case, it was unable to obtain the necessary evidence.[7] Mr. Fauré had either testified or given recorded statements on three occasions that he never asked Mr. Cuban to keep the PIPE information confidential and Mr. Cuban never agreed to keep the PIPE information confidential. That should have been the end of this matter.

---

[7] The SEC staff also took Mr. Owen's testimony in October 2007, and he confirmed the statements in his earlier affidavit, *i.e.,* he never asked Mr. Cuban to keep the information about the PIPE transaction confidential. Ex. F, SEC-MC0002960 at 44:5-8. *See also id.*, SEC-MC0002962 at 50:21-51:8, 2963 at 55:21-56:1 (no one at Mamma.com ever told Mr. Owen that Mr. Cuban had been asked to, or had offered or agreed to, maintain PIPE information in confidence).

**G. SEC's Unfounded Complaint**

On November 6, 2008, SEC Director of Enforcement Linda Thomsen gave a speech at Fordham University Law School in which she lauded the Commission's pursuit of "high profile insider trading cases." Remarks at the Ninth Annual A.A. Sommer, Jr., Corporate, Securities and Financial Law Lecture, *available at* http://www.sec.gov/news/speech/2008/spch110608lct.htm. Just over a week later, on November 17, the SEC filed its complaint against Mr. Cuban and put out a press release announcing the case. *See* SEC Files Insider Trading Charges Against Mark Cuban, *available at* http://www.sec.gov/news/press/2008/2008-273.htm. The crucial factual allegation in the complaint was: "The CEO prefaced the [June 28, 2004] call by informing Cuban that he had confidential information to convey to him, *and Cuban agreed that he would keep whatever information the CEO intended to share with him confidential.*" Complaint ¶ 14 (emphasis added). In fact, as described above, the statement was unsupportable – the SEC knew full well that Mr. Cuban had entered into no such agreement. Notably, while the SEC in other parts of the complaint cited the specific testimony of witnesses or quoted from documents, this statement stood unadorned, with no description of how Mr. Cuban entered into the supposed agreement.

**H. OIG Investigation of SEC Staff's Misconduct**

In March 2009, the SEC's Office of Inspector General ("OIG") announced that it was investigating the potential misconduct of SEC staff members related to the Cuban case. In its 2009 Semiannual Report to Congress, the OIG reported that it had "opened an investigation into a complaint received from counsel for a defendant in an SEC Enforcement action, alleging numerous instances of misconduct by several Enforcement staff members during the course of the investigation that resulted in the filing of the action." SEMIANNUAL REPORT TO CONGRESS, OCT. 1, 2008 – MARCH 31, 2009 at 61, *available at* http://www.sec-oig.gov/Reports/Semiannual /2009/semiapr09.pdf. These allegations "included various apparent violations of the Commission's conduct rules and the SEC's polices for conducting Enforcement investigations." *Id.* Although the report did not mention Mr. Cuban by name, a Wall Street Journal article noted

that a "person familiar with the matter confirmed the case involves Mr. Cuban, the owner of the Dallas Mavericks." Kara Scannell, *SEC Examines Actions by Staffers,* WALL ST. J., June 2, 2009 at C3.

## ARGUMENT

The conduct of the SEC in this case should be of great concern to the Court. The SEC's staff engaged in an "investigation" that obviously had a preordained outcome – bring an insider trading action against Mr. Cuban. Although the results of the investigation nevertheless exonerated Mr. Cuban (even under the SEC's legally flawed theory of insider trading), the SEC filed its case anyway. This is a textbook example of bad faith litigation. Mr. Cuban should be awarded his attorneys' fees and out-of-pocket litigation expenses.

**A.    Court Can Award Attorneys' Fees and Expenses under Either Inherent Power to Sanction or 28 U.S.C. § 2412(b)**

Based on the SEC's bad faith conduct, the Court can award Mr. Cuban his attorneys fees' and out-of-pocket litigation expenses under either its inherent power to sanction or pursuant to 28 U.S.C. § 2412(b).

A court has the inherent power to impose sanctions for bad faith conduct. *Chambers v. Nasco*, 501 U.S. 32, 44 (1991). The inherent power to sanction extends to a full range of litigation abuses, not just certain individuals or conduct covered by federal statutes and the Federal Rules of Civil Procedure. *Id*. As a sanction for bad faith conduct, a court may order "out-right dismissal of a lawsuit." *Id*. at 45. "Consequently, the 'less severe sanction' of an assessment of attorneys' fees is undoubtedly within a court's inherent power as well." *Id*. Sanctions may be imposed for "actions that led to the lawsuit" and for "the conduct of the litigation." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980); *see also Sanchez v. Rowe*, 870 F.2d 291, 294 (5th Cir. 1989); *Barton v. Drummond Co.*, 636 F.2d 978, 985 (5th Cir. 1981).

The fact that the litigant who has abused the judicial process is an agency of the federal government does not affect a court's inherent power to sanction. *FDIC v. Maxxam*, 523 F.3d 566, 595-596 (5th Cir. 2008) (sovereign immunity does not bar court from imposing sanctions).

"The government, as a party to a lawsuit, is subject to the same ethical and procedural rules as a private litigant, and risks the same sanctions if it fails to abide by these rules." *Id.* at 595. As for a private litigant, the sanctions can include "out-of-pocket costs and attorneys' fees." *Bradley v. United States*, 866 F.2d 120, 128 n.13 (5th Cir. 1989).

Alternatively, 28 U.S.C. § 2412(b) permits an award of attorneys' fees and expenses against the government "to the same extent that any other party would be liable under the common law." The U.S. Court of Appeals for the Fifth Circuit has held that this provision "incorporates the 'American rule' for fee-shifting," which permits an award of fees where the losing party has acted "'in *bad faith*, vexatiously, wantonly, or for oppressive reasons.'" *Perales v. Casillas*, 950 F.2d 1066, 1071 (5th Cir. 1992) (emphasis in original) (*quoting F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116 (1974)).[8] As under the court's inherent sanction power, a court "may consider conduct both during and prior to the litigation" in determining whether the government has acted in bad faith. *Id.*

Bad faith includes misconduct involving oppression, fraud, or abuse of the judicial process, *i.e.*, abusive misconduct that "constituted or was tantamount to bad faith." *Roadway Express*, 447 U.S. at 767. Courts have had no difficulty finding that plaintiffs act in bad faith when they file complaints or continue prosecuting cases even though the testimony of witnesses undermines the alleged factual basis of the claims. *See Ryan v. Hatfield,* 578 F.2d 275, 277 (10th Cir. 1978) (finding of bad faith and award of attorneys' fees upheld where prior testimony of witness undermined plaintiff's claim); *Nemeroff v. Abelson*, 704 F.2d 652, 659-660 (2d Cir. 1983) (finding of bad faith and awarding of attorneys' fees upheld, in part, where witness revealed he could provide no direct support for plaintiff's claim). Likewise, it is bad faith to institute an action where no reasonable attorney could have concluded that allegations supporting

---

[8] Although 28 U.S.C. § 2412(b) is part of the Equal Access for Justice Act, it merely codifies the American rule and does not incorporate the "eligibility" requirements of 28 U.S.C. § 2412(d). *See Perales*, 959 F.2d at 1072 (§ 2412(d) is alternative basis for claim of fees based on whether government's position was "substantially justified" and must be evaluated separately).

claims could be established. *Tedeschi v. Smith Barney, Harris Upham & Co.*, 579 F. Supp. 657, 661 (S.D.N.Y. 1983), *affd,* 757 F.2d 465, 466 (2d Cir. 1985).

**B.      SEC Acted In Bad Faith In Bringing Its Case Against Mr. Cuban**

The SEC acted in bad faith in bringing its case against Mr. Cuban and should be sanctioned.  As detailed above, in the course of its investigation, the SEC staff:

(a)      ignored exculpatory evidence;

(b)      initiated the Wells process, informing Mr. Cuban that the staff intended to recommend that the Commission bring an action against him for insider trading, even though the staff had no evidence of a confidentiality agreement;

(c)      improperly attempted (and may have succeeded) in preventing the Commission from reviewing Mr. Cuban's new Wells Submission;

(d)      closed its investigation into Mamma.com just days before seeking new testimony from key company witnesses; and

(e)      took the testimony of Mamma.com's CEO for the second time for the apparent purpose of getting him to change his prior statements.

Taken together, the conduct of the SEC suggests that its motivation in filing a complaint against Mr. Cuban was to bring a "high profile insider trading" case, with no thought as to whether the facts supported that predetermined outcome.  *Maxxam*, 523 F.3d at 587 (bringing of case for "improper purpose" is sanctionable).

Not only was the SEC motivated by an improper purpose, but it also compounded its misconduct by filing an unfounded complaint.  The SEC's assertion in its complaint that Mr. Cuban had "agreed that he would keep whatever information the CEO intended to share with him confidential" had no factual basis.  Moreover, the SEC "doubled down" on this allegation in its opposition to Mr. Cuban's motion to dismiss, claiming that based on the supposed existence of an "agreement of confidentiality," Mr. Cuban had engaged in "brazen subterfuge" and "actively induced the company" to provide him with information about the PIPE transaction. SEC Opposition to Motion to Dismiss at p. 21.  After two depositions and a recorded statement, however, the only conclusion to be drawn from Mr. Fauré's testimony was that on the June 28,

2004 phone call he did not ask Mr. Cuban to keep any information confidential and Mr. Cuban did not agree to keep any information confidential.

The sole support for the SEC's statement is Mr. Fauré's speculation that Mr. Cuban must have "acknowledged" in some way that the information he was about to receive was confidential in nature. Ex. L, SEC-MC0002931 at 11:19-20. As the Court held in its motion to dismiss order, the issue of whether there was any type of agreement between Mr. Fauré and Mr. Cuban sufficient to create a duty is "essentially" a matter of "the state law of contracts." *SEC v. Cuban*, No. 3-08-cv-2050-D (SAF), 2009 WL 2096166, at *5 (N.D. Tex. July 17, 2009). It is black-letter contract law (and simple common sense) that there can be no agreement between two parties in the absence of valid offer and acceptance plus a meeting of the minds supported by consideration. *See, e.g.*, 14 Tex. Jur.3d Contracts § 13 (2009). These elements could not possibly have been satisfied by Mr. Fauré's alleged declarative statement that the information he was about to provide was confidential, followed by Mr. Cuban supposedly saying "uh-hmm," "yes," or "go ahead." Ex. L, SEC-MC0002931 at 9:10-23.[9] Nor was an agreement created by his alleged "I'm screwed" statement, as the Court has recognized. *SEC v. Cuban*, 2009 WL 2096166, at *10 ("This statement, however, cannot reasonably be understood as an *agreement* not to sell based on the information.") (emphasis added). What emphatically did not happen is Mr. Fauré requesting that Mr. Cuban keep the information about the PIPE transaction confidential (offer) as a condition of receiving it (consideration) and Mr. Cuban agreeing to do so (acceptance).[10]

---

[9] Although the SEC attempted to rely on federal common law in its opposition to Mr. Cuban's motion to dismiss, the application of the federal common law of contracts does not change the analysis. Both federal and Texas law follow the Restatement (Second) of Contracts in setting forth the elements of a valid contract. *Compare Turner v. American Fed'n of Teachers Local 1565,* 138 F.3d 878, 882 (11th Cir. 1998) (using the Restatement (Second) of Contracts as a source of federal common law); *Bowden v. United States,* 106 F.3d 433, 439 (D.C. Cir. 1997) (explaining that the principles of the Restatement (Second) of Contracts are those "from which we would be inclined to fashion a federal common-law rule") *with Interfederal Capital, Inc. v. Flagstar Bank, FSB*, No. CIV.A. 399CV2318P, 2001 WL 1645480, at *4 (N.D. Tex. Dec. 19, 2001) (Texas law pertaining to elements of valid contract follows Restatement (Second) of Contracts).

[10] Notably, the SEC was willing to quote from Mr. Fauré's testimony in its complaint when it suited the agency's purposes (*e.g.*, the alleged "Well, now I'm screwed. I can't sell." statement by Mr. Cuban). Complaint ¶ 14. Mr. Fauré's account of telling Mr. Cuban that the information was confidential followed by some kind of acknowledgment, however, is missing – presumably because the SEC understood that including Mr. Fauré's exact

Nor is Mr. Fauré's apparent "belief" that Mr. Cuban would maintain the confidentiality of the information relevant. Ex. L, SEC-MC0002931 at 11:1-20. In its motion to dismiss order, the Court, consistent with the "meeting of the minds" element of a valid contract, found that "a mere unilateral expectation on the part of the information source – one that is not based on the other party's agreement" cannot create any kind of duty. *SEC v. Cuban*, 2009 WL 2096166, at *10; *see also*, *Official Airlines Schedule Information Services, Inc. v. Eastern Air Lines, Inc.*, 333 F.2d 672, 674 (5th Cir. 1964) (person may not unilaterally impose upon another a confidential relationship). Other courts, as noted by the SEC in its opposition to Mr. Cuban's motion to dismiss, uniformly have reached the same conclusion in insider trading cases. *See, e.g., Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir. 1980) (expectation of party of source that party receiving nonpublic information will not trade cannot impose duty of confidentiality); *SEC v. Maydew*, 916 F. Supp. 123, 129-130 (D. Conn. 1995) (same); *see also* SEC Opposition to Motion to Dismiss at p. 22 n.22.

In sum, there is no doubt that the SEC acted in bad faith, having brought its case for an improper purpose and having made a key factual assertion in its complaint that it knew was flatly contradicted by the evidence.

## C. Attorneys' Fees and Out-of-Pocket Litigation Expenses Are an Appropriate Sanction in this Case

The trial court has considerable discretion to set the appropriate sanction amount. *Willy v. Coastal Corp.*, 915 F.2d 965, 968 (5th Cir. 1990); *Davis v. Veslan Enters.*, 765 F.2d 494, 500-501 (5th Cir. 1985). Attorneys' fees are an appropriate sanction designed to deter frivolous litigation. *Merriman v. Security Ins. Co.*, 100 F.3d 1187, 1194 (5th Cir. 1996).[11] Mr. Cuban

---

statements on that subject would almost certainly have lead to the complaint being found factually deficient on its face and dismissed.

[11] The SEC is familiar with this remedy. In at least four published decisions, the SEC has been forced to pay attorneys' fees and expenses to defendants in actions brought by the Commission. *See SEC v. Zahareas*, 374 F.3d 624, 630-631 (8th Cir. 2004); *SEC v. Morelli*, No. 91 Civ. 3874 (LAP), 1995 WL 9387, at *13 (S.D.N.Y. Jan. 11, 1995); *SEC v. Blinder, Robinson & Co., Inc.*, 126 F.R.D. 61, 63 (D. Colo. 1989); *SEC v. Kluesner*, 834 F.2d 1438, 1440 (8th Cir. 1987). These awards were made pursuant to the Equal Access to Justice Act or the Federal Rules of Civil Procedure.

estimates that his attorneys' fees and out-of-pocket litigation expenses have exceeded $1 million since the SEC's filing of its complaint. An award of that magnitude hopefully will dissuade the SEC from pursuing such meritless claims in the future. *Id.*[12]

## CONCLUSION

For all of the reasons discussed above, Mr. Cuban respectfully requests that the Court sanction the SEC for its bad faith conduct in this case and award Mr. Cuban his attorneys' fees and out-of-pocket litigation expenses in an exact amount to be determined by the Court after deciding the issue of liability.[13]

---

[12] It should be noted that the SEC staff recently has been found by federal courts to have overreached in similar cases involving claims of insider trading related to PIPE transactions. In three of these cases, federal courts have soundly rejected at the motion to dismiss stage the enforcement staff's unfounded attempts to assert insider trading claims under Section 5(a) of the Securities Act of 1933 ("Section 5"). *See* Ex. M (Order Granting in part and Denying in part Motion to Dismiss, *SEC v. Berlacher*, No. 07-cv-3800 (ER) (E.D. Pa. Feb. 5, 2008)); *SEC v. Lyon*, 529 F. Supp. 2d 444 (S.D.N.Y. 2008); Ex. N (Order Granting in part and Denying in part Motion to Dismiss, *SEC v. Mangan*, No. 3:06-cv-531 (GCM) (W.D.N.C. Oct. 25, 2007)). Underscoring the staff's overly aggressive approach, the court in one of these cases condemned one of the staff's principal arguments as "pretty misleading." Transcript of Mot. Hr'g at 45*, Mangan*, No 3:06-cv-531 (GCM) (W.D.N.C. entered Nov. 2, 2007), *available at* http://online.wsj.com/public/resources/documents/mangan.pdf. In another of these cases, the court held that the staff's position found "no support in the text or purpose" of Section 5, and chided the staff for the "inherent logical implausibility" of its core argument. *Lyon*, 529 F. Supp. 2d at 454-455. In the same case, the court also found that the staff had "misleadingly" and "selectively" quoted from an SEC release. Ex. O (Excerpts from Opinion and Order Granting in part and Denying in part Motion to Dismiss, *Lyon*, No. 06-cv-14338 (SHJ), at pp. 17, 20, 25-26 (S.D.N.Y. Jan. 2, 2008)). The SEC team undoubtedly was embarrassed by this finding, and by motion, they importuned the court to amend its ruling. Ex. P (Plaintiff's Motion to Amend Opinion and Order, *Lyon*, No. 06-cv-14338 (SHJ) (S.D.N.Y. Jan. 11, 2008)). The court relented, but remained strongly critical of the staff's position. *Lyon*, 529 F. Supp. 2d 444.

[13] Pursuant to Fed. R. Civ. P. 54(d)(2)(C), it is appropriate for the court to "decide issues of liability for fees before receiving submissions on the value of services."

Respectfully submitted,

**DEWEY & LEBOEUF LLP**

/s/ Lyle Roberts

By: _____

Lyle Roberts (*pro hac vice*)
D.C. Bar No. 464789
Ralph C. Ferrara (*pro hac vice*)
D.C. Bar No. 156380
Stephen A. Best
D.C. Bar No. 428447
Henry W. Asbill
D.C. Bar No. 938811
DEWEY & LEBOEUF LLP
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 346-8000
Facsimile: (202) 346-8102
lroberts@dl.com
rferrara@dl.com
sbest@dl.com
hasbill@dl.com

Christopher J. Clark (*pro hac vice*)
N.Y. Bar No. 2854222
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333
cjclark@dl.com

*Attorneys for Mark Cuban*

OF COUNSEL:

Stephen M. Ryan
Texas Bar No. 24002881
DEWEY & LEBOEUF LLP
1000 Main Street, Suite 2550
Houston, Texas 77002
Telephone 713-287-2025
713-445-2125 – Fax
sryan@dl.com

Paul Coggins
Texas Bar No. 04504700
Kip Mendrygal
Texas Bar No. 24041472
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: 214-747-5070
Facsimile: 214-747-2091
coggins@fr.com
mendrygal@fr.com

## CERTIFICATE OF CONFERENCE

I certify that on August 26 and 28, 2009, counsel for Mark Cuban spoke via telephone with counsel for Plaintiff Securities and Exchange Commission ("SEC"), concerning the filing of Mr. Cuban's Motion for Attorneys' Fees and Expenses (the "Motion"). Counsel for Mr. Cuban and counsel for the SEC also exchanged multiple letters concerning the Motion between those dates. The SEC has communicated that it intends to oppose the Motion.

/s/ Lyle Roberts
_____
Lyle Roberts

## CERTIFICATE OF SERVICE

On August 28, 2009, I electronically submitted Mark Cuban's Motion for Attorneys' Fees and Expenses, Proposed Order, the Memorandum of Law of Mark Cuban in Support of Motion for Attorneys' Fees and Expenses, and the Appendix with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Lyle Roberts
_____
Lyle Roberts