**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 3-08-CV-2050-D (SAF) |
| | : | |
| **MARK CUBAN,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMMISSION'S MEMORANDUM OF
LAW IN OPPOSITION TO DEFENDANT MARK CUBAN'S
<u>MOTION FOR ATTORNEYS' FEES AND EXPENSES</u>**

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS .................................................................................................3

I.     The Insider Trading Claim is Properly Alleged in the Complaint and
Supported by an Extensive Factual Basis ...........................................................3

    A.     Mamma.com Extensively Discussed Inviting Cuban to Participate
in the PIPE and the Need for Confidentiality ...........................................4

    B.     Cuban Accepted a Duty of Confidentiality................................................6

    C.     Cuban Claims that He Has No Recollection of Speaking to the CEO.................12

    D.     The Facts Alleged Are Legally Sufficient to Prove an
Agreement to Undertake a Duty of Confidentiality................................13

II.     Cuban's Allegations of Investigative Misconduct Are Baseless .......................15

    A.     The Unauthorized Email Communications Sent by Jeffrey Norris
were Unrelated to the Investigation and Litigation.................................15

    B.     Cuban's Arguments about the Wells Process are Meritless .................18

    C.     Closing of the Unrelated Mamma.com Investigation Had
No Influence on the Investigation into Cuban's Illegal Trading ..........21

    D.     The Investigation by the SEC Inspector General, Initiated at Cuban's Request,
Provides No Support for His Motion ....................................................21

ARGUMENT......................................................................................................................22

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

Hollywood Fantasy Corp. v. Gabor,
    151 F.3d 203, 210 (5th Cir. 1998) ...................................................................14

Merkel v. United States,
    Civil Action No. 3:06-CV-1891-D, 2009 WL 2002902 (N.D. Tex. July 9, 2009)......22, 23

Nemeroff v. Abelson,
    704 F.2d 652 (2d Cir. 1983)............................................................................23, 24

Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc.,
    333 F.2d 672, 674 (5th Cir. 1964) ..................................................................13

Perales v. Casillas,
    950 F.2d 1066, 1071 (5th Cir. 1992) ......................................................... 22-23

Register.com, Inc. v. Verio, Inc.,
    356 F.3d 393, 403 (2d Cir. 2004)...................................................................14

Ryan v. Hatfield,
    578 F.2d 275 (10th Cir. 1978) ..................................................................23, 24

SEC v. Buntrock,
    No. 02 C 2810, 2002 WL 31684176 (N.D. Ill. Nov. 26, 2002).......................17

SEC v. Cuban,
    No. 3:08-CV-2050-D (SAF), --- F. Supp. 2d ---, 2009 WL 2096166
    (N.D. Tex. July 17, 2009) ..........................................................................9, 12

SEC v. Dorozhko,
    No. 07 Civ. 9606(NRB), 2008 WL 126612 (S.D.N.Y. Jan. 8, 2008), rev'd
    574, F.3d 42 (2d Cir. 2009).............................................................................2

SEC v. Keating,
    No. CV 91-6785 (SVW), 1992 WL 207918 (C.D. Cal. July 23, 1992) ...........................15

SEC v. Lyon,
    605 F. Supp. 2d 531 (S.D.N.Y. 2009)............................................................11

SEC v. Mayhew,
    916 F. Supp. 123 (D. Conn. 1995)..................................................................13

Southwest Airlines Co. v. BoardFirst, L.L.C.,
   No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) .................14

Tedeschi v. Smith Barney, Harris Upham & Co., Inc.,
   548 F. Supp. 1172 (S.D.N.Y. 1982)..................................................................... 24-25

Tedeschi v. Smith Barney, Harris Upham & Co., Inc.,
   579 F. Supp. 657 (S.D.N.Y. 1984)...........................................................................24

United States v. Chestman,
   947 F.2d 551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992) ...........9, 10, 13

United States Postal Service v. Gregory,
   534 U.S. 1, 10 (2001)............................................................................................17

Walton v. Morgan Stanley & Co.,
   623 F.2d 796 (2d Cir. 1980)....................................................................................13

## FEDERAL STATUTES AND REGULATORY MATERIALS

Privacy Act of 1974, 5 U.S.C. § 552a(b) ......................................................................18

Equal Access to Justice Act, 28 U.S.C. § 2412(b).........................................................23

Adopting Release, Selective Disclosure and Insider Trading,
   Exchange Act Release No. 34-43154, 65 Fed. Reg. 51716 (Aug. 15, 2000) .....................9

Procedure Relating to the Commencement of Enforcement Proceedings and Termination
   of Staff Investigations, Exchange Act Release No. 34-9796 (Sept. 27, 1972) .................19

## MISCELLANEOUS

"Cuban's Brother Comments on SEC emails," Dallas Bus. J., Nov. 21, 2008,
   available at http://dallas.bizjournals.com/dallas/stories/2008/11/17/daily64.html ...........18

Arthur F. Mathews, "Defending SEC and DOJ FCPA Investigations and Conducting
   Related Corporate Internal Investigations:  The Triton Energy/Indonesia SEC
   Consent Decree Settlements," 18 Nw. J. Int'l L. & Bus. 303, 413-14 (1998)..................20

David Scheer, "Mark Cuban Complaints on SEC Suit Said to Spur Review,"
   Bloomberg.com, June 2, 2009, available at
   http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aOHjwX9c8euM...........22

SEC Enforcement Manual (October 2008),
   available at http://www.sec.gov/divisions/enforce/enforcementmanual.pdf ...................20

Mark I. Steinberg & Ralph C. Ferrara,
      25 <u>Securities Practice: Federal & State Enforcement</u> § 3:56 (2001 & 2009 Supp.)..........20

Linda Chatman Thomsen, "True to Our Mission:  Why We Need the SEC," Remarks at
      the Ninth Annual A.A. Sommer, Jr. Corporate, Securities and Financial Law
      Lecture, New York, NY (Nov. 6, 2008), *available at*
      http://www.sec.gov/news/speech/2008/spch110608lct.htm. ..............................................2

**PLAINTIFF SECURITIES AND EXCHANGE COMMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MARK CUBAN'S MOTION FOR ATTORNEYS' FEES AND EXPENSES**

**INTRODUCTION**

Cuban's Motion for Attorneys' Fees and Expenses is meritless, identifies no proper basis for the imposition of sanctions, and should be denied.[1]  If Cuban's motion establishes anything, it is only that the crucial factual question in this case – whether Cuban accepted a duty of confidentiality – remains a genuine unresolved dispute.  No other element necessary to establish a prima facie insider trading case is reasonably in dispute:  It is undisputed that Cuban possessed material nonpublic information about Mamma.com Inc.'s ("Mamma.com") PIPE offering.  It is undisputed that this information was nonpublic when Cuban called his broker and demanded that he sell his stock in the company immediately.  It is undisputed that Cuban did not disclose that he was selling before the transaction was publicly announced.  It is undisputed that Cuban avoided substantial losses by selling his stock before the rest of the investing public learned the confidential information about the PIPE.  Given these undisputed facts, Cuban's claim that the Commission was unjustified in bringing this action – so unjustified as to warrant the extraordinary award of attorneys' fees – is stunning.[2]

Cuban's motion is equally deficient in claiming that the instant action was the result of bias against him.  There is simply no evidence to support the assertion of bias, only Cuban's

---

[1]  The Declaration of Robert B. Kaplan ("Kaplan Decl.") and exhibits thereto ("Kaplan Ex.") are submitted herewith in support of the Commission's Opposition.

[2]  Cuban asserts that the Court has been "forced to expend" resources on this case.  Cuban's Memorandum in Support at 2 (hereinafter "Mem.").  A review of the Court's dismissal opinion and the accompanying briefing reveals that the Court's use of resources included considering and rejecting the various arguments made by Cuban and his counsel, with the Court ultimately basing the dismissal on a legal interpretation that had not been established under existing law and that had not been explicitly argued by Cuban.  Since the Commission's action was carried out in good faith, it cannot be said that the Court was "forced" to use its resources addressing the issues raised in this case.

conjecture and speculation.  Lacking any evidence of bias, Cuban's motion is simply an effort to impugn the Commission and is an unwarranted imposition on this Court.

Finally, Cuban's assertion that the Commission's action against him was a manifestation of an improper objective – to bring high profile insider trading cases – is legally insufficient and reflects a fundamental misunderstanding of the purpose of the Commission and, in particular, the Division of Enforcement.[3]  Far from improper, bringing enforcement actions alleging violations of the federal securities laws, including insider trading cases of whatever profile – where, as here, the Commission determines they are warranted by the facts – is the primary purpose of the Division of Enforcement.[4]

The award of attorneys' fees is an extreme and extraordinary remedy, available only when a litigant's conduct is so egregious as to defile the very temple of justice.  Cuban's allegations are woefully insufficient to meet this standard.  The Complaint in this action was substantially justified and amply supported by the evidence obtained in the Commission's investigation, and Cuban has identified no facts that would support a finding of bad faith or improper purpose, nor

---

[3]     With no regard for context, Cuban repeatedly quotes former Division of Enforcement Director Linda Thomsen's November 2008 speech at Fordham University Law School. Mem. at 1, 16.  The speech described the variety of interesting insider trading cases brought in the preceding year.  Ms. Thomsen then said that "the pursuit of high profile insider trading cases is one example of how the SEC promotes investor confidence. . . ."  Linda Chatman Thomsen, "True to Our Mission:  Why We Need the SEC," Remarks at the Ninth Annual A.A. Sommer, Jr. Corporate, Securities and Financial Law Lecture, New York, New York (Nov. 6, 2008), *available at* http://www.sec.gov/news/speech/2008/spch110608lct.htm.  Director Thomsen's statement is both unquestionably accurate and completely uncontroversial:  Promotion of investor confidence is one of the most important functions of the Commission.

[4]     Conspicuously absent from Cuban's motion is any reference to SEC v. Dorozhko, No. 07 Civ. 9606 (NRB), 2008 WL 126612 (S.D.N.Y. Jan. 8, 2008), a case that he cited repeatedly in his motion to dismiss as purported evidence of the Commission attempting "to impermissibly expand the scope" of insider trading liability.  Mot. to Dismiss Mem. at 6-7, 24.  Illustrating the fleeting nature of Cuban's claim that the Commission is attempting some "impermissible expan[sion]" of the law, after Cuban's motion to dismiss was under submission with this Court, the Second Circuit vacated the district court's denial of the Commission's motion for a preliminary injunction.  See 574 F.3d 42 (2d Cir. 2009).  The appellate court described the Commission's fraud theory as "straightforward" and noted that "we are mindful of the Supreme Court's oft-repeated instruction that Section 10(b) should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes."  Id. at 49-50 (internal quotations and citation omitted).

could he.  Cuban's motion is not only completely without merit; it is frivolous.  The motion

should be denied.

## STATEMENT OF FACTS

Cuban's argument that the Commission lacked evidence that he agreed to keep the PIPE

information confidential fails.  The Commission's allegation that he accepted a duty of

confidentiality has substantial direct and circumstantial factual support in the investigative record.

## I.    THE INSIDER TRADING CLAIM IS PROPERLY ALLEGED IN THE COMPLAINT AND SUPPORTED BY AN EXTENSIVE FACTUAL BASIS

The Commission's Complaint properly alleged each element of a misappropriation insider

trading claim under existing law:  (i) Cuban accepted a duty to keep the PIPE information

confidential, (ii) he knowingly breached that duty, and (iii) the information, on the basis of which

he sold his Mamma.com shares, was material and nonpublic.[5]  The investigative record – let

alone the record that might have been developed through discovery – strongly supports the

Complaint's allegation that Cuban accepted a duty of confidentiality as to the PIPE information.

Mamma.com's CEO testified during the Commission's investigation that Cuban agreed to keep

the PIPE information confidential, and every relevant piece of evidence in the investigative

record corroborates this testimony.  Cuban – who claimed, incredibly, that he did not recall

speaking to the Mamma.com CEO about the PIPE – offers no evidence to the contrary.  It is

---

[5]      By his motion's silence, Cuban concedes – as he must – that the Complaint adequately alleged a knowing breach, as well as the nonpublic nature and materiality of the PIPE information on the basis of which he sold his Mamma.com shares.  That his breach was knowing is demonstrated by, among other things, his acknowledgement only hours before selling that he in fact could not sell because he was "screwed" by having agreed to keep the PIPE information confidential.  Kaplan Ex. 1 at 19:17-22.  The nonpublic nature of the PIPE information is established by Mamma.com's CEO's testimony that he told Cuban the information was confidential.  Kaplan Ex. 1 at 19:7-12; Kaplan Ex. 2 at 9:10-13.  Cuban never disclosed that he was selling before the transaction was publicly announced. Kaplan Ex. 2 at 28:3-29:17.  The materiality of the PIPE information is clear from the stock price decline following the PIPE announcement (resulting in losses avoided for Cuban in excess of $750,000).  Compl. ¶ 24.  Finally, Cuban's contemporaneous statements confirm that he sold on the basis of the PIPE information.  Kaplan Ex. 3 (July 2, 2004:  "I hate when companies do PIPES-type transactions to raise money.  It's dilutive, and I hate being diluted . . . that simple."); Kaplan Ex. 4 (Aug. 11, 2004: "Mamma did a PIPE financing, which is an immediate red flag in my book, so I sold.").

outrageous that Cuban, knowing all of these facts (even citing many of them in his motion) now moves for attorneys' fees and out-of-pocket expenses on the grounds that the Commission's insider trading claim "is wholly unsupported by the facts."  Mem. at 1.

A.    **Mamma.com Extensively Discussed Inviting Cuban to Participate in the PIPE and the Need for Confidentiality**

The decision to invite Cuban to participate in the PIPE was a momentous one for Mamma.com.  From the beginning, Mamma.com's executives were aware that they would be providing Cuban with material, nonpublic information if they invited him to participate. Consequently, they understood that they needed to take precautions to ensure that Cuban would keep the information confidential until the offering was announced.

On or about June 23, 2004 (approximately five days before Mamma.com publicly announced the PIPE), Arnold Owen, a representative at Merriman, Mamma.com's investment bank for the transaction, first suggested that Mamma.com consider asking Cuban if he wanted to participate in the PIPE – an idea that, while interesting to the company, also raised concerns about how Cuban might react.  Kaplan Ex. 5.  Mamma.com's executive chairman, David Goldman, emailed the company's CEO, Guy Fauré, to pass along Merriman's idea, noting presciently that "[Cuban] is against these [financing] instruments . . . [h]e could blow up at an inconvenient time . . . [h]e would be privy to information not available to other shareholders."  Id. Goldman later said that by this he meant that the PIPE "was material information . . . .  It was restricted . . . .  It was not broadly known and had not been disclosed, and given that [Cuban] would have the advantage if he chose to use it of having material information which did not -- which our other shareholders did not have."  Kaplan Ex. 6 at 52:3-11.  The company was also concerned that Cuban might disclose the PIPE information publicly and, thereby, undermine the offering.  Id. at 50:24-51:5 ("[O]ne of the risks . . . is that . . . Mark Cuban . . . says this

company's going to go for a PIPE, I'm going to sell all my shares, and then everybody else goes on the bandwagon and the whole pricing, underpinning of the transaction falls apart.").

Given its serious concerns about Cuban's possible reaction to the PIPE, Mamma.com's board thoroughly discussed the pros and cons of asking him to participate.  Id. at 52:21-23 (CEO and executive chairman "bashed all of these things around, whether we should and we shouldn't, then got on the phone with some directors to get their opinion"); id. at 59:5-11 ("[w]e were in constant dialogue on [whether to solicit Cuban] . . . [and] there were constant discussions about whether we would or we wouldn't, we should or we shouldn't").  All along the board recognized that Cuban might sell his shares after the announcement regardless whether he was solicited for, or chose to participate in, the PIPE – either because he was averse to PIPE financings, Kaplan Ex. 5, or, if not solicited, because the company had not bothered to ask him if he wanted to participate.  Kaplan Ex. 2 at 16:14-15; Kaplan Ex. 6 at 45:12-18.  Concluding that giving Cuban, the company's largest shareholder, the opportunity to maintain his equity stake was the right thing to do, the board decided to invite him to participate.  Kaplan Ex. 2 at 16:7-15; Kaplan Ex. 6 at 36:11-24, 45:12-18.[6]

Fauré knew and was instructed that Cuban had to understand that the information was confidential before he was told about the PIPE.  Kaplan Ex. 2 at 7:25-9:5; Kaplan Ex. 6 at 60:4-

---

[6]    Despite the Mamma.com executives' statements to the contrary, Cuban continues to argue that the company conspired to restrict him by extending an invitation even though the transaction was "fully subscribed."  Mem. at 8; May 26, 2009 Argument Tr. at 37:1-10.  The repetition of this argument is shameless:  Mamma.com's executive chairman told Cuban's lawyers that he believed Cuban could have participated, that he thought the company's lawyers could have made the necessary changes to the deal documents, and that he did not think "dilution" to other investors would have prohibited Cuban's participation.  Kaplan Ex. 6 at 24:8-16; 63:10-14; 66:7-22; 67:17-22.  The executive chairman said there would have been "no purpose just to tell [Cuban] we're contemplating a PIPE without him having an option" and that that was something Mamma.com "would never have considered" and "would not do."  Id. at 39:7-17; 40:1-13.  In a contemporaneous email, Cuban himself specifically acknowledged that Mamma.com's investment banker offered to "pull me out a piece [of the PIPE] if I wanted it."  Kaplan Ex. 7.  Indeed, at the time the CEO contacted Cuban, Mamma.com had already discussed making room for an additional investor with Merriman.  Kaplan Ex. 6 at 25:3-28:15.  Cuban's suggestion that Mamma.com contacted him only to restrict him is also patently nonsensical.  If the company had only wanted to prevent Cuban from selling before the PIPE was publicly announced, it simply never would have told him about it in the first place.

61:1.  The board instructed the Mamma.com CEO to contact Cuban and ensure that Cuban understood that he would need to keep the PIPE information confidential *before* the information was conveyed.  Id.[7]  The CEO understood that he was not to tell Cuban about the PIPE unless Cuban first acknowledged that he understood that the information was to be kept confidential.  Id.

### B.    Cuban Accepted a Duty of Confidentiality

As alleged in the Complaint, Mamma.com's CEO followed the board's instruction and ensured that Cuban understood that the information had to be kept confidential before conveying it to him.  The CEO testified under oath during the investigation:

> Q:    Do you recall exactly what Mr. Cuban said in response when you told him you had confidential information to convey to him?

> A:    I don't remember exact words.  <u>But there was some type of acknowledgement.  If not, I wouldn't have proceeded.</u>  So it might have been "um-hmm", "yes", "go ahead".

> Q:    So is it fair to say[,] to summarize what you just said[,] that you would not have conveyed the PIPE information to Mr. Cuban if he had not said something, even though you don't recall what the exact words were, at the beginning of the call to indicate that he would keep the information confidential?

> A:    Right.

> Q:    So after you told Mr. Cuban you had confidential information to convey to him, [he] said something – again, not recalling the exact words that [he] used – to acknowledge that he would keep the information you were going to convey to him confidential?

> A:    Well again, I don't remember the exact words.  <u>But there was certainly an acceptance which said ["]okay, yeah; go ahead.  I understand you're going to give me confidential information.["]</u>

> . . .

---

[7]    Mamma.com's executive chairman told the CEO to "advise Mr. Cuban that we were having a PIPE, whether he wished to participate to the extent at least of maintaining his equity position.  And that because we had concerns about privileged information, he had to understand that this was privileged information."  Kaplan Ex. 6 at 60:14-19.

Q:     And you believed that he was going to keep it confidential because of something he said --

A:     -- An acknowledge[ment] that, ["yes, you have confidential information.["]

. . .

Q.     [] At the time you sent this e-mail [providing Cuban with the Merriman contact information] were you relying on the fact that Mr. Cuban had acknowledged during your call with him – and even if you don't remember the exact words – that [he] couldn't trade Mamma securities until the PIPE was publicly announced?

A.     Yes.  After -- in the same way when I called him and said I got confidential information.  I waited for an acknowledgement so I understood if I send this that they'd treat this as confidential information.

Q.     And is it fair to say conversely that if Mr. Cuban had not acknowledged in some way – even if you don't remember the exact words [he] used – that he would keep the PIPE information confidential, you would not have sent this follow up e-mail to him?

A.     Right.

. . .

Q.     At the time you sent the e-mail to Mr. Cuban [providing the Merriman sales representative's contact information in case Cuban wanted "more information" about the PIPE], did you also rely on the fact that Mr. Cuban had acknowledged when he said something along the lines of "Now I'm screwed, I can't sell" that he was restricted from trading in Mamma until the PIPE was publicly announced?

A.     Yes.  I would say that was my understanding.

Kaplan Ex. 2 at 9:18-10:14; 11:17-20; 26:12-27:1; 27:22-28:2 (emphasis added).  This testimony, together with the CEO's unrefuted testimony that Cuban at the end of the same call stated "[w]ell, now I'm screwed.  I can't sell," provides a sufficient – indeed, compelling – factual basis for the Commission's allegation that Cuban accepted a duty of confidentiality, and requires the Court to deny Cuban's motion.

Cuban's claim that this testimony was an attempt to "force feed" answers and "[c]hange [the CEO's] [p]rior [s]tatements," Mem. at 2, 13, is groundless.  Witnesses are routinely

interviewed or testify more than once in investigations and cases to provide clarification, amplification, or additional detail.  The CEO's statements about Cuban's acceptance of a duty were consistent:  While he cannot recall the specific words Cuban used in choosing to accept the confidential information, he is certain that Cuban accepted.

Cuban's attack on the questioning technique, Mem. at 14, is, at best, puzzling. Mamma.com's CEO, a sophisticated businessman, was represented by experienced counsel and testified under oath.  The CEO's testimony about Cuban's acknowledgement and acceptance of the duty of confidentiality and that he would treat the information as confidential was clear (and corroborated), even though he did not recall Cuban's exact words.  And, his credibility was subject to the investigative staff's in-person assessment.  To insist that his answers would have been "no" instead of "yes" had some of the questions been phrased differently is Cuban's wishful thinking.  Further, the form of the questions was absolutely proper, whether asked, as here, during an *investigative testimony* session in which the Federal Rules of Civil Procedure and Evidence did not apply, or if asked during a pre-complaint interview or deposition in civil litigation.[8] Cuban, unsurprisingly, does not like the CEO's testimony because it demonstrates his acceptance of a duty of confidentiality.  Nonetheless, Cuban's cherry-picking of those snippets of transcript testimony he wishes to credit provides no support for his allegations that other testimony was improperly procured.  His accusations are meritless and provide no basis for the extraordinary award of attorneys' fees.

---

[8]     Of course, a form objection as the basis for deviation from the normal American rule on attorneys' fees would be unprecedented and unwarranted.

Further, the investigative transcripts have not been proffered as admissible trial testimony.  Unlike in the investigation, the CEO's testimony at trial would be subject to cross-examination, where opposing counsel is afforded an explicit opportunity to cross examine.  Rule 613 of the Federal Rules of Evidence is specifically designed to allow for the examination of a witness about prior statements.  The trier of fact would then weigh the credibility of the witness.  The Commission firmly believes that a jury would credit the CEO's testimony.

Significantly, every other piece of relevant evidence in the investigative record confirms Cuban's acceptance of a duty and corroborates the CEO's testimony. That Cuban himself understood he had accepted the duty to treat the information confidentially and that he therefore could not trade after the public announcement is confirmed when he ended the call by saying "now I'm screwed, I can't sell."[9] As surely as a smoking gun is evidence it has been fired, Cuban's "screwed . . . can't sell" statement is sufficient evidence that he had agreed to a duty of confidentiality.[10] The discussion during the phone call *before* the confidential information was provided and Cuban's statement *after* the information was provided, *considered together*, establish that an agreement of confidentiality was reached, which agreement was sufficient to state a claim under the law existing at the time the Commission filed its Complaint. The logic is inexorable: had Cuban not understood that he had agreed to maintain confidentiality (and

---

[9]    Cuban does not – and could not – contest the Complaint's allegation concerning his "screwed . . . can't sell" statement to Fauré. Not only did Fauré credibly and unambiguously testify about the statement in his sworn Commission investigative testimony, but he repeated it multiple times in his transcribed interview with Cuban's counsel, although such references are omitted from Cuban's submission to the Court.

[10]    This Court's holding in its opinion granting Cuban's motion to dismiss that Cuban's "screwed . . . can't sell" statement "cannot reasonably be understood as an agreement not to sell based on the information" is not to the contrary. See SEC v. Cuban, No. 03:08-CV-2050-D (SAF), --- F. Supp. 2d ---, 2009 WL 2096166, at *10 (N.D. Tex. July 17, 2009). Cuban's statement at the end of the call is, at the very least, evidence confirming that he had in fact agreed at the beginning of the call to keep the information confidential.

In addition, we respectfully submit that Cuban's "screwed . . . can't sell" statement also itself constituted an explicit acceptance of a duty of confidentiality – or, at the very least, is evidence that Cuban understood, agreed, and confirmed by the end of the call that he had an obligation to refrain from trading. Having expressed that understanding to Mamma.com, knowing that the company would rely on his statement that he could not sell, Cuban then obtained additional confidential information from Merriman on the basis of which he also traded.

Both the case law and the Commission's Regulation FD (Fair Disclosure) adopting release make clear that there is no requirement that an agreement to keep material, nonpublic information confidential *precede* the conveyance of the information. In United States v. Chestman, 947 F.2d 551 (2d Cir. 1991) (en banc), cert. denied, 503 U.S. 1004 (1992), a wife told her husband about a pending tender offer for her family's company but — unlike here — neither sought nor received her husband's agreement to keep the information confidential. See id. at 555-56, 571. The Second Circuit held that the wife's "don't tell" warning to her husband after she had already conveyed the information to him was insufficient unless he explicitly accepted the duty. Id. at 571. The court did not hold that the husband had to accept the duty before his wife conveyed the information. That there is no temporal requirement to the acceptance of the duty is confirmed by the Commission's final release for Regulation FD (Fair Disclosure), adopted as part of the same final rule as Rule 10b5-2. See Adopting Release, Selective Disclosure and Insider Trading, Exchange Act Release No. 34-43154, 65 Fed. Reg. 51716 n.28 (Aug. 15, 2000) ("[I]t will not be necessary for the issuer to obtain a confidentiality agreement before making the disclosure. An agreement obtained after the disclosure is made, but before the recipient of the information discloses or trades on the basis of it, will be sufficient.").

therefore refrain from trading), he would have told the CEO he was selling his stock right away. He would have no reason to believe he was restricted. Tellingly, Cuban said just the opposite. Cuban's own statement therefore confirms that he knew that he had undertaken a duty to not trade on the basis of the PIPE information.

Further, it can be reasonably inferred (respectfully, an inference to which the plaintiff was entitled under existing law) that by the "screwed . . . can't sell" statement Cuban accepted and acknowledged that he had a duty of confidentiality, including a prohibition on trading until the offering was publicly announced. It can further be inferred that Cuban knew that the company would understand and rely on the statement as such an agreement and acknowledgement of same. Chestman made clear that a duty is established by "evidence of an explicit acceptance . . . of a duty of confidentiality." 947 F.2d at 571. Cuban's statement ("Well, now, I'm screwed. I can't sell.") was an explicit acceptance by him that he had a duty of confidentiality and could not sell until after the PIPE was announced. Though a begrudging acceptance, it was an explicit acceptance nevertheless.[11] As a result of, and in reasonable reliance on, Cuban's statements, the company was induced to convey even more detailed nonpublic confidential information to Cuban through the placement agent. Indeed, Cuban admitted in his investigative testimony that the information that he received from the placement agent included that the offering was at a discount to the market price and that it included other incentives for investors. Kaplan Ex. 8 at 36:5-23; 40:10-17. Immediately after hanging up the telephone, Cuban called his broker and told him to sell his entire 600,000 share position in Mamma.com. Id. at 45:16-18.

Cuban himself contemporaneously confirmed that he had accepted a duty not to sell prior to the public announcement. At 7:42 a.m. the morning after he dumped his shares, Cuban,

---

[11]     Cuban certainly cannot testify that he made the "screwed . . . can't sell" statement based on a misunderstanding of the law. He already claimed under oath that he did not recall the telephone conversation. Kaplan Ex. 8 at 47:14-24; 60:1-11.

obviously concerned about his insider trading exposure, emailed his broker seeking cover.
Kaplan Ex. 7.  Cuban admitted that he had spoken to Fauré about the PIPE (though he
subsequently claimed to not recall speaking to him), admitted he had sold before the public
announcement, and attempted to concoct an excuse for having done so.  Id.  In his email sent
shortly after he dumped his shares, Cuban wrote that he "guess[ed]" the PIPE was public, even
though just hours earlier he had accepted a duty to maintain the confidentiality of the information.
Id.  Cuban's email confirms his scienter in breaching his promise not to sell until the PIPE was
announced.

Two contemporaneous emails sent by Mamma.com's executive chairman to other board
members further corroborate Fauré's testimony.[12]  In the first, sent several hours after Fauré
spoke to Cuban, the executive chairman wrote that Cuban had told Fauré that "he would sell his
shares (recognizing that he was not able to do anything until we announce the equity) . . . ."
Kaplan Ex. 9.  In the second, sent the next morning, he wrote that "we did speak to Mark Cuban
(Guy [Fauré] and, subsequently, our investment banker) to find out if he had any interest in
participating to the extent of maintaining his interest.  His answers were: he would not invest, he
does not want the company to make acquisitions, he will sell his shares which he can not do until
after we announce."  Kaplan Ex. 10.  In each email, consistent with Fauré's testimony, Kaplan
Ex. 1 at 19:13-19; Kaplan Ex. 2 at 9:18-10:14; 11:17-20; 26:12-27:1; 27:22-28:2, the executive

---

[12]     It is unclear why Cuban believes that the lack of mention of a confidentiality agreement in certain
contemporaneous documents means that one did not exist.  Mem. at 9-10.  All of the witnesses understood that the
transaction was confidential.  In this context, it is unsurprising that the evidence of a confidentiality agreement
consists primarily of Fauré's testimony.  See SEC v. Lyon, 605 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (denying cross
motions for summary judgment and holding, in denying defendants' motion, that "view[ing] the same body of
evidence in the light most favorable to the SEC . . . a reasonable juror could easily conclude that . . . defendants
manifestly accepted a duty of confidentiality either orally or in writing or through their course of conduct").
        Cuban inexplicably devotes an entire page of his motion to asserting that the Merriman banker on the
transaction did not enter into a confidentiality agreement with Cuban.  Mem. at 10-11.  Cuban's emphasis of this fact
is as puzzling as it is irrelevant.  The Complaint alleges Cuban was bound by a confidentiality agreement after his
conversation with Fauré.  Compl. ¶ 14.  He was still bound by that agreement when he spoke to Owen several hours
later (after Fauré provided Cuban with Owen's contact information).  It was unnecessary for Owen to obtain a second
agreement.

chairman writes that Cuban recognized that he "was not able [to sell]" and "can not sell" until after the announcement, thus corroborating that he had agreed not to sell.  Importantly, Cuban did not say he "would not" sell, i.e., voluntarily refrain from trading, but that he "could not" sell, confirming that he had agreed to keep the information confidential.[13]

### C.    Cuban Claims that He Has No Recollection of Speaking to the CEO

Cuban did not deny accepting a duty of confidentiality as to the PIPE information in his investigative testimony.  Instead, he claimed he did not recall speaking to Fauré about the PIPE at all.  Kaplan Ex. 8 at 47:14-24; 60:1-11.  Cuban's testimony on this point was not credible.  Cuban called Fauré four minutes after receiving an email from Fauré in which Fauré asked Cuban to call him "ASAP."  Kaplan Ex. 11.  Cuban and Fauré had a substantive eight minute and thirty-five second conversation in which Cuban became very upset and "flew off the handle."  Kaplan Ex. 1 at 18:22-19:3; Kaplan Ex. 9.  Several hours later, Fauré sent Cuban an email encouraging him to call Owen at Merriman if he wanted more information.  Kaplan Ex. 12.  Cuban spoke to Owen to obtain additional details.  Kaplan Ex. 8 at 36:5-23; 40:10-17.  Finally, Cuban sent his broker an email at 7:42 a.m. the morning after he sold his shares in which he told the broker that he had spoken to Fauré.  Kaplan Ex. 7.  Given the length and subject matter of Cuban's conversation with Fauré, his subsequent denial of any recollection of the conversation was not credible to the investigating staff,[14] and would not be credible to a jury.  Cuban's lack of recollection supports a negative inference against him and demonstrates his lack of credibility.

---

[13]    Goldman's emails, while not themselves definitive evidence of Cuban's agreement, see Cuban, 2009 WL 2096166, at *10, corroborate Fauré's testimony and, in conjunction with the other evidence, create a reasonable inference and allow a jury to infer that Cuban accepted a duty of confidentiality.

[14]    It is particularly telling that in testimony Cuban remembered his single conversation with Owen, but claimed that he did not even remember speaking to Fauré, his established primary contact at Mamma.com with whom he had exchanged emails and had phone conversations over the preceding three months.

### D.     The Facts Alleged Are Legally Sufficient to Prove an Agreement to Undertake a Duty of Confidentiality

For the duty of confidentiality to attach – as it did here – an investor must have the opportunity either (i) to accept a duty of confidentiality and its attendant restrictions (i.e., on use and disclosure) in order to have access to the information, or (ii) to refuse to accept the duty and the information, thereby avoiding any restrictions.  In other words, the duty cannot be "imposed unilaterally by entrusting a person with confidential information," Chestman, 947 F.2d at 567 (citation omitted), and it certainly was not so imposed in this case.  The two cases Cuban cites yet again, Walton v. Morgan Stanley & Co., 623 F.2d 796, 799 (2d Cir. 1980) and SEC v. Mayhew, 916 F. Supp. 123, 130 (D. Conn. 1995), see Mem. at 21; Mot. to Dismiss Mem. at 18 n.12, along with his new cite to Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc., 333 F.2d 672, 674 (5th Cir. 1964), stand simply for this black letter proposition.  None of these cases alleged an acceptance of the requisite duty.  Cases about the unilateral imposition of a duty are simply inapposite in this case containing an explicit acceptance of the duty of confidentiality.[15]

Moreover, the Commission plainly had a factual basis for the allegation that the CEO conditioned his offer of the PIPE information on Cuban's acceptance of a duty to maintain the information in confidence.  Among other facts, the CEO testified under oath that he prefaced his conversation with Cuban by telling him that he had confidential information to convey and that, in response, Cuban accepted the duty of confidentiality.[16]  Kaplan Ex. 1 at 19:7-12; Kaplan Ex. 2

---

[15]     Cuban cites the same cases to support his assertion that Fauré's understanding of Cuban's response is irrelevant.  Mem. at 21.  Fauré's understanding of Cuban's response is obviously relevant.  This is not a "unilateral imposition" case.  Therefore, Walton and Mayhew, Cuban's purported support for the "irrelevance" of Fauré's state of mind, do not apply.

[16]     In an attempt to avoid Fauré's uncontroverted and contemporaneously corroborated testimony, Cuban claims that the testimony shows that he at most "merely acknowledged that the information he was about to receive was confidential." Mem. at 15.  This is at war both with common sense and the record described above.  No

at 9:18-10:14; 11:17-20; 26:12-27:1; 27:22-28:2.  Cuban had the opportunity either (i) to take the information with the attendant confidentiality restrictions on which CEO conditioned the offer, or (ii) to reject the confidentiality condition, forgo the information, and hang up.  Cuban chose to take the information subject to the confidentiality condition, and, as he himself understood and accepted, was thereby duty-bound to refrain from trading until the public announcement.

It is irrelevant that Fauré does not remember the exact words Cuban used to accept the duty.  To reach an enforceable agreement, it is not necessary for the information recipient to say "I agree" or any other specific magic words.  See, e.g., Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) (when offeree has opportunity to accept or reject offer, form of acceptance is immaterial; agreement created regardless of whether offeree said "I agree"); see also Southwest Airlines Co. v. BoardFirst, L.L.C., No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (Boyle, J.) ("The law is not concerned with the particular manner in which an offeree makes his assent known to the offeror provided that it is effectively communicated." (citing Hollywood Fantasy Corp. v. Gabor, 151 F.3d 203, 210 (5th Cir. 1998)).[17]

Because the investigative evidence meets the legal standard for demonstrating an acceptance creating an agreement, the existence of an agreement is a question for the trier of fact.  Here, the Complaint alleges a confidentiality agreement, and the investigative record contains extensive evidence of acceptance of the offer creating the agreement for evaluation by the trier of fact.  See Gabor, 151 F.3d at 210 (record supports conclusion that offer was accepted where

---

reasonable juror would conclude that Cuban – a sophisticated businessman – was meaninglessly parroting Fauré's words back to him.  Cuban, in acknowledging the confidentiality of the information he was about to receive, did not simply acknowledge that the information was confidential – he accepted a duty.  It is unreasonable to suggest that these sophisticated parties did not understand the import of an offer of confidential information by a CEO and the acceptance of that information, subject to the confidentiality restriction, by the company's largest shareholder.

[17]    Cuban's contention that a declarative statement cannot elicit an agreement, Mem. at 20, is ludicrous.  Fauré informed Cuban that he had confidential information.  Kaplan Ex. 1 at 19:7-12; Kaplan Ex. 2 at 9:10-13.  According to the CEO's testimony concerning Cuban's response:  "I don't remember the exact words.  But there was certainly an acceptance which said ["]okay, yeah; go ahead.  I understand you're going to give me confidential information.["]  Kaplan Ex. 2 at 10:11-14 (emphasis added).

offeror told offeree that one of her counter-demands was "no problem" and there was no evidence that it rejected any counter-demand). The allegation of an agreement and the evidence supporting it present exactly the kind of question of fact appropriate for resolution at trial. There is no support for Cuban's reckless accusation that the Complaint lacked a factual basis; his meritless contention cannot support an award of attorneys' fees.

## II.    CUBAN'S ALLEGATIONS OF INVESTIGATIVE MISCONDUCT ARE BASELESS

Cuban fails in his effort to prove that the case against him was a result of bias. As an initial matter, the purported misconduct does not absolve him of the alleged insider trading.[18] More fundamentally, however, his allegations are nothing more than groundless innuendo and speculation. The motion fails to provide any factual support for Cuban's allegations of misconduct by the staff conducting the investigation.

### A.    The Unauthorized Email Communications Sent by Jeffrey Norris Were Unrelated to the Investigation and Litigation

The email communications by former Commission trial attorney Jeffrey Norris to Cuban, which were an unprofessional and inappropriate use of Commission email, were his own personal statements and views and were not authorized or endorsed by the Commission. Norris, located in the Commission's Fort Worth Regional Office at the time, did not participate in the Commission's investigation and had no role in the review, recommendation, or litigation of this case. Norris had no supervisory role or relationship with anyone working on the investigation. The investigation was conducted entirely by Commission staff in Washington, D.C. The Norris/Cuban email exchanges (Tab 8 to Cuban's Memorandum) were not a factor in, and had no

---

[18]    See, e.g., SEC v. Keating, No. CV 91-6785 (SVW), 1992 WL 207918, at *4 (C.D. Cal. July 23, 1992) ("The scope and conduct of the SEC's prefiling investigation bears absolutely no relevance to [defendant]'s culpability, which will be decided upon a presentation of the evidence").

effect on, the initiation or continuation of the investigation or the staff's recommendation that the Commission file insider trading charges against Cuban.  Kaplan Decl. ¶ 3.[19]

The chronology of the investigation demonstrates that Norris's emails could not possibly have motivated the investigation.  Staff in the Washington, D.C. office had interviewed Cuban concerning his trading in Mamma.com in December 2006 – three months before the events that apparently triggered the Norris emails.  Indeed, on March 12, 2007, as a result of his unwillingness to appear voluntarily for testimony, the Washington, D.C. staff conducting the investigation served Cuban with a subpoena relating to his trading in Mamma.com.  Although the procedure has subsequently been changed, at that time, Commission staff could only issue subpoenas after being authorized by the Commission following a presentation of facts to the Commission sufficient to support issuance of a formal order.  By March 12, 2007, the Washington, D.C. staff had determined that a subpoena was necessary, had sought and received formal order authority from the Commission to issue the subpoena, and had prepared and sent the subpoena.  Kaplan Decl. ¶ 4.

The investigation had therefore reached an advanced stage before the events that precipitated the Norris emails.  The emails' content establishes that they resulted from Norris's knowledge that Cuban might finance a movie titled "Loose Change."  Norris, who was (and remained) completely uninvolved in the investigation into Cuban's trading, first wrote to Cuban on March 28, 2007, more than three months after Washington, D.C. staff had first interviewed

---

[19]     Cuban points to the promptness of the Commission's assurance to his counsel that Norris was not involved in the investigation as evidence of misconduct.  Mem. at 12.  Shortly after Cuban provided the investigative staff with copies of the Norris emails, a senior enforcement official with supervisory responsibility for the investigation wrote a letter to Cuban's counsel stating that Norris had not played, and would not play, a role in the investigation.  Kaplan Ex. 13.  The official knew that the Cuban investigation was being conducted by Washington, D.C. enforcement staff, knew who was working on the investigation, and knew that Norris did not work on any aspect of the investigation.  It is not surprising that the official quickly, conclusively, and accurately informed Cuban's counsel that Norris was completely uninvolved in the investigation.  No further "investigation" concerning the lack of involvement by Norris in the investigation was necessary.  Cuban's reliance on a prompt and accurate response as evidence of a nefarious plot against him is spurious and illustrates the frivolity of his motion.

Cuban about his trading and more than two weeks after that same staff had subpoenaed Cuban's testimony.  It is impossible to conclude that the advanced investigation by Washington, D.C. staff was the result of animus against Cuban by a Commission employee in Fort Worth completely uninvolved in the investigation based on subsequent news that Cuban might sponsor a movie.

Where, as here, there is no evidence to the contrary, the Commission is entitled to a presumption of regularity with respect to its decision whether to initiate an enforcement action.  See, e.g., SEC v. Buntrock, No. 02 C 2180, 2002 WL 31681476, at *4 (N.D. Ill. Nov. 26, 2002) ("[I]n the absence of clear evidence to the contrary, it must be assumed that the Commission adhered to its own rules and exercised its discretion as Congress intended") (citation omitted); see also United States Postal Service v. Gregory, 534 U.S. 1, 10 (2001) ("we note that a presumption of regularity attaches to the actions of Government agencies") (citation omitted).  Cuban has offered no evidence (nor could he) suggesting that the emails between Norris and Cuban inappropriately influenced the Commission to initiate this action.[20]  Absent such evidence, the Commission's decision to initiate this action is entitled to the presumption and Cuban's allegations about Norris provide no support for his motion.

Cuban's opportunistic trumpeting of the inappropriate Norris emails is evidence that *his* motion is brought in bad faith.  He knows and has long known that Norris had no involvement in this investigation and exercised no inappropriate influence on the Commission in bringing this

---

[20]     Cuban's reference to former Commission Chairman Christopher Cox's receipt of one email exchange between Norris and Cuban illustrates the absolute dearth of evidence to support Cuban's claims of bias.  Though he was merely the recipient of an uninvited email exchange between Norris and Cuban, Chairman Cox, to avoid any potential appearance issues, recused himself from the Commission's vote on whether to authorize an enforcement action against Cuban.  Kaplan Decl. ¶ 7.

action.  Any "public embarrassment" or other perceived harm from the public dissemination of the Norris emails is the result of Cuban's deliberate choice to make them public.[21]

The Commission did its job in this case—it followed the facts and concluded there was a case that should be brought under existing law, notwithstanding the inappropriate but unrelated conduct by a single individual not involved in the investigation.[22]

### B.    Cuban's Arguments about the Wells Process are Meritless

One of the primary bases for Cuban's assertion that the Commission brought this action in bad faith is that he never received "assurances" that his untimely second Wells submission was considered by the Commission.  Mem. at 13, 19.  Cuban was not entitled to any "assurances" concerning his belated Wells submission; nonetheless, Cuban's untimely Wells submission and all of the interview transcripts that Cuban submitted therewith, along with his first Wells submission, were provided to the Commission for its consideration when deliberating the recommended enforcement action.  Kaplan Decl. ¶ 5.  Cuban's claim, Mem. at 19, that the staff "improperly attempted (and may have succeeded) in preventing the Commission from reviewing Mr. Cuban's new Wells Submission" is utterly specious.[23]

---

[21]    It has been reported that Cuban's brother posted the Norris/Cuban emails on the internet.  See "Cuban's Brother Comments on SEC e-mails," Dallas Bus. J., Nov. 21, 2008, *available at* http://dallas.bizjournals.com/dallas/stories/2008/11/17/daily64.html.

[22]    Cuban asserts that the Commission "apparently took no steps to discipline" Norris for his emails to Cuban. Mem. at 6.  Personnel matters concerning any Commission employee or former employee, including Norris, are protected by the Privacy Act of 1974, 5 U.S.C. § 552a(b).  Comment by the Commission on Cuban's conjecture concerning discipline against Norris thus is inappropriate.  However, any personnel or disciplinary matter concerning Norris or the emails is irrelevant to Cuban's motion since Norris did not participate in the Commission's investigation, and had no role in the review, recommendation, supervision, or litigation of the case.

[23]    Cuban himself apparently thinks so little of this argument that he declined to attach to his moving papers the untimely second Wells, the content of which he incorrectly alleges the Commission was deprived.

That Cuban faults the use of the Wells process after the Commission gave him not one, but two opportunities to avail himself of that process is galling.[24]  Cuban had no right to make a Wells submission at all; it is an informal process extended by the Commission in its discretion to provide a potential defendant with the opportunity to persuade the Commission that an enforcement action should not be brought.[25]  See Procedure Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations, Exchange Act Release No. 34-9796 (Sept. 27, 1972) at 1 (The Commission "has concluded that it would not be in the public interest to adopt formal rules" related to the Wells process).  The Wells process confers no rights at all:  no right to make any submission (though Cuban was permitted to make two), no right to notice of a possible proceeding, and certainly no right to "assurances" that an untimely submission will be considered.  The Commission declined to adopt formal requirements to avoid the "inappropriate[] inject[ion]" of irrelevant issues like those raised in Cuban's motion such as "whether or not the defendant or respondent had been afforded an opportunity to be heard prior to the institution of proceedings against him and the nature and extent of such opportunity."  Id.  Cuban's counsel's pique at not receiving an "assurance" concerning an untimely Wells

---

[24]     Indeed, in addition to his written submissions, Cuban's counsel was afforded yet another avenue to present legal and factual arguments to the staff during an in-person meeting on July 19, 2007 in Washington, D.C.  On August 8, 2007, new counsel for Cuban contacted the Commission, and on August 9, 2007 requested permission to make an additional Wells submission, which the Commission staff and Cuban's counsel agreed would be due by September 7, 2007.  Cuban's counsel failed to meet the September 7, 2007 deadline for a second Wells submission.  Cuban's counsel ultimately made an untimely second Wells submission on September 21, 2007.  Kaplan Decl. ¶ 5.

[25]     Cuban argues that he was somehow treated unfairly because, by his assessment, the staff was too early in providing him with the opportunity to make a submission to set forth any reasons that a case should not be brought against him – baldly suggesting that this was a "tactical device" to enable the staff "to preview substantial problems with the case."  Mem. at 7.  The topsy-turvy nature of Cuban's argument – that the staff was biased because he was *prematurely* given *too much* of an opportunity to demonstrate that a case should not be brought, when the very purpose of the discretionary process is to provide an entirely optional opportunity to demonstrate that an enforcement action should not be brought – illustrates the baseless nature of his motion.  It would be improper for a Court to make an extraordinary award of attorneys' fees based on a party's unhappiness with an agency's internal investigative process prior to filing a complaint based on then existing law.

submission, to which Cuban was never entitled in the first place, is absolutely no basis for an award of attorneys' fees by this Court.[26]

Cuban's argument that the staff's investigation was not "substantially complete" when he received a Wells notice on May 23, 2007 in violation of Commission policy found in the current Enforcement Manual ("Manual") is disingenuous. The Manual was not published until October 2008, more than a year after Cuban received his Wells notice, and the Manual "is intended to provide guidance only to the staff of the Division. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." Enforcement Manual, Section 1.1, *available at* http://www.sec.gov/divisions/enforce/enforcementmanual.pdf.[27] Further, there was compelling evidence of Cuban's violation of existing law when the Wells notice was provided. Among other things, there was direct and circumstantial evidence that Cuban received material, nonpublic confidential information in advance of a public announcement, had specifically acknowledged that he could not trade on the basis of the information received, traded anyway, and thereby avoided substantial losses. Hence, there was more than sufficient reason to provide Cuban with the opportunity to demonstrate, if he so elected, that a case should not be brought.[28]

---

[26]     Cuban's counsel has elsewhere recognized that the Wells process is an informal opportunity for potential defendants made available at the Commission's discretion and that it confers no rights on a Wells notice recipient. See, e.g., Mark I. Steinberg & Ralph C. Ferrara, 25 Securities Practice: Federal & State Enforcement § 3:56 (2001 & 2009 Supp.) ("The Wells Submission practice *does not confer any rights* upon the subjects of Commission investigations, nor guarantee their right to make a submission, nor does it create a formal pre-proceeding notification procedure.") (emphasis added).

[27]     The Court should summarily reject Cuban's fatuous argument that his own self-serving assessment of who the "key personnel," Mem. at 7, were who should have been interviewed prior to a Wells notice being issued should dictate whether the staff met an administrative standard that was not even in effect at the time of the investigation.

[28]     Despite Cuban's protests, additional investigation after receipt of a Wells submission is both common and appropriate. In many cases, the Wells submission itself will trigger the need for additional investigation. See, e.g., Arthur F. Mathews, "Defending SEC and DOJ FCPA Investigations and Conducting Related Corporate Internal Investigations: The Triton Energy/Indonesia SEC Consent Decree Settlements," 18 Nw. J. Int'l L. & Bus. 303, 413-14 (1998) (a "Wells Submission may cause the Staff to conduct further investigation or additional research").

C.    **Closing of the Unrelated Mamma.com Investigation Had No Influence on the Investigation into Cuban's Illegal Trading**

Cuban repeatedly attempts to tie an unrelated investigation involving Mamma.com opened years earlier to a second, subsequent investigation into his trading in Mamma.com that formed the factual basis for the Complaint. Mem. at 3, 13. There were two temporally and substantively distinct investigations involving Mamma.com. Kaplan Decl. ¶ 6. The earlier investigation, assigned internal reference number HO-09900, was conducted by one team of investigators. A second, subsequent investigation – into Cuban's trading in Mamma.com – assigned reference number HO-10576, was conducted by a different team of investigators and supervisors. Id. Cuban's repeated attempts to conflate the two investigations are meritless.

Cuban's speculation – there is no factual support – that the closing of the earlier Mamma.com investigation was part of a quid pro quo exchanged by the Commission for perjured testimony from Mamma.com executives in the subsequent investigation, Mem. at 13, deserves special condemnation. Cuban's allegation is irresponsible. While it should go without saying, let it be said plainly – Cuban's speculation is baseless and meritless. The earlier Mamma.com investigation, HO-09900, was not closed because of the investigation into Cuban's trading, HO-10576, and the closing of the earlier Mamma.com investigation was not directly or indirectly an exchange or inducement for testimony concerning Cuban's trading while in possession of material, nonpublic information. Kaplan Decl. ¶ 6. There was no quid pro quo by the Commission for allegedly perjured or any other testimony from Mamma.com executives concerning Cuban. Id.

D.    **The Investigation by the Commission Inspector General, Initiated at Cuban's Request, Provides No Support for His Motion**

Indicative of the groundless nature of his motion, Cuban includes a section in his brief concerning the initiation of an internal investigation by the Commission's Office of Inspector

21

General, Mem. at 16-17, even though the existence of an internal investigation provides no support for and has no bearing on his motion. With the exception of the inappropriate email exchanges between Norris and Cuban, the investigation was apparently initiated when Cuban's lawyer in this case submitted a complaint, presumably containing the same unfounded allegations that underlie this motion. Mem. at 16; see also David Scheer, "Mark Cuban Complaints on SEC Suit Said to Spur Review," Bloomberg.com, June 2, 2009, *available at* http://www.bloomberg .com/apps/news?pid=newsarchive&sid=aOHjwX9c8euM ("Stephen Best, an attorney for Cuban at Dewey & LeBoeuf LLP in Washington, confirmed that he submitted a complaint on Cuban's behalf in January"). The initiation of an internal investigation in response to a complaint from adversarial counsel does not suggest improper conduct, especially when the complaint was part of an aggressive defense strategy. The attempted bootstrapping of baseless accusations upon baseless accusations further illustrates the reckless and incendiary intent of Cuban's motion. It provides no support for the extraordinary remedy of an award of attorneys' fees and should not be countenanced by this Court.

## ARGUMENT

In a case not cited by Cuban, this Court recently recognized that the standard for federal courts to sanction truly egregious behavior through an award attorneys' fees is extremely high:

> Federal courts also have a limited, inherent power to impose sanctions against a vexatious litigant. The Supreme Court has held that "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." The imposition of sanctions using the court's inherent power should be reserved for situation in which the court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled."

Merkel v. United States, Civil Action No. 3:06-CV-1891-D, 2009 WL 2002902, at *4 (N.D. Tex. July 9, 2009) (citations omitted). The awarding of attorneys' fees under 28 U.S.C. § 2412(b) requires that improper conduct exceed the same extremely high standard. See Perales v. Casillas,

950 F.2d 1066, 1071 (5th Cir. 1992) ("Section 2412(b) . . . permits a fee award only when the

losing party acted "in *bad faith*, vexatiously, wantonly, or for oppressive reasons") (emphasis in

original; citations and quotations omitted).  A prevailing party's "bald assertions to the contrary"

notwithstanding, sanctions are unwarranted where "[t]here is no indication that [a losing party]

has acted oppressively, wantonly, or in bad faith" and "[i]f anything, the [losing party has]

presented questions of law and fact that reasonably required resolution by the court or by a jury."

Merkel, 2009 WL 2002902, at *4.

The SEC does not dispute that the Court has both the inherent authority and authority

under 28 U.S.C. § 2412(b) to impose sanctions, but it emphatically rejects any insinuation that

this litigation was brought or conducted with anything other than utmost good faith and respect

for the adjudicative process.  Cuban's motion offers no facts that approach – let alone surmount –

the "extremely high" bar necessary for the court to award him attorneys' fees.[29]  As demonstrated

throughout, whether Cuban agreed to maintain material, nonpublic information in confidence is a

genuine disputed issue of fact, and each of Cuban's allegations of investigatory bias or improper

purpose are entirely without factual merit.  Therefore, it is impossible to make the requisite

specific finding of bad faith.

The cases cited by Cuban helpfully demonstrate his failure to identify facts that support

the imposition sanctions.  Cuban exaggerates the holdings and ignores the facts of Ryan v.

Hatfield, 578 F.2d 275 (10th Cir. 1978) and Nemeroff v. Abelson, 704 F.2d 652 (2d Cir. 1983).

Mem. at 18.  Ryan was an action alleging that the defendant's slander caused the plaintiff to be

fired.  578 F.2d at 276-77.  However, in testimony in a prior adjudication, the plaintiff did not

---

[29]    In a footnote, Cuban cites three cases under the Equal Access to Justice Act of 1948, 28 U.S.C. § 2412 ("EAJA") and one case under the Federal Rules of Civil Procedure where defendants successfully recovered attorneys' fees from the Commission.  Mem. at 21 n.11.  None of the EAJA actions awarded fees based on a finding of bad faith.

mention defendant as having had a role in his firing and testified that he brought the action against defendant in order to obtain his testimony for use in a different action against other corporate officials.  See id. at 277.  Nemeroff was a putative class action against members of the financial press and several investors that alleged that the investor defendants took short positions based on their knowledge of forthcoming columns by the financial press defendants.  704 F.2d at 654.  During discovery, plaintiff learned that the two bases for his complaint had no factual support.  See id. at 656-57 (report plaintiff anticipated to show a correlation between columns and trading released during discovery showing no correlation; testimony demonstrates no support for rumors that columns were leaked).  In addition, there was evidence suggesting that the case was brought at the urging, and possibly with the financial support, of a non-party who was annoyed with the financial press defendants.  See id. at 659.  The court, "emphasiz[ing] the limited nature of its holding" concluded that sanctions were warranted by the "particular circumstances of this record."  Id. at 660.

Neither Ryan nor Nemeroff offer any support for the imposition of sanctions here.  Unlike in those cases, the investigative record here demonstrates the existence of a genuine factual dispute.  Similarly, the record strongly suggested that Ryan and Nemeroff were brought or continued for improper purposes, while Cuban has cited no facts supporting a conclusion that this action was initiated or continued for anything other than the Commission's valid purpose of enforcing the federal securities laws.

Cuban's citation to Tedeschi v. Smith Barney, Harris Upham & Co., Inc., 579 F. Supp. 657 (S.D.N.Y. 1984) ("Tedeschi II") is equally unavailing.  In Tedeschi v. Smith Barney, Harris Upham & Co., Inc., 548 F. Supp. 1172 (S.D.N.Y. 1982) ("Tedeschi I"), the court considered and rejected a number of the claims that formed the basis for sanctions in Tedeschi II.  The claims in the complaint were unambiguously unsupported by the facts when the complaint was filed.  For

24

example, one of the plaintiff's claims alleged that opposing counsel intended to deceive an adjudicative panel by falsely telling the panel that a third-party complaint had been asserted against the plaintiff.  548 F. Supp. at 1175-76.  At the time the complaint was filed, plaintiff was aware of the third-party complaint and plaintiff's counsel had acknowledged that he had received a copy of it.  Id. at 1176.  Sanctions are appropriate for such egregious misconduct, but they are clearly inappropriate here.  As demonstrated above, the Commission filed the Complaint with a good faith legal basis and each element of the Complaint was supported by substantial evidence.  Further, as also demonstrated above, Cuban's claim of improper motivation in bringing this case is unambiguously meritless.

## CONCLUSION

For the above stated reasons, the Court should deny Cuban's Motion for Attorneys' Fees and Expenses.

Dated: September 30, 2009                              Respectfully submitted,


*s/ Kevin P. O'Rourke*

Toby M. Galloway                                   Kevin P. O'Rourke (D.C. Bar No. 254920)
Texas Bar No. 00790733                             Julie M. Riewe (D.C. Bar No. 472470)
Securities and Exchange Commission                 Adam S. Aderton (D.C. Bar No. 496247)
Burnett Plaza, Suite 1900                          Securities and Exchange Commission
801 Cherry Street, Unit 18                         100 F Street, N.E.
Fort Worth, TX  76102                              Washington, D.C.  20549
(817) 978-6447                                     (202) 551-4442 (O'Rourke)
(817) 978-2700 (fax)                               (202) 772-9246 (fax) (O'Rourke)
                                                   orourkek@sec.gov

                                                   *Attorneys for Plaintiff*
                                                   *Securities and Exchange Commission*

### CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2009, I electronically filed the foregoing document with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send notification of such filing to all CM/ECF participants and counsel of record.

*s/ Kevin P. O'Rourke*
Kevin P. O'Rourke