## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )    Civil Action No. 3:08-cv-02050 (SAF)<br>) |
| **MARK CUBAN,** | )<br>) |
| Defendant. | )<br>) |

# REPLY BRIEF OF MARK CUBAN
# IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND EXPENSES

**ORAL ARGUMENT REQUESTED**

Table of Contents

Page

Table of Contents ..................................................................................................................... i

Table of Authorities ................................................................................................................. ii

INTRODUCTION .....................................................................................................................1

ARGUMENT .............................................................................................................................2

      I.      Mr. Cuban's Alleged Acknowledgement That The Information Was
            Confidential Did Not Create A Confidentiality Agreement ....................................2

      II.     The SEC Knew At The Time That It Filed Its Complaint That It Could Not
            Establish Any Of The Elements Of A Contractual Duty ..........................................4

      III.    The SEC Fails To Rebut The Clear Indicia Of Investigative Misconduct ..............8

CONCLUSION ........................................................................................................................10

Table of Authorities

Page(s)

**Cases**

*AMX Corp. v. Pilote Films*, No. 3:04-CV-2035-D, 2007 WL 1695120
 (N.D. Tex. June 5, 2007) ................................................................................. 5-6

*Franks v. Brookshire Bros., Inc.*, 986 S.W.2d 375 (Tex. App. 1999) ............................. 8

*Light v. Centel Cellular Co.*, 883 S.W.2d 642 (Tex. 1994) ............................................. 3

*Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559 (Tex. App. 2008) ........... 5

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ....................................... 6

*Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121 (Tex. App. 2005, pet. denied) .......... 6

*Southwest Airlines Co. v. BroadFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761
 (N.D. Tex. Sept. 12, 2007) .................................................................................. 6

*TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29 (Tex. App. 2005) ................................. 7

*Transperfect Translations Int'l, Inc. v. Merrill Corp.*, 159 Fed. Appx. 313 (2d Cir. 2005) ............ 3

*United States v. Cassese*, 273 F. Supp. 2d 481 (S.D.N.Y. 2003) .................................... 4

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) .............................................. 4

**Rules & Regulations**

SEC Rule 10b5-2 ................................................................................................................ 7

**Other**

Richard A. Lord, Williston on Contracts (4th ed. 2009) .............................................. 6, 8

## INTRODUCTION

When the SEC filed its Complaint alleging that Mark Cuban engaged in insider trading, this Court was entitled to assume the SEC had some factual support for its central allegation that Mr. Cuban entered into and then breached a confidentiality agreement. In fact, as the SEC knew from early on in its investigation and through the filing of the Complaint, the supposed confidentiality agreement never existed and its case was meritless.

Guy Fauré unequivocally testified that in their crucial June 28, 2004 telephone conversation, Mr. Cuban at most "*acknowledge[d]*" that the information Mr. Fauré intended to provide him was confidential. The SEC therefore indisputably knew Mr. Cuban had *not* "agreed" to keep the information confidential. Moreover, the SEC has consistently argued that a contractual duty to keep information confidential is necessary to create insider trading liability in this case. A mere acknowledgment that information is confidential, however, cannot form this contractual duty. The Court therefore need look no further than Mr. Fauré's testimony, upon which the SEC admits it relied, to conclude that the SEC acted in bad faith when it brought its action against Mr. Cuban.

The SEC's Opposition also provides nothing to dispel the strong inference that the agency engaged in repeated misconduct in its investigation of Mr. Cuban. The SEC's failure to offer this Court any affirmative rationale for, among other things, its misuse of the Wells process and its decision to drop the Mamma.com investigation right before seeking new testimony from company witnesses, further indicates that the SEC's case lacked merit all along, and it is no surprise that the Complaint the SEC eventually filed is unfounded.

The purpose of this motion is to vindicate the principle that the SEC – like any other government agency – cannot escape unscathed when it abuses the judicial process. Through its investigation and the filing of the Complaint, the SEC manufactured a case the SEC knew was not supported by the evidence, and as an appropriate sanction, the SEC should be ordered to pay Mr. Cuban's attorneys' fees and out-of-pocket litigation expenses.

# ARGUMENT

The SEC's Opposition utterly fails to refute Mr. Cuban's showing that the agency should never have filed this insider trading action. The SEC should be sanctioned.[1]

## I. Mr. Cuban's Alleged Acknowledgement That The Information Was Confidential Did Not Create A Confidentiality Agreement.

The SEC's entire case is built around the testimony of Guy Fauré, Mamma.com's CEO, concerning a single, eight-minute phone conversation on June 28, 2004 between Mr. Fauré and Mr. Cuban. The SEC readily concedes, as it must, that Mr. Fauré did *not* testify that Mr. Cuban "agreed" to keep any information he received about Mamma.com's upcoming PIPE offering confidential. In the testimony that the SEC reproduces in its Opposition and relies on exclusively (Opp. at 6-7), Mr. Fauré admits he does not remember what Mr. Cuban said, but then claims that Mr. Cuban must have *acknowledged* the information he was about to receive was confidential. The key testimony, as stated by the SEC, is: "Q: Do you recall exactly what Mr. Cuban said in response when you told him you had confidential information to convey to him? A: I don't remember exact words. <u>But there was some type of acknowledgement. If not, I wouldn't have proceeded.</u> So it might have been 'um-hmmm', 'yes', 'go ahead'." Opp. at 6 (emphasis in Opposition).[2]

Based on this testimony, the SEC spins an outlandish argument about how Mr. Cuban's mere acknowledgement was really an "enforceable agreement." Opp. at 13-15. As the SEC puts

---

[1] The SEC's Opposition contains a wealth of extraneous material, including arguments concerning various elements of the SEC's insider trading claim against Mr. Cuban. *See* SEC's Memorandum of Law in Opposition to Motion for Attorneys' Fees and Expenses ("Opp.") at 3 n.5 (non-public nature and materiality of PIPE information), 11 (scienter), 12 (Mr. Cuban's credibility as witness). Mr. Cuban does not concede that the SEC can establish *any* of the other elements of its case and the SEC's arguments are full of factual inaccuracies and unsupported assumptions. In this Reply, however, Mr. Cuban will focus on the issue of the confidentiality agreement, which (along with the SEC's investigative misconduct) is the basis for Mr. Cuban's sanctions request.

[2] The SEC's assertions that Mr. Cuban wishes some of Mr. Fauré's answers had been different and that Mr. Cuban has "cherry-pick[ed] . . . snippets of transcript testimony he wishes to credit" are absurd. Opp. at 8. To be clear, it is Mr. Cuban's position that even if all of the witness testimony obtained by the SEC were truthful and accurate, there is no factual basis for the SEC's allegation that Mr. Cuban entered into a confidentiality agreement.

2

it – in the form of a complete non sequitur – "Cuban, in acknowledging the confidentiality of the information he was about to receive, did not simply acknowledge that the information was confidential – he accepted a duty." Opp. at 14 n.16. The SEC cites no support for this bald assertion because none exists.

To the contrary, case law and common sense dictate that a person's acknowledgement or express recognition that he or she will be receiving confidential information from another person does *not* constitute an agreement to keep the information confidential. In *Light v. Centel Cellular Co.*, the Texas Supreme Court addressed this exact question. 883 S.W.2d 642 (Tex. 1994).[3] The plaintiff and the defendant there had entered into a written employment contract. The contract contained a prefatory clause stating the defendant would "acquire confidential customer-related information. . . ." *Id.* at 646 n.8. After quoting this language and other provisions of the contract, the court went on to rule that the defendant had *not* thereby made a "promise . . . to not disclose any of the confidential . . . information given to her," and the parties (therefore) had *not* formed a confidentiality "agreement." *Id.* at 647-648 & n.15.

Similarly, the U.S. Court of Appeals for the Second Circuit (applying Texas law) recently considered a non-compete agreement that contained, in a section entitled "Employee Acknowledges," a clause stating that the defendant would be receiving confidential information from the plaintiff. *Transperfect Translations Int'l, Inc. v. Merrill Corp.*, 159 Fed. Appx. 313 (2d Cir. 2005). The court found that this clause did *not* constitute "a promise within the meaning of Texas law sufficient to make the agreement enforceable." *Id.* at 314. Unsurprisingly, the court noted that a "promise is a quite different thing from an acknowledgment." *Id.*

Finally, the SEC's notion that Mr. Cuban's mere acknowledgement somehow created an enforceable agreement cannot even be reconciled with the SEC's own arguments in its opposition to Mr. Cuban's motion to dismiss. In its opposition, the SEC relied heavily on case

---

[3] In its Opposition, the SEC does not dispute that Texas contract law controls whether there was any type of agreement between Mr. Fauré and Mr. Cuban sufficient to create a duty. *See* Mr. Cuban's Memorandum of Law in Support of Motion for Attorneys' Fees and Expenses ("Open. Mem.") at 20. Nor is there any reason to believe that Texas law on this issue is different from that of other jurisdictions.

3

law that the SEC characterized as holding that insider trading liability can be predicated on the existence of an *express confidentiality agreement*. SEC's Memorandum of Law in Opposition to Motion to Dismiss at 14-20; *see, e.g., id.* at 14 (quoting – and even underlining for emphasis – a reference in *United States v. Chestman*, 947 F.2d 551, 571 (2d Cir. 1991) (en banc) to an "express agreement of confidentiality"). Tellingly, but not surprisingly, in none of cases cited by the SEC was an express confidentiality agreement inferred from a mere acknowledgment of the receipt of confidential information. *Compare*, *e.g.*, *United States v. Cassese*, 273 F. Supp. 2d 481, 483, 487 (S.D.N.Y. 2003) (although defendant was presented with confidentiality agreement and thereafter readily accepted confidential information, court held defendant had not accepted duty of confidentiality because he did not actually sign agreement).

Simply put, the SEC's attempted justification for its allegation that Mr. Cuban "agreed" to keep the information provided to him by Mr. Fauré confidential is bereft of any factual or legal support, as the SEC must have known all along.

## II. The SEC Knew At The Time That It Filed Its Complaint That It Could Not Establish Any Of The Elements Of A Contractual Duty.

Throughout this case, the SEC has repeatedly argued that (i) insider trading under a misappropriation theory can be established by the assumption of a *contractual* duty to keep information confidential and (ii) Mr. Cuban assumed such a duty by entering into an enforceable oral contract with Mr. Fauré to maintain the confidentiality of the PIPE offering information.[4] *See, e.g.*, SEC's Memorandum of Law in Opposition to Motion to Dismiss at 15 ("a contractual – not fiduciary – duty, like the contractual duty alleged in the instant case, could create insider trading liability under the misappropriation theory"). The SEC reiterates its "contractual duty" theory in its Opposition, asserting that an "enforceable agreement" was formed through Mr. Fauré's "offer" of confidential information and Mr. Cuban's "acceptance" of this offer. Opp. at

---

[4] The SEC apparently has no basis to plead any other theory of liability, as no other theory is asserted in its Complaint, and the SEC did not avail itself of its opportunity to amend the Complaint.

4

14. It is hornbook law, however, that no contract was ever formed between Mr. Fauré and Mr. Cuban.

To begin with, Mr. Fauré never made an "offer" to Mr. Cuban. As Mr. Fauré himself has stated: "I mentioned to [Mr. Cuban] that I had confidential information to convey to him. I told him that we were finalizing a private placement, and asked him if he was interested in participating in the private placement." Open. Mem., Exhibit ("Ex.") D (Fauré Deposition Transcript Excerpts), SEC-MC0002890 at 19:8-12. Nowhere in that recitation of the June 28, 2004 conversation is there evidence that Mr. Fauré asked Mr. Cuban to keep the information confidential as a condition of receiving it. *See AMX Corp. v. Pilote Films*, No. 3:04-CV-2035-D, 2007 WL 1695120, at *15 (N.D. Tex. June 5, 2007) (Fitzwater, J.) ("If an agreement is so indefinite that a court cannot determine the legal obligations and liabilities of the parties, it is not an enforceable agreement.").

The SEC attempts to fill that gap by insisting that Mamma.com and Mr. Fauré *meant* to enter into an enforceable agreement with Mr. Cuban on the issue of confidentiality. Opp. at 5-6. Putting aside the irrelevance of Mamma.com's or Mr. Fauré's unspoken intentions or beliefs (as opposed to what actually happened on the relevant phone call),[5] the SEC's assertion also happens to be a brazen misstatement and further evidence of the SEC's lack of good faith.

According to the SEC's Opposition: "The board instructed the Mamma.com CEO to contact Cuban and ensure that Cuban understood that he would need to keep the PIPE information confidential *before* the information was conveyed." Opp. at 6 (emphasis in Opposition). In support of this key assertion, however, the SEC offers only the following statement from David Goldman, Mamma.com's Chairman: "Mamma.com's executive chairman told the CEO to 'advise Mr. Cuban that we were having a PIPE . . . And that because we had

---

[5] The SEC's reliance on Mr. Fauré's understanding of what happened on the June 28, 2004 call (*see* Opp. at 13 n.15), is misplaced. As a matter of contract law, "[s]ubjective intent is irrelevant to the issue of whether the parties agreed . . . A determination of whether a meeting of the minds has occurred is based on an objective standard; thus, evidence of [one party's] subjective belief about what the contract says . . . is not relevant to whether there was a meeting of the minds. . . ." *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 568 (Tex. App. 2008) (citations omitted).

5

concerns about privileged information, he had to understand that this was privileged information.'" Opp. at 6 n.7. There is nothing in Mr. Goldman's statement about *ensuring* that Mr. Cuban would *keep* the information confidential. Mr. Goldman just confirms that Mr. Fauré was instructed to do exactly what Mr. Fauré now claims he did – tell Mr. Cuban that the information was confidential. Moreover, Mr. Goldman's statement is entirely consistent with all of the other available evidence.[6]

Not only does the SEC deliberately distort Mr. Goldman's statement, but it then relies on this distortion to assert that Mr. Fauré "offered" the PIPE information with "attendant confidentiality restrictions." Opp. at 14. There is simply "no there there": the actual evidence conclusively establishes that Mr. Fauré was not instructed to obtain a confidentiality agreement, did not seek to obtain a confidentiality agreement, and, as a result, never made an offer to Mr. Cuban to enter into a confidentiality agreement.

Inasmuch as Mr. Fauré never made an offer to Mr. Cuban, there was nothing for Mr. Cuban to accept. Indeed, the lack of a specific offer renders the SEC's reliance on cases discussing "acceptance by conduct" moot.[7] Even assuming, *arguendo*, that Mr. Fauré's announcement that he had confidential information could be construed as an express "offer" of the PIPE information in exchange for a promise on Mr. Cuban's part to keep the information

---

[6] *See, e.g.,* Open. Mem., Ex. H (Fauré Transcript Excerpts), SEC-MC0000472-474 at 68:11-70:1 (none of Mamma.com's Board members suggested, much less directed, that Mr. Cuban be asked to sign a confidentiality agreement or non-disclosure agreement, and none of the Board members asked or told Mr. Fauré to make sure Mr. Cuban agreed to keep information regarding the PIPE transaction confidential).

[7] To reach an enforceable agreement, the SEC states it is not necessary to use any "magic words." Opp. at 14. Although technically correct, this ignores the more relevant overall question: was there a reasonably certain offer and unambiguous acceptance, whatever the words used or conduct exhibited. *See, e.g.*, *AMX Corp.*, 2007 WL 1695120, at *15 ("a party cannot accept an offer to form a contract unless the terms of that contract are reasonably certain") (quoting *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 133 (Tex. App. 2005, pet. denied)); 2 Richard A. Lord, Williston on Contracts § 6:10 (4th ed. 2009) ("As a general principle, at common law an acceptance, in order to be effective, must be positive and unambiguous."). Notably, in both cases upon which the SEC relies (Opp. at 14), the offer was unambiguous and in writing, the defendant admitted it "knew perfectly well what terms [plaintiff] demanded," and the defendant proceeded to accept the contract through the conduct of using the plaintiff's website repeatedly on a daily basis, with each use a separate contract. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401-403 (2d Cir. 2004); *see also Southwest Airlines Co. v. BroadFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *4, *7 (N.D. Tex. Sept. 12, 2007) (Boyle, J.).

confidential, Mr. Fauré's own testimony establishes that Mr. Cuban did not accept any such offer. As discussed above, an "acknowledgement" does not constitute a promise to perform under an agreement.

Likewise without merit is the SEC's argument that Mr. Cuban's alleged statement "now I am screwed, I cannot sell," which was made at the end of the call, acted as an acceptance. The Wells Submission made by Mr. Cuban in September 2007 presented the SEC with clear legal arguments refuting that this statement could constitute an acceptance of any offer.[8] The SEC went ahead and filed its case anyway, arguing, *inter alia*, that this statement was sufficient. Unsurprisingly, this Court then held that the statement cannot be "reasonably understood" to constitute an agreement not to sell. The SEC now comes back for yet a third bite of the same apple and asserts in its Opposition that the Court's decision should be disregarded because, while the statement may not have been an acceptance of a duty not to sell, it was nevertheless an "acceptance of a duty of confidentiality." Opp. at 9-10. The SEC's sophistry knows no bounds. If saying "I cannot sell" does not constitute an agreement to refrain from selling, it obviously does not constitute an agreement to refrain from doing something *other than* selling (*i.e.*, disclosing confidential information).

Moreover, even if Mr. Cuban's alleged "I cannot sell" statement could be understood as some kind of acceptance, it was not a valid acceptance of Mr. Fauré's supposed offer. The statement came *after* Mr. Fauré provided the PIPE information to Mr. Cuban. The law is clear that a contract cannot be formed by a gratuitous promise made after the consideration has been provided.[9] *See, e.g., TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 37-38 (Tex. App. 2005) ("If

---

[8] The SEC's apparent reaction to these clear arguments, as discussed at length in Mr. Cuban's opening brief, was to close the investigation into Mamma.com and retake Mr. Fauré's testimony in a vain effort to create evidence of an agreement. Open. Mem. at 13-15.

[9] The SEC's "fix" for this insurmountable problem is buried in a footnote and involves (i) a tortured reading of the *Chestman* decision to find that although the court did not expressly address if the acceptance of a duty had to take place prior to the information being conveyed, it also did not say that a pre-acceptance was required, and (ii) a citation to the regulatory history (not even the rule itself) of the SEC's own Rule 10b5-2. Opp. at 9 n.10. The SEC has no license to rewrite contract law to expand the

7

anything in the classical law of contracts is clear, it is that past [or future] consideration is not good consideration. Any exchange has to be contemporaneous by definition, because the promise and the consideration for that promise must serve as reciprocal conventional inducements." (citations omitted; bracketed text in original)).[10]

The SEC's attempted justification for its assertion that Mr. Cuban had a contractual duty to keep the PIPE information confidential fails at every level. There was no offer, no acceptance, and, as a result, no enforceable agreement. The SEC's assertion to the contrary in its Complaint and subsequent pleadings was, and continues to be, false.[11]

### III. The SEC Fails To Rebut The Clear Indicia Of Investigative Misconduct.

Rather than provide this Court with affirmative responses to the many instances of investigative misconduct discussed in Mr. Cuban's opening brief, the SEC has chosen to rely on avoidance, deflection, and conclusory denials by a single declarant. A few key examples illustrate the problem.

First, far from establishing that the Jeffrey Norris e-mails are irrelevant to the Cuban matter, the SEC confirms that because of the e-mails Chairman Cox recused himself from the Commission's vote on whether to authorize an enforcement action against Cuban. Opp. at 17

---

scope of fraud liability under Section 10(b) and this is yet another example of the agency's overreaching in this case.

[10] *See also Franks v. Brookshire Bros., Inc.*, 986 S.W.2d 375, 378 (Tex. App. 1999) ("past consideration will not support a subsequent promise"); 4 Richard A. Lord, Williston on Contracts § 8:11 (4th ed. 2009) ("something that has been given before the promise was made and, therefore, was neither induced by the promise nor paid in exchange for it, cannot, properly speaking, be sufficient, valid, legal consideration").

[11] Incredibly, the SEC also asserts that Mamma.com and Mr. Cuban both "contemporaneously confirmed" the existence of a confidentiality agreement in e-mail correspondence. Opp. at 10-12. As shown above, there was no confidentiality agreement to confirm. So it is not surprising that none of the e-mails in question actually state that Mr. Cuban entered into a confidentiality agreement and, in the absence of such statements, the SEC's position amounts to nothing more than wishful thinking. *See, e.g.,* Open. Mem., Ex. E, SEC-MC-E0000287-290, 473 (four separate e-mails sent by David Goldman, the Chairman of Mamma.com's Board, to the company's Board members on June 28, 2004 and June 29, 2004, discussed the conversations between Mr. Fauré, Arnold Owen, and Mr. Cuban, but made no mention of Mr. Cuban entering into a confidentiality agreement).

8

n.20.  What the SEC fails to address is the possible effect, if any, of Chairman Cox's recusal on the actual vote.[12]

Second, the SEC insists that the Wells process "confers no rights at all" and that it had no obligation to provide the Commission with Mr. Cuban's submissions.  Opp. at 19.  As shown in Mr. Cuban's opening brief, however, the applicable federal regulation states that "*any submissions* by interested persons *will be* forwarded to the Commission in conjunction with the staff memorandum."  Open. Mem. at 12.  The SEC's Opposition just ignores this inconvenient regulation.

Third, the SEC says that when it issued its Wells notice to Mr. Cuban, it had engaged in an investigation sufficient to uncover "compelling evidence of Cuban's violation of existing law."  Opp. at 20.  The SEC's assertion is belied by the SEC's decision – *following the Wells process* – to retake Mr. Fauré's testimony, as well as its heavy reliance on that second testimony in its pleadings and Opposition.  Indeed, it is now clear that when the Wells notice was issued (a) the SEC's investigation was not "substantially complete," an internal standard that the SEC nowhere disputes was in effect as of 2007, and (b) the SEC did not have sufficient evidence to bring an action against Mr. Cuban, despite telling Mr. Cuban that it did.  Open. Mem. at 6-7.

Fourth, the SEC's decision to close its three-year-old investigation into Mamma.com just days before retaking Mr. Fauré's testimony is inherently suspicious.  Open. Mem. at 13.  The SEC asserts that the investigation was not closed at the direction of anyone assigned to the Cuban matter or in exchange for perjured testimony.  Opp. at 21.  Even if this were true, it hardly ends the inquiry, since it is not necessary for the SEC to have engaged in illegal conduct for this Court to find an absence of good faith.  The SEC's Opposition is notably silent as to whether there were communications between the Cuban investigative team and the Mamma.com investigative team about closing the Mamma.com investigation and, if so, what those

---

[12] Moreover, the SEC's denial that Mr. Norris had anything to do with the Cuban investigation seems at best premature, since, as the SEC concedes, its own Office of Inspector General – without the prompting of Mr. Cuban – is independently investigating Mr. Norris' actions.  Open. Mem. at 12 n.6; Opp. at 22.

9

communications were. Even more importantly, the SEC conspicuously fails to explain exactly why the Mamma.com investigation was closed at that particular time.

Finally, as to the SEC's retaking of Mr. Fauré's testimony even though he had already given two statements on the exact same subject matter, the SEC blithely notes that it is not unprecedented for the SEC to engage in additional investigation after the Wells process and that Mr. Fauré was represented by experienced counsel during the Commission's leading questions. Opp. at 8, 20 n.28. Neither response, of course, addresses the concerns raised by Mr. Cuban about the SEC's apparent abuse of the Wells process in connection with the decision to retake Mr. Fauré's testimony and its (ultimately unsuccessful) attempt to force feed Mr. Fauré the "right" answers concerning the existence of a confidentiality agreement. Open. Mem. at 13-15. The Court is entitled to conclude that the SEC's non-responsiveness is further evidence of a lack of good faith.

The SEC's Opposition raises more questions than it answers about the investigation of Mr. Cuban. In Mr. Cuban's view, the SEC's decision to allege in its Complaint – in complete disregard of the known facts – that Mr. Cuban entered into a confidentiality agreement is sufficient to justify the imposition of sanctions. If, however, the Court believes that it also needs to consider the SEC's investigative misconduct before rendering a decision, Mr. Cuban respectfully submits that it should order discovery to address the numerous unresolved factual issues discussed above.

## CONCLUSION

The SEC's Opposition, for all of its sound and fury, ultimately confirms what must have been obvious to the SEC all along: Mr. Cuban did not enter into a confidentiality agreement. Accordingly, it is appropriate for this Court to sanction the SEC for its decision to prosecute this meritless case. For all of the reasons stated above and in his opening brief, Mr. Cuban respectfully requests that he be awarded his reasonable attorneys' fees and out-of-pocket litigation expenses in an amount to be determined by the Court after further evidentiary submissions on that issue. Mr. Cuban requests oral argument on this motion.

Respectfully submitted,

**DEWEY & LEBOEUF LLP**

By: /s/ Lyle Roberts
_____
Lyle Roberts (*pro hac vice*)
D.C. Bar No. 464789
Ralph C. Ferrara (*pro hac vice*)
D.C. Bar No. 156380
Stephen A. Best
D.C. Bar No. 428447
Henry W. Asbill
D.C. Bar No. 938811
DEWEY & LEBOEUF LLP
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 346-8000
Facsimile: (202) 346-8102
rferrara@dl.com
sbest@dl.com
hasbill@dl.com
lroberts@dl.com

Christopher J. Clark (*pro hac vice*)
N.Y. Bar No. 2854222
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333
cjclark@dl.com

*Attorneys for Mark Cuban*

OF COUNSEL:

Stephen M. Ryan
Texas Bar No. 24002881
DEWEY & LEBOEUF LLP
1000 Main Street, Suite 2550
Houston, Texas 77002
Telephone 713-287-2025
Facsimile: 713-445-2125
sryan@dl.com

Paul Coggins
Texas Bar No. 04504700
Kip Mendrygal
Texas Bar No. 24041472
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: 214-747-5070
Facsimile: 214-747-2091
coggins@fr.com
mendrygal@fr.com

# CERTIFICATE OF SERVICE

On October 28, 2009, I electronically submitted the Reply Brief of Mark Cuban in Support of Motion for Attorneys' Fees and Expenses with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Lyle Roberts

Lyle Roberts