IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE          §
COMMISSION,                      §
                                 §
                    Plaintiff,   §
                                 §  Civil Action No. 3:08-CV-2050-D
VS.                              §
                                 §
MARK CUBAN,                      §
                                 §
                   Defendant.    §

MEMORANDUM OPINION
AND ORDER

In this civil enforcement action brought by plaintiff Securities and Exchange
Commission ("SEC") against defendant Mark Cuban ("Cuban") under the misappropriation
theory of insider trading, Cuban moves for summary judgment. Although the question
whether Cuban is entitled to summary judgment is in some respects a close one, the court
concludes that the SEC is entitled to present its case to a jury. The court therefore denies
Cuban's motion.

I

The background facts and procedural history of this case are set out in the court's
prior decision addressing Cuban's motion to dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b),
*see SEC v. Cuban*, 634 F.Supp.2d 713, 717-19 (N.D. Tex. 2009) (Fitzwater, C.J.) ("*Cuban
I*"), *vacated*, 620 F.3d 551 (5th Cir. 2010) ("*Cuban II*"), and the Fifth Circuit's opinion on

appeal, *Cuban II*, 620 F.3d at 552-53.[1]  The court will therefore summarize the background facts and procedural history here, and it will discuss the evidence in greater detail when addressing below the grounds of Cuban's summary judgment motion.

This is a civil enforcement action brought by the SEC against Cuban under the misappropriation theory of insider trading.  The SEC alleges that Cuban violated § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder[2] by selling shares of stock in Mamma.com Inc. ("Mamma.com")[3] after learning material, nonpublic information concerning a planned private investment in public equity ("PIPE") offering by the company.  According to the SEC, Cuban deceived Mamma.com by agreeing to maintain the confidentiality of the material, nonpublic information concerning the PIPE, agreeing not to trade on the information, but then selling all of his stock in the company without first disclosing to Mamma.com that he intended to trade on the information, thereby avoiding substantial losses when the stock price declined after the PIPE was publicly announced.

In *Cuban I* the court dismissed the SEC's complaint under Rule 12(b)(6).  It

---

[1]There is one other published opinion in this case.  In *SEC v. Cuban*, 798 F.Supp.2d 783 (N.D. Tex. 2011 ) (Fitzwater, C.J.), the court granted the SEC's motion to strike Cuban's affirmative defense of unclean hands, holding that Cuban had not adequately pleaded the prejudice prong of the defense.  *Id.* at 796-97.

[2]The court will focus its discussion and analysis on § 10(b) and Rule 10b–5 because the parties agree that § 17(a) is examined under the same standards.  *Cuban I*, 634 F.Supp.2d at 717 n.2.

[3]In June 2007 Mamma.com changed its name to Copernic Inc.  As in prior opinions, the court will refer to the company as Mamma.com.

concluded, in pertinent part, that to establish liability under the misappropriation theory of insider trading in the absence of another legal duty to refrain from trading on or otherwise using material, nonpublic information for personal benefit (such as a duty arising from a fiduciary relationship), the SEC could rely on an express or implied agreement. *Cuban I*, 634 F.Supp.2d at 725 ("The court therefore concludes that a duty sufficient to support liability under the misappropriation theory can arise by agreement absent a preexisting fiduciary or fiduciary-like relationship."). The court also held that the agreement "must consist of more than an express or implied promise merely to keep information confidential." *Id.* The recipient of the information "must agree to maintain the confidentiality of the information *and* not to trade on or otherwise use it." *Id.* The court assessed whether the SEC had adequately pleaded that "Cuban entered into an express or implied agreement with Mamma.com not to disclose material, nonpublic information about the PIPE offering *and* not to trade on or otherwise use the information." *Id.* at 727. The court concluded that, "while the SEC adequately plead[ed] that Cuban entered into a confidentiality agreement, it [did] not allege that he agreed, expressly or implicitly, to refrain from trading on or otherwise using for his own benefit the information the CEO [of Mamma.com] was about to share." *Id.* at 728; *see also id.* ("[T]he complaint asserts no facts that reasonably suggest that the CEO intended to obtain from Cuban an agreement to refrain from trading on the information as opposed to an agreement merely to keep it confidential."). The court dismissed the SEC's action with leave to replead, *id.* at 731, although the SEC opted to appeal rather than amend, *id.* at 732.

- 3 -

On appeal, the Fifth Circuit vacated and remanded.  *Cuban II*, 620 F.3d at 558.  The panel declined to address the analysis and legal conclusions in *Cuban I*, including this court's determination that liability under the misappropriation theory of insider trading could arise where there was an express or implied agreement to maintain the confidentiality of material, nonpublic information and not to trade on or otherwise use the information.  *See id.* ("Given the paucity of jurisprudence on the question of what constitutes a relationship of 'trust and confidence' and the inherently fact-bound nature of determining whether such a duty exists, we decline to first determine or place our thumb on the scale in the district court's determination of its presence or to now draw the contours of any liability that it might bring, including the force of Rule 10b5–2(b)(1).").  Instead, the panel reached a different conclusion regarding the adequacy of the SEC's complaint, *id.* at 556-57, holding that this court had erred in deeming the complaint inadequate.  The panel held that "[t]he allegations, taken in their entirety, provide more than a plausible basis to find that the understanding between the CEO [of Mamma.com] and Cuban was that he was not to trade, that it was more than a simple confidentiality agreement."  *Id.* at 557.[4]

Following the remand of the case and additional discovery, Cuban now moves for summary judgment, relying on grounds that relate directly to the court's analysis in *Cuban*

---

[4]Because the Fifth Circuit did not disturb this court's analysis of the law of the misappropriation theory of insider trading, and it vacated and remanded based on the court's erroneous evaluation of the sufficiency of the SEC's complaint under the law as the court had adopted it, the court adheres to *Cuban I* as the law of the case, except for the conclusion that the complaint was insufficient to state a claim on which relief could be granted.

- 4 -

*I* and others that do not.  He contends that the SEC has failed to show that he agreed to keep the PIPE transaction information confidential; that he agreed not to trade on the information; that he did not disclose his intention to sell his Mamma.com stock; and that the PIPE information was material and nonpublic.  The SEC opposes the motion.[5]

## II

When a party moves for summary judgment on a claim for which the opposing party will bear the burden of proof at trial, the party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the party does so, the opposing party must go beyond its pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citing *Edgar v. Gen. Elec. Co.*, 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.)).  Summary judgment is mandatory if the opposing party fails to meet this burden.  *Little*, 37 F.3d at

---

[5]Cuban has moved for leave to file an evidence appendix in support of his reply brief. The court grants the motion, although it notes that the evidence in the reply appendix does not affect the court's decision on his summary judgment motion.

1076.

## III

Cuban contends that no reasonable jury could find that he agreed to keep information about the Mamma.com PIPE confidential[6] or that he agreed not to trade on this information.

## A

As a threshold issue, the court considers Cuban's contention that the SEC cannot meet its burden of proving that Mamma.com and Cuban entered into an agreement without establishing a "valid offer and acceptance plus a meeting of the minds supported by consideration." D. Br. 23 ("It is black-letter contract law that there can be no agreement between two parties in the absence of valid offer and acceptance plus a meeting of the minds supported by consideration. These elements have not been, and cannot be, satisfied by the record in this case." (citation omitted)).

In *Cuban I* the court explained that,

> in concluding . . . that an agreement with the proper components can establish the duty necessary to support liability under the misappropriation theory, the court is not creating federal general common law. Because all states recognize and enforce duties created by agreement, the court is essentially relying on the state law of contracts to supply the requisite duty.

*Cuban I*, 634 F.Supp.2d at 722. The court neither adopted the contract law of any particular state nor suggested that the requirement of an agreement could only be satisfied by an

---

[6]Cuban also advances a separate but related argument that he could not have agreed to keep the PIPE information confidential because the information was not in fact confidential. The court addresses this contention *infra* at § V.

express contract.  The court referred several times to the sufficiency of an implied agreement to maintain the confidentiality of material, nonpublic information and not to trade on or otherwise use it.  *See id.* at 725 ("Where misappropriation theory liability is predicated on an agreement, however, a person must undertake, either expressly or implicitly, both obligations.  He must agree to maintain the confidentiality of the information *and* not to trade on or otherwise use it."); *id.* at 728 ("Thus while the SEC adequately pleads that Cuban entered into a confidentiality agreement, it does not allege that he agreed, expressly or implicitly, to refrain from trading on or otherwise using for his own benefit the information the CEO was about to share."); *id.* at 731 ("The court will allow the SEC . . . to file an amended complaint, if the SEC can allege that Cuban undertook a duty, expressly or implicitly, not to trade on or otherwise use material, nonpublic information about the PIPE offering.").  These references to an implied agreement were intentional because, under general contract principles, an agreement can be manifested implicitly.  *See, e.g.,* Restatement (Second) of Contracts § 19 (1981); 1 Richard A. Lord, *Williston on Contracts* § 1.3 (4th ed. 2010) (explaining that agreement "may be implied from the parties' conduct and the surrounding circumstances").

     The court therefore rejects Cuban's contention that the SEC must prove a "valid offer and acceptance plus a meeting of the minds supported by consideration."  D. Br. 23.  What the SEC must establish at trial is that Cuban agreed, at least implicitly, to maintain the confidentiality of Mamma.com's material, nonpublic information and not to trade on or otherwise use it.  And the existence of such an agreement can be implied from the parties'

- 7 -

conduct and the surrounding circumstances.

B

The court now considers whether a reasonable jury could find that Cuban agreed to keep the PIPE information confidential.

"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)). Here and throughout this memorandum opinion and order the court will summarize or provide examples of evidence that presents genuine and material fact issues that require a trial.

There is evidence in the summary judgment record that, on June 28, 2004, on the eve of the PIPE offering, Mamma.com's CEO, Guy Fauré ("Fauré"), emailed Cuban asking to speak with him as soon as possible. Cuban telephoned within five minutes. When Fauré answered the call, he told Cuban, "I've got confidential information." P. App. 308. Cuban responded, "Um hum, go ahead," or "Okay, uh huh, go ahead," or something to that effect. P. App. 308-09. Fauré then informed Cuban of the planned PIPE offering. Cuban reacted angrily to this news, and near the end of the conversation said something like, "Now I'm screwed. I can't sell." P. App. 310.

Cuban's "I can't sell" statement, made in the context of a telephone call in which Mamma.com's CEO led off by telling Cuban that he was disclosing confidential information,

- 8 -

would enable a reasonable jury to find that Cuban at least implicitly agreed to keep the information confidential.  This is because the jury could at least reasonably infer that Cuban would not have considered himself foreclosed from trading unless he believed he had agreed to treat the information as confidential.

Cuban is therefore not entitled to summary judgment on this basis.

## C

Cuban maintains that no reasonable jury could find that he agreed not to trade on the PIPE information.

In *Cuban II* the Fifth Circuit laid out a scenario under which the SEC's complaint had

> provide[d] more than a plausible basis to find that the understanding between the [Mamma.com] CEO and Cuban was that he was not to trade, that it was more than a simple confidentiality agreement.   By contacting the sales representative to obtain the pricing information, Cuban was able to evaluate his potential losses or gains from his decision to either participate or refrain from participating in the PIPE offering.   It is at least plausible that each of the parties understood, if only implicitly, that Mamma.com would only provide the terms and conditions of the offering to Cuban for the purpose of evaluating whether he would participate in the offering, and that Cuban could not use the information for his own personal benefit.  It would require additional facts that have not been put before us for us to conclude that the parties could not plausibly have reached this shared understanding . . . .  That both Cuban and the CEO expressed the belief that Cuban could not trade appears to reinforce the plausibility of this reading.

*Cuban II*, 620 F.3d at 557-58 (footnotes omitted).  Although summary judgment is governed by a higher standard than the one that applies when determining the plausibility of a claim

at the Rule 12(b)(6) stage,[7] the SEC has adduced sufficient summary judgment evidence to enable a reasonable jury to find in its favor under the scenario set forth in *Cuban II*.[8]

After Cuban and Fauré spoke, Cuban contacted Arnold Owen ("Owen"), head of the private placement group at Merriman Curhan Ford & Co. ("Merriman"), the investment bankers who were handling the planned PIPE.  Cuban had already acknowledged to Fauré that, having received the information about the PIPE, he could not sell his shares in the company.  According to an email that Mamma.com's Chairman of the Board, David

---

[7]"[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)[.]"  *Celotex Corp.*, 477 U.S. at 323 (alterations in original) (citing *Anderson*, 477 U.S. at 250).

[8]This scenario is not simply one developed by the Fifth Circuit in *Cuban II*.  The SEC relies on it now to prove Cuban's liability for insider trading:

> A reasonable factfinder could also conclude that Cuban deceived Mamma.  Cuban's actions constitute out-and-out deception.  Under the cloak of his agreements of confidentiality and not to trade, Cuban used the access provided by the company to obtain additional material, nonpublic information about the PIPE from the placement agent.  Cuban feigned loyalty to Mamma to obtain the confidential details of the PIPE, and then secretly converted the confidential information for his personal benefit.  Having obtained significant additional confidential information provided in reliance upon his agreement, Cuban deceived the company by selling his shares one minute later.  In doing so, Cuban misappropriated for himself an exclusive license to trade on the material nonpublic information about the PIPE.  Cuban's conduct defrauded Mamma of the confidential information it provided him in reliance on his agreement to maintain that information in confidence and not to trade.

P. Br. 30 (citations and internal quotation marks omitted).

Goldman ("Goldman"), sent to the Board of Directors summarizing what Fauré related to him about the Cuban conversation,

> [t]oday, after much discussion, [Fauré] spoke to Mark Cuban about this equity raise and whether or not he would be interested in participating.  As anticipated he initially "flew off the handle" and said he would sell his shares (*recognizing that he was not able to do anything until we announce the equity*) *but then asked to see the terms and conditions* which we have arranged for him to receive from one of the participating investor groups with which he has dealt in the past.

P. App. 759 (emphasis added).  If Cuban told Fauré, "I can't sell," if he recognized that he was not able to do anything until Mamma.com announced the PIPE, and he requested more information from Mamma.com about the PIPE, the jury could reasonably infer that he and Mamma.com implicitly agreed that Mamma.com would only provide him information about the terms and conditions of the PIPE "for the purpose of evaluating whether he would participate in the offering, and that Cuban could not use the information for his own personal benefit."  *Cuban II*, 620 F.3d at 557.  Viewing the summary judgment evidence in the light most favorable to the SEC as the summary judgment nonmovant, there is a genuine issue of fact whether Cuban agreed at least implicitly to refrain from trading on or otherwise using for his own benefit the nonpublic PIPE information.

In reaching this conclusion, the court emphasizes the closeness of this call.  As should be apparent from the court's reasoning in denying summary judgment, evidence concerning the contents of Cuban's telephone conversation with Fauré and of the conduct of Mamma.com that followed that conversation is critical.  It is based on this proof that the

- 11 -

court is able to say that a reasonable jury could find that Cuban recognized that he could not sell his shares until the PIPE was announced, that he requested more information about the PIPE, that he at least implicitly agreed that Mamma.com would only provide him this information so that he could evaluate whether he wanted to participate in the PIPE, and that, because of his implied agreement, he could not use the information for his personal benefit. Yet the summary judgment evidence portrays a relatively brief telephone conversation between Fauré and Cuban of approximately eight minutes, about which Fauré has a spotty memory in crucial respects, and sometimes only recalls Cuban's using ambiguous forms of non-verbal communication (e.g., "um hum" and "uh huh").  Even the statement Fauré does remember Cuban's making—"Now I'm screwed.  I can't sell"—requires supporting context, because in isolation it "can plausibly be read to express Cuban's view that learning the confidences regarding the PIPE forbade his selling his stock before the offering *but to express no agreement not to do so*."  *Cuban II*, 620 F.3d at 557 (emphasis added).  And as for whether Cuban requested more information about the PIPE—implicitly agreeing in exchange for such information that he would not trade on it—there is substantial record evidence that Cuban did *not* ask to see the terms and conditions of the transaction but that Fauré *invited* Cuban to contact Owen at Goldman's suggestion.  *See, e.g.,* P. App. 811 (email from Fauré to Cuban stating, "If you want more details about the private placement please contact . . . Owen." ).  This evidence would undercut the theory that Mamma.com only provided the terms and conditions of the PIPE offering after Cuban implicitly agreed that he could not use the information for his personal benefit.

Despite the closeness of this question, there is evidence—summarized above—that would enable a reasonable jury to find that Cuban agreed at least implicitly not to trade on the PIPE information.  The court must therefore deny his motion for summary judgment to the extent based on this ground.

IV

Cuban also contends that he is entitled to summary judgment because there is no evidence that he failed to disclose his intention to trade on the PIPE information.

A

*United States v. O'Hagan,* 521 U.S. 642 (1997), "states unmistakably that '[d]eception through nondisclosure is central to [this] theory[.]'" *Cuban I,* 634 F.Supp.2d at 723 (quoting *O'Hagan,* 521 U.S. at 654 (alterations added)).

> [F]ull disclosure forecloses liability under the misappropriation theory:  Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no "deceptive device" and thus no § 10(b) violation[.]

*O'Hagan*, 521 U.S. at 655.  This "disclosure obligation runs to the source of information." *Id.* at 655 n.6.  It is therefore necessary for the SEC to prove that Cuban did not disclose to Mamma.com his intention to trade on the nonpublic PIPE information.  If he did fully disclose this intention and thereby avoid deceiving Mamma.com, there is no liability under the misappropriation theory of insider trading.  *See O'Hagan*, 521 U.S. at 655 (holding that

- 13 -

"*full* disclosure forecloses liability under the misappropriation theory" (emphasis added)).[9]

B

Cuban maintains that there is uncontroverted evidence that he made full disclosure of his intention to trade.  He cites his deposition testimony that, when he discussed the PIPE with Owen (the head of Merriman's private placement group), he informed him that he was not going to participate in the PIPE and that he would sell his shares.

The court holds that a reasonable jury could find from the evidence in the summary judgment record that Cuban merely disclosed that he "was going to sell," not that he specified that he would sell *before* Mamma.com announced the PIPE.  *See, e.g.,* D. App. 437 (Cuban deposition testimony) ("I told him that I was not going to participate and I was going to sell my shares."); P. App. 935 (June 30, 2004 email from Cuban to his stockbroker) ("In my conversation with the salesrep, I told him, and I also told Guy Faure that if they did an offering like this, rather than a traditional secondary, that this was the first sign of a scam in the making, and that I would sell the stock because I didn't want to be associated with it."); P. App. 394-95 (deposition of Peter Blackwood of Merriman) ("Cuban made a comment . . . that he would be selling his shares at some point.").

---

[9]The SEC contends that disclosure must give the source of the information sufficient time to take action to prevent the recipient's trading on the information.  The court disagrees.  *O'Hagan* acknowledged that misappropriation theory liability is "only a partial antidote" because the recipient can avoid § 10(b) liability through disclosure to the source and then still trade.  *O'Hagan*, 521 U.S. at 559 n.9.  Although the *O'Hagan* Court noted that disclosure might enable the source to "seek appropriate equitable relief under state law," it did not hold that the recipient must give the source sufficient notice to enable the source to prevent the recipient's use of the information.  *See id.*

Accordingly, Cuban is not entitled to summary judgment on this basis.[10]

V

Cuban moves for summary judgment on the ground that the SEC cannot prove that the PIPE information was confidential.

A

Cuban contends that the summary judgment evidence shows that the PIPE information he received was not confidential because information about the Mamma.com PIPE was widely distributed to prospective investors, without confidentiality restrictions, Mamma.com had itself disclosed a possible PIPE, and Mamma.com disclaimed that the PIPE information was confidential.[11]  He posits that, under *O'Hagan*, only confidential information can serve as a basis for misappropriation theory liability.  Cuban also contends that, because the PIPE

---

[10]Because the court concludes that there is a genuine fact issue that precludes summary judgment, it need not decide whether disclosure to Owen, as Mamma.com's agent, would have been sufficient to constitute disclosure to Mamma.com.

[11]Cuban contends that a reasonable jury could not find that the PIPE information was confidential for these reasons: first, Mamma.com and Merriman had already provided the PIPE information to numerous prospective investors before Fauré contacted Cuban, there is no evidence that any prospective investor entered into a confidentiality agreement or was restricted in using the PIPE information, and Merriman did not enter into any such confidentiality agreement either; second, information about the Mamma.com PIPE was disclosed by the hedge fund investors to other hedge funds; third, Mamma.com appended its engagement letter with Merriman as an exhibit to its Form 20-F filed in May 2004, and the letter unequivocally stated that Merriman had been engaged to assist Mamma.com in obtaining financing in the form of a PIPE, among other things; and, fourth, there is nothing in the Mamma.com Securities Purchase Agreement ("SPA") that indicated that the PIPE information was confidential, and the SPA explicitly disclaimed that Mamma.com had provided the investors with nonpublic (or material) information.

information that Fauré provided him was not confidential, any agreement he made to keep the information confidential would be invalid under the contract doctrine of mutual mistake of fact.  Cuban maintains that a reasonable jury could only find that the information was not confidential and therefore could not have formed the basis of a valid agreement to maintain its confidentiality.

In reply to the SEC's response brief—which focuses on whether the PIPE information was *nonpublic*—Cuban maintains that the SEC has failed to address his arguments that the information was not *confidential*.  He differentiates in his reply brief between the use of the term *confidential* in relation to whether a confidentiality agreement was formed between himself and Mamma.com, and the use of the term *nonpublic* when referring to a standard element of a § 10(b) claim.  Cuban states that his "Opening Brief did not make any arguments regarding 'confidentiality' that had anything to do with the concept of 'nonpublic.'"  D. Reply Br. 13 n.11.

B

Because Cuban states that his argument regarding confidentiality does not challenge whether the SEC can establish the nonpublic information element of its insider trading claim, he is necessarily contending that there is a distinction between *confidential* information and *nonpublic* information, and that the SEC must prove that the PIPE information qualifies as both.  For support, he cites an instance in *O'Hagan* where the Court used the term *confidential* information instead of *nonpublic* information in describing the misappropriation theory.  *See* D. Br. 35 (interpreting *O'Hagan* as holding that "only '[a] company's

- 16 -

*confidential* information . . . qualifies as property to which the company has a right of exclusive use' and can serve as the basis for misappropriation theory liability" (quoting *O'Hagan*, 521 U.S. at 654)).   Cuban's argument fails because, in the context of the misappropriation theory of insider trading, the terms *confidential* information and *nonpublic* information essentially have the same meaning.   Therefore, the SEC's evidence that the PIPE information was *nonpublic* is sufficient to defeat the summary judgment argument that the information was not *confidential*.

Support for the premise that the terms *confidential* information and *nonpublic* information essentially have the same meaning can be found in *O'Hagan*'s use of both terms to refer to the same concept.   *Compare O'Hagan,* 521 U.S. at 652 ("The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b–5, when he misappropriates *confidential* information for securities trading purposes, in breach of a duty owed to the source of the information." (emphasis added)) *with id.* at 652-53 ("[T]he misappropriation theory outlaws trading on the basis of *nonpublic* information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." (emphasis added)).   *See also SEC v. Yun*, 327 F.3d 1263, 1269 n.11 (11th Cir. 2003) ("In this opinion, the words 'confidential information' mean 'material, nonpublic information.'").

*Cuban I* followed the same practice of treating the term *confidential* information as equivalent to *nonpublic* information.   In *Cuban I* the court addressed whether a duty that arose by agreement could be the basis for misappropriation theory liability.   *See Cuban I*, 634

- 17 -

F.Supp.2d at 722.  To answer this question, the court relied on the seminal Supreme Court case of *O'Hagan*, which was decided in the context "of fiduciaries and fiduciary relationships, duties, and obligations." *Id.* at 724 n.5.  The Supreme Court explained that, "[u]nder [the misappropriation] theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *O'Hagan*, 521 U.S. at 652.  This court, in deciding whether an agreement that arose outside a fiduciary relationship could give rise to a duty sufficient to support liability under the misappropriation theory, relied on principles drawn from *O'Hagan* that were based on fiduciary relationships. This court recognized that, "[w]here the trader and the information source are in a fiduciary relationship, this obligation arises by operation of law upon the creation of the relationship"; that "a fiduciary is bound to act loyally toward the principal, and as a part of the duty of loyalty, to use property that has been entrusted to him—including confidential information—to benefit only the principal and not himself"; and that "[b]ecause of the fiduciary's duty of loyalty, the principal has a right to expect that the fiduciary is not trading on or otherwise using the principal's confidential information." *Cuban I*, 634 F.Supp.2d at 724 (citing *O'Hagan,* 521 U.S. at 652).  When the court held that an agreement with the right elements could supply the necessary duty—indeed, might provide a duty superior to the one that arises in a fiduciary or similar relationship of trust and confidence, *see id.* at 725—it incorporated in its formulation an obligation of confidentiality like the one found in *O'Hagan*.  The court did so because confidentiality (nondisclosure) is part of the duty that

arises by law in a fiduciary relationship, and the court was attempting to ensure that a duty

created by agreement at least had corresponding attributes.  As the court explained,

> although conceptually separate, both nondisclosure and non-use
> comprise part of the duty that arises by operation of law when
> a fiduciary relationship is created.  Where misappropriation
> theory liability is predicated on an agreement, however, a person
> must undertake, either expressly or implicitly, both obligations.
> He must agree to maintain the confidentiality of the information
> *and* not to trade on or otherwise use it.

*Id.*; *see also id.* at 724 (recognizing "that a duty analogous to the fiduciary's duty of 'loyalty

and confidentiality' can be created by agreement").

When the court incorporated the concept of nondisclosure (i.e., an agreement to keep

information confidential) in the required elements of an agreement, it did not intend to

differentiate between *confidential* information and *nonpublic* information.  For example,

when distinguishing between nondisclosure and non-use of confidential information, the

court referred as well to "material, nonpublic information," as if the terms *confidential* and

*nonpublic* were interchangeable:

> With respect to *confidential* information, nondisclosure and
> non-use are logically distinct.  A person who receives material,
> *nonpublic* information may in fact preserve the confidentiality
> of that information while simultaneously using it for his own
> gain.  Indeed, the nature of insider trading is such that one who
> trades on material, *nonpublic* information refrains from
> disclosing that information to the other party to the securities
> transaction.

*Id.* at 725 (emphasis added) (footnote omitted).  When the court framed the question whether

the SEC had stated a plausible claim, it did so in terms of whether Cuban had agreed "not to

disclose material, nonpublic information about the PIPE offering" rather than whether he had

agreed not to disclose "confidential information":

> The court next addresses whether the SEC has adequately alleged that Cuban entered into an agreement sufficient to create the duty necessary to establish misappropriation theory liability. State common law can impose such a duty, provided Cuban entered into an express or implied agreement with Mamma.com not to disclose material, nonpublic information about the PIPE offering *and* not to trade on or otherwise use the information.

*Id.* at 727. And the court referred repeatedly to both *confidential* information and material,

*nonpublic* information throughout its opinion.  *See id.* at 723-25, 729, and 731 (confidential

information); *id.* at 717, 723-25, 727, and 731 (material, nonpublic information).

In sum, because the concepts of *confidential* information and *nonpublic* information

essentially have the same meaning, evidence that the PIPE information was *nonpublic*

supports the finding that the information was *confidential*, so as to defeat Cuban's motion

on this ground.

## C

Nor does the court agree that Cuban can rely on the contract doctrine of mutual

mistake of fact to undermine the validity of the confidentiality agreement.  In order for a duty

to be sufficient to support liability under the misappropriation theory, it must at least have

attributes that correspond to the ones recognized in *O'Hagan*.  *See Cuban I*, 634 F.Supp.2d

at 726-27 ("[I]f an agreement has the elements necessary to conform to the principles of the

misappropriation theory liability recognized in *O'Hagan*, it should not be determinative

whether the agreement creates a relationship in which one party is superior to, or exercises

control or dominance over, the other."). As noted above, *O'Hagan* was decided in the context "of fiduciaries and fiduciary relationships, duties, and obligations." *Cuban I*, 634 F.Supp.2d at 724 n.5. Because of the nature of a fiduciary relationship, the fiduciary's duties to the source of information are not subject to being excused by defenses like the contract defense of mutual mistake of fact. *See generally* Restatement (Third) of Agency § 1.01 cmt. d (2006) (explaining that creation of agency relationship (which has fiduciary duties) depends on person's acting as an agent or promising to do so, not on whether enforceable contract underlies agency relationship). If an agreement otherwise sufficient to create misappropriation theory liability under *Cuban I* could be invalidated based on such a defense, it would not conform to the principles of the misappropriation theory liability recognized in *O'Hagan*. This is so because the duty could be abrogated on grounds that would be legally insufficient to defeat a duty arising from a fiduciary relationship.

Moreover, permitting a duty created by agreement to be defeated by contract defenses would disserve the purpose of the misappropriation theory, which is "designed to 'protec[t] the integrity of the securities markets against abuses by "outsiders" to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders.'" *O'Hagan*, 521 U.S. at 653 (alterations in original) (citation omitted). "The theory is . . . well tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." *Cuban I*, 634 F.Supp.2d at 727 (quoting *O'Hagan*, 521 U.S. at 658) (internal quotation marks omitted). "Although informational disparity is

- 21 -

inevitable in the securities markets, investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law." *Id.* (quoting *O'Hagan*, 521 U.S. at 658) (internal quotation marks omitted). Paraphrasing and applying here what this court wrote in *Cuban I* , "investors likely would hesitate to venture their capital if they knew that . . . a corporate outsider . . . who had actually agreed with the source not to trade on such information . . . *could* do so [by successfully raising a contract defense to his agreement not to trade]." *Cuban I*, 634 F.Supp.2d at 727.

The court therefore concludes that Cuban cannot defeat an agreement that is otherwise sufficient to create misappropriation theory liability by relying on a contract defense such as mutual mistake.

D

The court holds that a reasonable jury could find that the PIPE information that Cuban received was nonpublic and therefore confidential.

A jury could reasonably find that information about the Mamma.com PIPE had not been "effectively disclosed in a manner sufficient to insure its availability to *the investing public*." *SEC v. Tex. Gulf Sulphur Co.,* 401 F.2d 833, 854 (2d Cir. 1968) (emphasis added).

> Information becomes public when disclosed to achieve a broad dissemination to the investing public generally and without favoring any special person or group, or when, although known only by a few persons, their trading on it has caused the information to be fully impounded into the price of the particular stock.

*SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (citations and internal quotation marks omitted); *see also United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (affirming jury instruction that information is public if made publicly available or known by analysts or investors whose trading has incorporated such information into stock price).  The summary judgment evidence would permit the finding that information concerning the PIPE had been provided to a limited number of prospective investors, had not been disclosed to Mamma.com shareholders (except board members and officers who were restricted from trading before the PIPE was announced), and had not been disclosed to the investing public.  Cuban, who was Mamma.com's largest shareholder, does not dispute that he was unaware of the PIPE until June 28, 2004, on the eve of the public announcement of the offering.

Cuban's reliance on the Form 20-F filing lacks force because the Merriman engagement letter referred to a PIPE as one of several possible investment banking services that Merriman might provide for Mamma.com.  It did not disclose the PIPE transaction that Mamma.com was contemplating or even state that a PIPE transaction was definitely being considered.

Cuban's reliance on the PIPE's Securities Purchase Agreement ("SPA") is also misplaced. The SPA stated that Mamma.com had not provided any of the purchasers any material, nonpublic information.  But this statement does not refer to the terms of the SPA itself, i.e., the PIPE offering information.  This language instead means that Mamma.com did not provide the purchasers material, nonpublic information about the company itself, beyond what federal securities law generally requires.  *See Harborview Master Fund, LP v.*

*Lightpath Techs., Inc.*, 601 F.Supp.2d 537, 546, 547 n.8 (S.D.N.Y. 2009) (explaining purpose of so-called "big boy" language in an SPA); *see also* P. App. 101-02 (deposition testimony of Mamma.com Board Chairman Goldman, who signed the SPA, explaining that this SPA language referred to information about the company, not about the PIPE).  This language in an SPA, ordinarily used in securities transactions between sophisticated investors, memorializes that the purchaser agreed to the transaction without access to material, nonpublic information *about the company*.  *See Harborview Master Fund*, 601 F.Supp.2d at 548.  The purpose is to receive an acknowledgment from a purchaser that he realizes there may be other material, nonpublic information that was not disclosed to him, thereby protecting the issuing company against claims by purchasers that they were misled.  *Id.* at 548-49.  The language on which Cuban relies does not eliminate the genuine issue of material fact concerning whether the PIPE information he received was confidential or nonpublic.

Cuban is not entitled to summary judgment on this basis.

## VI

Cuban contends that he is entitled to summary judgment on the ground that the information about the Mamma.com PIPE that he possessed when he sold his shares was not material information.

## A

To establish that Cuban is liable for insider trading, the SEC must show that he traded on nonpublic information of Mamma.com that was material.  *See O'Hagan*, 521 U.S. at 652,

655 n.7.  "[T]o fulfill the materiality requirement there must be a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Zagami v. Natural Health Trends Corp.*, 540 F.Supp.2d 705, 710 (N.D. Tex. 2008) (Fitzwater, C.J.) (alteration in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted)).  "A fact is material if there is a substantial likelihood that, under all the circumstances, the . . . fact would have assumed actual significance in the deliberations of the reasonable [investor]."  *Id.* (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)) (internal quotation marks omitted).  "Materiality is not judged in the abstract, but in light of the surrounding circumstances."  *Id.* (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003)) (internal quotation marks omitted).  Materiality is a mixed question of law and fact.  *Mayhew*, 121 F.3d at 51.

Although a court can determine that nonpublic information is immaterial as a matter of law, *see, e.g., Milano v. Perot Systems Corp.*, 2006 WL 929325, at *5 (N.D. Tex. Mar. 31, 2006) (Fitzwater, J.) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002)), "[b]ecause materiality is a mixed question of law and fact, it is usually left for the jury."  *ABC Arbitrage*, 291 F.3d at 359 (alteration in original) (quoting *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996)).  The materiality determination is appropriate for the trier of fact because it "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inferences to him."  *Basic*, 485 U.S. at 236 (citation and internal quotation marks omitted); *see also SEC*

*v. Snyder*, 292 Fed. Appx. 391, 404 (5th Cir. 2008) (per curiam) (citation omitted).

B

Cuban points to the absence of evidence that would enable a reasonable jury to find that the PIPE information that he possessed when he traded was material, specifically challenging the opinion testimony of the SEC's expert, Clemens Sialm, Ph.D. ("Dr. Sialm"). He also relies on affirmative evidence in the form of an event study prepared by his expert witness, Erik Sirri, Ph.D. ("Dr. Sirri"), which examined how the market reacted to the Mamma.com PIPE announcement. Dr. Sirri opines that the price reaction of Mamma.com stock to the PIPE announcement was not statistically significant, and therefore the information Cuban was given concerning the PIPE was not material at the time of the public announcement. Cuban contends that, although the Fifth Circuit has not squarely decided this question, other courts consider an event study to be the best evidence of whether a reasonable investor would have viewed the information as significant. Cuban also cites instances in which the SEC has itself relied on event studies as evidence of materiality in civil enforcement actions.

The SEC responds that, as a mixed question of law and fact, materiality is a question for the jury. It maintains that there is substantial evidence—including proof of Cuban's actions, PIPE participants' conduct, the immediate drop in Mamma.com's stock price after the PIPE announcement, the amount of the loss that Cuban was able to avoid, an assessment of Mamma.com's financial statements, and Dr. Sialm's expert analysis—that would enable a reasonable jury to find that the PIPE information was material.

C

The SEC has produced sufficient evidence for a reasonable jury to find that the PIPE information disclosed to Cuban was material.  For example, the SEC's expert, Dr. Sialm, opines that the Mamma.com PIPE information was material because a reasonable investor would expect that a PIPE with such incentives to investors would have the result of diluting shareholder value.[12]  *See* P. App. 246.  Also, the amount Mamma.com sought to raise via the PIPE offering significantly exceeded the funds it had received from its past four years of operations and stock issuance combined.  This and other evidence in the record[13] would enable a reasonable jury to find that the PIPE information that Cuban possessed would have been viewed by a reasonable investor as having significantly altered the total mix of information made available about Mamma.com.

---

[12]Cuban has filed a motion to exclude the expert testimony and reports of Dr. Sialm, which is currently pending for decision.  In his motion, however, he does not specifically challenge Dr. Sialm's opinion in this respect.  Accordingly, the court need not address the motion to exclude as a prerequisite to deciding the summary judgment motion.

[13]As the court points out above, when it denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact. *Valcho*, 658 F.Supp.2d at 812 n.8.  There is no need to do so here.

*   *   *

Accordingly, for the reasons explained, the court denies Cuban's motion for summary judgment.

**SO ORDERED**.

March 5, 2013.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE