## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Civil Action No. 3:08-cv-02050 (SAF)** |
| MARK CUBAN, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

# MOTION *IN LIMINE* OF DEFENDANT MARK CUBAN

TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................3

    A.    The Goldman Emails Are Inadmissible Hearsay and Should Be Excluded ...............3

        1.    The Goldman Emails are Not Admissible to Show Mamma.com's State of Mind ........................................................................................4

            a.    Federal Rule of Evidence 803(3) does not Render the Emails Admissible ................................................................5

            b.    The Emails May Not Be Used to Show Mamma.com's Mental State ...................................................................6

        2.    The Goldman Emails are Not Records of a Regularly Conducted Activity .......................................................................................7

        3.    The SEC Cannot Avail Itself of the Residual Exception ...............................9

        4.    The Goldman Emails Fail to Satisfy Any Other Hearsay Exceptions ..........11

████  ████████████████████████████████████████████████
      █████████████████████████████████████████████████████████████████
      ██  ██████████████████████████████████████████████
      █████████████████████████████████████████████████████████████████
      ██  ████████████████████████████████████████████
      ███████████████████████████████████████████████████████████████

    C.    Inadmissibility of April 2004 Emails and Argument that Mr. Cuban and Mr. Fauré had a Relationship of Trust and Confidence Before June 28, 2004 ...............20

    D.    Inadmissibility of Statements Regarding Alleged Materiality of PIPE Information ........................................................................................22

    E.    Inadmissibility of Excerpts From Mr. Cuban's Wells Submissions .........................24

CONCLUSION ....................................................................................................................25

TABLE OF AUTHORITIES

CONTINUED

                                                                              PAGE(S)

CASES

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................. 23

███████████████

████████████████████████████████████                ████████████████████████

███████████████████

███████████████████████████████████                ████████████████████████

*Canataxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*
   2008 WL 1999234 (S.D. Tex. May 8, 2008) ........................................... 8

██████████████████████████████

██████████████████████████████████████████████████████████████

*Daniels v. Lafler*,
   192 Fed. App. 408 (6th Cir. 2006)......................................................... 6

*E.E.O.C. v. Service Temps, Inc.*,
   2010 WL 1644909 (N.D. Tex. Apr. 22, 2010)......................................... 2

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   718 F.3d 423 (5th Cir. 2013) ................................................................ 3

██████████████████████████████

████████████████████████████████████████████████████████████████

*Greig v. Botros*,
   2013 WL 2169098 (10th Cir. May 21, 2013)......................................... 7

████████████████████████████

████████████████████████████████████████████████████████████████

*Hicks v. Charles Pfizer & Co. Inc.*,
   466 F. Supp. 2d 799 (E.D. Tex. 2005).................................................... 4

*Hilyer v. Howat Concrete Co., Inc.*,
   578 F.3d 422 (D.C. Cir. 1978)............................................................ 12

*In re Initial Public Offering Securities Litigation*,
   2004 WL 60290 (S.D.N.Y. Jan. 12, 2004).............................................. 5

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) .............................................................. 23

-ii-

TABLE OF AUTHORITIES

CONTINUED

PAGE(S)

████████████████

███████████████████████████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████████████████████

*Rock v. Huffco Gas & Oil Co., Inc.,*
  922 F.2d 272 (5th Cir. 1991) ................................................................. 8

*SEC v. Cuban,*
  620 F.3d 551 (5th Cir. 2010) ................................................................. 3

*SEC v. Texas Gulf Sulphur Co.,*
  401 F.2d 833 (2d Cir. 1968) ................................................................. 23

██████████

███████████████████████████████████████████████████████████████

██████████

███████████████████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████████████████████████

*U.S. v. $92,203.00 in U.S. Currency,*
  537 F.3d 504 (5th Cir. 2008) ................................................................. 4

*U.S. v. Bonner,*
  2008 WL 149970 (N.D. Tex. Jan. 14, 2008) (Fitzwater, J.) .................................... 2

*U.S. v. Cain,*
  587 F.2d 678 (5th Cir. 1979) ................................................................. 12, 13

███████████████

███████████████████████████████████████████████████████████████

██████████████

███████████████████████████████████████████████████████████████

*U.S. v. Cohen,*
  631 F.2d 1223 (5th Cir. 1980) ................................................................. 5, 6

████████████████

███████████████████████████████████████████████████████████████

████████████████

███████████████████████████████████████████████████████████████

TABLE OF AUTHORITIES

CONTINUED

PAGE(S)

*U.S. v. Ismoila*,
  100 F.3d 380 (5th Cir. 1996) ................................................................ 8

███████████
████████████████████████████████████████████████████████████

███████████████
████████████████████████████████████████████████████████████

*U.S. v. Judon*,
  567 F.2d 1289 (5th Cir. 1978) .............................................................. 13

*U.S. v. Kaiser*,
  609 F.3d 556 (2d Cir. 2010) ................................................................. 7

██████████
████████████████████████████████████████████████████████████

████████████
████████████████████████████████████████████████████████████

████████████
████████████████████████████████████████████████████████████

*U.S. v. Penney*,
  576 F.3d 297 (6th Cir. 2009) ............................................................... 12

*U.S v. Phillips*,
  219 F.3d 404 (5th Cir. 2000) ................................................................ 9

███████████████
████████████████████████████████████████████████████████████

*U.S. v. Walker*,
  410 F.3d 754 (5th Cir. 2005) ..................................................... 9, 10, 11

██████████████████████████████
████████████████████████████████████████████████████████████

*Versata Software, Inc. v. Internet Brands, Inc.*,
  2012 WL 2595275 (E.D. Tex. July 5, 2012) ............................... 7, 8, 9, 12

**STATUTES**

Securities Exchange Act of 1934 ................................................................. 13

TABLE OF AUTHORITIES

CONTINUED

PAGE(S)

**RULES AND REGULATIONS**

Federal Rules of Evidence

106 ........................................................................................................................... 25
403 ................................................................................................................... 4, 18, 19
408 ........................................................................................................................... 24
608(b) ............................................................................................................. 14, 17, 18
803 ...................................................................................................................... *passim*
805 ............................................................................................................................. 4
807 ....................................................................................................................... 9, 11

17 C.F.R. 202.5 ............................................................................................................. 24

**OTHER AUTHORITIES**

*In re Allied Stores Corp.*,
  SEC Release No. APR-293, 52 S.E.C. Docket 451, 1988 WL 357006 (1988) ...................... 24

Mueller & Kirkpatrick, *Federal Evidence*
  § 6:34 (2012) ........................................................................................................... 14
  § 6:37 ....................................................................................................................... 15

Richard C. Sauer, *The Erosion of the Materiality Standard in the Enforcement of the
  Federal Securities Laws*, 62 Bus. L. 317, 326 (2007) ............................................... 24

Securities and Exchange Commission, *Procedures Relating to the Commencement of
  Enforcement Proceedings and Termination of Staff Investigations*, Securities Act Release
  No. 5310, 1972 WL 128568, at *2 (Sept. 27, 1972) ............................................... 25

Defendant Mark Cuban respectfully makes this motion *in limine* to preclude the SEC from referring in the jury's presence to, or introducing evidence of, the following:

(i)    Emails written by David Goldman (Chairman of the Board of Directors of Mamma.com) that purport to paraphrase Mamma.com CEO Guy Fauré's paraphrase of Mr. Cuban's alleged statements during the June 28, 2004 telephone call between Mr. Fauré and Mr. Cuban, containing, *inter alia*, multiple levels of hearsay ("Goldman Emails" or "Emails") (Exs. A-C; *see also* Exs. Q-R, W, Y);[1,2]

(ii)   Provocative and prejudicial extrinsic evidence concerning tax liens and an unrelated SEC administrative order, ostensibly to impeach Michael Storck and Christopher Aguilar;

(iii)  Emails from April 2004 between Mr. Cuban and Mr. Fauré that do not refer to the Mamma.com PIPE, and that precede by two months the alleged formation on June 28, 2004 of a confidentiality and non-use agreement regarding information about the PIPE (Exs. L-M; *see also* Ex. P);[3]

(iv)   Statements made by Mr. Fauré, Mr. Goldman, and Merriman Curhan Ford (Mamma.com's private-placement agent) ("Merriman") reflecting their individual, subjective views of the alleged "materiality" of information about the Mamma.com PIPE;[4] and, separately, a statement made by Merriman that did not mention the

---

[1]   All documents designated "Ex." are exhibits to the concurrently filed Declaration of Lyle Roberts in Support of Defendant Mark Cuban's Motion *in Limine*, and all references to "App." are to the consecutively paginated page numbers on the lower right-hand corners of the Appendix.

[2]   The following deposition excerpts designated by the SEC relate to the Goldman Emails: Ex. D, Daniel Bertrand Dep., Jan. 31, 2012 ("Bertrand Dep.") 41:15-42:10, 42:12-13, 42:17-15, 42:19, 42:21-23, 42:25-43:4, 43:6-8, 43:10-22, 43:24, 44:2-23; 44:25-45:3, 45:5-10, 45:19-46:10, 46:12-18, 46:20-47:1, 47:4-23, 47:25-48:5, 48:7-49:4, 49:6-50:4, 50:23 (App. at 15-24); Ex. E, Guy Fauré Dep., Nov. 4, 2011 ("Fauré Dep.") 99:8-100:6, 100:8-101:14, 101:16-102:23, 102:25-103:12, 103:14-104:3, 104:5-12, 104:14-24, 105:2-7, 105:9-15, 105:17-106:12, 106:14, 107:23-108:19, 108:21-109:3, 109:5-110:7, 110:9-25, 111:3-6, 111:13-112:11, 112:13-19, 112:21-25 (App. at 55-68); Ex. F, David Goldman Dep. Oct. 21, 2011 ("Goldman Dep.") 68:7-68:15, 68:17-71:20; 72:1-23; 73:24-74:14, 75:01-04; 75:6-76:5, 76:11-19, 76:21-77:4, 77:6-7, 77:10-25, 78:2-11, 78:17-23, 79:2-15, 79:17-80:04; 81:14-82:3, 82:5-6, 82:8-86:8, 86:10-19; 86:21-87:8, 87:12-88:4, 88:6-22, 89:1-90:16, 90:19-91:8, 92:6-93:23, 94:1-95:3 (App. at 91-118).

[3]   The following deposition excerpts designated by the SEC relate to these April 2004 emails: Fauré Dep. 53:15-16, 53:18-22, 53:24-54:15, 54:22-55:12, 55:14, 55:19-56:3, 56:5-6, 56:8-17, 56:24-57:14, 57:16, 57:22-25, 58:3, 58:10-13, 58:15-22, 58:24-59:6 (App. at 28-34).

[4]   The following deposition excerpts designated by the SEC relate to these views: Fauré Dep. at 59:12-18, 59:20-60:5 (App. at 34-35); Goldman Dep. 48:21-24, 59:08-09 (App. at 82, 84).

Mamma.com PIPE at all, but merely indicated that the *SEC might* consider information about PIPEs generally to be material (Ex. N; *see also* Exs. O, S-V, X); and

(v)  Excerpts from the two "Wells submissions" that Mr. Cuban provided to the SEC, in June 2007 and September 2007 respectively, in which he attempted to achieve a negotiated resolution of the SEC's insider trading claims.

For the reasons set forth below, the foregoing matters are not admissible for any purpose and have no bearing on the issues in this case.  Even assuming, *arguendo*, that it could be shown that any of these matters may be relevant to a fact of consequence in this case, any probative value is far outweighed by the unfair prejudice and confusion caused by their admission into evidence. Permitting questioning of witnesses, comments to jurors or prospective jurors, or offers of evidence about these matters would be unfairly prejudicial.  Once referred to in front of the venire or the trial jury, the unfair prejudice could not be adequately addressed by objection of Mr. Cuban's counsel, nor cured by Court instruction.  Sustaining objections to such questions, statements, or evidence would not prevent the unfair prejudice, but would rather reinforce the development of questionable and inadmissible evidence.

Mr. Cuban respectfully requests that, prior to the commencement of the Court's voir dire, the Court order the SEC, its counsel, or any witnesses to refrain from any reference to these matters directly or indirectly, in any manner whatsoever, unless and until the SEC first obtains, outside the jury's hearing or presence, a ruling of the Court on the admissibility of the maters addressed.[5]

## ARGUMENT

**A.    The Goldman Emails Are Inadmissible Hearsay and Should Be Excluded**

The SEC has listed the Emails on its Exhibit List and indicated in the parties' meet and confer its intent to use the Goldman Emails prominently at trial.  However, no references to the

---

[5] It is Mr. Cuban's understanding that this Court typically does not make substantive rulings on the admissibility of evidence upon an *in limine* motion.  *See, e.g., E.E.O.C. v. Service Temps, Inc.*, 2010 WL 1644909, at *9 (N.D. Tex. Apr. 22, 2010) (Fitzwater, J.); *U.S. v. Bonner*, 2008 WL 149970, at *1 (N.D. Tex. Jan. 14, 2008) (Fitzwater, J.).  It is Mr. Cuban's further understanding that the SEC intends to seek such rulings in its *in limine* motions.  If the Court elects to make such rulings in response to the SEC's motions, Mr. Cuban respectfully requests that the Court make substantive rulings on the admissibility of the evidence identified in this motion as well.

Emails should be permitted due to the inadmissible nature of the Emails standing alone as well as the multiple layers of hearsay present in the statements within the Emails.  Specifically, Mr. Cuban expects the SEC to attempt to use three separate alleged assertions from the Goldman Emails:

- Mr. Cuban "said he would sell his shares," Exs. A-C (App. at 5-12);

- he "recogniz[ed] he was not able to do anything [i.e., sell his shares] until we announce the equity" or that he "cannot [sell] until after we announce," *id.*;

- he "asked to see the terms and conditions" of the PIPE.  Exs. A-B (App. at 5-9).

During the course of this matter, the SEC has relied heavily upon these inadmissible emails and the statements contained in them.  For instance, the SEC's Complaint features a passage from one of the Emails (Compl. ¶ 15) and the Fifth Circuit referred to that Email in its decision.  *SEC v. Cuban*, 620 F.3d 551, 557 (5th Cir. 2010).  In its Opposition to Mr. Cuban's Motion for Summary Judgment, the SEC highlighted a passage from one of the Emails, claiming it showed that Mr. Cuban "asked to see the terms and conditions" of the PIPE.  Pl's Opp. to Def.'s Mot. for Summary Judgment ("MSJ Opp.") at 12, Aug. 17, 2012, ECF No. 148.  The SEC also has suggested that the Emails establish the ultimate facts in their case—that Mr. Cuban entered into the requisite confidentiality and non-use agreement.  *Id.* at 14.

On their face, the Goldman Emails contain ***multiple layers of hearsay*** because they set forth Mr. Goldman's out-of-court statements about Mr. Fauré's out-of-court statements about what Mr. Cuban supposedly told Mr. Fauré in an out-of-court telephone conversation on June 28, 2004.[6]  The trustworthiness of documents that contain multiple layers of hearsay is subject to substantial doubt.[7]

---

[6]  As noted, Mr. Goldman himself did not participate in any way in the June 28, 2004 call.

[7]  The SEC cannot eliminate these multiple layers of hearsay by claiming that, because the "Urgent" Email concludes with the valediction "Guy and Dave," it is Mr. Fauré's statement and not Mr. Goldman's.  Mr. Fauré testified Mr. Goldman was the author of the Exhibit B, and expressly stated that "Mr. Goldman composed this email after me conveying my impression of the call."  Fauré Dep. 101:20-102:2 (Mr. Goldman typed email), 104:23-105:12, 202:23-25 (App. at 57-58, 60-61, 75); *see also* Ex. G, Guy Fauré Inv. Tr., Sept. 7, 2007 ("Fauré Inv. Tr.") 58:2 ("Q:  Do you have a recollection of how [Exhibit B] was prepared?  A:  Not by me.") (App. at 130).  Mr. Goldman's deposition testimony also establishes he alone made the statement.  He acknowledged that the draft of Exhibit B was his "writeup of the summary of what Mr. Faure had told [him] about his conversation with Mr. Cuban."  Goldman Dep., ("Goldman Dep.") at 71:17-72:8 (App. at 93-94); *see also id.* at 65:4-66:4, 171:8-23 (Exhibit A is "summary . . . of what Guy told me" regarding conversation with Mr. Cuban) (App. at 88-89, 119).  In fact, Mr. Goldman candidly conceded that Exhibit B is not a literal recounting of what Mr. Fauré said, but instead "reflects *my understanding* of what [Mr. Fauré] told me Mark Cuban said, not the specific words."  *Id.* at 171:21-23 (emphasis added) (App. at 119); *see also id.* at 93:21-94:14, 124:12-25, 189:17-24 (acknowledging "editorial comment" in Goldman Email) (App. at 115-16, 118, 123); Fauré Dep. at 207:18-208:2 (acknowledging Goldman's editorializing in Goldman Emails) (App. at 76-77).  Mr. Goldman also

3.

*See, e.g., Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 806-07 (E.D. Tex. 2005) ("the risk of deception or mistake is compounded with each additional layer of hearsay, as any error will inevitably be passed on regardless of the accuracy or sincerity of the author").  Moreover, where a document contains multiple levels of hearsay, the statements in question are inadmissible unless the proponent can demonstrate that each layer of hearsay is independently admissible.  *See, e.g.,* Fed. R. Evid. 805; *U.S. v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008).

In the meet and confer preceding this Motion, the SEC indicated its intent to argue that the Goldman Emails should be admitted because they constitute (i) documents reflecting Mamma.com's state of mind, (ii) records of regularly conducted activities, and/or (iii) documents that fall into the residual hearsay exception.  The SEC made passing reference to other hearsay exceptions it may rely upon, but did not specify which exceptions applied to the Emails.  Accordingly, this brief will address the potential arguments which the SEC may rely on to overcome the clear hearsay nature of the Goldman Emails.  For the reasons set forth below no exception to the hearsay rule is applicable to the Goldman Emails and they should be excluded.[8]

### 1.    The Goldman Emails are Not Admissible to Show Mamma.com's State of Mind

During the meet-and-confer process, the SEC stated that it intends to use the Goldman Emails to show Mamma.com's state of mind.  The only mental state at issue in this matter is Mamma.com's "understanding" about its alleged agreement with Mr. Cuban.[9]  The SEC did not indicate whether it intends to rely on the hearsay exception of Federal Rule of Evidence 803(3) for

---

acknowledged that he was the one who "affixed Guy's name" to Exhibit B.  Goldman Dep. at 216:22-217:6 (App. at 124-25).

[8]   Additionally, to the extent that the SEC intends to argue that the Goldman Emails demonstrate that Mr. Cuban acknowledged the confidentiality of the PIPE information or expressed that he was bound not to trade, they are inadmissible under Fed. R. Evid. 403 as duplicative of Mr. Fauré's testimony.  Fauré Dep. at 81:2-82:14, 87:23-88:5, 190:10-191:25 (App. at 46-47, 50-51, 72-73).  The SEC cannot justify wasting the time of the jury, the Court, and Mr. Cuban through the needless presentation of cumulative evidence.  Fed. R. Evid. 403.

[9]   This is consistent with how the SEC used the Goldman Emails in its summary judgment opposition.  *See, e.g.,* MSJ Opp. at 12 (Goldman Email "confirm[s] Mamma's *understanding* that Cuban 'can not' sell before the public announcement); *id.* at 14 (Fauré and Goldman "believed Cuban would not sell before the public announcement," and "[t]heir *understanding* is corroborated by contemporaneous [Goldman Emails]"); *id.* at 27 (Emails are "contemporaneous emails reflecting Mamma's *understanding* that Cuban could not sell") (emphasis added).

"then-existing mental, emotional, or physical condition," or whether it intends use the Emails for the non-hearsay use of showing Mamma.com's mental state. Neither argument has merit.[10]

> a.    **Federal Rule of Evidence 803(3) does not Render the Emails Admissible**

Rule 803(3) does not apply to the Goldman Emails. That Rule applies only to declarations of mental condition. *See, e.g., U.S. v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) (the exception "must be understood to narrowly limit those admissible statements to declarations of condition— "I'm scared"—and not belief . . ."). The portions of the Goldman Emails in question contain no descriptions of Mamma.com's then-existing state of mind about any alleged agreement. Rather, the statements consist exclusively of descriptions of what *Mr. Cuban* allegedly said or did during his call with Guy Fauré. For example, the Emails claim that Mr. Cuban "flew off the handle," "said he would sell his shares," and "asked to see the terms and conditions" of the PIPE. Ex. A (App. at 9). Statements of what Mr. Cuban allegedly said—which do not refer to Mamma.com or any mental state of Mamma.com—are not "statement[s] of [Mamma.com's] then-existing state of mind." Fed. R. Evid. 803(3).

The SEC is further prohibited from using Rule 803(3) to convey to the jury the reasons *why* Mamma.com may have had any alleged mental state. *See, e.g., Cohen*, 631 F.2d at 1225. The Fifth Circuit has clearly explained that Rule 803(3) "does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, *or what he might have believed that would have induced the state of mind*." *Id.* at 1225 (emphasis added). In *Cohen*, the Court explained that Rule 803(3) "limit[s] those admissible statements to declarations of condition—'I'm scared'—and not belief—'I'm scared because Galkin threatened me.'" *Id.* Here, the SEC seeks to introduce the Emails, which include Cuban's alleged statements about the timing of selling his shares and requesting details of the PIPE. Assuming *arguendo* that the Emails do show Mamma.com's state of mind, the Emails and the included statements do not fall under the Rule

---

[10]  By claiming that the Goldman Emails reflect *Mamma.com*'s mental state—as opposed to the mental state of Mr. Fauré or Mr. Goldman—the SEC tries to gloss over multiple levels of hearsay. The Goldman Emails contain the statements of two separate declarants: Fauré and Goldman. Mr. Fauré made statements to Mr. Goldman and then Mr. Goldman allegedly later recorded those statements in a series of emails. By referring to Mamma.com, the SEC tries to create the impression that Mamma.com is the only declarant.

803(3) exception because they do not simply demonstrate a state of mind, but rather indicate *why* Mamma.com held the particular state of mind.  In other words, the SEC wants to use the Emails to answer the question "Why would Mamma.com have understood an agreement was in place?" by telling the jury, "Because Mark Cuban made the following statements."  That use is not allowed by the Federal Rules of Evidence.  *See Daniels v. Lafler*, 192 Fed. App. 408, 424 (6th Cir. 2006) (collecting cases from numerous circuits and holding that "[t]he circuits that have considered the issue are consistent in holding that Federal Rule of Evidence 803(3) . . . does not allow the admission of statements as to *why* the declarant had [a certain] state of mind").

Finally, Rule 803(3) does not permit the admission of "statement[s] of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3).  The SEC has not explained how a mental state of "understanding" about what happened can be distinguished from a statement of memory or belief to prove the fact remembered or believed.  Furthermore, the portions of the Goldman Emails in question consist *entirely* of descriptions of Mr. Cuban's alleged statements.  The SEC's arguments about the "state of mind" hearsay exception merely disguise a thinly veiled attempt to prove Mr. Cuban made certain statements to Mr. Fauré on June 28, 2004.[11]

**b.      The Emails May Not Be Used to Show Mamma.com's Mental State**

Alternatively, the SEC may contend that it needs no hearsay exception because it only seeks to show Mamma.com's mental state concerning what it agreed to, which does not require any of the underlying statements to actually be true.  This avenue of admissibility is also closed to the SEC. Rule 803(3) makes clear when a party can or cannot use a document containing out-of-court statements that might reflect the declarant's mental state.  As noted, the Rule contains a carve-out that prevents the introduction of "statement[s] of memory or belief to prove the fact remembered or believed."  If a party could introduce evidence of an out-of-court statement simply by claiming that it is a non-hearsay use to show the declarant's memory (or "understanding") of the statement, then Rule 803(3) and its carve-out would have little effect.  Courts have rejected this tactic.  *See, e.g.,*

---

[11] Indeed, certain statements in the Goldman Emails that the SEC relies on for their truth—such as the statement that Mr. Cuban asked for more details about the PIPE—have no other support in the record.

*Greig v. Botros*, 2013 WL 2169098, at *7 (10th Cir. May 21, 2013) (rejecting argument that party could testify as to hearsay statements because her testimony simply reflected her "understanding" of what the hearsay declarant told her, and affirming trial court ruling that this argument unpersuasively "camouflage[d]" hearsay statements as non-hearsay); *see also U.S. v. Kaiser*, 609 F.3d 556, 572 (2d Cir. 2010) (dismissing argument that testimony about hearsay statements merely reflected witness's "understanding" about what the hearsay declarant intended).

Moreover, the SEC cannot contend that the Goldman Emails reflect Mamma.com's "understanding" of what it had agreed to unless Mr. Cuban's alleged statements *are* introduced for the truth of the matter asserted. This renders the Emails hearsay, regardless of the SEC's purpose. *See Kaiser*, 609 F.3d at 573 (if evidence is introduced for non-hearsay purpose, it still must be excluded as hearsay if the non-hearsay purpose depends on the truth of the matter asserted). Nothing else in the Goldman Emails, other than the description of Mr. Cuban's alleged words and conduct, tends to show what Mamma.com allegedly agreed to.

### 2.    The Goldman Emails are Not Records of a Regularly Conducted Activity

Mr. Fauré's supposed statements to Mr. Goldman cannot be considered a record of a regularly conducted business activity. Commonly referred to as the "business records" exception, this exception requires that "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling" and that "making the record was a regular practice of that activity." Fed. R. Evid. 803(6); *see also Versata Software, Inc. v. Internet Brands, Inc.*, 2012 WL 2595275, at *4 (E.D. Tex. July 5, 2012) (Bryson, J.) (inherent reliability of records that are regularly made and maintained "is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience in relying on them, or by a duty to make an accurate record as part of a continuing job or occupation") (quoting Fed. R. Evid. 803(6) advisory committee notes). Thus, if any person involved in making the record was not engaged in a regularly conducted activity, the "assumption of reliability, accuracy, and trustworthiness" accorded to records that arise from a regularly conducted activity "collapses." *See Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 279 (5th Cir. 1991); *see also U.S. v. Ismoila*, 100

F.3d 380, 392 (5th Cir. 1996) (exception applies only if "both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business").

The Goldman Emails, and the statements contained in them, were not the product of a "regularly conducted activity" or "regular practice" of Mamma.com or any of its agents. Mr. Goldman explicitly testified that he did not send Exhibit B in compliance with any company policy maintained by Mamma.com, and he conceded that his sending of that Email "was [an] exceptional circumstance because of the imminent closure of the PIPE and having to keep the board apprised of all developments." Goldman Dep. 181:15-182:4 (App. at 121-22). According to Mr. Goldman, conveying someone else's conversation to the board—as Mr. Goldman did in the Goldman Emails—was "never a normal circumstance," and "in this case it was exceptional to summarize where we stood . . . ." *Id.* at 182:6-16 (App. at 122). Moreover, Mr. Goldman never maintained a regular practice of communicating with the Mamma.com board via email about any subject. He explicitly testified that he would communicate with the board by email only "if the particular situation required explanation and clarification and [he] judged it to be of significant importance . . . ." *Id.* at 33:12-22 (App. at 80). According to Mr. Goldman, his email communications with the board amounted to an "exception" that occurred only "when it was merited"; "[t]here was no regular communication" between Mr. Goldman and the board. *Id.* at 33:25-34:18 (App. at 80-81). Nor can the SEC show that any statement by Mr. Goldman or Mr. Fauré constituted a record that was routinely retained for later use. *See Versata*, 2012 WL 2595275, at *5-7 (collecting cases, including *Canataxx Gas Storage Ltd. v. Silverhawk Capital Partners*, LLC, 2008 WL 1999234 (S.D. Tex. May 8, 2008) (Rosenthal, J.), for proposition that records that are not routinely retained for later use cannot be admitted under Rule 803(6)).

Thus, all the SEC can show is that Mr. Fauré and Mr. Goldman were reporting on irregular, non-recurring matters—*i.e.*, the PIPE and its developments—that were of interest to the board. Occasional communications that convey matters of interest to a company are "based on instances of

perceived need and convenience, not a system for preparing and retaining business records as a regular and routine practice." *Versata*, 2012 WL 2595275, at *5-7.

### 3.      The SEC Cannot Avail Itself of the Residual Exception

The Goldman Emails cannot be admitted under the residual exception of Federal Rule of Evidence 807.  The Fifth Circuit commands that the Rule 807 exception "is to be used only rarely, in truly exceptional cases."  *U.S. v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005) (quoting *U.S. v. Phillips*, 219 F.3d 404, 419 n.23 (5th Cir. 2000)) (internal punctuation omitted).  Among other requirements, records that fit into the residual exception must bear "circumstantial guarantees of trustworthiness" that are the "equivalent" of the other hearsay exceptions.[12]  Fed. R. Evid. 807(a)(1).  The SEC bears the burden of showing that the circumstances of the Goldman Emails bear equivalent guarantees of trustworthiness to, say, statements made for medical diagnoses or made under the belief of imminent death.  *See* Fed. R. Evid. 803(4), 804(2).

These Emails do not present the "truly exceptional case[]" the Fifth Circuit envisions.  The statements in the Goldman Emails lack guarantees of trustworthiness that are equivalent to the other hearsay exceptions, which the Fifth Circuit has described as the "lodestar" of the exception. *Walker*, 410 F.3d at 758.  As established above, Mr. Goldman was not speaking as to matters within his own knowledge.  *See, e.g.,* Goldman Dep. 49:21-25, 176:8-17 (App. at 83, 120).  No one in the chain of hearsay in the Goldman Emails was under oath.  *Walker*, 410 F.3d at 758 (statements made under oath may indicate trustworthiness).  Both Mr. Goldman and Mr. Fauré have conceded that their statements do not reflect the exact words that they heard, but rather their own "impression" or "understanding" of what was going on.  *See, e.g.,* Fauré Dep. 104:7-22 (App. at 60); Goldman Dep.

---

[12]   In addition, Rule 807(a)(3) requires that the evidence in question be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  The SEC cannot satisfy this prong for several of the statements in the Goldman Emails.  Guy Fauré explicitly testified that Mr. Cuban was mad on the call and that he supposedly recognized that he could not sell his Mamma.com stock.  *See, e.g.,* Fauré Dep. 83:18-84:2, 87:23-88:5 (App. at 48-49, 50-51).  This direct testimony of Mr. Fauré, who was a firsthand participant in the call with Mr. Cuban, is manifestly more probative than the Goldman Emails, which are the result of a chain of secondhand information culminating in an email reflecting Mr. Goldman's "summary" or "understanding" of a phone call he did not participate in.  Goldman Dep. 71:17-72:8; *see also id.* 65:4-66:4, 171:8-23 (App. at 88-89, 93-94, 119).

171:8-23 (App. at 119).  Lacking a transcript or recording of the June 28, 2004 call, none of the relevant statements in the Goldman Emails is objectively verifiable.

The evidence suggests the hearsay statements in the Goldman Emails are not trustworthy. Mr. Goldman made clear these Emails were drafted in a chaotic situation, prone to producing errors. Goldman Dep. 71:1-2 ("Q: And there was a lot going on that day?  A: Yes.") (App. at 93); *see also infra* at 11 (discussing Mr. Goldman's acknowledgement of at least one actual error due to the "fluid situation").  Regardless of what Mr. Cuban actually said, Mr. Goldman and Mr. Fauré had an incentive to convey to the Mamma.com Board of Directors that Mr. Fauré contacted Mr. Cuban, informed him the PIPE information was confidential, and ensured that Mr. Cuban should treat it accordingly.  *See Walker*, 410 F.3d at 178 (incentive not to tell truth cuts against guarantees of trustworthiness).  After all, the Board instructed Mr. Fauré about how to approach Mr. Cuban with the PIPE offering, Fauré Dep. 69:21-74:11 ("the board specifically asked me to convey to [Mr. Cuban] that I had confidential information for [him], and then invite him to participate in the PIPE") (App. at 40-45); Goldman Dep. 62:18-65:2 (App. at 85-88), and those at Mamma.com knew that approaching Mr. Cuban about the PIPE offering might be a delicate situation.  *See, e.g.,* Fauré Dep. 62:5-65:23 (App. at 36-39); Ex. H, June 23, 2004 Email from D. Goldman to G. Fauré, entitled "New Equity" (App. at 132).  Mr. Fauré and Mr. Goldman therefore would have had an incentive to convey to the Mamma.com board that the sensitive issue of Mr. Cuban's reaction to the PIPE offering was handled appropriately and in accordance with the board's instructions.

The Goldman Emails also contain uncorroborated statements contrary to the remainder of the evidentiary record in this case.  For example, Exhibit B informs the Mamma.com board of directors that Mr. Cuban allegedly "asked to see the terms and conditions" of the PIPE.  Ex. B (App. at 9).  Mr. Goldman recalls that Mr. Fauré had told him this.  Goldman Dep. 176:18-25 (App. at 120).  But Mr. Fauré did not recall Mr. Cuban ever asking for any additional information about the transaction.  Fauré Dep. 194:22-25 (App. at 74).  To the contrary, Mr. Fauré testified he provided Mr. Cuban with an opportunity to learn more details about the PIPE only at Mr. Goldman's suggestion.  *Id.* 90:21-91:6 (App. at 53-54).

10.

Moreover, the trustworthiness of the Goldman Emails is further suspect for the simple reason that they contain uncontested errors. In his June 29, 2004 email to the Board of Directors, Mr. Goldman stated that Mr. Cuban had told Mr. Fauré that "he does not want the company to make acquisitions . . . ." Ex. C (App. at 11). Nevertheless, Mr. Goldman later had to send out a corrective email to the board, noting that the developments with Mr. Cuban represented a "fluid situation," which led to an error in the earlier Emails: Mr. Cuban "did not say that he was not interested in Mamma making an acquisition, he did say that if we had an acquisition, we could then consider how to and find ways to finance it." Ex. I, June 29, 2004 Email from D. Goldman to Mamma.com Board entitled "Press Release" (App. at 134). In addition, both the Exhibits A and B claim that Mamma.com "arranged for [Mr. Cuban] to receive [the terms and conditions of the PIPE] from one of the participating investor groups with which he has dealt in the past." Ex. A, B (App. at 7, 9). But this sentence is also erroneous and was never corrected. Mr. Cuban did not receive any terms and conditions from a "participating investor group." It is undisputed that to the extent that Mr. Cuban received additional PIPE details, he received them from Merriman Curhan Ford, Mamma.com's placement agent. *See* Ex. J, June 28, 2004 Email from G. Fauré to M. Cuban, entitled "Contact" (App. at 136). The fact that all three of the Goldman Emails contain errors strongly casts doubt on the trustworthiness of the Goldman Emails as a whole. The Rule 807 residual exception is inappropriate here.

### 4. The Goldman Emails Fail to Satisfy Any Other Hearsay Exceptions

**Present Sense Impression (Fed. R. Evid. 803(1)).** The SEC cannot invoke the exception for present sense impressions because that exception is available only for "[a] statement describing or explaining an event or condition, made while *or immediately after* the declarant perceived it." Mr. Fauré did not convey his impressions to Goldman either "while" or "immediately after" perceiving them. Fed. R. Evid. 803(1) (emphasis added). In the Fifth Circuit, a lapse of fifteen minutes or more between the event and the making of the record renders the exception unavailable. *See*, *e.g.*, *U.S. v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979) (reversing admission of hearsay evidence on grounds that "an out-of-court statement made at least fifteen minutes after the event it describes

11.

is not admissible" under Fed. R. Evid. 803(1) because "[t]his time span hardly qualifies as 'immediately'" under that Rule) (citing *Hilyer v. Howat Concrete Co., Inc.*, 578 F.3d 422, 426 n.7 (D.C. Cir. 1978)).[13]   Mr. Fauré conceded that, after he spoke to Mr. Cuban, he may have "gone out for a quick sandwich for 15, 20 minutes, 30 minutes" after the call with Mr. Cuban before returning to the office.   Fauré Dep. 88:19-89:2 (App. at 51-52).   In an earlier examination, Mr. Fauré stated that he "probably" went out to lunch after his call with Mr. Cuban, and he conveyed his recollection of the call to Mr. Goldman "[w]ithin an hour," but ultimately he could not remember.   Fauré Inv. Tr. 51:16-52:19 (App. at 128-29).   Mr. Fauré's concession that he may have eaten lunch for as much as thirty minutes or an hour before returning to the office and making his statement to Mr. Goldman removes these statements from the 803(1) exception.[14]

**Excited Utterance (Fed. R. Evid. 803(2)).**   No evidence suggests Mr. Fauré's statements to Mr. Goldman were made in a state of excitement.   To the contrary, the evidence suggests all of Mr. Fauré's statements to Mr. Goldman were made after a lapse of time that would have allowed for calm reflection.

**Recorded Recollection (Fed. R. Evid. 803(5)).**   Fed. R. Evid. 803(5)'s exception applies only when the record "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately," "was made or adopted by the witness when the matter was fresh in the witness's memory," and "accurately reflects the witness's knowledge."   *Id.*   Mr. Fauré remembers that Mr. Cuban was angry on the call and that he allegedly recognized that he could not sell, and he testified accordingly.   Fauré Dep. 83:18-84:2, 87:23-88:5, 103:8-24, 104:7-22, 117:3-5 (App. at 48--51, 59-60, 69).   Moreover, the SEC, as the party that hopes to introduce the Goldman Emails at trial through a hearsay exception, has the burden of laying a "proper predicate . . . to show its admissibility as such."   *U.S. v. Judon*, 567 F.2d 1289, 1294 (5th Cir. 1978) (trial court erred in

---

[13]   *Accord Versata Software, Inc. v. Internet Brands, Inc.*, 2012 WL 2595275, at *8-9 (E.D. Tex. July 5, 2012) (Bryson, J.) (recognizing fifteen-minute rule of *Cain* as binding); *U.S. v. Penney*, 576 F.3d 297, 313-14 (6th Cir. 2009) (statement made ten to fifteen minutes after event was properly excluded as hearsay because it was not made "immediately" after the event and thus did not satisfy Fed. R. Evid. 803(1)).

[14]   Furthermore, the SEC cannot show that Mr. Goldman recorded his conversation with Mr. Fauré within fifteen minutes.   Indeed, one of the Goldman Emails was not sent until June 29—the day *after* Mr. Fauré supposedly conveyed his conversations with Mr. Cuban to Mr. Goldman.   Ex. C (App. at 11-12).

admitting "memorandum [that] may have qualified as a hearsay exception" because party advocating the evidence did not lay the "proper predicate" for invocation of Rule 803(5)). Mr. Fauré was deposed at length by both parties, and the SEC thus had every opportunity to lay the foundation for a recorded-recollection exception. The SEC, however, did not do so.

[redacted]

















[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

### C. Inadmissibility of April 2004 Emails and Argument that Mr. Cuban and Mr. Fauré had a Relationship of Trust and Confidence Before June 28, 2004

In its Opposition to Mr. Cuban's Motion for Summary Judgment, the SEC argued that Mr. Cuban "***agreed*** to maintain the PIPE information in confidence when he spoke with Fauré ***on June 28, 2004*** … [and] ***agreed*** not to trade." MSJ Opp. at 24-25. The SEC has acknowledged that the issue in this case is whether Mr. Cuban entered into an "***agreement***" on June 28, 2004 to keep the PIPE information confidential and not to trade on it.

Elsewhere in its Opposition to Mr. Cuban's summary judgment motion, however, the SEC suggested, for the first time, that two isolated email exchanges between Mr. Cuban and Guy Fauré in *April* 2004 (the "April 2004 Emails") showed the existence of a purported "relationship" of confidence, or a fiduciary-like relationship between Mr. Cuban and Mr. Fauré.

In the first such email exchange, on April 6, 2004, Mr. Cuban, who had been receiving press inquiries about an ongoing SEC investigation of Mamma.com, asked Mr. Fauré about the investigation.  Ex. L (App. at 148).  Mr. Fauré emailed in response, "I would rather you call me since this is under 'confidentiality.'"  *Id.*  In the second April 2004 email exchange, Mr. Cuban inquired generally about Mamma's potential acquisitions, stating that "obviously, what you tell me is confidential."  Ex. M (App. at 153).  In response, Mr. Fauré provided a generic description of Mamma's acquisition strategy, and he declined to provide any detailed information, including, for example, the names of any acquisition targets.  *Id.*  Neither of these exchanges refer to any PIPE transaction, or any agreement about PIPE information.

The Court's rulings on the summary judgment motion and the *Daubert* motions confirm that the ultimate issue in this case is whether there was an "agreement" to keep the PIPE information confidential and not trade on it.  Mem. and Op. at 8-13, March 5, 2013, ECF No. 178; Mem. and Op. at 5, July 23, 2013, ECF No. 200 ("Daubert Op.").  In its ruling on the *Daubert* motion, the Court explicitly observed that "[t]he SEC does *not* allege that Cuban and Mamma.com had a *fiduciary relationship* or that another duty – *apart from an agreement* – supports its misappropriation theory claim."  Daubert Op. at 5 (emphasis added).

Mr. Cuban expects that the SEC nevertheless may attempt to prove a pre-existing fiduciary relationship by reference to the April 2004 Emails at trial.  The SEC should not be permitted to do so, and the Emails should be excluded.  The April 2004 Emails would confuse and mislead the jury.  The SEC's use of the Emails at trial plainly would suggest to the jury – in direct conflict with this Court's prior rulings and the SEC's Complaint – that whether Mr. Cuban has insider trading liability could turn upon the nature of the "relationship" he had with Mr. Fauré, as opposed to whether Mr. Cuban entered into a confidentiality and non-use agreement during the phone call on June 28, 2004.

The April 2004 Emails also are wholly irrelevant.  As noted above, the SEC may argue that the Emails show Mr. Cuban and Mr. Fauré had a relationship of confidence in April 2004.  There is **no** evidence connecting the April 2004 Emails to the June 28, 2004 phone call.  Mr. Fauré did not testify (in words or substance) that the June 28, 2004 call "was a continuation and made in the context of" the April Emails, nor did he testify (in words or substance) Mr. Cuban's supposed "willingness" to exchange confidential information influenced Mr. Fauré or Mamma in any respect on June 28, 2004 or at any time thereafter.[24]  No testimony, nor any other evidence, is present in the record to indicate that the April 2004 Emails bear on the ultimate issue of any relevance to whether an agreement was formed during the June 28 phone call.[25]

**D.**    **Inadmissibility of Statements Regarding Alleged Materiality of PIPE Information**

In an effort to establish that the PIPE information received by Mr. Cuban was material, the SEC in its Opposition to Mr. Cuban's Motion for Summary Judgment referred to statements made by Fauré, Goldman, and Merriman suggesting that *they* considered the information to be "material."  *See* MSJ Opp. at 4-5, 41 ("Mamma believed the PIPE was material"); *id.* at 42 ("Merriman also treated Mamma's PIPE information [] as material").  For the same purpose, the SEC also attempted to use a written statement by Merriman dated June 14, 2004 and titled, "Private Placement Transaction Acknowledgement," raising the "possibility" that the SEC might consider "knowledge of a potential private placement to be material non-public information."  *See id.* at 4; Ex. N (App. at 156).  The SEC may attempt to use some of all of the same statements for the same purpose at trial.

---

[24]  Similarly, the evidence confirms that Mr. Cuban and Mr. Fauré did **not,** in April 2004 (or at any other time prior to the June 28, 2004 telephone call) enter into a master confidentiality agreement.  Fauré Dep. 174:13-175:24 (App. at 70-71).

[25] In the alternative, if the Court rules that the April Emails themselves are admissible, the SEC should still be precluded from arguing that Mr. Cuban and Mr. Fauré had a relationship of trust and confidence or any type of quasi-fiduciary relationship that arose before June 28, 2004.  As noted above, such an argument is wholly inappropriate because the Court has already recognized that the only duty that could be at issue in this case is one that arose by agreement on June 28, 2004.  Moreover, the SEC should not be permitted to proceed on a theory that it did not plead in its Complaint and that it did not disclose until its opposition to Mr. Cuban's motion for summary judgment—that is, *after* the close of discovery in this matter.  Thus, the Court should preclude the SEC from making or referring to this argument, and from asking any questions of witnesses that might suggest that Mr. Cuban and Mr. Fauré had a relationship of trust and confidence or any type of pre-existing quasi-fiduciary relationship.  The Court should further provide a limiting instruction to the jury to the effect that any relationship between Mr. Cuban and Mr. Fauré before June 28, 2004 is not at issue.

The subjective views of Fauré, Goldman, and Merriman about the significance of the PIPE information—and, likewise, Merriman's views as to whether the SEC might "possibly" consider PIPE information to be material—are entirely irrelevant to whether information about the Mamma.com PIPE was, in fact, material.  In determining whether information was material, the proper analysis is whether the "reasonable investor" would have viewed the information as "having altered the 'total mix' of information" available to investors.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 418 (5th Cir. 2001) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  This is an *objective* inquiry and the individual, subjective views of Mamma.com's executives and placement agent have nothing to do with that inquiry.  *Nathenson*, 267 F.3d at 413; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 433 (5th Cir. 2013).

Indeed, Fauré, Goldman, and Merriman are the worst imaginable proxies for the "reasonable investor" in Mamma.com securities.  They were privy to an enormous amount of material, nonpublic information about the company and its financial condition.  With respect to the PIPE information in particular, they all were participants in ongoing internal discussions about the PIPE and had access to information regarding the PIPE not available to the ordinary investor.  As such, the "mix" of information available to Fauré, Goldman, and Merriman was greater and qualitatively different than that available to a reasonable investor.  Accordingly, the subjective views of Messrs. Fauré and Goldman and Merriman on the significance of the PIPE information *to them* have no bearing on whether the PIPE information disclosed to Mr. Cuban would have been considered significant by investors under the applicable legal standard.[26]

E.    **Inadmissibility of Excerpts From Mr. Cuban's Wells Submissions**

Mr. Cuban anticipates that at trial the SEC will attempt to refer to certain statements contained in excerpts from two Wells submissions that Mr. Cuban provided to the SEC, in June

---

[26]  The case law makes clear that in an insider trading case, the views of company personnel (as may be reflected by their trading activity) constitute evidence of materiality only if their views are informed solely by the information in question (thus making it clear that the information was significant).  *See, e.g.*, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968).  Conversely, if the insider has additional non-public information in his possession, the insider's views are **not** relevant to materiality.  *See id.*; *see also* Richard C. Sauer, *The Erosion of the Materiality Standard in the Enforcement of the Federal Securities Laws*, 62 Bus. L. 317, 326 (2007) (noting that where an individual has additional information not known to the market, that individual is not a reasonable proxy for the "reasonable investor").

2007 and September 2007 respectively (the "Wells Submissions"). In its Opposition to Mr. Cuban's

Motion for Summary Judgment, the SEC referred to statements in the Wells Submissions to

establish that Mr. Cuban had supposedly "admitted" (i) that he sold his Mamma.com stock because

of the Mamma.com PIPE and his sale of the stock therefore was made with the requisite scienter,

and (ii) that information about the PIPE information was material and nonpublic. MSJ Opp. at 15,

16 n.13; SEC Opp. to Mot. to File App. at 6-8 & nn. 5-6, Oct. 10, 2012, ECF No. 158 ("Opp. to File

App."). The SEC may attempt to use the same statements for the same purpose at trial.

 The excerpts from the Wells Submissions are inadmissible for these, or any other purposes,

because they constitute "statement[s] made during compromise negotiations about the claim[s]."

Fed. R. Evid. 408. The purpose of a Wells submission, as reflected in the SEC's regulations

governing such submissions, *see* 17 C.F.R. 202.5(c), is to provide information to the SEC in an

effort to persuade the Commission not to bring an enforcement action—*i.e.*, to reach a negotiated

resolution, or settlement, of the prospective claims without the need for full-blown litigation.

 That the excerpts from the Wells Submissions are inadmissible for this reason is confirmed

in *In re Allied Stores Corp.*, SEC Release No. APR-293, 52 S.E.C. Docket 451, 1988 WL 357006

(1988). There, just as here, the SEC Enforcement Division argued that a defendant's Wells

submission should be admitted into evidence because it contained an "implicit admission." *Id.* at

*1. The SEC Administrative Law Judge, however, refused to allow the Wells submission to be

admitted into evidence because "Rule 408 of the Federal Rules of Evidence expressly excludes

statements made in compromise negotiations" and exclusion is in accordance with "the general

confidentiality that is ordinarily accorded documents that have the purpose of settling or resolving

issues, opposing views, or controversies." *Id.* The judge further noted that the SEC Enforcement

Division, in its zeal to prevail in the dispute, "does not take seriously the possible chilling effect that

a ruling in its favor could have on the willingness of prospective respondents to make Wells

Submissions," and that introducing the Wells submission into evidence "would be a deterring factor

inconsistent with the encouragement that the Commission has given to the making of those

submissions." *Id.* at 2. The Court should follow the ALJ's reasoning and not allow the SEC to use

Mr. Cuban's Wells Submissions as weapons against him in this trial.[27]

Furthermore, the SEC's own stated policy is to discourage parties from using a Wells submission to dispute facts.  Securities and Exchange Commission, *Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations*, Securities Act Release No. 5310, 1972 WL 128568, at *2 (Sept. 27, 1972); *see also* Opp. to File App. at 7 n.5. ("Cuban correctly notes that the SEC's Wells Submission guidance discourages parties from disputing any facts alleged by the SEC . . . .").  Mr. Cuban would suffer severe and incurable prejudice if the SEC were permitted to suggest to the jury that Mr. Cuban freely made certain "admissions" in his Wells Submissions, when in reality he made those statements in a context in which he was discouraged by the SEC's own policy to contest the SEC's position on the "facts."[28]

## CONCLUSION

For the foregoing reasons, Mr. Cuban respectfully requests that his Motion *in Limine* be granted and an appropriate Order be issued consistent with the Motion.

---

[27] The SEC may seek to rely on an unreported district court case, *In re Initial Public Offering Securities Litigation*, 2004 WL 60290 (S.D.N.Y. Jan. 12, 2004).  The dispute in that case focused upon whether Wells submissions had to be produced in civil discovery on the grounds of relevance, which the court acknowledged was for discovery purposes a "quite broad" standard and could be inclusive of inadmissible evidence.  *Id.* at *4.  In reaching its decision that the Wells submissions at issue were discoverable, the court recognized the SEC's policy of encouraging Wells respondents not to challenge the SEC's views of the facts.  *Id.* at *3.  The court concluded, however, that contrary to the SEC's unambiguous stated policy, "sophisticated counsel will use Wells submissions as an opportunity to present the target's view of the facts, as well as the law."  *Id.*  This decision offers no guidance to the Court in the determination of whether to exclude the Wells submission from this trial.

[28] Should the Court reject Mr. Cuban's position and find that the excerpts from the Wells Submissions may come into evidence, Mr. Cuban respectfully requests that the Submissions be admitted in their entirety.  *See* Fed. R. Evid. 106.

Dated:  September 16, 2013                     Respectfully submitted,


                                              By:   */s/ Thomas M. Melsheimer*
                                                    Thomas M. Melsheimer
                                                    State Bar No. 13922550
                                                    melsheimer@fr.com
                                                    Scott C. Thomas
                                                    Texas Bar No. 24046964
                                                    sthomas@fr.com
                                                    FISH & RICHARDSON P.C.
                                                    1717 Main Street, Suite 5000
                                                    Dallas, TX  75201
                                                    (214) 747-5070 (telephone)
                                                    (214) 747-2091 (facsimile)

                                                    Lyle Roberts (*pro hac vice*)
                                                    D.C. Bar No. 464789
                                                    George E. Anhang (*pro hac vice*)
                                                    D.C. Bar No. 461936
                                                    COOLEY LLP
                                                    1299 Pennsylvania Ave NW, Suite 700
                                                    Washington, DC 20004
                                                    (202) 842-7855 (telephone)
                                                    (202) 842-7899 (facsimile)
                                                    lroberts@cooley.com
                                                    ganhang@cooley.com

Stephen A. Best
D.C. Bar No. 428447
BROWN RUDNICK LLP
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
(202) 536-1700 (telephone)
(202) 536-1701 (facsimile)
sbest@brownrudnick.com

Angela M. Papalaskaris (*pro hac vice*)
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
(212) 209-4800 (telephone)
apapalaskaris@brownrudnick.com

Leslie A. Maria (*pro hac vice*)
D.C. Bar No. 484806
SCHIFF HARDIN LLP
901 K Street, NW
Washington, DC 20001
(202) 778-6419 (telephone)
(202) 778-6460 (facsimile)
lmaria@schiffhardin.com

Christopher J. Clark (*pro hac vice*)
N.Y. Bar No. 2854222
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200 (telephone)
(212) 751-4864 (facsimile)
christopher.clark2@lw.com

*Attorneys for Mark Cuban*

## CERTIFICATE OF CONFERENCE

In accordance with Local Rules 7.1(b) and 7.1(h) of the United States District Court for the Northern District of Texas, I hereby certify that the parties met in person and conferred on this motion on September 6, 2013.

*/s/ Thomas M. Melsheimer*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of September, 2013, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  The electronic case files system sends a "Notice of Electronic Filing" to all counsel who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Thomas M. Melsheimer*
Thomas M. Melsheimer

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 3:08-cv-02050 (SAF)** |
| | ) | |
| MARK CUBAN, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX
TO DEFENDANT MARK CUBAN'S MOTION *IN LIMINE***

## INDEX TO
## APPENDIX

| Declaration and Attachments | Appendix Page No. |
|---|---|
| Declaration of Lyle Roberts in Support of Mark Cuban's Motion in *Limine* | 1 - 4 |
| **Exhibit A –** Email from David Goldman to Guy Fauré and Michael Storck re Note to Directors, dated June 28, 2004 | 5 - 7 |
| **Exhibit B –** Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re New Equity URGENT, dated June 28, 2004 | 8 - 9 |
| **Exhibit C –** Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re New Equity, dated June 29, 2004 | 10 - 12 |
| **Exhibit D –** Excerpts from the Deposition Transcript of Daniel Bertrand, dated January 31, 2012 | 13 - 25 |
| **Exhibit E –** Excerpts from the Deposition Transcript of Guy, dated November 4, 2011 | 26 - 77 |
| **Exhibit F –** Excerpts from the Deposition Transcript of David Goldman, dated October 21, 2011 | 78 - 125 |
| **Exhibit G –** Excerpts from the Investigative Testimony Transcript of M. Guy Fauré, dated September 7, 2007 | 126 - 130 |
| **Exhibit H –** Email from David Goldman to Guy Fauré re New Equity, dated June 23, 2004 | 131 - 132 |
| **Exhibit I –** Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re Press Release, dated June 29, 2004 | 133 - 134 |
| **Exhibit J –** Email from Guy Fauré to Mark Cuban re Contact, dated June 28, 2004 | 135 - 136 |
| **Exhibit K –** Declaration of Kevin Cross, dated September, 2013 | 137 - 146 |
| **Exhibit L –** Email from Guy Fauré to Mark Cuban re Mamma.com, dated April 6, 2004 | 147 - 151 |
| **Exhibit M –** Email from Mark Cuban to Guy Fauré re insider sales, dated April 23, 2004 | 152 - 154 |
| **Exhibit N –** Merriman Curhan Ford & Co., Private Placement Transaction Acknowledgement Letter, dated June 14, 2004 | 155 - 157 |
| **Exhibit O –** Email from Andrew Fineberg to wmatthews@amaranthllc.com re PIPE_Acknowledgement.pdf, dated June 23, 2004 | 158 - 162 |
| **Exhibit P –** Email from Mark Cuban to Guy Fauré, re insider | 163 - 165 |

2

| | |
|---|---|
| sales, dated April 23, 2004 | |
| **Exhibit Q** – Email from David Goldman to ikramer@icongo.com re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 28, 2004 | 166 - 169 |
| **Exhibit R** – Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 28, 2004 | 170 - 171 |
| **Exhibit S** – Email from Andrew Fineberg to emily.lansdowne@hemny.com re PIPE_Acknowledgement.pdf | 172 - 176 |
| **Exhibit T** – Email from Andrew Fineberg to akansler@proskauer.com re PIPE Acknowledgement Letter, dated June 24, 2004 | 177 - 183 |
| **Exhibit U** – Email from Andrew Fineberg to akansler@proskauer.com re PIPE Acknowledgement Letter, dated June 24, 2004 | 184 - 190 |
| **Exhibit V** – Email from Andrew Fineberg to wmatthews@amaranthllc.com re PIPE Guideilnes [*sic*] Letter, dated June 25, 2004 | 191 - 194 |
| **Exhibit W** – Email from Claude E. Forget to David Goldman; Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Guy Fauré re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 28, 2004 | 195 - 197 |
| **Exhibit X** – Email from Ian Trumpower to Ags@mcfco.com re FW: Merriman Acknowledgement, dated June 28, 2004 | 198 - 201 |
| **Exhibit Y** – Email from Robert Raich to dgoldman@intasys.com re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 29, 2004 | 202 - 204 |

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | **Civil Action No. 3:08-cv-02050 (SAF)** |
| MARK CUBAN, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**DECLARATION OF LYLE ROBERTS IN SUPPORT OF**
**DEFENDANT MARK CUBAN'S MOTION *IN LIMINE* TO EXCLUDE JUNE 2004**
**HEARSAY EMAILS OF DAVID GOLDMAN**

Lyle Roberts makes the following declaration under 28 U.S.C. § 1746:

1.      My name is Lyle Roberts and I am a partner with the law firm of Cooley LLP.  I am a member in good standing of the bars of Virginia, Maryland, and the District of Columbia.  I am admitted *pro hac vice* to practice before this Court in this matter.

2.      I submit this Declaration in Support of Defendant Mark Cuban's Motion *in Limine*.

3.      I have personal knowledge of the documents attached to this Declaration and I declare that the attached copies are true and correct copies of the documents purported to be.

4.      Attached as **Exhibit A** to this Declaration is a true and correct copy of an Email from David Goldman to Guy Fauré and Michael Storck re Note to Directors, dated June 28, 2004.

5.      Attached as **Exhibit B** to this Declaration is a true and correct copy of an Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re New Equity URGENT, dated June 28, 2004.

6.      Attached as **Exhibit C** to this Declaration is a true and correct copy of an Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re New Equity, dated June 29, 2004.

7.      Attached as **Exhibit D** to this Declaration is a true and correct copy of excerpts from the Deposition Transcript of Daniel Bertrand, dated January 31, 2012.

8.      Attached as **Exhibit E** to this Declaration is a true and correct copy of excerpts from the Deposition Transcript of Guy, dated November 4, 2011.

9.      Attached as **Exhibit F** to this Declaration is a true and correct copy of excerpts from the Deposition Transcript of David Goldman, dated October 21, 2011.

10.      Attached as **Exhibit G** to this Declaration is a true and correct copy of excerpts from the Investigative Testimony Transcript of M. Guy Fauré, dated September 7, 2007.

11.      Attached as **Exhibit H** to this Declaration is a true and correct copy of an Email from David Goldman to Guy Fauré re New Equity, dated June 23, 2004.

12.      Attached as **Exhibit I** to this Declaration is a true and correct copy of an Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re Press Release, dated June 29, 2004.

13.      Attached as **Exhibit J** to this Declaration is a true and correct copy of an Email from Guy Fauré to Mark Cuban re Contact, dated June 28, 2004.

14.      Attached as **Exhibit K** to this Declaration is a true and correct copy of Declaration of Kevin Cross, dated September, 2013.

APP. 2

15.     Attached as **Exhibit L** to this Declaration is a true and correct copy of an Email from Guy Fauré to Mark Cuban re Mamma.com, dated April 6, 2004.

16.     Attached as **Exhibit M** to this Declaration is a true and correct copy of an Email from Mark Cuban to Guy Fauré re insider sales, dated April 23, 2004.

17.     Attached as **Exhibit N** to this Declaration is a true and correct copy of the Merriman Curhan Ford & Co., Private Placement Transaction Acknowledgement Letter, dated June 14, 2004.

18.     Attached as **Exhibit O** to this Declaration is a true and correct copy of an Email from Andrew Fineberg to wmatthews@amaranthllc.com re PIPE_Acknowledgement.pdf.

19.     Attached as **Exhibit P** to this Declaration is a true and correct copy of an Email from Mark Cuban to Guy Fauré, re insider sales, dated April 23, 2004.

20.     Attached as **Exhibit Q** to this Declaration is a true and correct copy of an Email from David Goldman to ikramer@icongo.com re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 28, 2004.

21.     Attached as **Exhibit R** to this Declaration is a true and correct copy of an Email from David Goldman to Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Fauré re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 28, 2004.

22.     Attached as **Exhibit S** to this Declaration is a true and correct copy of an Email from Andrew Fineberg to emily.lansdowne@hemny.com re PIPE_Acknowledgement.pdf.

23.     Attached as **Exhibit T** to this Declaration is a true and correct copy of an Email from Andrew Fineberg to akansler@proskauer.com re PIPE Acknowledgement Letter, dated June 24, 2004.

APP. 3

24.     Attached as **Exhibit U** to this Declaration is a true and correct copy of an Email from Andrew Fineberg to akansler@proskauer.com re PIPE Acknowledgement Letter, dated June 24, 2004.

25.     Attached as **Exhibit V** to this Declaration is a true and correct copy of an Email from Andrew Fineberg to wmatthews@amaranthllc.com re PIPE Guideilnes [*sic*] Letter, dated June 25, 2004.

26.     Attached as **Exhibit W** to this Declaration is a true and correct copy of an Email from Claude E. Forget to David Goldman; Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Guy Fauré re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 28, 2004.

27.     Attached as **Exhibit X** to this Declaration is a true and correct copy of an Email from Ian Trumpower to Ags@mcfco.com re FW: Merriman Acknowledgement, dated June 28, 2004.

28.     Attached as **Exhibit Y** to this Declaration is a true and correct copy of an Email from Robert Raich to dgoldman@intasys.com re New Equity URGENT – YOUR APPROVAL REQUIRED, dated June 29, 2004.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  September 16, 2013
            Washington, D.C.


                              By: s/ Lyle Roberts
                                   Lyle Roberts

APP. 4

# EXHIBIT A

EXHIBIT

SEC 10
9-28-11   lm

| From: | David Goldman <dgoldman@intasys.com> |
|-------|--------------------------------------|
| Sent: | Monday, June 28, 2004 6:43 PM |
| To: | Guy Faure <guy@mamma.com>; Storck, Michael E. [MEStorck@blair-roach.com] |
| Subject: | Note to Directors |
| Attach: | DRAFT to Directors re PIPE.doc |

Can you pleaser rteview and comment on the attached?

Related to Mark Cuban - Michael it would be helpful if warrants were excluded from the calculation in case our mercurial friend changed his mind.

DG0001885

APP. 6

DRAFT to Directors:

We are nearing completion of negotiation of the new equity raise. The definitive agreement is not completed yet but discussions with our counsel and that of the investors has resulted in substantially all of the terms and conditions reflecting those approved by the board. One last issue being addressed is that of penalties should, in effect, the company neglect to carry out all measures with respect to registration filings which, should we screw up, would result in a cashless exercise option with respect to warrants (repeat - this is only if we screw-up). This is subject to clarifying that this is not inconsistent with OSC regulations that may preclude any reference to cashless exercise.

We have also reworked the penalty issue for failing to register within 120 days such that the company would be subject to a maximum penalty of 5% payable either in cash or shares at our option at 1% per month.

Note: with respect to registration: We are nearing completion of filing for the 105,000 MAXIM warrants and, based on closing this equity raise prior to month's end, will piggyback the registration of the new equity/warrants (as well as warrants currently issued to Merriman Curhan Ford) with this filing.

While the board had indicated that we raise $15 million, we may be slightly oversubscribed at about $17 million (final numbers not available). This is about 1.5 million shares at $10.88 if we include today's price plus 600,000 warrants at about $15.72 if incl. today's price. In addition to receiving your approval for the equity could you please approve this increased amount so that we do not have to put anyone on allocation?

Today, after much discussion, Guy spoke to Mark Cuban about this equity raise and whether or not he would be interested in participating. As anticipated he initially "flew off the handle" and said he would sell his shares (recognizing that he was not able to do anything until we announce the equity) but then asked to see the terms and conditions which we have arranged for him to receive from one of the participating investor groups with which he has dealt in the past.

With your approval, we would expect to close at the close of business either today or tomorrow depending on concluding the agreement.

# EXHIBIT B

From: David Goldman [mailto:dgoldman@intasys.com]
Sent: Monday, June 28, 2004 3:51 PM
To: Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David
Goldman; Claude E. Forget; Guy Faure
Subject: New Equity URGENT - YOUR APPROVAL REQUIRED


We are nearing completion of negotiation of the new equity raise. The
definitive agreement is not completed yet but discussions with our
counsel and that of the investors has resulted in substantially all of
the terms and conditions reflecting those approved by the board. One
last issue being addressed is that of penalties should, in effect, the
company neglect to carry out all measures with respect to registration
filings which, should we screw up, would result in a cashless exercise
option with respect to warrants (repeat - this is only if we screw-up).
This is subject to clarifying that this is not inconsistent with OSC
regulations that may preclude any reference to cashless exercise.

We have also reworked the penalty issue for failing to register within
120 days such that the company would be subject to a maximum penalty of
5% payable either in cash or shares at our option at 1% per month.

Note: with respect to registration: We are nearing completion of filing
for the 105,000 MAXIM warrants and, based on closing this equity raise
prior to month's end, will piggyback the registration of the new
equity/warrants (as well as warrants currently issued to Merriman
Curhan
Ford) with this filing.

While the board had indicated that we raise $15 million, we may be
slightly oversubscribed at about $17 million (final numbers not
available). This is about 1.5 million shares at $10.85 if we include
today's price plus 600,000 warrants at about $15.68 if incl. today's
price. In addition to receiving your approval for the equity could you
please approve this increased amount so that we do not have to put
anyone on allocation?

Today, after much discussion, Guy spoke to Mark Cuban about this equity
raise and whether or not he would be interested in participating. As
anticipated he initially "flew off the handle" and said he would sell
his shares (recognizing that he was not able to do anything until we
announce the equity) but then asked to see the terms and conditions
which we have arranged for him to receive from one of the participating
investor groups with which he has dealt in the past.

With your approval, we would expect to close at the close of business
either today or tomorrow depending on concluding the agreement.

Guy and Dave



# EXHIBIT C



**From:** David Goldman [mailto:dgoldman@intasys.com]
**Sent:** Tuesday, June 29, 2004 9:29 AM
**To:** Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Faure
**Subject:** New equity


Thanks your responses. I have answered each of your inquiries individually so will summarize where we stand for all:


With exception of minor boilerplate with respect to reconciling Canadian and US requirements which are expected to be clarified today, we have concluded the agreement as at 11:30 pm last night (Monday evening). Following is a summary of details, some clarifications, and other related information:

- we will issue 1,515,816 shares at a price of $10.95 (five day avg. closing bid price) for gross proceeds of $16.6 million
- we will issue 606,326 warrants exercisable six months hence for a 4 1/2 year period at $15.82 per share
- the cashless exercise provision is only for the case where, if after we receive registration, the Company fails to make requisite filings to maintain the registration ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- we did speak to Mark Cuban (Guy and, subsequently, our investment banker) to find out if he had any interest in participating to the extent of maintaining his interest. His answers were: he would not invest, he does not want the company to make acquisitions, he will sell his shares which he can not do until after we announce. The last possibility had been pointed out by Guy at the board meeting.
- we intend to file by mid-July for registration of these securities in additon to the 105,000 MAXIM and the 40,000 Merriman warrants outstanding
- one director has questioned if we should wait and see where share price heads. Prior to yesterday's intense trading volume and price run-up we had been scheduled to close on Monday (yesterday) but delays particularly with US./Canada reconciliation deferred closing until today and investors agreed to include yesterday's price in the avg. I don't believe that trying to guess the market is appropriate as we would not necessarily have access to the money aside from there being no guarantees that we will continue to see a run-up.
- un-related but pertinent is that NASDAQ has spoken to us and our counsel re-anything behind yesterday's (Monday) activity. We don't know but some speculation (unfounded to our knowledge) on chat board.
- I erred in one summary of yesterday's conditons. We have a maximum 5% penalty if we don't succeed in registration 120 days from now as I had ponted out but the penalty accumulates at 1% for the first subsequent month and 2% for each of the subsequent two months (not 1% per month as indicated). If the SEC delays

**FOIA Confidential Treatment    Requested by Mamma.com, Inc.**

**MammaPro00292**
APP. 11
SEC-MC0002158

registration, the difference between a seven month and nine month period to cap out is probably not relevant.

If anything else comes up, will keep you posted.

As soon as we have the press release draft completed, will forward to you for your comments and editing. Will release at day's end.

Will have a resolution drafted reflecting your approval as this has been slightly modified from board approval with respect to the dollar amount. To be clear, assuming approved and based on yesterday's response we have approval. If otherwise please scream NOW before our 12 noon teleconference (Tuesday) to dot the i's and cross the t's.

Dave

FOIA Confidential Treatment    Requested by Mamma.com, Inc.

**MammaPro00293**
APP. 12
SEC-MC0002159

# EXHIBIT D

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

                                                                        Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF TEXAS

 3                  DALLAS DIVISION

 4

 5

 6    SECURITIES AND EXCHANGE      )
      COMMISSION,                  )
 7                                 )
                                   )
 8    Plaintiff,                   )
                                   )
 9    -vs-                         )
                                   )
10    MARK CUBAN,                  )
                                   )
11                                     Civil Action No.
      Defendant.
12                                     3:08-cv-02050

13                                     (SAF)`

14

15

16

17              The videotaped deposition of DANIEL

18    BERTRAND, called by the Plaintiff for

19    examination, for the taking of evidence in the

20    Province of Quebec, Canada, at the request of a

21    court of a foreign country (The United States of

22    America) pursuant to Articles 2, 20 and 46 of the

23    Code of Civil Procedure of Quebec and Article 9

24    of the Special Procedures Act, R.S.Q. c. P-27.

25

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

                                                               Page 41

 1                MR. BEST:  Objection, form.

 2                THE WITNESS:  Yes.

 3   BY MR. O'ROURKE:

 4        Q.    And did you know him to be someone

 5   who was diligent?

 6                MR. BEST:  Objection, form.

 7                THE WITNESS:  Yes.

 8                MR. O'ROURKE:  Let's change tapes.

 9                BY THE VIDEOGRAPHER:  Going off the

10   record at 11:17 a.m.

11                BY THE VIDEOGRAPHER:  This begins

12   tape number two in the deposition of Daniel

13   Bertrand.  We are back on the record at

14   11:28 a.m.

15   BY MR. O'ROURKE:

16        Q.    Mr. Bertrand, I show you what

17   previously was marked as Plaintiff's Exhibit 43,

18   bearing the Mamma production Bates number at the

19   time it was produced in the SEC's investigation

20   of MammaPro002291.  And my question to you is:

21   Are you familiar with this e-mail?

22        A.    Yes.

23        Q.    And is this an e-mail that Mr.

24   Goldman sent to you and the members of the board

25   on June 28, 2004?

Daniel Bertrand                                            January 31, 2012

Montreal, Canada

                                                          Page 42

1         A.      Yes.

2         Q.      And at the bottom of the e-mail it

3    shows as from Guy and Dave.  And who is that

4    referring to?

5         A.      It refers to the approval of the

6    financing for all members of the administration

7    board.

8         Q.      But at the bottom you see -- at the

9    bottom it says Guy and Dave.  Does that indicate

10   it was sent on behalf of both of them?

11              MR. BEST:  Objection, form.

12              THE WITNESS:  That is what I

13   presume, yes.

14              MR. BEST:  Move to strike.

15   BY MR. O'ROURKE:

16        Q.      Is that your belief, seeing e-mails

17   with both of their names at the bottom?

18              MR. BEST:  Objection, form.

19              THE WITNESS:  Yes.

20              MR. BEST:  Move to strike.

21   BY MR. O'ROURKE:

22        Q.      And what was the purpose of this

23   e-mail, as you understood it?

24              MR. BEST:  Objection, form.

25              THE WITNESS:  It was a final

APP. 16

Daniel Bertrand                                                              January 31, 2012

Montreal, Canada

Page 43

```
1    approval for the PIPE.

2    BY MR. O'ROURKE:

3         Q.    Was it requesting the approval?  Is

4    that what you are suggesting?

5              MR. BEST:  Objection, form.

6              THE WITNESS:  That is what I read in

7    the text.  It says:  "Your approval required" in

8    the subject.

9              MR. BEST:  Move to strike.

10   BY MR. O'ROURKE:

11        Q.    Calling your attention to the

12   subject of this e-mail where it says:  "New

13   Equity URGENT - YOUR APPROVAL REQUIRED." Do you

14   see that?

15        A.    Yes.

16        Q.    And what did you understand that to

17   mean?

18        A.     It was approve the final conditions

19   of the PIPE by the members of the board.

20        Q.    Was it also to give the members of

21   the board and yourself an updated report where

22   things stood?

23             MR. BEST:  Objection, form.

24             THE WITNESS:  Possibly as well, yes.

25             MR. BEST:  Move to strike.
```

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

Page 44

1

2    BY MR. O'ROURKE:

3          Q.      And did you understand that this

4    e-mail was sent at the time, as indicated in the

5    first sentence, that Mamma was nearing completion

6    of the negotiations for the PIPE?

7          A.      Yes.

8          Q.      And is this an e-mail that you would

9    have reviewed at the time received?

10         A.      Possibly, yes. I would say so.

11         Q.      You would say so based on what?

12         A.      Well, the e-mail was addressed to

13   me, and I normally read all my e-mails.

14         Q.      And calling your attention to the

15   fifth paragraph that begins:

16                 "Today, after much discussion, Guy

17   spoke to Mark Cuban."

18                 Do you see that paragraph?

19         A.      Yes.

20         Q.      And did you understand that to refer

21   to the discussion with Mark Cuban that you told

22   us about before the break?

23         A.      Yes.

24                 MR. BEST:  Objection, form.

25   BY MR. O'ROURKE:

APP. 18

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

Page 45

1        Q.    And the writing style of that

2   paragraph, were you familiar with Mr. Goldman's

3   writing style?

4              MR. BEST:  Objection, form.

5              THE WITNESS:  Yes, this is his

6   writing style.

7   BY MR. O'ROURKE:

8        Q.    Mr. Bertrand, did you receive

9   another e-mail from Mr. Goldman the following day

10  concerning the PIPE?

11             MR. BEST:  Objection, form.  Are you

12  going to ask him a question about this document?

13  You gave him a document.  He is now looking at

14  it.

15  BY MR. O'ROURKE:

16       Q.    Do you need the question read back?

17       A.    Please.

18             Question was read back.

19             THE WITNESS:  Possibly, yes.

20  BY MR. O'ROURKE:

21       Q.    Let me show you what was previously

22  marked as Plaintiff's Exhibit 46 bearing the

23  Mamma production Bates number MammaPro00292 and

24  293 as it was produced to the SEC in the

25  investigation.  As produced it also included a

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

Page 46

1    blacked-out part of two lines.  And do you see

2    that that e-mail is different than the previous

3    one that we looked at that was dated the 28th,

4    Exhibit 43?

5           A.    Yes, they are different.

6           Q.    And what's been marked as

7    Plaintiff's Exhibit 46, is that a copy of an

8    e-mail that you received from Mr. Goldman on

9    June 29th?

10          A.    Yes.

11                MR. BEST:  Objection, form.

12   BY MR. O'ROURKE:

13          Q.    And was that sent to you and the

14   members of the board as well, as we have

15   previously seen on some other e-mails?

16          A.    Yes.

17          Q.    And what was your understanding of

18   the purpose of this e-mail?

19                MR. BEST:  Objection, form.

20                THE WITNESS:  It was to confirm the

21   final conditions of the PIPE.

22   BY MR. O'ROURKE:

23          Q.    And finally -- was it after

24   agreement had been reached the night before?

25          A.    That is what is indicated on the

Daniel Bertrand                                                        January 31, 2012

Montreal, Canada

Page 47

 1   document, yes.

 2                  MR. BEST:  Objection form.  Move to

 3   strike.

 4   BY MR. O'ROURKE:

 5        Q.     And calling your attention to the

 6   first page of Exhibit 46, the fourth bullet point

 7   on that page, do you see that?

 8        A.     Yes.

 9        Q.     It says:

10                "We did speak to Mark Cuban (Guy,

11   and subsequently our investment banker) to find

12   out if he had any interest in participating to

13   the extent of maintaining his interest."

14                Do you see that?

15        A.     Yes.

16        Q.     And did I read it correctly so far?

17        A.     Yes.

18        Q.     And then it goes on to say:

19                "His answers were:  He would not

20   invest, he does not want the company to make

21   acquisitions.  He will sell his shares, which he

22   cannot do until after we announce."

23                And did I read that correctly?

24                MR. BEST:  Objection, form.

25                THE WITNESS:  Yes.

Daniel Bertrand                                          January 31, 2012

Montreal, Canada

Page 48

```
 1
 2    BY MR. O'ROURKE:
 3        Q.     And is this something that you would
 4    have read, based on your practice at the time of
 5    receipt of this e-mail from Mr. Goldman?
 6               MR. BEST:  Objection, form.
 7               THE WITNESS:  Yes.
 8    BY MR. O'ROURKE:
 9        Q.     And the reference in that bullet
10    point at the beginning:
11               "We did speak to Mark Cuban (Guy and
12    subsequently our investment banker)", do you have
13    an understanding as to who that investment banker
14    was?
15        A.     It was our banker Merriman, I
16    presume, because that was the banker that was
17    mandated by the company.
18        Q.     And that would be Merriman Curhan &
19    Ford?
20        A.     Yes.
21        Q.     And that was the firm that the
22    engagement agreement was entered into that we
23    looked at earlier this morning?
24        A.     Yes.
25        Q.     Again, style-wise, does -- do you
```

Daniel Bertrand                                                      January 31, 2012

Montreal, Canada

```
                                                          Page 49

 1    recognize the style, the way this e-mail in

 2    general and that bullet point in particular is

 3    written?

 4           A.      Yes.

 5                   MR. BEST:  Objection, form.

 6    BY MR. O'ROURKE:

 7           Q.      And whose style do you recognize it

 8    to be?

 9           A.      Mr. David Goldman.

10           Q.      Sir, let me call your attention to a

11    one-page document, which is marked as Plaintiff's

12    Exhibit 47.  And was that -- have you had a

13    chance to look at it?

14           A.      Yes.

15           Q.      And is that another e-mail that was

16    sent from Dave Goldman to you and the members of

17    the board?

18           A.      Yes.

19           Q.      And for starters, was there attached

20    to this a draft press release?

21           A.      Yes.

22           Q.      And you do recall we saw earlier the

23    press release -- the public announcement did go

24    out that afternoon or evening?

25           A.      Yes.
```

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

Page 50

```
 1         Q.     And then the next paragraph, does

 2    that correct -- make a correction with respect to

 3    the previous e-mail from Mr. Goldman concerning

 4    the communication with Cuban -- Mr. Cuban?

 5                    MR. BEST:  Objection, form.

 6                    THE INTERPRETER:  Could you repeat

 7    the question?  I am not sure I got it.

 8                    Question was read back.

 9                    MR. BEST:  Objection, form.

10                    THE WITNESS:  Yes, it was to correct

11    or to bring a clarification to the previous

12    e-mail.

13    BY MR. O'ROURKE:

14         Q.     Concerning communication with Mr.

15    Cuban?

16         A.     Yes.

17         Q.     Okay.  Now, sir, do you recall if

18    there were any further -- if there was any

19    further discussion concerning the communication

20    with Mr. Cuban that day, the 29th, prior to the

21    public announcement of the PIPE by Mamma?

22                    MR. BEST:  Objection, form.

23                    THE WITNESS:  I don't recall.

24    BY MR. O'ROURKE:

25         Q.     Okay.  Subsequently did there come a
```

Daniel Bertrand                                                    January 31, 2012

Montreal, Canada

Page 51

 1   point in time in which you learned that Mr. Cuban

 2   had sold his shares in Mamma?

 3        A.    Yes.

 4        Q.    And did you initially learn it from

 5   a filing he made?

 6        A.    I learned it from an e-mail sent by

 7   Mr. David Goldman.

 8        Q.    I show you what's been marked as

 9   Plaintiff's Exhibit 50.  Is that the e-mail?

10        A.    Yes.

11        Q.    And the e-mail refers to Mr. Cuban

12   having filed with the SEC that he had sold his

13   600,000 shares.  Do you see that?

14        A.    Yes.

15        Q.    Now, did you learn at that time that

16   Mr. Cuban had in fact sold his shares prior to

17   the public announcement of the PIPE offering by

18   Mamma?

19             MR. BEST:  Objection, form.

20             THE WITNESS:  No, no.

21   BY MR. O'ROURKE:

22        Q.    Subsequently did there come a point

23   in time that you learned that Mr. Cuban sold his

24   shares prior to the public announcement?

25        A.    Yes.

# EXHIBIT E

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT TEXAS

 3               DALLAS DIVISION

 4    --------------------------------------

 5   SECURITIES AND EXCHANGE COMMISSION

 6                         Plaintiff,

 7          -v-           Civ. No. 3:08-cv-2050

 8                         (SAF)

 9   MARK CUBAN,

10                         Defendant.

11   --------------------------------------

12

13              DEPOSITION of GUY FAURE, a

14   non-party witness herein, held at the Offices of

15   Ropes & Gray, 1211 Avenue of the Americas, New

16   York, New York on November 4, 2011 at 9:33 a.m.,

17   and before Helene Gruber, CSR, a Notary Public of

18   the State of New York.

19

20

21

22

23

24

25

                         Page 1
```

APP. 27

```
 1                        G. Faure

 2    mostly by e-mail.  Is this one of those

 3    e-mails that he is asking what he can do to

 4    help out the company, as you described it?

 5         A.   Yes.

 6         Q.   And specifically the first

 7    paragraph, "Where would you like me to help

 8    out?  Happy to do it where I can if you have a

 9    specific idea.  Is there a specific biz area

10    you want promoted?  Mamma.com traffic or

11    building the network?"

12              That in particular is an example of

13    what you were referring to?

14              MR. BEST:  Objection to form.

15         Q.   Is that an example of what you were

16    referring to?

17              MR. BEST:  Objection to form.

18         A.   Yes.

19         Q.   Then he goes on next paragraph, "As

20    you know, I think blogs are hot.  If you have

21    a product that supports blogs, I can add

22    blogmaverick.com."  Is that another example?

23              MR. BEST:  Objection to form.

24         A.   Yes.

25         Q.   What about the next paragraph?  I
```

APP. 28

```
  1                    G. Faure

  2   will read it, and you can tell me first if I

  3   have read it correctly.  "What other

  4   acquisitions are you looking at?  May be

  5   companies I can help with, and obviously what

  6   you tell me is confidential, and since I can't

  7   buy stock right now, it's not anything I can

  8   act on either so let me know how I can help

  9   there."

 10            Did I read that correctly?

 11       A.    Yes.

 12       Q.    And is that something that you

 13   received from Mr. Cuban on April 23rd, 2004,

 14   the date of the e-mail?

 15       A.    Yes.

 16       Q.    Did you understand from that that he

 17   was asking in particular about acquisitions

 18   that you were considering?

 19            MR. BEST:  Objection to form.

 20            MR. O'ROURKE:  Let me strike that

 21       and start over.

 22       Q.    What did you understand the request

 23   to -- what kind of information was he

 24   requesting there?

 25       A.    I don't specifically recall or can
```

Page 54

APP. 29

New York, NY

```
 1                    G. Faure

 2   make this up, but I am reading that he is

 3   basically asking, you know, "In your

 4   mergers -- "In your M&A strategy, are you

 5   looking at other acquisitions or" -- you know,

 6   "What type of acquisitions are you looking

 7   for?"

 8       Q.   And the representation there, the

 9   statement, I should say, there, "And obviously

10   what you tell me is confidential," is that

11   something that you would have read at the

12   time?

13            MR. BEST:  Objection to form.

14       A.   Yes.

15       Q.   And is that something -- did you

16   take that into consideration at the time?

17            MR. BEST:  Objection to form.

18       A.   I don't recall.

19       Q.   But you would have received it at

20   the time and reviewed it at the time?

21       A.   Yes.

22       Q.   And also the statement by him there

23   following up on the request for acquisition

24   information, "And since I can't buy stock

25   right now and it is not something I can act on
```

Page 55

APP. 30

New York, NY

```
  1                    G. Faure

  2   either," is that something you also would have

  3   reviewed when you received it at the time?

  4            MR. BEST:  Objection to form.

  5       A.   I would have read it, yes.

  6       Q.   And considered it?

  7            MR. BEST:  Objection to form.

  8       A.   I am not sure what you mean by

  9   "considered it."

 10            I mean, "And obviously what you tell

 11   me is confidential, and since I can't buy

 12   stock right now it is not anything I can act

 13   on either," I am not certain what it

 14   particularly relates to at this time, but I

 15   can certainly read the statement and

 16   understand that he would keep confidential

 17   information.

 18       Q.   Confidential information that you

 19   provided to him pursuant to this e-mail?

 20            MR. BEST:  Objection to form.

 21            MR. O'ROURKE:  Strike that.

 22       Q.   Did you respond to this e-mail?

 23       A.   I don't recall.

 24            MR. O'ROURKE:  Let me ask the court

 25       reporter to mark this document as the
```

Page 56

APP. 31

```
 1                    G. Faure

 2        next exhibit, 64.

 3               (E-mail dated April 23, 2004 marked

 4        SEC Exhibit 64.)

 5        Q.   The court reporter has handed you

 6    what has been marked as Exhibit 64, Bates

 7    number MCSEC0000583 through 584.  It is a

 8    two-page exhibit containing a string of

 9    e-mails.

10               I call your attention to the first

11    page, and not the top e-mail but the second

12    e-mail from the top.  Does that appear to be

13    your response to the e-mail from Mr. Cuban

14    that we marked as Exhibit number 63?

15               MR. BEST:  Objection to form.

16        A.   Yes.

17        Q.   And is that an e-mail that you

18    received from Mr. Cuban on April 23rd, 2004 at

19    the indicated -- after you sent --

20               MR. O'ROURKE:  Strike that and

21        start over.

22        Q.   Did you send that e-mail, the second

23    one there from the top of the page, after you

24    received Mr. Cuban's e-mail that we had marked

25    as Exhibit 63?
```

Page 57

APP. 32

New York, NY

```
 1                    G. Faure

 2              MR. BEST:  Objection to form.

 3        A.    Yes.

 4        Q.    And the information that you provide

 5   in that e-mail that has the time 7:57 a.m.

 6   stated there, is that information concerning

 7   your acquisition strategy?

 8              MR. BEST:  Objection to form.

 9        A.    Yes.

10        Q.    What was your purpose in providing

11   this to Mr. Cuban?  By "this," I am referring

12   to the information provided in the e-mail sent

13   at 7:57.

14              MR. BEST:  Objection to form.

15        A.    I am basically responding to his

16   question about what is your -- you know, what

17   type of acquisitions are you looking at and

18   where can I help out?

19              You know, I am giving him some

20   broad, you know, information about I am

21   looking to make acquisitions in those areas.

22        Q.    Per his request?

23              MR. BEST:  Objection to form.

24        A.    Yes.

25        Q.    And then on top of your e-mail there
```

Page 58

APP. 33

```
 1                    G. Faure

 2    is an e-mail dated 4-23 at 11:28 a.m. from

 3    Mark Cuban.  Is that something that you also

 4    received from Mr. Cuban, an e-mail that you

 5    received?

 6        A.   Yes.

 7        Q.   And is he replying there, as you

 8    read it at the time, to your information on

 9    your acquisition strategy?

10             MR. BEST:  Objection to form.

11        A.   Yes.

12        Q.   Sir, calling your attention to the

13    PIPE transaction that was -- of Mamma.com that

14    was publicly announced on June 29th, 2004, as

15    that PIPE or proposed PIPE was evolving

16    through the month of June 2004, how did the

17    company treat information concerning the

18    possible PIPE?

19             MR. BEST:  Objection to form.

20        A.   Could you clarify your question?

21    What do you mean by --

22        Q.   Was it treated confidentially?

23        A.   I believe so, yes.

24        Q.   And why was that?

25        A.   Because this PIPE transaction was
```

New York, NY

```
 1                    G. Faure

 2   a -- was a material transaction.  It was a

 3   significant investment in a public company;

 4   therefore, it had to be treated as

 5   confidential information.

 6        Q.   Did there come a point in time in

 7   June of 2004 in which someone raised the idea

 8   of approaching Mark Cuban concerning a

 9   possible participation in the Mamma.com PIPE?

10        A.   Yes.

11        Q.   And how did that come to be?

12        A.   I don't specifically recall whom,

13   but I remember in late June that the board

14   members had a discussion where they said

15   should we invite Mr. Cuban, who is an

16   important shareholder in the company, to

17   participate in this transaction.

18        Q.   Do you recall any communications

19   before that board consideration?

20        A.   Not specifically, no.

21        Q.   The board consideration that you are

22   referring to, do you recall it was on

23   June 28th, 2004?

24             MR. BEST:  Objection to form.

25        A.   Yes.
```

APP. 35

New York, NY

```
 1                    G. Faure

 2    here in the US.

 3         Q.   Or July 4th?

 4         A.   Or July 4th.

 5         Q.   Do you recall receiving this e-mail

 6    from Mr. Goldman?

 7         A.   I see it now so, yes, I have

 8    received it.

 9              MR. BEST:  I am going to object to

10         the answer.  It is non-responsive.

11         Q.   You see it now.  Do you have any

12    doubt that you received it on that date?

13         A.   No.

14         Q.   Do you see where it says "Guy, Arnie

15    called me with an interesting question, should

16    we ask Cuban if he wants to participate.  My

17    off-the-cuff answer was he is against these

18    instruments.  Sent him your blog comment.  He

19    could blow up at an inconvenient time.  He

20    would be privy to information not available to

21    other shareholders.  Your thoughts, Dave."

22              Do you recall if you communicated

23    with Mr. Goldman concerning the subject

24    matter of this e-mail?

25         A.   I recall informing Mr. Goldman,
```

Page 62

APP. 36

```
 1                    G. Faure

 2   verbally or through e-mail, that Mr -- that he

 3   is against these instruments, that Mr. Cuban

 4   was not a big supporter of PIPE transactions.

 5        Q.   When you said "he is against it,"

 6   were you referring to Mr. Cuban?

 7        A.   Yes.

 8        Q.   And what were you referring to

 9   there?

10        A.   I recall --

11             MR. BEST:  Object to the form of

12        the question.

13        A.   I recall that Mr. Cuban had a blog,

14   and he discussed on a blog mentioning another

15   or other companies that did a PIPE

16   transaction, and he wasn't a big supporter of

17   that.

18        Q.   But the reference there in the

19   e-mail to you from Mr. Goldman, "He could blow

20   up at an inconvenient time," did you

21   understand that that would have referred to

22   Mr. Cuban?

23             MR. BEST:  Objection to form.

24        A.   Yes.

25        Q.   And did you discuss that with
```

New York, NY

```
 1                    G. Faure

 2   Mr. Goldman?

 3        A.   I don't recall specifically.  I

 4   mean, we had -- when we had the board

 5   conversation, I guess this was discussed; that

 6   Mr. Cuban might not be a big supporter, so do

 7   we still invite him or not, and weighing the

 8   plus or minuses.  It was further decided that

 9   we should invite him.

10        Q.   And was one of the factors that he

11   could blow up at an inconvenient time, do you

12   recall?

13             MR. BEST:  Objection to form.

14        Q.   When you were discussing this with

15   the board members?

16        A.   Well, blow up at an inconvenient

17   time, I am not sure what it means, but not

18   being a big supporter of PIPEs, he could be

19   against it, yes.

20        Q.   What about the he would be privy to

21   information not available to other

22   shareholders; was that a factor you discussed

23   with Mr. Goldman either in response to this

24   e-mail or in connection with the discussions

25   with the board?
```

Page 64

APP. 38

New York, NY

```
 1                    G. Faure
 2      A.   I don't recall what that specific
 3  sentence meant at that time.  Obviously we
 4  will get into a conversation where he was
 5  invited, and it was -- this was confidential
 6  information.  The PIPE was an instrument.
 7            MR. BEST:  I am going to object to
 8       the answer as not being responsive to
 9       the question.
10      Q.   The reference there in the e-mail
11  "He would be privy to information not
12  available to other shareholders," did you
13  understand at this point in time from
14  June 23rd until June 28th that shareholders
15  generally had not been apprised of the
16  possible PIPE?
17            MR. BEST:  Objection to form.
18      A.   That our general community of
19  shareholders?
20      Q.   General community of shareholders
21  had not been apprised?
22      A.   That is right.  They were not --
23  they had not been informed about the PIPE yet.
24      Q.   And the reference to "Send him your
25  blog comment" that is there --
```

Page 65

New York, NY

```
 1                    G. Faure

 2        Q.   And it reads "Guy, does it make

 3   sense to invite Cuban to be part of the PIPE?

 4   He may be offended if we don't offer.  Also

 5   from a marketing perspective it might help.

 6   Have you thought about this?  When do you want

 7   to get caught up?  Thanks, Tom."

 8             Did I read that correctly?

 9             MR. BEST:  Objection to form.

10        A.   Yes.

11        Q.   Is this an e-mail that you received

12   from Mr. O'Shea on or about June 24th, 2004

13   concerning inviting Mr. Cuban?

14             MR. BEST:  Objection to form.

15        A.   Yes.

16        Q.   And do you recall if you discussed

17   that subject matter with Mr. O'Shea in that

18   time period prior to the board meeting on the

19   24th?

20        A.   I don't recall, no.

21        Q.   Now, you referred to a discussion

22   with the board on June 24th.  Do you recall

23   generally what you said about that?

24   June 28th.  I am sorry.

25        A.   Yes.
```

APP. 40

New York, NY

```
  1                      G. Faure

  2        Q.   I would like to focus on that.  Did

  3   Mr. Goldman participate in the discussion?

  4        A.   Yes.

  5        Q.   Where were you for the discussion?

  6        A.   I was with Mr. Goldman in the

  7   Montreal offices.

  8        Q.   Do you recall if anyone else was

  9   physically present for the discussion?

 10        A.   I believe Mr. Daniel Bertrand, our

 11   CFO, was also present on the conversation.  I

 12   am not 100 percent certain, but I believe he

 13   was.

 14        Q.   I apologize for the

 15   mispronunciation, but Mr. Bertrand, was he a

 16   member of the board?

 17        A.   No, he was not.

 18        Q.   What was his position?

 19        A.   CFO of the company.

 20        Q.   Chief financial officer?

 21        A.   That is right.

 22        Q.   Do you recall if members of -- any

 23   other members of the board participated in the

 24   call -- in the discussion?

 25        A.   Yes.  I believe that most, if not
```

APP. 41

```
 1                    G. Faure

 2    all, other members of the board were on the

 3    telephone.

 4         Q.   Participated by telephone?

 5         A.   Yes.

 6         Q.   What was the subject of the

 7    discussion?

 8         A.   The subject of the discussion was to

 9    try to wrap up this PIPE transaction, and

10    offering Mr. Cuban an invitation to the PIPE

11    was also part of that conversation.

12         Q.   What was said about whether Mr.

13    Cuban should be offered a chance to

14    participate?

15         A.   Well, I don't specifically recall

16    the words, but --

17         Q.   Do you recall in substance?

18         A.   I recall that there were some

19    discussions that Mr. Cuban, being a

20    significant shareholder, supported the company

21    but not necessarily supportive of a PIPE

22    transaction.  Should we or should we not be

23    inviting him to participate in this PIPE

24    transaction, and the conclusion was that we

25    should.
```

Page 71

New York, NY

```
 1                    G. Faure

 2       Q.   And for what reason?

 3       A.   Again, I don't specifically recall

 4   the words, but, you know, if we don't invite

 5   him and he doesn't like the PIPEs, he will

 6   feel offended.  At least we might have a

 7   chance if we invite him that if he likes the

 8   company enough, that he might want to

 9   participate, but the conclusion was that --

10   you know, weighing the pros and cons was to

11   basically invite him.

12       Q.   Was he the largest shareholder at

13   the time?

14       A.   I believe so, yes.

15       Q.   Do you recall if in substance

16   anything was said about possible dilution of

17   his position if he was not allowed to

18   participate?

19       A.   Don't specifically recall, no.

20       Q.   Was a decision made to offer him an

21   opportunity to participate in the PIPE?

22       A.   Yes.

23            MR. BEST:  Objection to form.

24       A.   Yes.  At this conversation it was

25   decided that we should invite him.
```

APP. 43

New York, NY

```
 1                    G. Faure

 2       Q.   Was anything said about how that

 3  invitation would be extended?

 4       A.   Yes.  The board asked me to contact

 5  Mr. Cuban, because I had been in contact with

 6  him, and the board specifically asked me to

 7  convey that I had confidential information for

 8  Mr. Cuban, and then invite him to participate

 9  in a PIPE.

10       Q.   You said asked you to contact him

11  because you had been in contact with him.  Are

12  you referring to the business discussions with

13  him that you told us about earlier this

14  morning?

15       A.   Yes.

16       Q.   And you referred to "Tell him that

17  it was confidential information."  What did

18  you understand by that?

19            MR. BEST:  Objection to form.

20       A.   My understanding is that the board

21  proceeded to ask me to invite Mr. Cuban, and

22  just make sure that -- you know, "Make sure

23  you tell him that you have confidential

24  information, and then invite him to

25  participate," because this PIPE was a
```

Page 73

APP. 44

Guy Faure                                                                November 4, 2011

New York, NY

```
 1                    G. Faure

 2   confidential matter.

 3        Q.   As you described earlier?

 4        A.   Yes.

 5        Q.   Do you recall what time of day this

 6   meeting was, or this discussion was, I should

 7   say, with Mr. Goldman and possibly

 8   Mr. Bertrand and the board?

 9        A.   In the morning.

10        Q.   On June 28th?

11        A.   That's correct.

12        Q.   And then did you contact Mr. Cuban

13   as you were instructed to do?

14        A.   Yes.

15        Q.   How did you proceed with that?

16             MR. BEST:  Objection to form.

17        A.   I recall after the meeting sending

18   an e-mail to Mr. Cuban telling him that --

19   asking him to call me, and that I had

20   something to tell him or discuss.

21        Q.   Did you receive a return call from

22   him?

23        A.   Yes, I did.

24        Q.   What was the timing of the return

25   call compared to when you sent the e-mail out?
```

Page 74

APP. 45

```
 1                    G. Faure

 2       Q.   Mr. Faure, when Mr. Cuban called you

 3   in response to your e-mail, the phone call

 4   that you received at 1:00 o'clock on

 5   June 28th, what did you -- what was said in

 6   the phone call?

 7       A.   Well, Mr. Cuban called me.  I

 8   answered the phone, and I said "Mark, I've got

 9   confidential information."

10            He somewhat acknowledged that I had

11   confidential information.

12            I don't remember any specific words,

13   but he said "um hum, go ahead," something to

14   that effect.

15            I proceeded to mention to him that

16   we were close to concluding a PIPE

17   transaction, and that the board wanted to

18   invite him to participate in this PIPE

19   transaction.

20       Q.   Okay.  Now, when you said that you

21   had confidential information, was that the

22   first thing you said to him about the PIPE?

23       A.   I believe so, yes.

24       Q.   Was that at the beginning of the

25   call?
```

<div align="center">Page 81</div>

New York, NY

```
 1                    G. Faure

 2        A.   Yes.

 3        Q.   Did he acknowledge what you said to

 4   him?

 5             MR. BEST:  Objection to form.

 6        A.   I believe so, yes.

 7        Q.   Just so we are clear, how did he

 8   acknowledge that?

 9             MR. BEST:  Objection to form.

10        A.   Again, I don't remember the specific

11   words, but it was "Okay, uh huh, go ahead,"

12   which in my mind certainly said "Okay, I

13   understand you have confidential information.

14   Go ahead."

15        Q.   Was it after then that you proceeded

16   to say something else?

17        A.   Yes.

18        Q.   What was the something else that you

19   said?

20        A.   "We are concluding a PIPE

21   transaction.  The board would like to invite

22   you.  Are you interested -- are you interested

23   in participating in this PIPE?"

24        Q.   And then what was his response?

25        A.   His response was very negative.  He
```

Page 82

APP. 47

Guy Faure                                                    November 4, 2011
New York, NY

```
 1                    G. Faure
 2   said "No, no way.  I'm against PIPE.  It
 3   dilutes shareholder base.  You should be
 4   growing organically.  You don't need any
 5   financing," and the conversation went back and
 6   forth where I said "Well, I think it is the
 7   right time for us to do this type of
 8   investment.  The stock price is well-priced
 9   right now.  It is a good moment to do this
10   type of transaction," but he disagreed, he
11   disagreed, and did not want to participate.
12            Then I guess at the end of the call
13   he did mention to me "Well, now I'm" --
14   something like "Now I'm screwed.  I can't
15   sell."
16            This was pretty much the
17   conversation, the gist of the conversation.
18       Q.   What was the tone of the
19   conversation after you mentioned that the
20   company was proceeding with the PIPE?
21       A.   Well, Mr. Cuban was not impolitely
22   yelling at me.  It was, I would say,
23   somewhat -- it was okay, courteous, but it was
24   emotional.  He got -- he was not happy,
25   obviously not happy about us making this type
```

Page 83

```
 1                   G. Faure

 2    of transaction.

 3         Q.    You mentioned a back and forth

 4    discussion.  Did I hear you correctly?

 5         A.    Yes.

 6         Q.    Was that back and forth discussion

 7    before he made the comment "Well, now I'm

 8    screwed; I can't sell"?

 9         A.    Mostly, yes.

10         Q.    Did you tell him the purpose in that

11    back and forth discussion, the purpose of the

12    PIPE?

13         A.    Yes.

14              MR. BEST:  Objection to form.

15         Q.    What did you tell him in that

16    regard?

17         A.    Again, I don't specifically remember

18    the words, but I mentioned that for a small

19    company like us, competing in a competitive

20    sector, it was a good opportunity for us to

21    build, like we mentioned before, a war chest;

22    having some money to -- in order to pursue our

23    M&A activities, because it was difficult to

24    grow the company, you know, organically.

25              And that's when the back and
```

New York, NY

```
  1                    G. Faure

  2    question.

  3         Q.   Did you consider that to be strong

  4    language when he said it?

  5              MR. BEST:  Objection to form.

  6         A.   Yes, it was strong, emotional, but,

  7    again, I was not necessarily personally

  8    offended by it.

  9         Q.   When you told him that you had

 10    confidential information to provide, did Mr.

 11    Cuban say anything to indicate that he did not

 12    want to receive such information?

 13         A.   No.

 14         Q.   When you told him that you had

 15    confidential information to provide, did you

 16    after that, did you understand that he would

 17    treat the information confidentially?

 18              MR. BEST:  Objection to form.

 19         A.   It was my deduction that with his

 20    acknowledgment being an "Uh huh, yes," or "go

 21    ahead," that yes, he understood he had

 22    confidential information.

 23         Q.   After the discussion, the back and

 24    forth discussion and the statement by Mr.

 25    Cuban "Well, now I'm screwed.  I can't sell,"
```

Page 87

APP. 50

New York, NY

```
 1                    G. Faure

 2   did you understand that he would not sell

 3   until after the public announcement?

 4             MR. BEST:  Objection to form.

 5        A.   Yes.

 6        Q.   Do you recall if you told him the

 7   amount of money that was to be raised in the

 8   PIPE in this phone call that you had with Mr.

 9   Cuban?

10        A.   No, I don't specifically recall

11   telling him the exact amount.

12        Q.   Do you think that is something you

13   would have told him?

14             MR. BEST:  Objection to form.

15        A.   I mean, perhaps.  I believe I had an

16   idea of how much we were able to raise so I

17   might have given him a range, but I am not

18   sure.  I don't specifically recall.

19        Q.   After the phone call with Mr. Cuban

20   was concluded, what did you do?

21        A.   I don't specifically recall if I

22   went out for a quick sandwich for 15, 20

23   minutes, 30 minutes, but I certainly came back

24   to the office fairly quickly after, and I

25   recall informing Mr. Goldman of the gist of
```

Page 88

APP. 51

```
 1                    G. Faure

 2   the conversation.

 3        Q.   Did you have a further communication

 4   with Mr. Cuban concerning the PIPE?

 5            MR. BEST:  Objection to form.

 6        A.   I recall later on that day sending

 7   Mr. Cuban an e-mail basically telling him that

 8   "If you want more information about the PIPE

 9   transaction, contact MCF," and I believe I

10   told him Mr. Arnie Owen and gave him the

11   coordinates.

12        Q.   By "coordinates," you mean the phone

13   number to call him at, phone number or e-mail?

14        A.   Phone number or e-mail, yes.

15            MR. O'ROURKE:  Let me ask the court

16        reporter to mark this document as the

17        next exhibit.

18            (E-mail dated June 28, 2004 marked

19        SEC Exhibit 69.)

20        Q.   Mr. Faure, the court reporter has

21   kindly marked Exhibit number 69 as the next

22   exhibit and has handed it to you.  Is this a

23   copy of an e-mail that you sent to Mr. Mark

24   Cuban?

25        A.   Yes.
```

Page 89

APP. 52

New York, NY

```
 1                    G. Faure

 2       Q.   And did you send it on June 28,

 3   2004?

 4       A.   Yes.

 5       Q.   Was this the follow-up e-mail that

 6   you referred to?

 7       A.   Yes.

 8       Q.   The e-mail with the coordinates?

 9            MR. BEST:  Objection to form.

10       Q.   Was this the e-mail with the

11   coordinates that you referred to?

12       A.   Yes.

13       Q.   It reads, does it not, "Hi, Mark.

14   If you want more details about the private

15   placement, please contact (I guess you or your

16   financial advisors) Arnie Owen at," a phone

17   number provided.  "Arnie is with Merriman

18   Curhan & Ford.  Regards," and it is your

19   signature block with the Mamma logo, correct?

20       A.   Correct, yes.

21       Q.   Why were you sending him to Mr. Owen

22   for more details?

23            MR. BEST:  Objection to form.

24       A.   I vaguely recall that after

25   informing Mr. Goldman about my phone
```

APP. 53

```
 1                    G. Faure

 2   conversation, he said "Why don't you" -- he

 3   asked me "Why don't you at least send him

 4   Arnie's coordinates, that if he wants more

 5   information about the PIPE, he can contact him

 6   directly."

 7        Q.   Did Mr. Arnie Owen have more

 8   information about the PIPE, the details of it,

 9   than you had?

10        MR. BEST:  Objection to form.

11        A.   If he had more details than I had?

12   Yes.

13        Q.   I mean, would Mr. Arnie Owen have

14   known the terms of the deal at that point in

15   time?

16        MR. BEST:  Objection to form.

17        A.   Yes.

18        Q.   Do you know if you knew the terms at

19   that point in time?

20        A.   Yes.  I knew some of the broader

21   terms, but Mr. Owen was the expert in those

22   types of transactions.  That was what he was

23   doing.

24        Q.   By sending Mr. Cuban to Mr. Arnie

25   Owen if he wanted those additional details,
```

APP. 54

New York, NY

```
 1                    G. Faure

 2        Q.   And then did Mr. Goldman take steps

 3   to prepare an e-mail concerning what you told

 4   him?

 5             MR. BEST:  Objection to form.

 6        A.   I don't recall if he immediately

 7   took steps, no.

 8        Q.   Do you recall that he prepared an

 9   e-mail?

10        A.   Yes, I believe so.

11        Q.   And do you recall where you were

12   when you filled him in on the phone call with

13   Mr. Cuban?

14        A.   I believe I was in the Montreal

15   office.

16        Q.   Do you recall where in the Montreal

17   office; your office, Mr. Goldman's or

18   somewhere else?

19        A.   I don't specifically recall.

20   Probably in my office or in his office.

21        Q.   Let me show you what was previously

22   marked as Plaintiff SEC Exhibit 43, a one-page

23   e-mail dated June 28, 2004.  Are you familiar

24   with that e-mail?

25        A.   Yes.
```

                         Page 99

APP. 55

New York, NY

```
 1                    G. Faure

 2      Q.   Was that an e-mail signed by both

 3   you and Mr. Dave Goldman?

 4      A.   Correct.

 5      Q.   Was it sent from the e-mail address

 6   of Mr. Dave Goldman?

 7           MR. BEST:  Objection to form.

 8      A.   Correct.

 9      Q.   And who was it sent to?

10      A.   It was sent to Mr. Daniel Bertrand,

11   Robert Raich, Irwin Kramer, David Schwartz,

12   Dave Goldman, Claude Forget and myself,

13   therefore the board except for Daniel

14   Bertrand, who is not a board member but the

15   CFO of the company.

16      Q.   The subject matter listed is New

17   Equity Urgent - Your Approval Required.  Do

18   you recall why it was so labeled?

19      A.   Let me take a second just to review

20   this.

21      Q.   Please.

22           (Pause in the proceedings.)

23      A.   Well, I understand that this e-mail

24   where we were in the last leg of completing

25   this equity talks about in the first part, the
```

APP. 56

```
 1                    G. Faure

 2     first four paragraphs, about technicalities in

 3     completing this PIPE financing, and last or

 4     second to last paragraph was pertaining to my

 5     discussion with Mr. Cuban.

 6         Q.   The paragraph about your discussion

 7     with Mr. Cuban is the one that begins "Today

 8     after much discussion, Guy spoke to Mark Cuban

 9     about this equity raise"?

10         A.   Correct.

11         Q.   What was the intent of including, as

12     you understood it, of including that paragraph

13     about your communication with Mr. Cuban in the

14     e-mail to the board and Mr. Bertrand?

15              MR. BEST:  Objection to form.

16         A.   I understand that this was partly or

17     specifically my discussion with Mr. Cuban

18     coming back to the board to inform them on how

19     my conversation went with Mr. Cuban.

20         Q.   The paragraph in here that concerns

21     your conversation with Mr. Cuban, "Today after

22     much discussion" paragraph, did you type that

23     up?

24         A.   No, I did not.

25         Q.   Who did?
```

APP. 57

New York, NY

```
 1                    G. Faure

 2         A.   Mr. Goldman.

 3         Q.   Did you have a chance to review it

 4    before it went out?

 5         A.   Yes.

 6         Q.   And why was that?

 7         A.   Well, first of all, I know Mr.

 8    Goldman would not send something signed by

 9    himself and myself even if he composes it

10    without showing it to me before.

11         Q.   The paragraph read, "Today after

12    much discussion Guy spoke to Mark Cuban about

13    this equity raise and whether or not he would

14    be interested in participating.  As

15    anticipated, he initially flew off the handle

16    and said he would sell his shares (recognizing

17    that he was not able to do anything until we

18    announced the equity) but then asked to see

19    the terms and conditions, which we have

20    arranged for him to receive from one of the

21    participating investor groups with which he

22    has dealt in the past."

23              Did I read that correctly?

24              MR. BEST:  Objection to form.

25         A.   Yes.
```

Alderson Reporting Company
1-800-FOR-DEPO

APP. 58

New York, NY

```
 1                    G. Faure

 2        Q.   The reference there to "as

 3   anticipated, 'he initially flew off the

 4   handle,'" what was that referring to?

 5        A.   Most probably this was referring to

 6   our knowledge of him not being necessarily

 7   fond of a PIPE-type transaction.

 8        Q.   And the reference there, the

 9   statement there that "And said he would sell

10   his shares (recognizing that he was not able

11   to do anything until we announced the equity)"

12   what is that referring to?

13             MR. BEST:  Objection to form.

14        A.   This refers to the tone of the

15   conversation where he was not -- not only --

16   he was not willing to participate in the PIPE.

17   He reiterated -- well, he mentioned that in

18   the conversation, that he didn't like PIPEs

19   and he would not participate in the PIPE, and

20   by saying "Now I'm screwed.  I can't sell," an

21   obvious deduction that I had was that he would

22   not want to any longer participate in being an

23   owner of Mamma.com stock; but that he would

24   not sell before he could.

25        Q.   By "he could," you are referring to
```

Page 103

New York, NY

```
 1                    G. Faure

 2   when?

 3        A.    Until this becomes --

 4              MR. BEST:  Objection to form.

 5        A.    Until the PIPE becomes publicly

 6   announced.

 7        Q.    The statement "Recognizing that he

 8   was not able to do anything until we announced

 9   the equity," is that a summary of what in your

10   mind upon reviewing this before it went out,

11   was that a summary of what he said to you in

12   your conversation with him?

13              MR. BEST:  Objection to form.

14        A.    This was an impression on my part

15   after having the conversation.  He did not

16   necessarily use this -- these words, but the

17   tone of the conversation, not being fond of

18   the PIPEs and saying "Now I'm screwed.  I

19   can't sell" was an obvious deduction that not

20   only is he not going to participate, but he is

21   going to eventually divest his investment in

22   Mamma.com.

23        Q.    Is that a summary of what he then

24   told you as you understood it on the call?

25              MR. BEST:  Objection to form.
```

Page 104

APP. 60

New York, NY

```
 1                    G. Faure

 2        A.    This is a summary of our

 3   interpretation of the call, yes.

 4        Q.    Who chose -- did somebody choose to

 5   use those words, "Recognizing that he was not

 6   able to do anything" rather than using the

 7   term "screwed.  I can't sell"?

 8             MR. BEST:  Objection to form.

 9        A.    As I mentioned, Mr. Goldman composed

10   this e-mail so Mr. Goldman composed this

11   e-mail after me conveying my impression of the

12   call.

13        Q.    When you say "impression of the

14   call," are you talking about your recollection

15   of what Mr. Cuban had said on the call?

16             MR. BEST:  Objection to form.

17        A.    Correct.

18        Q.    Let me show you what was previously

19   marked as Plaintiff's Exhibit 42, a one-page

20   exhibit, the top part of which is an e-mail

21   from Michael Storck to David Goldman, the

22   bottom half of which is an e-mail, appears to

23   be an e-mail from Mr. Goldman to you and

24   Michael Storck at 2:43 p.m. on June 28th.  Do

25   you see that?
```

Page 105

APP. 61

New York, NY

```
 1                     G. Faure

 2              MR. BEST:  Objection to form.

 3       A.   I am sorry.  Can you repeat the

 4  question?

 5       Q.   Let me try it again.  Calling your

 6  attention to Exhibit number 42, the second

 7  half of the exhibit, the bottom e-mail there,

 8  do you see that?

 9       A.   Yes.

10       Q.   Was that an e-mail that Mr. Goldman

11  sent to you and Michael Storck on June 28th at

12  about -- at 2:43 p.m?

13              MR. BEST:  Objection to form.

14       A.   Yes.

15       Q.   What does the first sentence there

16  read?

17       A.   "Can you please review the comment

18  on the attached?"

19       Q.   Can you recall, do you recall what

20  that attachment was?

21       A.   No.

22       Q.   Was it a draft or a version of the

23  e-mail that he subsequently sent to the board,

24  do you recall?

25              MR. BEST:  Objection to form.  He
```

Page 106

APP. 62

New York, NY

```
 1                    G. Faure

 2        said he doesn't recall.

 3        A.    I don't recall.

 4        Q.    What about the second sentence

 5   there, "Related to Mark Cuban, Michael, it

 6   would be helpful if warrants were excluded

 7   from the calculation in case our mercurial

 8   friend changed his mind."  Do you see that?

 9        A.    Yes.

10        Q.    Do you have an understanding of what

11   Mr. Goldman was referring to there?

12             MR. BEST:  Objection to form.

13        A.    I don't recall, no.

14        Q.    Did you have -- do you recall having

15   a discussion, any discussion with Mr. Goldman

16   in which he referred to Mark Cuban as being

17   mercurial?

18             MR. BEST:  Objection to form -- I

19        withdraw that objection.

20        A.    No, and I would say that I am not

21   sure what mercurial means.

22        Q.    Fair enough.

23             Let me show you a copy of what was

24   previously marked as SEC Exhibit 41.

25             MR. O'ROURKE:  Note for the record,
```

Page 107

APP. 63

New York, NY

```
 1                      G. Faure

 2        a recent production from -- with Bates

 3        number DG1885 through 1886 by Mr.

 4        Goldman.

 5        Q.   Looking at this version of the cover

 6   e-mail along with the attachment draft to

 7   directors, does this refresh your recollection

 8   at all in terms of whether by this e-mail Mr.

 9   Goldman sent you a draft of the e-mail sent to

10   the board?

11        A.   Well, I guess this confirms that the

12   attachment to the previous e-mail you showed

13   me is the attachment that we reviewed in the

14   previous e-mail that was sent to all the board

15   members, yes.

16        Q.   Based on that review, does this

17   appear to you to be the means by which Mr.

18   Goldman sent you a copy of the proposed e-mail

19   for your review?

20             MR. BEST:  Objection to form.

21        A.   No.  I don't recall if I first saw

22   this draft to directors through this e-mail or

23   some other means.

24        Q.   So it may have been he just brought

25   it to you or sent it to you?
```

APP. 64

New York, NY

```
 1                      G. Faure

 2        A.   Maybe he just brought it to me,

 3   maybe I --

 4             MR. BEST:  Objection to form.

 5        A.   -- I saw it here when he sent this

 6   to myself and Michael Storck.

 7        Q.   I call your attention to what was

 8   previously marked as Plaintiff's Exhibit

 9   number 46, a two-page e-mail from Mr. Goldman,

10   subject:  New equity, dated June 29, 2004,

11   noting that there is one or two lines blacked

12   out in the middle of the document as was

13   produced.

14             Are you familiar with this e-mail,

15   sir?

16        A.   Yes.

17        Q.   What was this e-mail?

18        A.   To me this seems to be the wrap-up

19   of the points of the private -- the PIPE, the

20   private investment.

21        Q.   Was it an e-mail to the Board of

22   Directors as well as Mr. Daniel Bertrand?

23        A.   Yes.

24        Q.   By "wrap-up," you mean what?

25        A.   Wrapping up the -- informing the
```

APP. 65

New York, NY

```
 1                    G. Faure

 2   board on the technical points and informing

 3   the board on my conversation with Mr. Cuban.

 4        Q.   Did you have an understanding as to

 5   whether this also was a result of you filling,

 6   at least in part, filling Mr. Goldman in on

 7   your conversation with Mr. Mark Cuban?

 8             MR. BEST:  Objection to form.

 9        A.   Yes.  This is the thread of e-mails

10   that were prepared and sent to the board, yes.

11        Q.   On the first page of that e-mail,

12   the fourth bullet point, is that the paragraph

13   therein that refers to your -- about your

14   conversation with Mr. Mark Cuban?

15        A.   Correct.

16        Q.   And the statement on the fourth --

17   third, fourth and fifth lines, "His answers

18   were he would not invest.  He does not want

19   the company to make acquisitions.  He will

20   sell his shares, which he cannot do until

21   after we announce."

22             Do you see that?

23        A.   Yes.

24        Q.   Was that consistent with what you

25   had told Mr. David Goldman?
```

Page 110

APP. 66

New York, NY

```
  1                    G. Faure
  2              MR. BEST:  Objection to form.
  3       A.    Yes.
  4       Q.    You said that that e-mail marked as
  5  Exhibit number 46 was a wrap-up e-mail.
  6       A.    Yes.
  7              MR. BEST:  No.  You said it.
  8              MR. O'ROURKE:  Anything else you
  9        wanted to add to interrupt?  You are
 10        wrong, you are wrong, you are wrong.
 11              MR. BEST:  You said it was a
 12        wrap-up.
 13       Q.    Calling your attention back to
 14  Exhibit number 46, sir, was that sent on
 15  June 29 before the public announcement of the
 16  Mamma.com PIPE?
 17       A.    I believe so.  I believe the public
 18  announcement was done after trading that day.
 19       Q.    After the close of trading that day?
 20       A.    Right.
 21       Q.    Let me show you, sir, what was
 22  marked previously as Plaintiff's Exhibit
 23  number 49, two-page exhibit, and ask you to
 24  review that, and after you have reviewed that,
 25  if you can tell us if you know what that is.
```

Page 111

APP. 67

New York, NY

```
 1                    G. Faure

 2              Note while you are looking at it

 3    that it has the Bates number SEC-MC2994 and

 4    2995.

 5              (Pause in the proceedings.)

 6        A.   Yes.  This is the press

 7    announcement, the public announcement of

 8    our -- of the completed private equity

 9    financing.

10        Q.   What time was that issued on

11    June 29, 2004?

12              MR. BEST:  Objection to form.

13        A.   The press release here says 1800

14    hours, 6:00 o'clock at night.

15        Q.   Is that consistent with your

16    recollection as to when it was released?

17        A.   Yes.

18        Q.   Was this the first time that the

19    PIPE was publicly announced?

20              MR. BEST:  Objection to form.

21        A.   Yes.

22        Q.   And the press release announces the

23    amount of the PIPE, the amount of money being

24    raised by the PIPE, does it not?

25        A.   Yes.
```

Page 112

APP. 68

New York, NY

```
 1                    G. Faure

 2        A.    Because that was not my expectation.

 3    I expected he would sell his shares, but not

 4    before the public announcement as deducted

 5    from my phone conversation with him.

 6        Q.    Based on the discussion you had with

 7    him on June 28th, 2004?

 8            MR. BEST:  Objection to form.

 9        A.    Correct.

10        Q.    Mr. Faure, had you ever met me

11    before today?

12        A.    No, I haven't.

13        Q.    Had you ever talked with me before

14    today?

15        A.    I don't believe so.

16        Q.    And my colleagues here, Mr. Adam

17    Aderton -- same questions with respect to my

18    colleagues here.  Mr. Adam Aderton, Mr. Duane

19    Thompson?

20        A.    I don't believe so.  I have met a

21    few SEC personnel, but I don't believe I have

22    met any of them today.

23        Q.    And Mr. Terence Healy?

24        A.    Correct.

25        Q.    Either meeting or talking with them?
```

New York, NY

```
 1                    G. Faure

 2      Q.   Do you know the term temporary

 3   insider?

 4           MR. O'ROURKE:  Objection to form.

 5      A.   I know the term, and I don't recall

 6   that -- if he had been a temporary insider.

 7           I remember reviewing the notes here

 8   that we did share some information at some

 9   point, and he said that, you know, "I

10   understand I have confidential information."

11      Q.   We are going to get to that in a

12   second.

13           Do you recall that you ever gave

14   Mr. Cuban confidential information?

15           MR. O'ROURKE:  Same objection.

16      A.   Not specifically, no.

17      Q.   Indeed, at the time you called

18   Mr. Cuban on June 28, 2004, the company had a

19   fiduciary duty to Mr. Cuban as a shareholder,

20   correct?

21           MR. O'ROURKE:  Objection to form.

22      A.   In what sense are you saying that?

23      Q.   You had duties as regards --

24      A.   To all shareholders.

25      Q.   As he was a shareholder, you wrote
```

```
1                      G. Faure
2   you had fiduciary duties just like to any
3   other shareholder.
4            MR. O'ROURKE:  Objection to form.
5        A.   Yes.
6        Q.   Did Mr. Cuban owe any duties to you
7   as of June 28, 2004?
8            MR. O'ROURKE:  Objection to form.
9        A.   I don't believe so.
10       Q.   Do you believe that he was under any
11  type of master confidentiality agreement with
12  you?
13       A.   No.
14       Q.   Did you agree at the time you called
15  Mr. Cuban on June 28, 2004 you had an
16  understanding that any information,
17  preexisting understanding that any information
18  you shared was confidential?
19       A.   No.
20       Q.   If you had such an understanding,
21  you probably wouldn't have prefaced the call
22  saying you had confidential information,
23  correct?
24       A.   Correct.
25       Q.   Now, let me refer you back to
```

```
 1                    G. Faure

 2            MR. O'ROURKE:  Objection to form.

 3       A.   If this transcript is correct, yes.

 4       Q.   Do you have any reason to believe it

 5  is not correct?

 6       A.   No.

 7       Q.   Did you ever edit this transcript as

 8  regards this question?

 9       A.   No.

10       Q.   Let me turn our attention back to

11  the June 28, 2004 call with Mr. Cuban.  Was it

12  your understanding at the time of the June 28,

13  2004 call that since you told Mr. Cuban that

14  the information was confidential, and that he

15  gave some sort of acknowledgment to that, that

16  he was prevented from telling anyone else

17  about the information?

18       A.   I guess anyone else that didn't --

19  you know, he could speak to other people at

20  Mamma that had this information or our

21  investors, but basically it is my

22  understanding that if he had confidential

23  information, he had to keep it to himself.

24       Q.   If you need a break --

25       A.   I am fine.
```

APP. 72

New York, NY

```
 1                    G. Faure

 2      Q.    Was it also your understanding as of

 3  the June 28, 2004 call that since you told Mr.

 4  Cuban that the information was confidential

 5  and he gave some sort of acknowledgment, that

 6  he was as well prevented from trading

 7  Mamma.com securities based upon that

 8  information?

 9      A.    Yes, and that was confirmed with the

10  "Well, now I'm screwed.  I can't sell."  When

11  he said "Well, now I'm screwed.  I can't

12  sell," it sort of confirms to me that he

13  understands he cannot sell, he cannot trade

14  stock right now.

15      Q.    In the beginning of the call when he

16  gave some sort of acknowledgment --

17      A.    Yes.

18      Q.    -- to your statement that you have

19  confidential information, you also believe

20  that that acknowledgment inferred that he was

21  restricted from trading in the securities of

22  Mamma.com?

23      A.    Well, that -- yes.  That he would --

24  that he understands he is about to get

25  confidential information and accepts it.
```

Page 191

APP. 73

New York, NY

```
 1                     G. Faure

 2        Q.   Do you recall Mr. Cuban saying "I

 3   will not sell"?

 4        A.   No.  Again, I believe he said "I

 5   can't sell.  I'm screwed.  I can't sell."

 6        Q.   He didn't say "I can't sell" until

 7   the public announcement; is that correct?

 8        A.   Correct.

 9        Q.   And he didn't say "I won't sell

10   until the public announcement"?

11        A.   Correct.

12        Q.   Did you ask him what he meant by his

13   statement "I can't sell"?

14        A.   I don't believe so, no.

15        Q.   Did Mr. Cuban ever ask to speak to

16   any participating investor in the PIPE

17   transaction?

18        A.   I don't recall.

19        Q.   Did Mr. Cuban ask to speak to Mr.

20   Owen?

21        A.   I don't recall.

22        Q.   Did Mr. Cuban ask for anymore

23   information whatsoever about the prospective

24   private placement opportunity?

25        A.   I don't recall.
```

Alderson Reporting Company
1-800-FOR-DEPO

APP. 74

New York, NY

```
 1                      G. Faure

 2        A.   It doesn't specifically say that in

 3   that paragraph.

 4        Q.   Does it say anywhere in this

 5   paragraph that Mr. Cuban specifically

 6   acknowledged the confidentiality of this

 7   information?

 8        A.   Again, besides what is in the

 9   parenthesis, it doesn't specifically say.

10        Q.   What is in the parenthesis that you

11   are speaking to, which is "Recognizing that he

12   was not able to do anything until we announced

13   the equity," is a reference to the

14   acknowledgment at the beginning of the call

15   that whatever the words were, he acknowledged

16   that you had confidential information to share

17   with him?

18             MR. O'ROURKE:  Objection.

19        A.   I think -- sorry -- I think it is

20   two things.  I think it is the acknowledgment,

21   and the fact that he said "Well, now I'm

22   screwed.  I can't sell."

23             This e-mail was composed by Dave

24   Goldman following my verbal conversation I had

25   with Mr. Cuban.
```

Page 202

APP. 75

New York, NY

```
 1                    G. Faure

 2   about the equity raise in confidence, correct?

 3        A.   Correct.

 4        Q.   Nowhere in that e-mail does it say

 5   that Mr. Cuban agreed that he would not trade

 6   his shares in Mamma.com securities, correct?

 7        A.   Correct.

 8        Q.   In fact, it says he will sell his

 9   shares, correct?

10             MR. O'ROURKE:  Objection to the

11        form.

12        A.   He will sell his shares which he

13   cannot do until we announce.

14        Q.   There is a section in this e-mail

15   that says he will sell his shares, correct?

16             MR. O'ROURKE:  Objection to form.

17        A.   Yes.

18        Q.   It is not equivocal as in "he might

19   sell his shares," correct?

20             MR. O'ROURKE:  Continuing objection

21        here.

22        A.   Again, that -- that is an editorial

23   comment here from Dave Goldman pertaining to

24   the conversation I had with him, and Cuban is

25   not happy about this transaction, and he will
```

Page 207

New York, NY

```
 1                  G. Faure

 2   most certainly get out.

 3        Q.   Did Mr. Cuban -- sitting here today,

 4   do you recall whether or not Mr. Cuban said he

 5   will sell his shares in Mamma.com?

 6        A.   No.

 7             MR. BEST:  Let me have this marked

 8        as Defendant's 14.

 9             (E-mail dated June 29, 2004 marked

10        Defendant's Exhibit 14.)

11        Q.   Do you see Defendant's 14?

12        A.   Yes.

13        Q.   Can you compare it to SEC's

14   Exhibit 46, please?

15        A.   Yes.

16        Q.   Except for the time stamp, does it

17   appear to be in the form -- basically the form

18   and the type, does it appear to be the same

19   document?

20        A.   Yes.

21        Q.   What is the time stamp of

22   Defendant's 14?

23        A.   One is at -- Defendant's 14 is at

24   1:29 p.m, and the SEC one is at 9:29 a.m.

25        Q.   Do you know why there is a four hour
```

# EXHIBIT F

David Goldman                                                    October 21, 2011
Chicago, IL

```
                                                        Page 1

  1              IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
  2                       DALLAS DIVISION

  3  SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
  4                                 )
                 Plaintiff,         ) Civil Action No.
  5                                 ) 3:08-cv-02050
         vs.                        ) (SAF)
  6                                 )
     MARK CUBAN,                    )
  7                                 )
                 Defendant.         )
  8

  9

 10

 11

 12          The videotaped deposition of DAVID

 13  GOLDMAN, called by the Plaintiff for

 14  examination, taken pursuant to the Federal Rules

 15  of Civil Procedure of the United States District

 16  Courts pertaining to the taking of depositions,

 17  taken before Marianne Nee, a Certified Shorthand

 18  Reporter of the State of Illinois, CSR License

 19  No. 84-2341, taken at 311 South Wacker Drive,

 20  Suite 3000, Chicago, Illinois, on October 21,

 21  2011, at 8:35 a.m.

 22

 23

 24                      # # # # #

 25
```

David Goldman                                          October 21, 2011

Chicago, IL

                                                              Page 33

1        Q    -- May 27th.  So sometime prior to

2    that?

3        A    Yes.

4        Q    Now, as part of your duties and

5    responsibilities as the chairman or executive

6    chairman of the board, was it your

7    responsibility to keep other board members

8    apprised of developments?

9        A    Yes.

10       Q    And what were your -- how did you do

11   that generally over time?

12       A    Well, it depends.  In general principle

13   we had board meetings at which we reviewed items

14   of general concern, but on exceptional cases

15   where there were items which I regarded as being

16   significant which had a more immediate

17   requirement, I would either speak to the board

18   by phone, because it was a very small number of

19   people, or if the particular situation required

20   explanation and clarification and I judged it to

21   be of significant importance, I would

22   communicate with them via e-mail.

23       Q    Via e-mail?

24       A    Yes, sir.

25       Q    Okay.  And were those e-mails that were

APP. 80

David Goldman                                                              October 21, 2011

                                    Chicago, IL

                                                                    Page 34

 1    prepared and sent to the board members pursuant

 2    to your responsibility as chairman of the board?

 3              MR. BEST:  Objection; form.

 4    BY MR. O'ROURKE:

 5        Q    Were they?

 6              MR. BEST:  Objection to the form.

 7    BY THE WITNESS:

 8        A    Yes.  Yes, and also we had a -- just to

 9    add something to that, we had a board that was

10    very involved in the company, in its direction,

11    and I was aware that they liked to know what we

12    were doing if it was significant, so that's what

13    motivated the communications on a by exception

14    basis.

15    BY MR. O'ROURKE:

16        Q    On a --

17        A    By exception basis.  It was when it was

18    merited.  There was no regular communication.

19        Q    So when something was of sufficient

20    significance, you would keep the board apprised

21    by e-mail?

22              MR. BEST:  Objection; form, leading.

23    BY MR. O'ROURKE:

24        Q    Is that correct?

25        A    Yes.

Chicago, IL

Page 48

1    potential investor?

2        A    No.  One of the eventual subscribers we

3    met with.

4        Q    Because they had already -- they were

5    already a potential investor in the --

6        A    Yes.

7        Q    -- deal with Merriman?

8        A    Yes.

9        Q    But the approach was to --

10            MR. BEST:  Objection to form.

11   BY MR. O'ROURKE:

12       Q    Just so we're clear because there was

13   an interruption in your earlier answer, what was

14   the -- your approach in terms of treating this

15   information?  I understand about no market

16   transactions.

17       A    We didn't discuss it with anybody.

18       Q    And that was because of the

19   confidential nature of it?

20            MR. BEST:  Objection to form.

21   BY MR. O'ROURKE:

22       Q    Okay.  Why was that?

23       A    Because we believed it was material

24   information.

25       Q    Now, sir, set aside any contact, for

Chicago, IL

Page 49

1    now setting aside any contact with Mr. Mark

2    Cuban concerning the PIPE, did there come a

3    point in time in which you learned of a

4    connection between Mr. Mark Cuban and Mamma?

5        A    Because of his filings with getting in

6    excess of a five percent position in the

7    company, as soon as he filed that we were aware

8    that he had a significant interest in the

9    company.  I don't remember the exact date that

10   that occurred.  When he made that filing we

11   became aware.

12       Q    And what did that filing tell you in

13   terms of the size of his position?

14       A    I don't remember exactly how many

15   shares he had.  I remember it was in excess of

16   five percent.

17       Q    And did you understand that to -- him

18   to then be after that acquisition be the largest

19   shareholder of Mamma?

20       A    Yes.

21       Q    And did you ever speak to Mr. Mark

22   Cuban concerning matters related to Mamma?

23       A    No.  I never communicated directly,

24   although I did have some e-mail communications

25   with him.

APP. 83

Page 59

1    shareholders."

2              What are you referring to there?

3        A    That we had not advised other

4    shareholders that we were undertaking a private

5    placement and we would be giving him specific

6    information that we had not given to other

7    shareholders.

8        Q    Did you consider there the materiality

9    of the information?

10             MR. BEST:  Objection; form.

11   BY THE WITNESS:

12       A    That was one of the considerations is

13   that, as I stated earlier, we believed that this

14   was material information.

15   BY MR. O'ROURKE:

16       Q    Now, the date of this e-mail, Exhibit

17   39, is Wednesday, June 23.  Do you see that?

18       A    Yes.

19       Q    Do you recall where that fell on the --

20   or do you recall that the next day was a

21   holiday?

22       A    That's a Quebec national holiday, June

23   24.  That's a major holiday and so that nothing

24   really of any substance would happen in Montreal

25   on the Thursday, Friday, Saturday, Sunday until

David Goldman                                                    October 21, 2011

Chicago, IL

                                                               Page 62

1    about offering to make an offer to Mr. Cuban to

2    participate in the PIPE.  I don't mean to

3    characterize it in any way but just to get us

4    back into that.

5            Do you recall your testimony generally?

6    A    Yes.

7    Q    And then you indicated that you

8    discussed that matter with Mr. Guy Faure and

9    indeed sent him the e-mail that we discussed as

10   Exhibit 39, correct?

11   A    Yes.

12   Q    And you mentioned the Quebec holiday

13   which would have been on Thursday, the 24th.

14           Did you discuss the matter of

15   contacting Mr. Mark Cuban orally with Mr. Guy

16   Faure on the 23rd, the date of the --

17   A    Yes.

18   Q    Okay.  And was there back and forth

19   between you and he at that time?

20   A    Yes, and discussions with directors.

21   Q    And did those discussions continue on

22   the morning of June 28th?

23   A    I don't recollect whether they

24   concluded on the 23rd with directors or whether

25   we continued on the 28th with directors.  I

David Goldman                                                October 21, 2011

Chicago, IL

Page 63

1    don't recollect the exact timing on that.

2         Q    What about with Mr. Guy Faure though?

3         A    I believe we concluded either -- most

4    likely on the 23rd, but I couldn't swear to

5    that.  It could have been on the 28th.  Guy

6    would contact Mark Cuban and ask him if he was

7    interested, and following discussion with

8    directors, Guy was reminded that he would

9    stipulate to Mr. Cuban that he was in receipt of

10   confidential information.

11        Q    And why was it that Guy Faure was to

12   make that contact?

13        A    Because he was the only officer up

14   until that time who had any direct

15   communications with Mark Cuban.

16        Q    And what do you mean when you say was

17   to stipulate about the confidentiality of --

18        A    It was to advise Mark Cuban that he was

19   receiving confidential information.

20        Q    The information about the PIPE?

21        A    About the PIPE.

22        Q    And did you so advise him?

23        A    I believe so.

24        Q    And was that pursuant to discussions

25   with the board and with Mr. Faure?

APP. 86

Page 64

1      A     Yes.

2      Q     And was it your understanding that

3   Mr. Cuban was expected to act in accordance with

4   that stipulation?

5           MR. BEST:  Objection; objection to

6   form, objection to form of the question.

7   BY THE WITNESS:

8      A     The reason we asked Guy to tell

9   Mr. Cuban that it was confidential was because

10  we believed that this created -- this was a

11  transfer of information not generally available

12  to others.

13  BY MR. O'ROURKE:

14     Q     And thus, did that mean to you that the

15  information needed to continue being treated

16  confidentially?

17          MR. BEST:  Objection to form.

18  BY MR. O'ROURKE:

19     Q     What did that mean to you?

20     A     It meant that he would have to -- he

21  should recognize that he is receiving

22  confidential information not available to

23  anybody else.

24     Q     And to treat it accordingly?

25          MR. BEST:  Objection to form.

Chicago, IL

Page 65

 1   BY THE WITNESS:

 2       A    Obviously to treat it accordingly.

 3   BY MR. O'ROURKE:

 4       Q    And did you come to understand that

 5   Mr. Faure made that phone call to Mr. Mark

 6   Cuban?

 7       A    Yes.

 8       Q    And how did you understand that?

 9       A    Guy I believe on the 28th reviewed the

10   context of the phone call with Mr. Cuban and I

11   believe because many things were happening in

12   clearing the PIPE, in my communications with the

13   board with respect to the PIPE, I included a

14   summary of the context of his conversation with

15   Mr. Cuban.

16       Q    And when you say Mr. Faure reviewed --

17                  (Brief interruption.)

18   BY MR. O'ROURKE:

19       Q    You said Mr. Faure reviewed the context

20   of the communication.  I think I know what you

21   mean by that but maybe your way of saying it is

22   a little different than the way I would say it.

23   I'm not going to say the way I would say it.

24   What did you mean by that?

25       A    Guy summarized his conversation with

Chicago, IL

Page 66

1    Mr. Cuban for me and I summarized it on an

2    e-mail which Guy read and concurred with the

3    summary as being, as representing the nature of

4    the discussions that he had with Mr. Cuban.

5        Q    And did you -- what was the timing of

6    this summary that Mr. Faure provided to you

7    compared to when you understood the phone call

8    with Mr. Cuban took place?

9        A    It was probably very shortly

10   thereafter.

11       Q    And then between --

12            MR. BEST:  Objection to form unless he

13   knows.

14   BY MR. O'ROURKE:

15       Q    When you say probably, do you mean --

16       A    There was not much time between the

17   time we spoke.  It was on the 28th.  I have no

18   idea when Guy spoke to Mr. Cuban is my answer.

19       Q    Did you understand it was shortly

20   thereafter?

21       A    I understood --

22            MR. BEST:  Objection to form.

23   BY THE WITNESS:

24       A    I understood that Guy advised me after

25   his conversation with Mr. Cuban as to the

APP. 89

Page 68

1            MR. BEST:  Objection to the form.

2   BY THE WITNESS:

3      A    That was part of his review of the

4   conversation which he had with Mr. Cuban was

5   what he said and what Mr. Cuban said.

6   BY MR. O'ROURKE:

7      Q    And did -- what did he tell you

8   Mr. Cuban said?

9      A    That Mr. Cuban recognized that he had

10  received this information and according to Guy

11  recognized that that imposed some restrictions

12  on him.

13     Q    When you say he recognized he received

14  the information, are you referring to the

15  confidentiality of the information?

16           MR. BEST:  Objection to the form.

17  BY THE WITNESS:

18     A    I'm referring that he recognized that

19  receiving the information concerning the PIPE

20  imposed some restrictions on him.

21                    (Plaintiff SEC Exhibit 41

22                     was marked for

23                     identification.)

24  BY MR. O'ROURKE:

25     Q    Now, let me call your attention to

APP. 90

David Goldman                                    October 21, 2011

Chicago, IL

Page 69

1     what's been marked as Exhibit 41 by the court

2     reporter, Plaintiff's Exhibit 41 --

3         A    Hm-hm.

4         Q    -- a two-page document bearing your

5     production Bates No. DG0001885 through 1886.

6         A    Hm-hm, yes.

7         Q    And is this a copy of an e-mail, the

8     cover -- the first page, is it a cover e-mail

9     that you sent from your computer at Intasys or

10    Mamma at that time to Mr. Guy Faure and Michael

11    Storck?

12        A    Yes.

13        Q    And was that on or about June 28, 2004?

14        A    Yes.

15        Q    And then let me also show you what's

16    been marked as Plaintiff's Exhibit No. 42.

17                         (Plaintiff SEC Exhibit 42

18                          was marked for

19                          identification.)

20    BY MR. O'ROURKE:

21        Q    And the bottom half of that exhibit --

22    first of all, do you see there is two e-mails

23    reflected on Exhibit 42?

24        A    Pardon?

25        Q    Do you see that there is two e-mails

David Goldman                                                    October 21, 2011

Chicago, IL

Page 70

1    reflected on Exhibit 42?  There is a bottom half

2    and then there is a response on the top half?

3         A    Yes, I see that.

4         Q    In the bottom half of Exhibit 42 do you

5    see that the substance of that is the same as

6    what was marked as Exhibit 41?

7         A    Yes.

8         Q    Now, Exhibit 41, that bears the time

9    indication of 6:43 p.m.  Do you see that?

10        A    Yes.

11        Q    If you look at the one marked Exhibit

12   42, the bottom half, that has the time stamp of

13   2:43.  Do you see that?

14        A    Yes.

15        Q    A message from you to Guy Faure and

16   Michael Storck?

17        A    Yes.

18        Q    And then above on Exhibit 42 the first

19   e-mail has what appears to be a response from

20   you -- to you from Michael, is that right?

21        A    Yes.

22        Q    Now, calling your attention to Exhibit

23   41, do you know if that 6:43 was Greenwich Mean

24   Time or Eastern Time of 2:43?

25        A    I have no idea.

David Goldman                                                    October 21, 2011

Chicago, IL

                                                              Page 71

 1        Q    And there was a lot going on that day?

 2        A    Yes.

 3        Q    At any rate, you sent this e-mail with

 4   an attachment which was to be a -- was this to

 5   be -- the attachment to be an e-mail to the

 6   board to be sent?

 7        A    Yes.

 8        Q    And were you asking for comments to

 9   review -- for review and comments of Mr. Faure

10   and Mr. Storck?

11        A    Yes.

12        Q    And the attachment, the next to last

13   paragraph of the attachment, the second page

14   refers, does it not, to a discussion that Guy

15   had with Mr. Mark Cuban?

16        A    Yes.

17        Q    And is that your writeup of the summary

18   of what Mr. Faure had told you about his

19   conversation with Mr. Cuban?

20        A    Yes.

21        Q    And does it reflect Mr. Cuban's

22   response to it?

23        A    It reflects --

24             MR. BEST:  Objection.  Object to the

25   form.

                   Alderson Reporting Company
                      1-800-FOR-DEPO

                                                       APP. 93

Page 72

1    BY MR. O'ROURKE:

2        Q    Does it reflect his response to what

3    Mr. Guy Faure told him?

4        A    It reflects what Guy told me his

5    response was.

6        Q    What Guy told you Mr. Cuban's response

7    was, is that correct?

8        A    Yes.

9        Q    And Mr. Faure had a chance to review

10   this?

11       A    Yes.

12       Q    And was it through this e-mail to him

13   that he first reviewed it or had he already

14   looked at it, do you know?

15       A    Given our offices were adjacent, I'm

16   pretty confident that because it was a draft,

17   that he just looked at it in draft form.  I must

18   have also relayed a hard copy to him, but in any

19   event he had occasion to review it before I sent

20   it.

21       Q    Before you finalized and send it to the

22   board members?

23       A    Yes.

24       Q    And are you also -- were you also

25   meaning to say he would have reviewed it before

Chicago, IL

Page 73

1   you even sent it out in this format?

2       A    Pardon?

3            MR. BEST:  Objection to form.

4   BY MR. O'ROURKE:

5       Q    Were you indicating that he also would

6   have reviewed it before you sent it out as

7   attachment to this e-mail?

8            MR. BEST:  Objection; form.

9   BY THE WITNESS:

10      A    I don't recollect.  Given -- as I

11  stated, given he was next to my office and given

12  I typed a draft obviously in Word, I probably

13  printed out a hard copy in addition to sending

14  him an e-mail.

15  BY MR. O'ROURKE:

16      Q    And did Mr. Faure, to your

17  recollection, ever propose any edits to the

18  summary of his conversation with Mr. Cuban?

19      A    I don't recollect, but if he had they

20  would have been reflected in the final e-mail.

21      Q    The final e-mail being the one sent to

22  the board members?

23      A    Yes.

24      Q    The statement included in the summary

25  in the attachment, "As anticipated he" --

Page 74

1    referring to Mark Cuban -- "he initially 'flew

2    off the handle' and said that he would sell his

3    shares (recognizing that he was not able to do

4    anything until we announced the equity) but then

5    asked to see the terms and conditions which we

6    have arranged for him to receive from one of the

7    participating investor groups with which he has

8    dealt in the past."

9            Do you see that?

10   A    Yes.

11   Q    Now, the reference to Mr. Cuban

12   initially having -- initially that he flew off

13   the handle, what did you understand that to

14   mean?

15           MR. BEST:  Objection; form.

16   BY THE WITNESS:

17   A    It was just the tone of Guy's relaying

18   the information to me that upset Mr. Cuban and

19   he became -- he was visually, visibly -- pardon

20   the word on the phone conversation using

21   visibly -- upset by the information which Guy

22   had relayed to him.

23   BY MR. O'ROURKE:

24   Q    Verbally?

25   A    Verbally.

Chicago, IL

Page 75

1      Q    And then recognizing that he was not

2    able to do anything until we announced the

3    equity, was that -- what did you understand that

4    to mean?

5          MR. BEST:  Objection; form.

6    BY THE WITNESS:

7      A    Again, I'm only relaying the

8    information Guy relayed to me from his

9    conversation and the substance of that

10   information was Guy saying that comment that

11   Mr. Cuban made was indicated that he recognized

12   that he could not -- he would not sell the

13   shares or could not sell the shares until after

14   the PIPE had been announced.

15                    (Plaintiff SEC Exhibit 43

16                    was marked for

17                    identification.)

18   BY MR. O'ROURKE:

19     Q    Let me call your attention next to what

20   the court reporter has marked as Exhibit 43, a

21   one-page document.  It has the Mamma production

22   Bates MammaPro00291.  You referred earlier to

23   the final version of the summary.

24          Was this the final version that you

25   were referring to?

David Goldman                                                    October 21, 2011

Chicago, IL

Page 76

1       A     It appears to be.

2       Q     And was this a -- the final version,

3    was it an e-mail that you sent to the members of

4    the board?

5       A     Yes.

6       Q     And I said you.  Is this -- it was sent

7    on your -- you sent the e-mail, did you not, but

8    it was signed by or on behalf of both you and

9    Mr. Guy Faure?

10           MR. BEST:  Objection to form.

11   BY MR. O'ROURKE:

12      Q     Or was it sent by both you and Mr. Guy

13   Faure?

14      A     I was -- I ended with the salutation

15   Guy and Dave which I would not have done had Guy

16   not been in concurrence with the information.

17      Q     Now, the e-mail, was this to inform the

18   board members of the developments with respect

19   to the PIPE as of this time on June 28, 2004?

20           MR. BEST:  Objection; form.

21   BY THE WITNESS:

22      A     More specifically it was to bring them

23   up to date with the final status of the terms

24   and conditions and to get their approval before

25   we could conclude.

Page 77

1   BY MR. O'ROURKE:

2       Q    So there were items included in this

3   e-mail that needed board approval before

4   proceeding?

5            MR. BEST:  Objection; form.

6   BY MR. O'ROURKE:

7       Q    Is that what you're saying?

8       A    We had --

9            MR. BEST:  Objection; form.

10  BY THE WITNESS:

11      A    Because we had not -- because the terms

12  of the PIPE had been continuously changing, we

13  required the board members to approve the final

14  terms and conditions and that's what we

15  requested in this e-mail.

16  BY MR. O'ROURKE:

17      Q    And the subject, could you read the

18  subject matter at the top, the Re line?

19      A    "Your approval required."

20      Q    And that's referring to approval of the

21  board?

22      A    For the PIPE.

23      Q    For the PIPE.  And the change in

24  conditions?

25      A    Hm-hm, yes.

Page 78

1            MR. BEST:  Objection.

2     BY MR. O'ROURKE:

3        Q    And one of the change in conditions,

4     maybe the fourth paragraph down, do you see

5     where it says, "While the board had indicated

6     that we raise 15 million, we may be slightly

7     over subscribed at about 17 million (final

8     numbers not available)."

9            Was this one of the things that it

10    involved was the amount of money to be raised?

11       A    Yes.

12       Q    Now, there is a reference here to being

13    oversubscribed.  When you made the proposal to

14    Mr. Cuban through Guy --

15           MR. BEST:  Objection.  Go ahead.  I'm

16    sorry.

17    BY MR. O'ROURKE:

18       Q    Let me start over.  There is a

19    reference in that paragraph to being slightly

20    oversubscribed.

21           When the decision was made to offer

22    Mr. Cuban a chance to participate in a PIPE,

23    were you doing it to just tie his hands?

24           MR. BEST:  Objection; form.

25           MR. GUSTMAN:  I'll also object.  It's

APP. 100

David Goldman                                    October 21, 2011

Chicago, IL

Page 79

1    ambiguous.

2    BY THE WITNESS:

3        A    As I stated, we did it based on the

4    context of a recommendation from Arnie that we

5    discussed because of the fact that he would drop

6    below the five percent threshold, and we thought

7    it was fair and equitable to offer him an

8    opportunity to invest in the PIPE to retain his

9    interest, and that was pure and simply that

10   there were no other considerations.

11   BY MR. O'ROURKE:

12       Q    And if he had decided to participate,

13   how would that have related to the fact that you

14   were slightly oversubscribed at this point in

15   time?

16           MR. BEST:  Objection; form.

17   BY THE WITNESS:

18       A    We hadn't got that far in defining how

19   we would do it, but we would have probably

20   either cut back on the pro rata contributions of

21   others, or one of the issues that had been

22   outstanding which we were trying to get -- seek

23   clarification on was whether warrants had to be

24   included in the dilution calculation or not, and

25   if we had had an interpretation from NASDAQ that

APP. 101

Page 80

1    that was not essential, that would have obviated

2    a necessity to reduce should Mr. Cuban have

3    decided to contribute to reduce the contribution

4    of others.

5    BY MR. O'ROURKE:

6        Q    But one way or another, if he had had

7    an interest in participating, would you have

8    found a way for him to participate?

9        A    Yes.

10       Q    And why is that?

11       A    Because if we made him the offer, it

12   was a commitment on our part that we would

13   follow through.

14       Q    And the paragraph, the following

15   paragraph, "Today, after much discussion, Guy

16   spoke to Mark Cuban," that's the same paragraph

17   we discussed with respect to the earlier -- the

18   attachment to the earlier exhibit, correct,

19   Exhibit No. 41?

20           MR. BEST:  Objection; form.

21   BY THE WITNESS:

22       A    It's the same paragraph.

23   BY MR. O'ROURKE:

24       Q    So no changes were made to that after

25   Mr. Faure had reviewed it?

Page 81

1          MR. BEST:  Objection; form.

2    BY THE WITNESS:

3      A    Not that I can see.

4    BY MR. O'ROURKE:

5      Q    And sending this e-mail to the board

6    members at approximately -- at 3:51 on June 28th

7    and seeking their approval on certain items and

8    bringing them up to date on the status of the

9    new equity, the PIPE, were you sending the board

10   members this information pursuant to your duty

11   as the chairman of the board of Mamma?

12         MR. BEST:  Objection; form.

13   BY THE WITNESS:

14     A    I was sending that information as, in

15   fact, as chairman of Mamma I was effectively the

16   pointman with MCF on the PIPE and it was my

17   responsibility to, A, keep the board informed

18   about this and, B, make sure that the board had

19   approved what the company was about to do.

20                   (Plaintiff SEC Exhibit 44

21                    was marked for

22                    identification.)

23   BY MR. O'ROURKE:

24     Q    Now, in addition to filling the board

25   in by way of e-mails to the entire board, did

Page 82

1    you also have any communication with individual

2    members of the board, either by phone, in person

3    or by separate e-mail --

4              MR. BEST:  Objection.

5    BY MR. O'ROURKE:

6        Q    -- concerning the PIPE?

7              MR. BEST:  Objection; form.

8    BY THE WITNESS:

9        A    I probably had some individual

10   inquiries from certain board members about

11   certain aspects of the PIPE which I responded

12   to.

13   BY MR. O'ROURKE:

14       Q    Let me show you what's been marked by

15   the court reporter as Plaintiff's Exhibit No.

16   44.  It bears your production Bates No. DG415

17   through 417, a three-page exhibit, a series of

18   e-mails and I first call your attention to the

19   bottom half -- bottom third of the second page

20   continuing over to the third page.

21             Do you see that that appears to be the

22   e-mail that you sent to the board that we just

23   discussed as Exhibit No. 43?

24       A    Yes.

25       Q    And then there is some e-mails above

David Goldman                                               October 21, 2011

Chicago, IL

Page 83

1    that appear to be to and from you or exchanges

2    between you and Mr. Kramer, Irwin Kramer.  Do

3    you see that?

4         A    Yes.

5         Q    And then the top e-mail on the first

6    page, is that a continuation of the exchange of

7    e-mails with Mr. Kramer -- is it Irving?

8         A    Irwin.

9         Q    Irwin Kramer, sorry.  And that's from

10   you to Mr. Kramer, is it not?

11        A    Yes.

12        Q    And that's on June 28th, that one says

13   8:33.  Do you know if that's Greenwich Mean Time

14   or 4:33 Eastern Time?

15        A    I have no idea.

16        Q    Although do you see the last e-mail

17   that you're responding to from Mr. Kramer

18   reflects a time of 4:13 p.m.?

19        A    Yes.

20        Q    By this top e-mail are you further

21   informing Mr. Kramer of information concerning

22   the contact with Mr. Cuban?

23        A    Pardon?

24        Q    By this e-mail at the top are you

25   providing Mr. Kramer with additional information

APP. 105

David Goldman                                                    October 21, 2011

Chicago, IL

Page 84

1    or explaining to him further the contact with

2    Mr. Mark Cuban?

3        A    I'm reiterating what I had thought

4    Irwin would have known from our previous

5    conversations.

6        Q    And whether -- it starts off, "Cuban

7    would be about 4.59 percent."  Do you see that?

8        A    Yes.

9        Q    What did you mean by that?

10       A    That would be his interest post-PIPE.

11       Q    If he did not --

12       A    If he did not subscribe.

13       Q    To the PIPE?

14       A    Yes.

15       Q    And then the summary there, it appears

16   to be a summary.  Is that what you meant by

17   summary?

18       A    What?

19       Q    Strike that.  Let me start over.

20            The statement there, "Our idea was to

21   allow him to invest up to an amount which would

22   retain his interest but he doesn't seem so

23   inclined."

24            Was that a summary you were -- a

25   further summary you were providing to Mr. Kramer

APP. 106

David Goldman                                                    October 21, 2011

Chicago, IL

Page 85

1    with respect to the state of Mr. Cuban's

2    possible subscription to the PIPE?

3        A    Yes.

4        Q    And then the next sentence says, "The

5    bigger question is will he sell and flog us on

6    his blog."  Do you see that?

7        A    Yes.

8        Q    And what did you mean by that?

9        A    Will he sell his shares after the

10   announcement of the PIPE and will he make a

11   comment on his blog.

12       Q    And by flog, what did you mean?  A

13   negative --

14       A    A negative comment.

15                      (Plaintiff SEC Exhibit 45

16                       was marked for

17                       identification.)

18   BY MR. O'ROURKE:

19       Q    And let me next show you what's been

20   marked as Exhibit No. -- Plaintiff's Exhibit No.

21   45 bearing the Mamma Bates number production

22   number MammaPro000318, and is this an e-mail

23   from -- does this include an e-mail from you at

24   the top to Mr. David Schwartz --

25       A    Yes.

David Goldman                                                  October 21, 2011

Chicago, IL

                                                              Page 86

    1      Q    -- on June 29th?

    2      A    Yes.

    3      Q    And this would be the following day,

    4   correct?

    5      A    Correct.

    6      Q    And this one, was it sent on or about

    7   8:33 a.m. as indicated Eastern Daylight Time at

    8   the top?

    9           MR. BEST:  I object to the form.

   10   BY THE WITNESS:

   11      A    Assuming the times are correct.

   12   BY MR. O'ROURKE:

   13      Q    This one the time's incorrect?

   14           MR. BEST:  I believe he said assuming

   15   the times are correct.

   16   BY MR. O'ROURKE:

   17      Q    Well, you're saying --

   18      A    I did send this to David on the 29th.

   19      Q    In the morning does it appear?

   20           MR. BEST:  Objection to form.

   21   BY THE WITNESS:

   22      A    I don't recollect when I sent it to

   23   him.

   24   BY MR. O'ROURKE:

   25      Q    Well, if this was Greenwich Time, you

Chicago, IL

Page 87

```
 1   would have been up awfully early Eastern Time,

 2   correct?

 3       A    That may have been possible at that

 4   time.

 5       Q    The top e-mail that you did send to

 6   Mr. Schwartz, and that's David Schwartz who's on

 7   the board of Mamma, correct?

 8       A    Yes.

 9       Q    And this is additional discussion that

10   you were having with individual board members?

11            MR. BEST:  Objection; form.

12   BY MR. O'ROURKE:

13       Q    Was this additional discussion you were

14   having with individual board members?

15       A    This was in response to his inquiries.

16       Q    And does this summarize what Mr. Faure

17   had told you about Mr. Cuban's response to the

18   proposal concerning the PIPE?

19       A    Pardon?

20       Q    Does this summarize the approaches to

21   Mr. Cuban concerning the PIPE?

22       A    At that time that was correct.

23   Subsequently I clarified that I believe in that

24   he didn't say that he does not want the company

25   to make acquisitions.
```

Chicago, IL

                                                        Page 88

 1      Q    Okay.  But this was your information or

 2   your understanding at the time you sent this

 3   e-mail?

 4      A    Yes.

 5           MR. BEST:  Objection; form.

 6   BY MR. O'ROURKE:

 7      Q    At the time you sent this e-mail, do

 8   you see where it starts off, "Re - Mark Cuban:

 9   We spoke to him yesterday as did our advisors."

10           Now, when you say "we spoke to him

11   yesterday," are you talking about the company

12   collectively spoke to him yesterday?

13      A    Guy.

14      Q    Guy spoke to him?

15      A    On behalf of the company.

16      Q    And then where you say "as did our

17   advisors," who was the advisor on the PIPE?

18      A    That would have been Arnie.

19      Q    Arnie Owen?

20      A    Yes.

21      Q    That's what you're referring to there?

22      A    Yes.

23      Q    In the next sentence, "We had asked if

24   he would be interested in the idea" -- let me

25   start over.

Page 89

```
 1            The next sentence, "We had asked if he
 2    would be interested and the idea was that he
 3    could maintain his equity percentage."
 4            Is that basically what you've told us
 5    already?
 6       A    Yes.
 7       Q    And then it says, "He was against and
 8    said the following..."  you're there talking
 9    about Cuban?
10       A    Yes.
11       Q    "...either to Guy or directly to our
12    investment banker who also spoke to him."
13            Again, the investment banker there
14    would have been Arnie?
15       A    Yes.
16       Q    And then it's colon and then there is
17    three -- the next part says, "He would not
18    invest, he does not want the company to make
19    acquisitions, and he will sell his shares.  The
20    last possibility had been pointed out by Guy at
21    the board meeting."  Do you see that?
22       A    Yes.
23       Q    Okay.  And had Guy previously indicated
24    that there was a fear that Mr. Cuban would sell
25    his shares?
```

Page 90

```
 1      A    Yes.

 2      Q    And then the very last sentence says --

 3   of that e-mail is, "Will send a summary to all

 4   directors shortly."

 5           And was that intended to be another

 6   summary to be sent that morning?

 7      A    Yes, I presume so.

 8      Q    And then let me call your attention to

 9   what's been marked as Plaintiff's Exhibit 46.

10                    (Plaintiff SEC Exhibit 46

11                     was marked for

12                     identification.)

13   BY THE WITNESS:

14      A    Hm-hm.

15   BY MR. O'ROURKE:

16      Q    And was this --

17           MR. BEST:  I don't have the document

18   yet, Kevin.

19           MR. O'ROURKE:  While you're getting it,

20   let me just note for the record that the Bates

21   number of this document is from Mamma's

22   production MammaPro00292 and 293, a two-page

23   exhibit.  I also note for the record, as it was

24   produced to us, in the middle of the first page

25   there appears to be a line and a part of the --
```

David Goldman                                                    October 21, 2011

Chicago, IL

Page 91

1    three-fourths of one line and the next partial

2    line that's redacted.

3    BY MR. O'ROURKE:

4        Q    Mr. Goldman, was this a summary that

5    you sent to all the members of the board?

6        A    Yes.

7        Q    And was it sent on June 29, 2004 as

8    indicated here at 9:29 a.m.?

9            MR. BEST:  Objection; form.

10   BY THE WITNESS:

11       A    It was sent sometime on Tuesday

12   morning.  Whether that time is precise or not, I

13   can't recollect exactly when.

14   BY MR. O'ROURKE:

15       Q    Does this summarize for the benefit of

16   all the board members for the reasons that you

17   stated earlier, you kept the board members

18   informed of where things stood with respect to

19   the PIPE?

20           MR. BEST:  Objection; form.

21   BY THE WITNESS:

22       A    Yes.

23   BY MR. O'ROURKE:

24       Q    Were things moving along at this point

25   in terms of finalizing the PIPE?

APP. 113

Chicago, IL

Page 92

```
 1      A    Yes.

 2      Q    Indeed, was it later that afternoon or

 3  evening that the PIPE transaction was finalized

 4  and then publicly announced?

 5           MR. BEST:  Objection; form.

 6  BY THE WITNESS:

 7      A    Yes.

 8  BY MR. O'ROURKE:

 9      Q    And calling your attention, there is a

10  number of bullet points on that first page of

11  the exhibit.  Do you see that?

12      A    Yes.

13      Q    And calling your attention to the

14  fourth bullet point, does that bullet point

15  concern speaking to Mark Cuban?

16      A    Yes.

17      Q    And the first part of it reads as

18  follows, does it not:  "We did speak to Mark

19  Cuban (Guy and, subsequently, our investment

20  banker) to find out if he had any interest in

21  participating to the extent of maintaining his

22  interest."

23           Did I read that correctly?

24      A    Yes.

25      Q    And was that an accurate statement on
```

David Goldman                                          October 21, 2011

Chicago, IL

Page 93

1    your part there, that the company through Guy

2    and the investment banker did speak to Mark

3    Cuban to the extent of seeing if he had any

4    interest in participating in the PIPE to

5    maintain his interest?

6              MR. BEST:  Objection; form.

7    BY THE WITNESS:

8        A    Yes, I believe that's what information

9    was relayed to him.

10   BY MR. O'ROURKE:

11       Q    Then it says "his answers were..." and

12   that's referring to Mark Cuban's answers, does

13   it not?

14       A    Yes.

15       Q    "...he would not invest, he does not

16   want the company to make acquisitions, he will

17   sell his shares which he cannot do until after

18   we announce."

19             Do you see that?

20       A    Yes.

21       Q    And does that accurately state what you

22   understood the responses from Mr. Cuban to be as

23   relayed to you?

24             MR. BEST:  Objection; form.

25

Chicago, IL

Page 94

1    BY THE WITNESS:

2         A    I'm not sure when I wrote this whether

3    the "which" at this point in time was me

4    editorializing or me confirming what I confirmed

5    in the previous e-mails.

6    BY MR. O'ROURKE:

7         Q    When you say are you editorializing,

8    you mean using different words?

9         A    No, no, no.  Which I was advising the

10   board of which I was making a statement which he

11   could not sell until after we announced.   At

12   this point in time I'm not sure whether I was

13   resuming a conversation or making an editorial

14   comment for the board's information.

15        Q    Well, under either case was it based on

16   what you had been told --

17        A    It was based on my understanding, yes.

18        Q    -- based on what you had been told, and

19   what you had communicated in writing to the

20   board on the previous day?

21        A    Yes.

22        Q    And in your mind was it entirely

23   consistent with what you had communicated to the

24   board the previous day?

25        A    Yes.

APP. 116

David Goldman                                                    October 21, 2011

Chicago, IL

Page 95

1     Q    And by this e-mail were you again

2   asking for the board if they had any issues or

3   concerns or opposition to let you know --

4         MR. BEST:  Objection; form.

5   BY MR. O'ROURKE:

6     Q    -- with respect to the PIPE?

7         MR. BEST:  Objection to form.

8   BY THE WITNESS:

9     A    I was not requesting their approval.  I

10  had asked for their approval prior and I would

11  think that that approval would have been

12  authorization of the proceedings.

13  BY MR. O'ROURKE:

14    Q    Although did they have one last chance

15  to scream?

16    A    They could have screamed.

17    Q    And, in fact, calling your attention to

18  the second page, the last line --

19    A    The board members --

20        THE COURT REPORTER:  I'm sorry.  Can I

21  remind you to wait until he finishes the

22  question.

23        THE WITNESS:  Sorry.

24  BY MR. O'ROURKE:

25    Q    Calling your attention to the second

David Goldman                                                    October 21, 2011

Chicago, IL

Page 124

1    the forget exact words -- was that he recognized

2    that we had put a collar around him in terms of

3    his ability to sell the shares until such time

4    as the PIPE was announced, but the words that

5    Guy used were much stronger than that.

6    BY MR. BEST:

7         Q    Okay.  Do you recall today sitting here

8    what those words were?

9         A    I don't recall exactly.  I remember

10   some swear words involved, but I don't remember

11   exactly.

12        Q    And when you cited in your e-mails

13   which we'll get into in a little bit that there

14   was a constraint, that he was constrained from

15   selling, did Guy tell you that Cuban used those

16   exact words or was that your interpretation of

17   the conversation?

18        A    That was my summary of the words that

19   Guy relayed to me.

20        Q    Okay.  But Mr. Cuban did not say the

21   words specifically, I'm constrained from

22   selling, as you have written them in your

23   e-mail?

24        A    Not the way I wrote them in the e-mail,

25   no.

APP. 118

Page 171

1        Q    Do you recall ever giving any -- let me

2    turn off my phone.  Sorry.

3             Turning your attention to DG00001886,

4    the attachment to SEC Exhibit 41, do you recall

5    when during June 28, 2004, you prepared this

6    draft attachment?

7        A    Just sometime that day.

8        Q    Okay.  Now, I want to go through the

9    text of this e-mail, text of the draft

10   referencing Mark Cuban.  You did not participate

11   in the call with Mark Cuban?

12       A    No.

13       Q    So anything discussed in this paragraph

14   is what -- is something you heard from someone

15   else, correct?

16       A    Is a summary --

17       Q    It's a summary?

18       A    -- of what Guy told me.

19       Q    Okay.  Does this paragraph reflect what

20   Guy actually told you that Mark Cuban said?

21       A    No.  It reflects my understanding of

22   what he told me Mark Cuban said, not the

23   specific words.

24       Q    And let's go through it one kind of

25   sentence at a time.  "Today, after much

Chicago, IL

Page 176

1    repeated that.  I didn't infer.  It was my

2    summary of what Guy told me.

3    BY MR. BEST:

4        Q    And when did that take place in the

5    conversation?

6             MR. O'ROURKE:  Which one?

7    BY MR. BEST:

8        Q    When did Mr. Cuban's statement that he

9    felt constrained about his ability to sell his

10   shares take place in his conversation with

11   Mr. Faure?

12       A    I can't answer that question because I

13   wasn't there.

14       Q    And you don't know the exact words --

15       A    No.

16       Q    -- that Mr. Cuban purportedly used?

17       A    No.

18       Q    And then it says, "...but then asked to

19   say the terms and conditions which we have

20   arranged for him to receive from one of the

21   participating investor groups with which he has

22   dealt in the past."

23            Where did this statement derive if you

24   recall?  Did Mr. Faure tell you this?

25       A    Yes.

APP. 120

Chicago, IL

Page 181

1       Q    And what's the time listed on this
2    e-mail?

3       A    7:51 p.m.

4       Q    And is this, except for the time of
5    7:51 p.m., the same e-mail as SEC's Exhibit 43?

6       A    It appears to be.

7       Q    Okay.  Do you have any explanation as
8    to the four-hour differential in time between
9    what appears to be the same e-mail?

10      A    No.

11      Q    Does this assist you in determining the
12   accurate time that you sent the e-mail?

13      A    No.

14      Q    Let me turn your attention to SEC 43.

15           Did the company require you to send
16   this e-mail?  Were you required as a part of
17   company policy to send an e-mail such as this?

18           MR. O'ROURKE:  Object to the form.

19   BY THE WITNESS:

20      A    No.

21   BY MR. BEST:

22      Q    Was this e-mail sent in your normal
23   business duties or was this an exceptional
24   circumstance?

25           MR. O'ROURKE:  Objection to form.

APP. 121

Chicago, IL

Page 182

1    BY THE WITNESS:

2        A    It was exceptional circumstance because

3    of the imminent closure of the PIPE and having

4    to keep the board apprised of all developments.

5    BY MR. BEST:

6        Q    Was it your normal course to send

7    e-mails to the board referencing conversations

8    that you did not participate in or was that an

9    exceptional circumstance?

10           MR. O'ROURKE:   Objection to the form.

11   BY THE WITNESS:

12       A    I'm trying to think of whether -- it

13   was never a normal circumstance where I would

14   repeat someone else's conversation, but in this

15   case it was exceptional to summarize where we

16   stood and that's why I did it.

17   BY MR. BEST:

18       Q    Did you send -- did you send an e-mail

19   to the board members of every call that Guy

20   Faure had with third parties?

21       A    Definitely not.

22       Q    Did you memorialize every call that Guy

23   informed you about with third parties?

24       A    Definitely not.

25       Q    And as part of your duties as executive

Page 189

1           Let's speak to the last sentence, last

2      part of the sentence, "he will sell his shares

3      which he cannot do until after we announce."

4      And again Guy Faure informed you that Mr. Cuban

5      announced that he would sell his shares?

6           MR. O'ROURKE:  Objection to the form.

7      BY MR. BEST:

8      Q    Did he announce, did Mr. Faure tell you

9      that Mr. Cuban made any comment whatsoever about

10     what he was going to do with the shares of his

11     Mamma.com stock?

12          MR. O'ROURKE:  Objection to the form.

13     BY THE WITNESS:

14     A    To my recollection, yes, he said he

15     would sell.

16     BY MR. BEST:

17     Q    The remaining words in this sentence,

18     were those your words of inferring what the

19     conversation was or did Mark Cuban specifically

20     say those words?

21          MR. O'ROURKE:  Object to the form.

22     BY THE WITNESS:

23     A    As I stated earlier, I believe that's

24     my editorial comment, it's my inference.

25

Chicago, IL

Page 216

1   and Mr. Guy Faure?

2       A    Yes.

3            MR. BEST:  Object to form.

4   BY MR. O'ROURKE:

5       Q    It was signed by both you and Mr. Guy

6   Faure, correct, sir?

7            MR. BEST:  Object to form.

8   BY THE WITNESS:

9       A    Yes.

10           MR. BEST:  Objection to form.

11  BY THE WITNESS:

12      A    I should clarify.  If I sent an e-mail

13  and I put Guy's name at the bottom of the

14  e-mail, I would not have done that unless he

15  concurred with the contents.

16  BY MR. O'ROURKE:

17      Q    And then you put both names to indicate

18  it was coming from both of you?

19      A    Correct.

20           MR. BEST:  Object to form.

21  BY MR. O'ROURKE:

22      Q    So even though you did not directly

23  participate in the communication with Cuban,

24  Mr. Cuban, that is referred to in the paragraph

25  there, this e-mail is from both you and Mr. Guy

APP. 124

David Goldman                                           October 21, 2011

Chicago, IL

Page 217

1   Faure who did participate in that communication,

2   is that correct?

3           MR. BEST:  Objection; form.

4   BY THE WITNESS:

5       A    I sent the e-mail and I affixed Guy's

6   name because he agreed to the contents.

7   BY MR. O'ROURKE:

8       Q    Thank you.  Now, the statement in

9   Exhibit 43 that we were referring to,

10  recognizing he was not able to do anything until

11  after we announced the equity, which also shows

12  up in that draft that you sent to Mr. Guy Faure

13  and Mike Storck that's marked as SEC Exhibit 41,

14  that same paragraph, the reference to again

15  recognizing he was not able to do anything until

16  after we announced -- until we announced the

17  equity, in response to a question from Mr. Best,

18  you referred to having to tone down Mr. Faure's

19  language.

20          Was it with respect to that substantive

21  statement that you were referring?

22          MR. BEST:  Objection; form.

23  BY THE WITNESS:

24      A    It was with respect to his reaction and

25  using terms that I would not use, yes.  I would

# EXHIBIT G

<u>WORKING DRAFT NOT CERTIFIED</u>

**EXAMINATION OF**
**M. GUY FAURÉ**

*ATTORNEYS :*

**Me STEPHEN A. BEST**
**Me CHRISTOPHER CLARK**
**Me LYLE ROBERTS**
**Me THOMAS FEENEY**

**Me JASON BROWN,**
*for M. GUY FAURÉ.*

RT070907B.DRAFT

**Robert Tétrault, s.o.**
**September 7th, 2007**

APP. 127

GUY FAURÉ
WITNESS
EXAMINATION

13   Q-   Do you recall any conversation with either Mr. Goldman,
         Mr. Bertrand or anyone else within Mamma about contact
         between Mr. Owen and Mr. Cuban ?

     A-   I do not believe so, no.

14   Q-   Aside from sending this e-mail, can you tell us what you
         recall doing after you spoke to Mr. Cuban about the pipe
         transaction ?

     A-   I believe that is about it.

15   Q-   Well, did you discuss it with anyone at mamma.com ?

     A-   Yes, sure, I related my conversation to Dave Goldman and
         Daniel Bertrand about Mr. Cuban not sounding very keen on
         participating in the pipe transaction.

16   Q-   Okay.  Do you recall how long after the telephone call
         with Mr. Cuban you conveyed that information to, I do not
         know if you did it about at the same time or separately ?

     A-   I think very shortly.  I was on my way off to lunch, so I
         probably went to lunch and came back or maybe even just
         after the phone.  Maybe I conveyed to, Dave Goldman was
         probably the first one that I conveyed the information to.

17   Q-   Okay.  Unlike...

     A-   Within an hour, I would say.

- 51 -

GUY FAURÉ
WITNESS
EXAMINATION

8   Q-   Right.  Unlike many of your other answers before, you just said you probably, most likely, etc.   Do you have a recollection of conveying the information to Mr. Goldman or is the reason you know you conveyed it to Mr. Goldman cause you have seen documents or e-mails that seemed to reflect that ?

      A-   No, I know that I have conveyed the information to Mr. Goldman.

9   Q-   Okay.

      A-   When specifically ?  Right after the phone call or did I go and take a sandwich and tell him half an hour later, that I do not remember.

0   Q-   Okay.  Do you remember whether you conveyed it to Mr. Goldman via telephone or his office ?

      A-   I believe in his office.

1   Q-   Okay.  When you say "I believe", do you remember or you are just kind of making...

      A-   I am pretty sure I recall that day he was there.

2   Q-   Okay.

      A-   Cause we had a meeting in the morning, so...

3   Q-   Right.

      A-   ... I do not believe I told him face to face.

4   Q-   Here is what I am trying to get you to distinguish between, cause it is important.  You are certain or you

- 52 -

GUY FAURÉ
WITNESS
EXAMINATION

A-   Yes.

1   Q-   It is sent from Dave Goldman, but at the bottom it is
     signed Guy and Dave.

A-   M'hm.

2   Q-   Do you have a recollection of how this was prepared ?

A-   Not by me.

3   Q-   Do you know whether Mr. Goldman prepared it ?

A-   I believe so.

4   Q-   Okay.  You did not sit there and watch him doing though ?

A-   No.

5   Q-   Okay.  Do you know website you saw it before Mr. Goldman
     circulated it ?

A-   Again, I assume he did, cause he always did it.  He would
     not send something signed by Dave and Guy without showing
     it to me and say are you okay with it, but I do not recall
     seeing it before.

6   Q-   You do not have a particular recollection, but it was his
     practice to show you a document if your name was going to
     be on it ?

A-   Yes.

,7   Q-   Okay.   I want to first of all take you down four
     paragraphs to the paragraph that says :

- 58 -

APP. 130

# EXHIBIT H

**David Goldman**

| | |
|---|---|
| **From:** | David Goldman [dgoldman@intasys.com] |
| **Sent:** | Wednesday, June 23, 2004 2:41 PM |
| **To:** | Guy Faure |
| **Subject:** | New Equity |

Guy

Arnie called me with an interesting question: Should we ask Cuban if he wants to participate. My off the cuff answer was:

He is against these instruments (sent him your blog comment)

He could blow up at an inconvenient time.

He would be privy to information not available to other shareholders.

Your thoughts?

Dave



DEPOSITION EXHIBIT
PENGAD 800-631-6989
PLTF-SEC 39
10.21.11

ÒIA Confidential Treatment Requested by Mamma.com, Inc.

MammaPro00317

SEC-MC0002123

# EXHIBIT I

From: David Goldman [mailto:dgoldman@intasys.com]
Sent: Tuesday, June 29, 2004 10:44 AM
To: Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David
Goldman; Claude E. Forget; Guy Faure
Cc: Maria Elena Di Fruscia
Subject: Press Release

Attached please find DRAFT of Press Release. Please comment.

In a fluid situation, please note following correction to my note re-
Cuban. He did not say that he was not interested in Mamma making an
acquisition, he did say that if we had an acquisition, we could then
consider how to and find ways to finance it.

Marai Elena: Please prepare in format for release but hodl until
approved. Tentative to be released early to NASDAQ Stockwatch fro
review and then reelase at close of business today.

Dave



FOIA Confidential Treatment    Requested by Mamma.com, Inc.

MammaPro00294

APP. 134

SEC-MC0002160

# EXHIBIT J

**From:** Guy Fauré [guy@mamma.com]
**Sent:** Monday, June 28, 2004 3:51 PM
**To:** Mark Cuban
**Subject:** Contact

Hi Mark,

If you want more details about the private placement please contact (I guess you or your financial advisors) Arnie Owen at 415-248-5613. Arnie is with Merriman Curhan Ford & Co.

Regards,

**Guy Fauré**
**President & CEO**

388 st-jacques st. west, 9th floor
montreal, qc  h2y 1s1

t: 514.908.4346
f: 514.844.3532
guy@mamma.com
www.mamma.com







# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:08-cv-02050 (SAF) |
| MARK CUBAN, | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF KEVIN J. CROSS

Kevin J. Cross makes the following declaration under 28 U.S.C. § 1746:

1.      I am a partner with the law firm of Lippes Mathias Wexler Friedman LLP in Buffalo, New York.  I am a member in good standing of the New York bar.

2.      I currently represent Michael E. Storck in connection with this matter, and have represented him at all relevant times during the pendency of this matter.

3.      I have personal knowledge of the statements made in this declaration.  If called to testify in this matter, I would testify consistently with the statements made herein.

4.      During the pendency of this matter, both the SEC and Mr. Cuban's counsel have approached me and Mr. Storck seeking documents and testimony from Mr. Storck.

5.      I have made Mr. Storck and any relevant, non-privileged documents available to both sides in this action.

6.      Attached as Exhibit A is a true and correct copy of an email chain dated September 15, 2011 among myself and counsel for the SEC and Mr. Cuban, subject line "FW: Production of documents by Michael Storck."

1

APP. 138

7.      I have had many email exchanges and phone calls with Kevin O'Rourke of the SEC regarding Mr. Storck and relevant documents in this case.  I attached hereto as Exhibit A, by way of example, an email chain dated September 15, 2011.  Ex. A at 2-4.  It confirms that I have been fully cooperative with the SEC and have been willing to provide the SEC with the same access to Mr. Storck and relevant documents as Mr. Cuban's counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2013
       Buffalo, N.Y.

By: _____
    Kevin J. Cross

2

APP. 139

**Kevin Cross**
_____

| | |
|---|---|
| **From:** | Kevin Cross |
| **Sent:** | Thursday, September 15, 2011 9:29 AM |
| **To:** | Michael Storck; Richard Scherer; Vincent Miranda (vmiranda@lippes.com) |
| **Subject:** | FW: Production of documents by Michael Storck |

FYI

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**From:** ORourke, Kevin [mailto:ORourkeK@SEC.GOV]
**Sent:** Wednesday, September 14, 2011 7:09 PM
**To:** Kevin Cross
**Cc:** Thompson, Duane; Aderton, Adam S.; SBest@BHFS.com; LRoberts@deweyleboeuf.com; BNysenbaum@BHFS.com; Riewe, Julie M.
**Subject:** Production of documents by Michael Storck

Dear Mr. Cross:

I write in response to your email earlier today concerning the above-referenced matter. First, our insistence on adherence to the return date for the document production was and is necessitated by the procedural posture of the litigation. In late August, I received, through Mr. Cuban's counsel, a declaration executed by Mr. Storck on July 20, 2011. Then, on August 29, 2011, Mr. Cuban filed a motion that relied substantially on Mr. Storck's declaration. That is what necessitated our contacting Mr. Storck to request documents and seek to schedule his deposition. As you well know, Mr. Storck and I have spoken directly in the past with the encouragement of both yourself and Mr. Storck. My understanding was that your role was assisting Mr. Storck in retrieving documents for production. Thereafter, Mr. Storck informed me that he had checked your calendar and that he agreed to accept service of a subpoena scheduling his deposition for September 19, 2011, a date he proposed. Cuban's counsel was provided with notice of the subpoena before it was served on Mr. Storck. Mr. Storck's testimony could be relevant to addressing Mr. Cuban's pending motion. For this reason, it was imperative that I move quickly to schedule his deposition.

With respect to the subpoenaed documents, we appreciate Mr. Storck's provision on September 2, 2011 of documents that were attached as exhibits to his first declaration. As you note, I sent additional emails on September 6 and September 7, 2011 to clarify the scope of the subpoena requests. I believed these emails would be helpful to you in understanding the scope of the subpoena requests. You note that since the time you confirmed that you would send documents, Mr. Cuban's counsel flew to Buffalo to review documents for which the company's privilege had been waived. Indeed, it appears that Mr. Cuban's counsel was at your offices on Friday, September 9, 2011 reviewing documents for which the privilege had previously been asserted. At the time Cuban's counsel was conducting their review, they had not yet informed us that the privilege had been waived. Therefore, we were unable to make arrangements to review these previously privileged documents at the same time as Cuban's counsel. We look forward to making arrangements to review these documents at your offices and regret that we could not have spared you the disruption by reviewing and copying documents at the same time as Mr. Cuban's counsel. We simply were not informed the privilege was waived until Cuban's counsel had apparently completed their collection from you. We specifically look forward to production of each of the documents that you identified on the privilege log that you produced in response to the earlier subpoena duces tecum.

I do remain puzzled about your previous failure to identify a basis for your claimed scheduling conflict, given the specific commitment by Mr. Storck to an agreeable date. If the reason for claiming a conflict was personal, you should have said that all along, just like you finally did in your email of earlier today. That would have gone a long way to developing a cordial working relationship. A willingness on your part to have a

1

telephone discussion when I suggested it, also would have gone a long way. At any rate, the deposition date now has been extended by agreement until September 28 at 9:00 a.m. at the previously identified location of our court reporter.

While Cuban's counsel has informed us that they have no objection to us taking as much time as necessary to depose Mr. Storck, we understand that your position is that Mr. Storck will not be available for more than seven hours. We will endeavor to complete our examination in the allotted time, recognizing that Cuban's counsel has already spent significantly more time meeting with Mr. Storck, but we may need to move for additional time should seven hours prove inadequate.

Finally, you mention that I wrote to you that we were anticipating delivery of responsive documents by September 14, 2011. Obviously, this was in error. As you previously agreed, we are anticipating delivery of all of the documents responsive to the subpoena duces tecum by tomorrow evening, September 15, 2011. I regret my typographical error.

While it is unfortunate that you believe our working relationship necessitated an email such as the one you sent early this morning, I remain committed to working with you in a professional manner.

Regards,
Kevin O'Rourke

**Kevin P. O'Rourke**
Assistant Chief Litigation Counsel
Securities and Exchange Commission
100 F St., NE
Washington, D.C. 20549-4010
(202) 551-4442

---

**From:** Kevin Cross [mailto:Kcross@lippes.com]
**Sent:** Wednesday, September 14, 2011 12:00 AM
**To:** ORourke, Kevin
**Cc:** Thompson, Duane; Aderton, Adam S.; Michael Storck; SBest@BHFS.com; LRoberts@deweyleboeuf.com; BNysenbaum@BHFS.com
**Subject:** RE: Sept. 28

Mr. O'Rourke: my office has been nothing but professional and cordial in dealing with the SEC's requests and recent subpoena. Despite our professionalism you have been needlessly threatening and demanding. My patience is at an end, and frankly, I am disappointed that a government agency such as the SEC behaves in this manner. Let me review the facts:

1) My firm represents Michael Storck, a former outside attorney for Mamma.com, a company that is apparently relevant to the action that the SEC has filed against Mark Cuban. Mr. Storck is a **non-party fact witness**.

2) On August 30, 2011, you spoke to my client without me and he agreed to accept service of the SEC's subpoena and provide whatever documents he could quickly to you by September 1, 2011.

2

STORCK0004540

3)  On September 1, 2011 your subpoena arrived via email against "Michael Storck" setting a return date of September 19 (via agreement by email with Michael Storck) and requesting documents by September 15.

4)  On September 2, 2011 Mr. Storck provided to you via email some documents responsive to your subpoena as a courtesy the very next day after the subpoena was received.

5)  On September 6, you sent an email noting that you still sought additional documents and asked that they be produced by September 15.

6)  On September 7, the next day, you sent another email clarifying what was included in subpoena requests due on September 15.

7)  On that same date and only six days after service of the non-trial subpoena, again September 7, I advised you that due to scheduling issues (which I did not disclose at the time as they are personal in nature relating to commitments with my family) we requested the deposition be put off until the 26th or 28th of September, only one week later.

8)  In response you wrote to me and advised that the deposition date was worked out in advance (although I later learned you failed to provide any notice to Mr. Cuban's counsel which is improper) and that you would not agree to change the date and "reminded" or threatened me with contempt of court for my attempt to change the date.

9)  Only after I wrote to you and advised that I would seek the protection of the Court, did you recant your position and propose to work out another date.

10) A new date for deposition was set of September 28 by mutual agreement with my office, you and Mark Cuban's Counsel.

11) I confirmed that our office would provide documents responsive to the SEC's subpoena by September 15, which I will note was a relatively small amount of documents and I was intending to provide to you via email as a courtesy without cost.

12) Since the time I notified you that we would provide documents, Mamma.com's successor, waived the privilege that prevented our office from turning over significant documentation in our last production some time ago, and Mark Cuban's counsel requested that it be permitted to fly to Buffalo to review those privileged documents that were previously not provided.  That request was accommodated.

13) On September 13 you advised via email that "it may be that we need more than 7 hours for the Storck examination. We have not yet seen the documents as to which privilege was previously asserted by Storck. [Cuban's Counsel] has confirmed that he will be producing a copy of all of the documents from that collection that he or his people designated for copying. We understand that all of the documents not so selected, and there were many, will be separately produced by Storck and his firm, in addition to any other documents as to which privilege had been applicable or claimed.  Further, we are awaiting delivery to our offices tomorrow [September 14] of the documents responsive to our subpoena duces tecum, which has a return date of tomorrow.  Based on these documents, it is possible that a longer deposition will be required." You also later wrote on the same day via email "we require the production from Michael Storck of all of the documents referred to."

3

STORCK0004541

14) I then called you as a courtesy to advise that, just like Mr. Cuban's counsel, you are welcome to come to our offices and review the documents as kept in the normal course of business or you can pay the reasonable costs for production.

15) You sent an email this evening, September 13 stating "In response to your phone message, we expect copies, either hard copies or a disc, of all documents responsive to the pending subpoena duces tecum to arrive tomorrow as required and as you promised."

Now let me clarify our position with regard to your expectations. I never promised to provide to you any documents by September 14. We intend to use our best efforts to provide a response to your subpoena served on Michael Storck (and, of note, not our law firm) by the date of September 15 as noted in the subpoena. I will not, nor have I ever agreed, to provide to you at our cost copies of the thousands of pages of materials that are now available to you, after the recent waiver of privilege. (Of note, we had provided documents on a prior occasion to the SEC and requested reimbursement for our significant costs which was never provided by the SEC, despite our delivering the documents in good faith.) If you wish to pay the cost for reproduction or travel to our offices, you may review those documents. My offer of review is the same to the SEC as it is to Mark Cuban's counsel. I do not play favorites. In fact, we do not have a dog in this fight. You have simply never asked to review anything at our offices and Mr. Cuban's counsel has. Your request that we pay for production is an undue burden pursuant to FRCP 45.

Additionally, we will not be providing Mr. Storck for any time period longer than the required period of 7 hours on September 28 as in our opinion that is more than adequate time for you and Mr. Cuban's counsel to depose him on these issues. As far as the allocation of that deposition time, I take no position on that issue.

If you disagree with any of the above, please immediately advise and we will hold-off on the subpoena response and seek protection from the Western District of New York to clarify our responsibilities as a non-party witness as to costs and timing issues. If I do not hear from you we will assume you have no objections and will provide our response as promised by September 15.
Sincerely

Kevin J. Cross, Partner
Lippes Mathias Wexler Friedman LLP
665 Main Street, Suite 300
Buffalo, New York  14203-1425
Tel:   (716) 853-5100, ext. 370
Fax:   (716) 853-5199
Email: kcross@lippes.com
Web: http://www.lippes.com

**From:** ORourke, Kevin [mailto:ORourkeK@SEC.GOV]
**Sent:** Tuesday, September 13, 2011 7:17 PM
**To:** Kevin Cross; Michael Storck
**Cc:** Thompson, Duane; Aderton, Adam S.
**Subject:** RE: Sept. 28

Kevin,

4

APP. 143   STORCK0004542

In response to your phone message, we expect copies, either hard copies or a disc, of all documents responsive to the pending  subpoena duces tecum to arrive tomorrow as required and as you promised.
Kevin

**Kevin P. O'Rourke**
Assistant Chief Litigation Counsel
Securities and Exchange Commission
100 F St., NE
Washington, D.C. 20549-4010
(202) 551-4442

**From:** ORourke, Kevin
**Sent:** Tuesday, September 13, 2011 4:44 PM
**To:** 'Best, Stephen A.'; 'kcross@lippes.com'; 'Mstorck@lippes.com'
**Cc:** 'Nysenbaum, Brian D.'; 'LRoberts@deweyleboeuf.com'; Thompson, Duane; Aderton, Adam S.
**Subject:** RE: Sept. 28

Steve,
Thank you for the clarification. However, based on the waiver of privilege, as well as your review of documents, we require the production from Michael Storck of all of the documents referred to.
Regards,
Kevin

**From:** Best, Stephen A. [mailto:SBest@BHFS.com]
**Sent:** Tuesday, September 13, 2011 4:36 PM
**To:** ORourke, Kevin; kcross@lippes.com; Mstorck@lippes.com
**Cc:** Nysenbaum, Brian D.; LRoberts@deweyleboeuf.com; Thompson, Duane; Aderton, Adam S.
**Subject:** RE: Sept. 28

Kevin- I concur with everything though to the sentence below, I did not and cannot make representations on behalf of Michael or his firm. I specifically stated that we were allowed to review documents at the law offices and earmarked certain documents for copying, that there were numerous documents identified in the privilege log that we did not look at, and numerous documents we did not copy and you need to confer with Kevin Cross regarding access to those.

"We understand that all of the documents not so selected, and there were many, will be separately produced by Storck and his firm, in addition to any other documents as to which privilege had been applicable or claimed."

**From:** ORourke, Kevin [mailto:ORourkeK@SEC.GOV]
**Sent:** Tuesday, September 13, 2011 4:25 PM
**To:** Best, Stephen A.; kcross@lippes.com; Mstorck@lippes.com
**Cc:** Nysenbaum, Brian D.; LRoberts@deweyleboeuf.com; Thompson, Duane; Aderton, Adam S.
**Subject:** RE: Sept. 28

APP. 144   STORCK0004543

Counsel,
Also, I told Steve Best this afternoon that it may be that we need more than 7 hours for the Storck examination.
We have not yet seen the documents as to which privilege was previously asserted by Storck. Steve has
confirmed that he will be producing a copy of all of the documents from that collection that he or his people
designated for copying. We understand that all of the documents not so selected, and there were many, will be
separately produced by Storck and his firm, in addition to any other documents as to which privilege had been
applicable or claimed.  Further, we are awaiting delivery to our offices tomorrow of the documents responsive
to our subpoena duces tecum, which has a return date of tomorrow.
Based on these documents, it is possible that a longer deposition will be required.
Regards,
Kevin

**Kevin P. O'Rourke**
Assistant Chief Litigation Counsel
Securities and Exchange Commission
100 F St., NE
Washington, D.C. 20549-4010
(202) 551-4442


**From:** Best, Stephen A. [mailto:SBest@BHFS.com]
**Sent:** Tuesday, September 13, 2011 1:43 PM
**To:** kcross@lippes.com; Mstorck@lippes.com
**Cc:** ORourke, Kevin; Nysenbaum, Brian D.; LRoberts@deweyleboeuf.com; Thompson, Duane; Aderton,
Adam S.
**Subject:** Sept. 28


Michael/Kevin-

I have spoken to Kevin, Duane and Adam and agreed to give the SEC a reasonable amount of time to depose Michael. Kevin thinks
the deposition may take 7 hours. Kevin may take less than 7 but wants to at least reserve this amount of time. I may need an hour or
two depending on the testimony.

The question for you is whether you both consent to going a little past 7 hours and getting it all done on the 28th? Please let us know
your thoughts.

Regards,
Steve

-------------------------
Stephen A. Best
Brownstein Hyatt Farber Schreck, LLP
1350 I Street, NW., Suite 510
Washington, DC  20005
T:202.747.0500
F:202.296.7009


To ensure compliance with requirements imposed by the IRS, we inform you that any federal tax advice contained in this
communication (including any attachments) is not intended or written to be used, and cannot be used, for purposes of (i) avoiding
penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or tax-

APP. 145                              STORCK0004544

related matter addressed herein.

STATEMENT OF CONFIDENTIALITY & DISCLAIMER:  The information contained in this email message is attorney privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this email is strictly prohibited. If you have received this email in error, please notify us immediately by replying and delete the message. Thank you.

APP. 146
STORCK0004545

# EXHIBIT L

Print - Close Window

**From:** Guy Faure [mailto:guy@mamma.com]
**Sent:** Tuesday, April 06, 2004 12:25 PM
**To:** mark@hd.net
**Subject:** RE: Mamma.com

Mark,

I'm following this up closely with Joel. I believe he will email you a status in the next few minutes. I'll keep you informed, but I believe that this is a slip-up from our 3rd party supplier.

On the other issues, I would rather you call me since this is under "confidentiality ".

Regards,

Guy Fauré
President & CEO

388 st-jacques st. west, 9th floor
montreal , qc  h2y 1s1

t: 514.908.4346
f: 514.844.3532
guy@mamma.com
www.mamma.com



-----Original Message-----
**From:** mark cuban [mailto: mark.cuban@dallasmavs.com ]
**Sent:** 6 avril, 2004 12:15
**To:** guy@mamma.com
**Subject:** FW: Mamma.com

Guy, this certainly cant be the way things happen going forward. I was told that this was just a misunderstanding on the part of the customer. They obviously do not feel that way. What happened ?

And can you give me the information on this SEC inquiry ? Im getting reporters questions, not just about the inquiry, but it appears that insiders sold stock around the time of the run up. Is this true ? I didn't see it in SEC filings.

m

**From:** Scott R. Gingold [mailto:scott@powerfeedback.com]
**Sent:** Tuesday, April 06, 2004 8:49 AM
**To:** Jason Cobbler; mark@hd.net



EXHIBIT
11
RR 4/3/07

EXHIBIT KS
II 105
Cuban 2-10-12
PENGAD 800-631-6989

MC000203

SEC-MC0003041

**Subject:** Re: Mamma.com

Good Morning Jason,

Though I don't blame you in any way, its become pretty obvious that mamma.com has **\*NO\*** sincere interest in our business. A week has passed since our last email exchange and we have not heard from anyone in customer service. I have directed my marketing manager to eliminate any further and/or future consideration of a CPC or ad buy campaign with mamma.com.

As a seasoned business consultant (Successful Strategies Company) and someone (powerfeedback.com) who helps companies better understand their customer service needs, it is pretty clear that mamma.com has deep systems, operational and process problems and that it would not be in our best interest to proceed any further.

Mark, for what its worth, we were first attracted to mamma.com because of your affiliation with the company. Their lack of customer service and "issues" don't represent the image which you have created and represent.

I wish mamma.com the best of luck as I sincerely believe that "luck" is what will be needed at this point to carry the day for the company.

Sincerely, Scott Gingold

Jason Cobbler wrote:

```
Hi Scott,

I understand.   You should be hearing from a customer service rep shortly.
Regards,

Jason Cobbler
Account Executive
Mamma Media Solutions
T (514) 908-4333
F (514) 844-3532
Toll Free (888) 844-2372 x 133
Jason@mamma.com
www.mamma.com


-----Original Message-----
From: Scott Gingold [mailto:scott@powerfeedback.com]
Sent: March 30, 2004 2:51 PM
To: jason@mamma.com
Subject: Re: Mamma.com


Thanks Jason. Perhaps we can right the ship and do more with mamm.com, but,
candidly I am not overly optomistic based on what I have seen thus far.

Either way, I appreciate your efforts.

.....Scott

-----Original Message-----
From: "Jason Cobbler" <jason@mamma.com>
Date: Tue, 30 Mar 2004 14:25:30
```

MC000204

APP. 149

SEC-MC0003042

To: "Scott R. Gingold" <scott@powerfeedback.com>
Subject: RE: Mamma.com

Hi Scott,

I have forwarded your email to customer service. I do not handle the Mamma
Collections submissions. They will contact you ASAP.
Regards,

Jason Cobbler
Account Executive
Mamma Media Solutions

T (514) 908-4333
F (514) 844-3532
Toll Free (888) 844-2372 x 133
Jason@mamma.com
www.mamma.com

-----Original Message-----
From: Scott R. Gingold [mailto:scott@powerfeedback.com]
Sent: March 30, 2004 12:19 PM
To: Jason Cobbler
Subject: Re: Mamma.com

Thanks Jason. In a nutshell, as a "test", my marketing manager signed up
for the "Mamma Collection Submission-Velocity Submit" to test the claim of -

This service option includes the following:

· Guaranteed site review within two business days.
· Since The Mamma Collection is human-reviewed, the sites submitted
to the Mamma Collection can be given greatly enhanced relevancy and
placement.

We never heard another word about this, tried to make inquiry by email and
phone and were unsuccessful. We had been planning to buy a CPC ad campaign,
but, once we saw the lack of customer service in this instance, we pulled
back.

....Scott

Jason Cobbler wrote:

Hi Scott,

I hope all is well. I had received an email from Mark indicating that you
were having problems contacting our customer service. Please contact me and
I will forward you to our customer service representatives. My contact
information is below.

Regards,

Jason Cobbler
Account Executive
Mamma Media Solutions

T (514) 908-4333
F (514) 844-3532

MC000205

Toll Free (888) 844-2372 x 133
Jason@mamma.com
www.mamma.com

This email may contain material that is PRIVILEGED and CONFIDENTIAL for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

MC000206

APP. 151

SEC-MC0003044

# EXHIBIT M

**From:**      mark cuban
**Sent:**      4/23/2004 3:36:27 AM
**To:**        'Guy Faure' guy@mamma.com;
**Cc:**
**Bcc:**
**Subject:**   RE: insider sales

Where would you like me to help out ? Happy to do it where I can if you have a specific idea. Is there a specific biz area you want promoted ? Mamma.com traffic or building the network ?

As you know I think blogs are hot, if you have a product that supports blogs, I can add blogmaverick.com ,

What other acquisitions are you looking at, may be companies I can help with. An obviously, what you tell me is confidential, and since I cant buy stock right now, its not anything I can act on either. So let me know how I can help there.

---

**From:** Guy Faure [mailto:guy@mamma.com]
**Sent:** Thursday, April 22, 2004 9:10 PM
**To:** mark@hd.net
**Subject:** RE: insider sales

Hi Mark,

Insider sales will be published in our annual report (probably end of May or June), but they will be published amalgamated. If you want to see individual filings, you can view them on www.sedi.ca site which is the Canadian filing site for insiders governed by the Ontario Securities Exchange Commission ( as we are).

Biz is going great! We are working hard on closing the Digital Arrow deal which will contribute to added revenue and Ebitda. We should publish our Q1 earnings by the second week of May. I'm already working at additional acquisitions. We should speak soon on ways you could give Mamma added exposure if your still up for it.

If you need help on the SEDI site, call me .

Take care,


**Guy Faure**
**President & CEO**

388 st-jacques st. west, 9th floor
montreal, qc  h2y 1s1

t: 514.908.4346
f: 514.844.3532
guy@mamma.com
www.mamma.com

-----Original Message-----
**From:** mark cuban [mailto:mark.cuban@dallasmavs.com]
**Sent:** 22 avril, 2004 19:15
**To:** 'Guy Faure'
**Subject:** insider sales

Guy
When are you going to file to show the shares sold by insiders this year ?

Haven't seen them online yet

And how is biz going ? Any new or exciting things comingup ?



m

CONFIDENTIAL

APP. 154
MCSEC0000582

# EXHIBIT N



**MERRIMAN**
**CURHAN**
**FORD & CO.**

June 14 , 2004

RE:  **Private Placement Transaction Acknowledgement**

We at Merriman Curhan Ford & Co. (MCF) are committed to offering the best service we can as a broker dealer and investment bank. As a part of that service, we look forward to providing you with private investment opportunities in public companies.

In an effort to continue that service and protect your interests as an investor client, we write you now to remind you of potential trading restrictions that you may face after receiving information from Merriman Curhan Ford & Co. regarding private placement investment transactions. You are a valued customer and so we seek your acknowledgement of these potential trading restrictions.

As part of the process of providing you with interesting investment ideas, you may be advised of a public company's offer of a private capital investment transaction in exchange for their public equity. While we are not aware of applicable statutory language, we have noted a position stated by representatives of the Securities and Exchange Commission in recent popular financial services press. This position holds that knowledge of a public company's intent to seek private financing in exchange for its equity is material non-public information.

Given the possibility for the Commission to consider knowledge of a potential private placement to be material non-public information and the potential application of Rule 10b5-1 of the Exchange Act of 1934, you should not trade in a company's securities (either directly or indirectly) based upon material non-public information. Further, you should not disclose the fact of a potential private placement, until that information has been made available to the public.

While Merriman Curhan Ford & Co. has always treated knowledge of a potential private placement as material non-public information, we ask that you read this letter and acknowledge your receipt and review with your signature below. Upon our receipt of your signed acknowledgement, we will continue to approach you with new offers for private placement



Exhibit
_56_
Christy R. Sievert, CSR, RPR

Confidential Treatment
Requested by K&L Gates

HBK_2-0003519A

APP. 156

PIPE_Acknowledgement.pdf (Attachment 1 of 1)



investing opportunities. Once signed and returned to us, this letter will cover all future communications between Merriman Curhan Ford & Co. and your firm as well as the funds you manage regarding private placements unless the SEC requires further documentation.

Should you have any questions regarding our services, please do not hesitate to telephone our president, Greg Curhan at 415-248-5678 or myself at 415-248-5634.

Best Regards,

Chris Aguilar
MERRIMAN CURHAN FORD & CO.
General Counsel and
Chief Compliance Officer

I HEREBY ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED THE INFORMATION IN THIS LETTER AND AM AUTHORIZED TO SIGN THIS ACKNOWLEDGEMENT AS INDICATED BELOW.

_____
Fund Manager Company Name

By:_____
Print Name

By:_____
Signature

_____
Date

Confidential Treatment
Requested by K&L Gates

601 MONTGOMERY STREET, 18TH FLOOR ■ SAN FRANCISCO, CA 94111
(415) 248-5600 MAIN ■ (415) 248-5691 FAX
(800) 909-7897 TRADING

HBK_2-0003519B

# EXHIBIT O

| | |
|---|---|
| **From:** | Andrew Fineberg <afineberg@mcfco.com> |
| **Sent:** | Wednesday, June 23, 2004 4:51 PM (GMT) |
| **To:** | wmatthews@amaranthllc.com |
| **Subject:** | SEC Trading Restrictions Surrounding PIPE's |
| **Attach:** | PIPE_Acknowledgement.pdf |

Will,


As a part of our client services process, we are required by our Chief Compliance
Officer to send you the attached letter indicating recent interest in PIPE activity
by the SEC. We request your signature to acknowledge receipt of this letter.


You probably have received similar letters from other firms marketing PIPEs. As you
will see after reading the letter, your signature is only to acknowledge your
receipt, not to bind you to any interpretation or the circumstances described.


Our firm requires that the letter be printed, signed and returned either via fax,
electronic mail (scanned and converted to .pdf format), or postal mail before July
2, 2004. If you choose to fax, please direct it to my attention at 415-248-5692.
Our CCO is mandating that we will not be able to contact you regarding new PIPE
opportunities until your acknowledgement has been received.


Please feel free to call me or our General Counsel, Christopher Aguilar directly at
415-248-5634 if you have any questions or concerns.


We greatly appreciate your cooperation, and look forward to showing you new
investment opportunities in the future.


Best Regards,

Andrew



Andrew Fineberg

Private Placement Group

MERRIMAN CURHAN FORD & CO.

afineberg@merrimanco.com

PLAINTIFF'S
EXHIBIT
149

```
office: 415-262-1333

cell: 415-516-8897

fax 415-248-5692

trading: 800-909-7897

DISCLAIMER: Please click on this link for disclaimer and other important
information relating to this message (
<http://www.merrimanco.com/MCF/emaildisclaimer.php>
http://www.merrimanco.com/MCF/emaildisclaimer.php)
```



MERRIMAN
CURHAN
FORD & CO.

June 14 , 2004

### RE:  Private Placement Transaction Acknowledgement

We at Merriman Curhan Ford & Co. (MCF) are committed to offering the best service we can as a broker dealer and investment bank. As a part of that service, we look forward to providing you with private investment opportunities in public companies.

In an effort to continue that service and protect your interests as an investor client, we write you now to remind you of potential trading restrictions that you may face after receiving information from Merriman Curhan Ford & Co. regarding private placement investment transactions.  You are a valued customer and so we seek your acknowledgement of these potential trading restrictions.

As part of the process of providing you with interesting investment ideas, you may be advised of a public company's offer of a private capital investment transaction in exchange for their public equity.  While we are not aware of applicable statutory language, we have noted a position stated by representatives of the Securities and Exchange Commission in recent popular financial services press.  This position holds that knowledge of a public company's intent to seek private financing in exchange for its equity is <u>material non-public information</u>.

Given the possibility for the Commission to consider knowledge of a potential private placement to be material non-public information and the potential application of Rule 10b5-1 of the Exchange Act of 1934, you should not trade in a company's securities (either directly or indirectly) based upon material non-public information.  Further, you should not disclose the fact of a potential private placement, until that information has been made available to the public.

While Merriman Curhan Ford & Co. has always treated knowledge of a potential private placement as material non-public information, we ask that you read this letter and acknowledge your receipt and review with your signature below.  Upon our receipt of your signed acknowledgement, we will continue to approach you with new offers for private placement

SEC-MCF-0002626
APP 1661



investing opportunities. Once signed and returned to us, this letter will cover all future communications between Merriman Curhan Ford & Co. and your firm as well as the funds you manage regarding private placements unless the SEC requires further documentation.

Should you have any questions regarding our services, please do not hesitate to telephone our president, Greg Curhan at 415-248-5678 or myself at 415-248-5634.

Best Regards,

Chris Aguilar
MERRIMAN CURHAN FORD & CO.
General Counsel and
Chief Compliance Officer

I HEREBY ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED THE INFORMATION IN THIS LETTER AND AM AUTHORIZED TO SIGN THIS ACKNOWLEDGEMENT AS INDICATED BELOW.

_____
Fund Manager Company Name


By:_____
Print Name


By:_____
Signature


_____
Date

SEC-MCF-002627
APPF 162

# EXHIBIT P

**From:**    mark cuban
**Sent:**    4/23/2004 11:28:01 AM
**To:**      'Guy Fauré' guy@mamma.com;
**Cc:**
**Bcc:**
**Subject:**   RE: insider sales

All great points. My only concern on Europe is that the cost structure goes way up. The value of Mamma right now is that you are lean and mean. Every new paid for search goes pretty much to the bottom line. Go to Europe, and you have new people, new challenges, huge costs.

Have you identified any smaller or niche search engines and networks out there ? 2 man shops that are too small for anyone else to consider that you can get cheap ?

One I have seen I www.icerocket.com, there are of course thousands of no names like this. But they can add up

m

---

**From:** Guy Fauré [mailto:guy@mamma.com]
**Sent:** Friday, April 23, 2004 7:57 AM
**To:** mark@hd.net
**Subject:** RE: insider sales

Building traffic on the Mamma.com engine is a big and expensive challenge. If you can help give the engine exposure in the U.S., we should discuss. I will send you (next week) an old TV add we produced a few years ago.

On the acquisition side, I'm looking at adding to our three offerings:
1) Search (pay per click) sites & distribution network
2) Ad Network (large publisher network) in the U.S. or Europe
3) Email marketing ; large DB of records in U.S.

I'm completing the acquisition of an email co now. I would be reluctant of buying another one before I get to understand the potential of this one before. On the search side the businesses tend to be overpriced...Therefore the Ad Network is my most interesting target right now. I've identified a few in the U.S. and Europe. It would be great to make an incursion in Europe as the market is not as occupied an in the U.S. and the CPM's are much higher!

Food for thought,

**Guy Fauré**
**President & CEO**

388 st-jacques st. west, 9th floor
montreal, qc h2y 1s1

t: 514.908.4346
f: 514.844.3532
guy@mamma.com
www.mamma.com

EXHIBIT
SEC 64
DD 11/4/11
PENGAD 800-631-6989

-----Original Message-----
**From:** mark cuban [mailto:mark.cuban@dallasmavs.com]
**Sent:** 23 avril, 2004 03:36
**To:** 'Guy Faure'
**Subject:** RE: insider sales

Where would you like me to help out ? Happy to do it where I can if you have a specific idea. Is there a specific biz area you want

promoted ? Mamma.com traffic or building the network ?

As you know I think blogs are hot, if you have a product that supports blogs, I can add blogmaverick.com ,

What other acquisitions are you looking at, may be companies I can help with. An obviously, what you tell me is confidential, and since I cant buy stock right now, its not anything I can act on either. So let me know how  I can help there.

---

**From:** Guy Faure [mailto:guy@mamma.com]
**Sent:** Thursday, April 22, 2004 9:10 PM
**To:** mark@hd.net
**Subject:** RE: insider sales

Hi Mark,

Insider sales will be published in our annual report (probably end of May or June), but they will be published amalgamated. If you want to see individual filings, you can view them on www.sedi.ca site which is the Canadian filing site for insiders governed by the Ontario Securities Exchange Commission ( as we are).

Biz is going great! We are working hard on closing the Digital Arrow deal which will contribute to added revenue and Ebitda. We should publish our Q1 earnings by the second week of May. I'm already working at additional acquisitions. We should speak soon on ways you could give Mamma added exposure if your still up for it.

If you need help on the SEDI site, call me .

Take care,


**Guy Fauré**
**President & CEO**

388 st-jacques st. west, 9th floor
montreal, qc  h2y 1s1

t: 514.908.4346
f: 514.844.3532
guy@mamma.com
www.mamma.com



-----Original Message-----
**From:** mark cuban [mailto:mark.cuban@dallasmavs.com]
**Sent:** 22 avril, 2004 19:15
**To:** 'Guy Faure'
**Subject:** insider sales

Guy
When are you going to file to show the shares sold by insiders this year ?

Haven't seen them online yet

And how is biz going ? Any new or exciting things comingup ?

m

CONFIDENTIAL

# EXHIBIT Q

**From:**       David Goldman <dgoldman@intasys.com>
**Sent:**       Monday, June 28, 2004 8:33 PM
**To:**         ikramer@icongo.com
**Subject:**    RE: New Equity URGENT - YOUR APPROVAL REQUIRED

Cuban would be at about 4.95%. Our idea was to allow him to invest up to an amount which would retain his inerest but he doesn't seem so inclined. The bigger question is will he sell and flog us on his blog.

Dave

-----Original Message-----
From: Irwin Kramer [mailto:ikramer@icongo.com]
Sent: Monday, June 28, 2004 4:13 PM
To: David Goldman
Subject: RE: New Equity URGENT - YOUR APPROVAL REQUIRED


ok..What is Mark Cuban going to do..Will he still have in excess of 5 percent



---------------------------------------------
Irwin Kramer
President and CEO
PGA Exchange
204 St.- Sacrement., Suite 700
Montreal, Quebec
H2Y 1W8
Canada
t: 514.904-2114 x-202 or 888.550.2999
f: 514.866.8404
c: 514.795.4794
e: ikramer@pgaexchange.com <mailto:ikramer@pgaexchange.com>
w: http://www.pgaexchange.com
---------------------------------------------



-----Original Message-----
From: David Goldman [mailto:dgoldman@intasys.com]
Sent: Monday, June 28, 2004 4:09 PM
To: ikramer@icongo.com
Subject: RE: New Equity URGENT - YOUR APPROVAL REQUIRED


Irwin

This is part of the risk statement in the agreement and I have eprsonally spoken to the key investor (who brought others in) about this. Also, Guy and

DG0000415


DEPOSITION
EXHIBIT
PENGAD 800-631-6989
PHS SEC 44
10-21-11

APP. 167

I had a teelconference with one other investor on background of teh company
and we clearly ppointed out the SEC investigation as a risk in the
investment decision.

Dave

-----Original Message-----
From: Irwin Kramer [mailto:ikramer@icongo.com]
Sent: Monday, June 28, 2004 4:03 PM
To: David Goldman
Subject: RE: New Equity URGENT - YOUR APPROVAL REQUIRED


OK.Approved providing that full disclosure is made to investors of the SEC
probe as we have discussed



---------------------------------------------
Irwin Kramer
President and CEO
PGA Exchange
204 St.- Sacrement., Suite 700
Montreal, Quebec
H2Y 1W8
Canada
t: 514.904-2114 x-202 or 888.550.2999
f: 514.866.8404
c: 514.795.4794
e: ikramer@pgaexchange.com <mailto:ikramer@pgaexchange.com>
w: http://www.pgaexchange.com
---------------------------------------------



-----Original Message-----
From: David Goldman [mailto:dgoldman@intasys.com]
Sent: Monday, June 28, 2004 3:51 PM
To: Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David
Goldman; Claude E. Forget; Guy Faure
Subject: New Equity URGENT - YOUR APPROVAL REQUIRED



We are nearing completion of negotiation of the new equity raise. The
definitive agreement is not completed yet. Redacted
Redacted One last issue being
addressed is that of penalties should, in effect, the company neglect to
carry out all measures with respect to registration filings which, should we
screw up, would result in a cashless exercise option with respect to
warrants (repeat - this is only if we screw-up). This is subject to

DG0000416

APP. 168

clarifying that this is not inconsistent with OSC regulations that may
preclude any reference to cashless exercise.

We have also reworked the penalty issue for failing to register within 120
days such that the company would be subject to a maximum penalty of 5%
payable either in cash or shares at our option at 1% per month.

Note: with respect to registration: We are nearing completion of filing for
the 105,000 MAXIM warrants and, based on closing this equity raise prior to
month's end, will piggyback the registration of the new equity/warrants (as
well as warrants currently issued to Merriman Curhan Ford) with this filing.

While the board had indicated that we raise $15 million, we may be slightly
oversubscribed at about $17 million (final numbers not available). This is
about 1.5 million shares at $10.85 if we include today's price plus 600,000
warrants at about $15.68 if incl. today's price. In addition to receiving
your approval for the equity could you please approve this increased amount
so that we do not have to put anyone on allocation?

Today, after much discussion, Guy spoke to Mark Cuban about this equity
raise and whether or not he would be interested in participating. As
anticipated he initially "flew off the handle" and said he would sell his
shares (recognizing that he was not able to do anything until we announce
the equity) but then asked to see the terms and conditions which we have
arranged for him to receive from one of the participating investor groups
with which he has dealt in the past.

With your approval, we would expect to close at the close of business either
today or tomorrow depending on concluding the agreement.

Guy and Dave

DG0000417

# EXHIBIT R

From: David Goldman [mailto:dgoldman@intasys.com]
Sent: Monday, June 28, 2004 3:51 PM
To: Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David
Goldman; Claude E. Forget; Guy Faure
Subject: New Equity URGENT - YOUR APPROVAL REQUIRED


We are nearing completion of negotiation of the new equity raise. The
definitive agreement is not completed yet but discussions with our
counsel and that of the investors has resulted in substantially all of
the terms and conditions reflecting those approved by the board. One
last issue being addressed is that of penalties should, in effect, the
company neglect to carry out all measures with respect to registration
filings which, should we screw up, would result in a cashless exercise
option with respect to warrants (repeat - this is only if we screw-up).
This is subject to clarifying that this is not inconsistent with OSC
regulations that may preclude any reference to cashless exercise.

We have also reworked the penalty issue for failing to register within
120 days such that the company would be subject to a maximum penalty of
5% payable either in cash or shares at our option at 1% per month.

Note: with respect to registration: We are nearing completion of filing
for the 105,000 MAXIM warrants and, based on closing this equity raise
prior to month's end, will piggyback the registration of the new
equity/warrants (as well as warrants currently issued to Merriman
Curhan
Ford) with this filing.

While the board had indicated that we raise $15 million, we may be
slightly oversubscribed at about $17 million (final numbers not
available). This is about 1.5 million shares at $10.85 if we include
today's price plus 600,000 warrants at about $15.68 if incl. today's
price. In addition to receiving your approval for the equity could you
please approve this increased amount so that we do not have to put
anyone on allocation?

Today, after much discussion, Guy spoke to Mark Cuban about this equity
raise and whether or not he would be interested in participating. As
anticipated he initially "flew off the handle" and said he would sell
his shares (recognizing that he was not able to do anything until we
announce the equity) but then asked to see the terms and conditions
which we have arranged for him to receive from one of the participating
investor groups with which he has dealt in the past.

With your approval, we would expect to close at the close of business
either today or tomorrow depending on concluding the agreement.

Guy and Dave



FOIA Confidential Treatment   Requested by Mamma.com, Inc.

MammaPro00291

APP. 171

SEC-MC0002157

# EXHIBIT S

| | |
|---|---|
| **From:** | Andrew Fineberg <afineberg@mcfco.com> |
| **Sent:** | Wednesday, June 23, 2004 7:20 PM (GMT) |
| **To:** | emily.lansdowne@hcmny.com |
| **Subject:** | SEC Trading Restrictions Surrounding PIPE's |
| **Attach:** | PIPE_Acknowledgement.pdf |

---

Emily,


Here is the message and letter to be signed and returned that I sent to Adam and
Scott. Can you please help me get it executed?


Thanks.

Andrew


As a part of our client services process, we are required by our Chief Compliance
Officer to send you the attached letter indicating recent interest in PIPE activity
by the SEC. We request your signature to acknowledge receipt of this letter.


You probably have received similar letters from other firms marketing PIPEs. As you
will see after reading the letter, your signature is only to acknowledge your
receipt, not to bind you to any interpretation or the circumstances described.


Our firm requires that the letter be printed, signed and returned either via fax,
electronic mail (scanned and converted to .pdf format), or postal mail before July
2, 2004. If you choose to fax, please direct it to my attention at 415-248-5692.
Our CCO is mandating that we will not be able to contact you regarding new PIPE
opportunities until your acknowledgement has been received.


Please feel free to call me or our General Counsel, Christopher Aguilar directly at
415-248-5634 if you have any questions or concerns.


We greatly appreciate your cooperation, and look forward to showing you new
investment opportunities in the future.

PLAINTIFF'S
EXHIBIT
150

Best Regards,

Andrew Fineberg



Andrew Fineberg

Private Placement Group

MERRIMAN CURHAN FORD & CO.

afineberg@merrimanco.com

office: 415-262-1333

cell: 415-516-8897

fax 415-248-5692

trading: 800-909-7897

DISCLAIMER: Please click on this link for disclaimer and other important
information relating to this message (
<http://www.merrimanco.com/MCF/emaildisclaimer.php>
http://www.merrimanco.com/MCF/emaildisclaimer.php)

SEC-MCF-E0005990

APP. 174



**MERRIMAN CURHAN FORD & CO.**

June 14 , 2004

### RE: Private Placement Transaction Acknowledgement

We at Merriman Curhan Ford & Co. (MCF) are committed to offering the best service we can as a broker dealer and investment bank. As a part of that service, we look forward to providing you with private investment opportunities in public companies.

In an effort to continue that service and protect your interests as an investor client, we write you now to remind you of potential trading restrictions that you may face after receiving information from Merriman Curhan Ford & Co. regarding private placement investment transactions. You are a valued customer and so we seek your acknowledgement of these potential trading restrictions.

As part of the process of providing you with interesting investment ideas, you may be advised of a public company's offer of a private capital investment transaction in exchange for their public equity. While we are not aware of applicable statutory language, we have noted a position stated by representatives of the Securities and Exchange Commission in recent popular financial services press. This position holds that knowledge of a public company's intent to seek private financing in exchange for its equity is <u>material non-public information</u>.

Given the possibility for the Commission to consider knowledge of a potential private placement to be material non-public information and the potential application of Rule 10b5-1 of the Exchange Act of 1934, you should not trade in a company's securities (either directly or indirectly) based upon material non-public information. Further, you should not disclose the fact of a potential private placement, until that information has been made available to the public.

While Merriman Curhan Ford & Co. has always treated knowledge of a potential private placement as material non-public information, we ask that you read this letter and acknowledge your receipt and review with your signature below. Upon our receipt of your signed acknowledgement, we will continue to approach you with new offers for private placement

601 MONTGOMERY STREET, 18TH FLOOR ■ SAN FRANCISCO, CA 94111
(415) 248-5600 MAIN ■ (415) 248-5691 FAX
(800) 909-7897 TRADING

SEC-MCF-000 5991
APPF 175



investing opportunities. Once signed and returned to us, this letter will cover all future communications between Merriman Curhan Ford & Co. and your firm as well as the funds you manage regarding private placements unless the SEC requires further documentation.

Should you have any questions regarding our services, please do not hesitate to telephone our president, Greg Curhan at 415-248-5678 or myself at 415-248-5634.


Best Regards,

Chris Aguilar
MERRIMAN CURHAN FORD & CO.
General Counsel and
Chief Compliance Officer


I HEREBY ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED THE INFORMATION IN THIS LETTER AND AM AUTHORIZED TO SIGN THIS ACKNOWLEDGEMENT AS INDICATED BELOW.


_____
Fund Manager Company Name


By:_____
Print Name


By:_____
Signature


_____
Date

SEC-MCF-005992
APP 176

# EXHIBIT T

| | |
|---|---|
| **From:** | Andrew Fineberg <afineberg@mcfco.com> |
| **Sent:** | Thursday, June 24, 2004 7:13 PM (GMT) |
| **To:** | akansler@proskauer.com |
| **Cc:** | aowen@mcfco.com; Christopher Aguilar <Ags@mcfco.com> |
| **Subject:** | PIPE Acknowledgement Letter |
| **Attach:** | Form of Agreement_1.doc; PIPE_Acknowledgement.pdf |

Adam,

I work with Arnie Owen in the Private Placement Group at Merriman Curhan Ford & Co. I would like to offer my assistance to you in this process of getting a document signed regarding PIPE notifications.  I know that you already spoke to Chris Aguilar, our General Counsel.

I am sure that there are several sensitivities here, and I want you to know that we are open to hearing any suggestions that you may have, including any regarding this process.  Per his advice, I am sending you several versions of acknowledgement letters that work from our perspective.  May I suggest that you please review them and make any edits or comments that you feel necessary?

If this will suffice - great.  Otherwise, I am available via phone or email at any time.

Fran has a bit more detail from the message that I left with her for you.

Thanks and best regards,

Andrew


Andrew Fineberg

Private Placement Group

MERRIMAN CURHAN FORD & CO.

afineberg@merrimanco.com

office: 415-262-1333

cell: 415-516-8897



EXHIBIT 92
Deponent Aguilar
Date 1/25/12 Rptr. HH
WWW.DEPOBOOK.COM

```
fax 415-248-5692

trading: 800-909-7897

DISCLAIMER: Please click on this link for disclaimer and other important
information relating to this message (
<http://www.merrimanco.com/MCF/emaildisclaimer.php>
http://www.merrimanco.com/MCF/emaildisclaimer.php)
```

From time to time, _____ may approach you in connection with a possible purchase by you directly from an issuer (the "Issuer") of (i) registered securities of public companies in a potential shelf takedown (also known as a "registered direct placement of securities") for which _____ will be engaged as a placement agent by the time we approach you, or (ii) unregistered securities of public companies (also known as a "PIPE offering") for which _____ will be engaged as a placement agent by the time we approach you (collectively, a registered direct placement of securities and a PIPE offering will be referred to as a "Proposed Transaction").

In connection with your evaluation of a Proposed Transaction and provided that you agree in advance to receive the Confidential Information with respect to each such Proposed Transaction, you will be orally provided with only (i) the Issuer's name, (ii) the type, amount and basic terms of the securities that may be offered in the Proposed Transaction, and (iii) the timing of the Proposed Transaction (collectively, the "Confidential Information"). We understand that we do not have the right to provide you with the Confidential Information via mail, fax or e-mail. We will not provide you with such Confidential Information without first receiving your consent, and any additional information regarding the Issuer or the Proposed Transaction will only be provided to you by means of a prospectus or prospectus supplement, in the case of a registered direct placement of securities, or by means of SEC filed documents, in the case of a PIPE offering.

You agree that you will use the Confidential Information only in connection with your evaluation of a Proposed Transaction and not for any other purpose. All Confidential Information shall be held in confidence by you and your officers, directors, employees, agents and financial and legal advisors (collectively, the "Representatives") and shall not be disclosed to any other person without our prior written consent or except as may be required by law, regulation or legal process (as you may be advised by legal counsel), or to the extent such Confidential Information is or becomes publicly available, other than as a result of a breach of this Acknowledgment. You also agree that you will direct your Representatives not to disclose to any other person or entity that you have received Confidential Information, that investigations, discussions or negotiations are taking place concerning a Proposed Transaction, or any of the terms, conditions or other facts with respect to a Proposed Transaction, including the status thereof. We represent and warrant to you that we have the full legal right to provide any such Confidential Information that we provide to you.

You hereby acknowledge that the U.S. securities laws would prohibit any person who has material non-public information about a company from purchasing or selling, directly or indirectly, securities of such company (including entering into hedge transactions involving such securities), or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. You agree that you will not use or permit any third party to use, and that you will use your reasonable best efforts to assure that none of your Representatives will use or permit any third party to use, any of the Confidential Information we provide in contravention of the U.S. securities laws.

Other than with respect to the matters specifically addressed herein, this Acknowledgment shall not create any legal obligation of any kind whatsoever between the parties. Without limiting the generality of the foregoing, we shall not be obligated to inform you of any Proposed Transaction in which we become or may become involved, and you shall be under no obligation to receive any information from us or to purchase any securities from any Issuer. Neither this Acknowledgment nor your receipt of any Confidential Information shall be deemed an offer of any securities. Any offering of an Issuer's securities will be made by means of a prospectus and accompanying prospectus supplement that will contain or incorporate by reference detailed information about the Issuer and the Proposed Transaction.

This Acknowledgment shall cease to apply to any Proposed Transaction upon the earlier of (i) the public disclosure of the Confidential Information, other than as a result of a breach of this Acknowledgment, (ii) your entering into a confidentiality agreement with respect to the Confidential Information and/or the Proposed Transaction (which will supercede this Acknowledgment), (iii) the termination of the Proposed Transaction as disclosed to you by the Issuer or _____, and (iv) 60 days from your receipt of the Confidential Information; provided, however, that if we and any third party enter into any agreement of purpose similar to this Acknowledgment ("Other Acknowledgment") that ceases to apply to "confidential information" (as defined in the Other Acknowledgment) in fewer than 60 days from the receipt by the third party of such confidential information, the number of days in (iv) of the first clause of this sentence shall be automatically adjusted downward to the number of days applicable under the Other Acknowledgment, and we will notify you of such adjustment in writing.  Further, you may terminate this Acknowledgment at any time by giving us notice and this Acknowledgment will immediately cease to be in effect; provided, however, that it shall continue to apply to any Confidential Information disclosed to you prior to the giving of such termination notice to which this Acknowledgment still applies.

This Acknowledgment may be executed in counterparts and will be governed and interpreted in accordance with New York law.  Please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning to us a copy of this Acknowledgment.

Very truly yours,

_____

By: _____
Name: _____
Title: _____

Acknowledged as of the date set forth above:

**[FUND NAME]**

By: _____
Name:

Title:



**MERRIMAN CURHAN FORD & CO.**

June 14 , 2004

### RE:  Private Placement Transaction Acknowledgement

We at Merriman Curhan Ford & Co. (MCF) are committed to offering the best service we can as a broker dealer and investment bank. As a part of that service, we look forward to providing you with private investment opportunities in public companies.

In an effort to continue that service and protect your interests as an investor client, we write you now to remind you of potential trading restrictions that you may face after receiving information from Merriman Curhan Ford & Co. regarding private placement investment transactions.  You are a valued customer and so we seek your acknowledgement of these potential trading restrictions.

As part of the process of providing you with interesting investment ideas, you may be advised of a public company's offer of a private capital investment transaction in exchange for their public equity.  While we are not aware of applicable statutory language, we have noted a position stated by representatives of the Securities and Exchange Commission in recent popular financial services press.  This position holds that knowledge of a public company's intent to seek private financing in exchange for its equity is <u>material non-public information</u>.

Given the possibility for the Commission to consider knowledge of a potential private placement to be material non-public information and the potential application of Rule 10b5-1 of the Exchange Act of 1934, you should not trade in a company's securities (either directly or indirectly) based upon material non-public information.  Further, you should not disclose the fact of a potential private placement, until that information has been made available to the public.

While Merriman Curhan Ford & Co. has always treated knowledge of a potential private placement as material non-public information, we ask that you read this letter and acknowledge your receipt and review with your signature below.  Upon our receipt of your signed acknowledgement, we will continue to approach you with new offers for private placement

SEC-MCF0003533
APP. 182



**MERRIMAN CURHAN FORD & CO.**

investing opportunities. Once signed and returned to us, this letter will cover all future communications between Merriman Curhan Ford & Co. and your firm as well as the funds you manage regarding private placements unless the SEC requires further documentation.

Should you have any questions regarding our services, please do not hesitate to telephone our president, Greg Curhan at 415-248-5678 or myself at 415-248-5634.

Best Regards,

Chris Aguilar
MERRIMAN CURHAN FORD & CO.
General Counsel and
Chief Compliance Officer

I HEREBY ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED THE INFORMATION IN THIS LETTER AND AM AUTHORIZED TO SIGN THIS ACKNOWLEDGEMENT AS INDICATED BELOW.

_____
Fund Manager Company Name

By:_____
Print Name

By:_____
Signature

_____
Date

SEC-MCF0003534
APP. 183

# EXHIBIT U

| | |
|---|---|
| **From:** | Andrew Fineberg <afineberg@mcfco.com> |
| **Sent:** | Thursday, June 24, 2004 7:13 PM (GMT) |
| **To:** | akansler@proskauer.com |
| **Cc:** | aowen@mcfco.com; Christopher Aguilar <Ags@mcfco.com> |
| **Subject:** | PIPE Acknowledgement Letter |
| **Attach:** | Form of Agreement_1.doc; PIPE_Acknowledgement.pdf |

Adam,


I work with Arnie Owen in the Private Placement Group at Merriman Curhan Ford & Co.
I would like to offer my assistance to you in this process of getting a document
signed regarding PIPE notifications.  I know that you already spoke to Chris
Aguilar, our General Counsel.


I am sure that there are several sensitivities here, and I want you to know that we
are open to hearing any suggestions that you may have, including any regarding this
process.  Per his advice, I am sending you several versions of acknowledgement
letters that work from our perspective.  May I suggest that you please review them
and make any edits or comments that you feel necessary?


If this will suffice – great.  Otherwise, I am available via phone or email at any
time.


Fran has a bit more detail from the message that I left with her for you.


Thanks and best regards,

Andrew



Andrew Fineberg

Private Placement Group

MERRIMAN CURHAN FORD & CO.

afineberg@merrimanco.com

office: 415-262-1333

cell: 415-516-8897



EXHIBIT 92
Deponent *Aguilar*
Date 1/25/12 Rptr. *LH*
WWW.DEPOBOOK.COM

SEC-MCF0003529

APP. 185

```
fax 415-248-5692

trading: 800-909-7897

DISCLAIMER: Please click on this link for disclaimer and other important
information relating to this message (
<http://www.merrimanco.com/MCF/emaildisclaimer.php>
http://www.merrimanco.com/MCF/emaildisclaimer.php)
```

SEC-MCF0003530
APP. 186

From time to time, _____ may approach you in connection with a possible purchase by you directly from an issuer (the "Issuer") of (i) registered securities of public companies in a potential shelf takedown (also known as a "registered direct placement of securities") for which _____ will be engaged as a placement agent by the time we approach you, or (ii) unregistered securities of public companies (also known as a "PIPE offering") for which _____ will be engaged as a placement agent by the time we approach you (collectively, a registered direct placement of securities and a PIPE offering will be referred to as a "Proposed Transaction").

In connection with your evaluation of a Proposed Transaction and provided that you agree in advance to receive the Confidential Information with respect to each such Proposed Transaction, you will be orally provided with only (i) the Issuer's name, (ii) the type, amount and basic terms of the securities that may be offered in the Proposed Transaction, and (iii) the timing of the Proposed Transaction (collectively, the "Confidential Information"). We understand that we do not have the right to provide you with the Confidential Information via mail, fax or e-mail. We will not provide you with such Confidential Information without first receiving your consent, and any additional information regarding the Issuer or the Proposed Transaction will only be provided to you by means of a prospectus or prospectus supplement, in the case of a registered direct placement of securities, or by means of SEC filed documents, in the case of a PIPE offering.

You agree that you will use the Confidential Information only in connection with your evaluation of a Proposed Transaction and not for any other purpose. All Confidential Information shall be held in confidence by you and your officers, directors, employees, agents and financial and legal advisors (collectively, the "Representatives") and shall not be disclosed to any other person without our prior written consent or except as may be required by law, regulation or legal process (as you may be advised by legal counsel), or to the extent such Confidential Information is or becomes publicly available, other than as a result of a breach of this Acknowledgment. You also agree that you will direct your Representatives not to disclose to any other person or entity that you have received Confidential Information, that investigations, discussions or negotiations are taking place concerning a Proposed Transaction, or any of the terms, conditions or other facts with respect to a Proposed Transaction, including the status thereof. We represent and warrant to you that we have the full legal right to provide any such Confidential Information that we provide to you.

You hereby acknowledge that the U.S. securities laws would prohibit any person who has material non-public information about a company from purchasing or selling, directly or indirectly, securities of such company (including entering into hedge transactions involving such securities), or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. You agree that you will not use or permit any third party to use, and that you will use your reasonable best efforts to assure that none of your Representatives will use or permit any third party to use, any of the Confidential Information we provide in contravention of the U.S. securities laws.

Other than with respect to the matters specifically addressed herein, this Acknowledgment shall not create any legal obligation of any kind whatsoever between the parties. Without limiting the generality of the foregoing, we shall not be obligated to inform you of any Proposed Transaction in which we become or may become involved, and you shall be under no obligation to receive any information from us or to purchase any securities from any Issuer. Neither this Acknowledgment nor your receipt of any Confidential Information shall be deemed an offer of any securities. Any offering of an Issuer's securities will be made by means of a prospectus and accompanying prospectus supplement that will contain or incorporate by reference detailed information about the Issuer and the Proposed Transaction.

This Acknowledgment shall cease to apply to any Proposed Transaction upon the earlier of (i) the public disclosure of the Confidential Information, other than as a result of a breach of this Acknowledgment, (ii) your entering into a confidentiality agreement with respect to the Confidential Information and/or the Proposed Transaction (which will supercede this Acknowledgment), (iii) the termination of the Proposed Transaction as disclosed to you by the Issuer or _____, and (iv) 60 days from your receipt of the Confidential Information; provided, however, that if we and any third party enter into any agreement of purpose similar to this Acknowledgment ("Other Acknowledgment") that ceases to apply to "confidential information" (as defined in the Other Acknowledgment) in fewer than 60 days from the receipt by the third party of such confidential information, the number of days in (iv) of the first clause of this sentence shall be automatically adjusted downward to the number of days applicable under the Other Acknowledgment, and we will notify you of such adjustment in writing.  Further, you may terminate this Acknowledgment at any time by giving us notice and this Acknowledgment will immediately cease to be in effect; provided, however, that it shall continue to apply to any Confidential Information disclosed to you prior to the giving of such termination notice to which this Acknowledgment still applies.

This Acknowledgment may be executed in counterparts and will be governed and interpreted in accordance with New York law.  Please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning to us a copy of this Acknowledgment.

Very truly yours,

_____

By: _____
Name: _____
Title: _____

Acknowledged as of the date set forth above:

**[FUND NAME]**

By:_____
Name:

Title:



**MERRIMAN
CURHAN
FORD & CO.**

June 14 , 2004

### RE:  Private Placement Transaction Acknowledgement

We at Merriman Curhan Ford & Co. (MCF) are committed to offering the best service we can as a broker dealer and investment bank. As a part of that service, we look forward to providing you with private investment opportunities in public companies.

In an effort to continue that service and protect your interests as an investor client, we write you now to remind you of potential trading restrictions that you may face after receiving information from Merriman Curhan Ford & Co. regarding private placement investment transactions.  You are a valued customer and so we seek your acknowledgement of these potential trading restrictions.

As part of the process of providing you with interesting investment ideas, you may be advised of a public company's offer of a private capital investment transaction in exchange for their public equity.  While we are not aware of applicable statutory language, we have noted a position stated by representatives of the Securities and Exchange Commission in recent popular financial services press.  This position holds that knowledge of a public company's intent to seek private financing in exchange for its equity is <u>material non-public information</u>.

Given the possibility for the Commission to consider knowledge of a potential private placement to be material non-public information and the potential application of Rule 10b5-1 of the Exchange Act of 1934, you should not trade in a company's securities (either directly or indirectly) based upon material non-public information.  Further, you should not disclose the fact of a potential private placement, until that information has been made available to the public.

While Merriman Curhan Ford & Co. has always treated knowledge of a potential private placement as material non-public information, we ask that you read this letter and acknowledge your receipt and review with your signature below.  Upon our receipt of your signed acknowledgement, we will continue to approach you with new offers for private placement

SEC-MCF0003533
APP. 189



investing opportunities. Once signed and returned to us, this letter will cover all future communications between Merriman Curhan Ford & Co. and your firm as well as the funds you manage regarding private placements unless the SEC requires further documentation.

Should you have any questions regarding our services, please do not hesitate to telephone our president, Greg Curhan at 415-248-5678 or myself at 415-248-5634.

Best Regards,

Chris Aguilar
MERRIMAN CURHAN FORD & CO.
General Counsel and
Chief Compliance Officer

I HEREBY ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED THE INFORMATION IN THIS LETTER AND AM AUTHORIZED TO SIGN THIS ACKNOWLEDGEMENT AS INDICATED BELOW.

_____
Fund Manager Company Name

By:_____
Print Name

By:_____
Signature

_____
Date

SEC-MCF0003534
APP. 190

# EXHIBIT V

| | |
|---|---|
| **From:** | Andrew Fineberg <afineberg@mcfco.com> |
| **Sent:** | Friday, June 25, 2004 7:32 AM |
| **To:** | wmatthews@amaranthllc.com |
| **Cc:** | Christopher Aguilar <Ags@mcfco.com> |
| **Subject:** | PIPE Guideilnes Letter |
| **Attach:** | Form of Agreement_2.doc |

Will,

This letter is both more specific and written with more legalese. The original letter that we sent you was drafted by our General Counsel, Christopher Aguilar to let people know about what we have seen in the marketplace. The signature we request on that letter is to acknowledge that you received it, not to bind you to any of the terms in it. But I understand your attorney's position about what that signature may imply.

Please have your attorney review and mark up this new letter to meet her standards. I will show it to my General Counsel and if necessary, ask him to contact your attorney to discuss it. She can also call Chris directly if she wishes at 415-248-5634. He is out of the office until Monday, however.

Re: Mamma.com, I will let you know of timing as soon as I get more details.

All the best,
Andrew


Andrew Fineberg
Private Placement Group
MERRIMAN CURHAN FORD & CO.
afineberg@merrimanco.com
office: 415-262-1333
cell: 415-516-8897
fax 415-248-5692
trading: 800-909-7897

DISCLAIMER: Please click on this link for disclaimer and other important information relating to this message
(http://www.merrimanco.com/MCF/emaildisclaimer.php)



FOIA CONFIDENTIAL TREATMENT REQUESTED BY MERRIMAN HOLDINGS, INC.

APP. 192
MCF000708

From time to time, Merriman Curhan Ford & Co. (MCF) may approach you in connection with a possible purchase by you directly from an issuer (the "Issuer") of (i) registered securities of public companies in a potential shelf takedown (also known as a "registered direct placement of securities") for which MCF will be engaged as a placement agent by the time we approach you, or (ii) unregistered securities of public companies (also known as a "PIPE offering") for which MCF will be engaged as a placement agent by the time we approach you (collectively, a registered direct placement of securities and a PIPE offering will be referred to as a "Proposed Transaction").

In connection with your evaluation of a Proposed Transaction and provided that you agree in advance to receive the Confidential Information with respect to each such Proposed Transaction, you will be orally provided with only (i) the Issuer's name, (ii) the type, amount and basic terms of the securities that may be offered in the Proposed Transaction, and (iii) the timing of the Proposed Transaction (collectively, the "Confidential Information"). We understand that we do not have the right to provide you with the Confidential Information via mail, fax or e-mail. We will not provide you with such Confidential Information without first receiving your consent, and any additional information regarding the Issuer or the Proposed Transaction will only be provided to you by means of a prospectus or prospectus supplement, in the case of a registered direct placement of securities, or by means of SEC filed documents, in the case of a PIPE offering.

You agree that you will use the Confidential Information only in connection with your evaluation of a Proposed Transaction and not for any other purpose. All Confidential Information shall be held in confidence by you and your officers, directors, employees, agents and financial and legal advisors (collectively, the "Representatives") and shall not be disclosed to any other person without our prior written consent or except as may be required by law, regulation or legal process (as you may be advised by legal counsel), or to the extent such Confidential Information is or becomes publicly available, other than as a result of a breach of this Acknowledgment. You also agree that you will direct your Representatives not to disclose to any other person or entity that you have received Confidential Information, that investigations, discussions or negotiations are taking place concerning a Proposed Transaction, or any of the terms, conditions or other facts with respect to a Proposed Transaction, including the status thereof. We represent and warrant to you that we have the full legal right to provide any such Confidential Information that we provide to you.

You hereby acknowledge that the U.S. securities laws would prohibit any person who has material non-public information about a company from purchasing or selling, directly or indirectly, securities of such company (including entering into hedge transactions involving such securities), or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. You agree that you will not use or permit any third party to use, and that you will use your reasonable best efforts to assure that none of your Representatives will use or permit any third party to use, any of the Confidential Information we provide in contravention of the U.S. securities laws.

Other than with respect to the matters specifically addressed herein, this Acknowledgment shall not create any legal obligation of any kind whatsoever between the parties. Without limiting the generality of the foregoing, we shall not be obligated to inform you of any Proposed Transaction in which we become or may become involved, and you shall be under no obligation to receive any information from us or to purchase any securities from any Issuer. Neither this Acknowledgment nor your receipt of any Confidential Information shall be deemed an offer of any securities. Any offering of an Issuer's securities will be made by means of a prospectus and accompanying prospectus supplement that will contain or incorporate by reference detailed information about the Issuer and the Proposed Transaction.

This Acknowledgment shall cease to apply to any Proposed Transaction upon the earlier of (i) the public disclosure of the Confidential Information, other than as a result of a breach of this Acknowledgment, (ii) your entering into a confidentiality agreement with respect to the Confidential Information and/or the Proposed Transaction (which will supercede this Acknowledgment), (iii) the termination of the Proposed Transaction as disclosed to you by the Issuer or MCF, and (iv) 60 days from your receipt of the Confidential Information; provided, however, that if we and any third party enter into any agreement of purpose similar to this Acknowledgment ("Other Acknowledgment") that ceases to apply to "confidential information" (as defined in the Other Acknowledgment) in fewer than 60 days from the receipt by the third party of such confidential information, the number of days in (iv) of the first clause of this sentence shall be automatically adjusted downward to the number of days applicable under the Other Acknowledgment, and we will notify you of such adjustment in writing.  Further, you may terminate this Acknowledgment at any time by giving us notice and this Acknowledgment will immediately cease to be in effect; provided, however, that it shall continue to apply to any Confidential Information disclosed to you prior to the giving of such termination notice to which this Acknowledgment still applies.

This Acknowledgment may be executed in counterparts and will be governed and interpreted in accordance with New York law.  Please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning to us a copy of this Acknowledgment.

Very truly yours,

_____

By: _____
Name: _____
Title: _____

Acknowledged as of the date set forth above:

**[FUND NAME]**

By:_____
Name:

Title:

APP. 194

MCF000710

# EXHIBIT W

| | |
|---|---|
| **From:** | Claude E. Forget <c.e.forget@sympatico.ca> |
| **Sent:** | Monday, June 28, 2004 9:51 PM |
| **To:** | 'David Goldman' <dgoldman@intasys.com>; 'Daniel Bertrand' <dbertrand@intasys.com>; 'Robert Raich' <rraich@spiegelsohmer.com>; 'Irwin Kramer' <ikramer@icongo.com>; 'David Schwartz' <dschwartz@aitventures.com>; 'David Goldman' <goldmand@sympatico.ca>; 'Guy Faure' <guy@mamma.com> |
| **Subject:** | RE: New Equity URGENT - YOUR APPROVAL REQUIRED |

Dave & Guy - I have no hesitation in approving the higher ceiling especially in the current market context. With regard to penalties this has apparently moved in the right direction with a 5% cap; however I do not fully understand what is meant by the expression "if we screw up". It suggests to me that the penalty applies if we are denied the registration because of some error on our part (that seems reasonable) but it does not clearly rule out a penalty if registration is denied for some reason beyond our control (which is not so reasonable as we seem to be providing insurance against an unknown risk). Can you tell us which meaning is intended?

-----Message d'origine-----
De : David Goldman [mailto:dgoldman@intasys.com]
Envoyé : 28 juin 2004 14:51
À : Daniel Bertrand; Robert Raich; Irwin Kramer; David Schwartz; David Goldman; Claude E. Forget; Guy Faure
Objet : New Equity URGENT - YOUR APPROVAL REQUIRED

We are nearing completion of negotiation of the new equity raise. The definitive agreement is not completed yet but discussions with our counsel and that of the investors has resulted in substantially all of the terms and conditions reflecting those approved by the board. One last issue being addressed is that of penalties should, in effect, the company neglect to carry out all measures with respect to registration filings which, should we screw up, would result in a cashless exercise option with respect to warrants (repeat - this is only if we screw-up). This is subject to clarifying that this is not inconsistent with OSC regulations that may preclude any reference to cashless exercise.

We have also reworked the penalty issue for failing to register within 120 days such that the company would be subject to a maximum penalty of 5% payable either in cash or shares at our option at 1% per month.

Note: with respect to registration: We are nearing completion of filing for the 105,000 MAXIM warrants and, based on closing this equity raise prior to month's end, will piggyback the registration of the new equity/warrants (as well as warrants currently issued to Merriman Curhan Ford) with this filing.

While the board had indicated that we raise $15 million, we may be slightly oversubscribed at about $17 million (final numbers not available). This is about 1.5 million shares at $10.85 if we include today's price plus 600,000 warrants at about $15.68 if incl. today's price. In addition to receiving your approval for the equity could you please approve this increased amount so that we do not have to put anyone on allocation?

Today, after much discussion, Guy spoke to Mark Cuban about this equity raise and whether or not he would be interested in participating. As anticipated he initially "flew off the handle" and said he would sell his shares (recognizing that he was not able to do anything until we announce

DG0000876

the equity) but then asked to see the terms and conditions which we have arranged for him to receive from one of the participating investor groups with which he has dealt in the past.

With your approval, we would expect to close at the close of business either today or tomorrow depending on concluding the agreement.

Guy and Dave

DG0000877

APP. 197

# EXHIBIT X

| | |
|---|---|
| **From:** | Ian Trumpower <ITrumpower@hbk.com> |
| **Sent:** | Monday, June 28, 2004 1:36 PM |
| **To:** | 'Ags@mcfco.com' |
| **Subject:** | FW: Merriman Acknowledgement |

Chris - can you give me a status update - we are trying to get all of the traders on one system for dealing with private placements and would like to wrap this up as soon as possible.  If all looks good on the master confi please fax an executed copy to me at 214-979-8308 so I can get countersigned and back to you.

Thanks,
Ian

-----Original Message-----
**From:** Ian Trumpower
**Sent:** Friday, June 18, 2004 11:20 AM
**To:** 'Christopher Aguilar'
**Cc:** Arnold Owen
**Subject:** RE: Merriman Acknowledgement

Great - I look forward to hearing from you.  Note, the agreement was originally drafted by Citi and B of A and seems likely become the industry standard method of dealing with PIPEs.

Ian

    -----Original Message-----
    **From:** Christopher Aguilar [mailto:Ags@mcfco.com]
    **Sent:** Friday, June 18, 2004 11:14 AM
    **To:** Ian Trumpower
    **Cc:** Arnold Owen
    **Subject:** RE: Merriman Acknowledgement

    Ian:

    I have received your voice and electronic mail.

    I will review the proposed Confidentiality Agreement and provide you with my comments, if any, today.

    Chris

    **Christopher Aguilar**
    General Counsel and Chief Compliance Officer
    ags@merrimanco.com
    **MERRIMAN CURHAN FORD & CO.**
    a subsidiary of MCF Corporation
    601 Montgomery Street, 18th Floor
    San Francisco, CA  94111
    telephone (415) 248-5634
    facsimile  (415) 723-7165

    The information contained in this electronic mail message is confidential information intended only for use of the individual or entity named above, and is privileged. If the reader of this message is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender by reply or telephone (415-248-5634), and delete the original message.  Thank you.
    DISCLAIMER: Please click on this link for disclaimer and other important information relating to this message
    (http://www.merrimanco.com/MCF/emaildisclaimer.php)

    -----Original Message-----
    **From:** Ian Trumpower [mailto:ITrumpower@hbk.com]



Exhibit
**55**
Christy R. Sievert, CSR, RPR

HBK-P-0009917

**Sent:** Thursday, June 17, 2004 4:51 PM
**To:** Christopher Aguilar
**Cc:** Tom Waugh; Andrew Fineberg
**Subject:** FW:

Chris - as I mentioned in the voicemail I just left you, we have addressed the situation below with the other placement agents we deal with through the use of the attached master confidentiality agreement.  Let's discuss once you have had an opportunity to review.

Regards,
Ian Trumpower

---------------------------------
*Ian N. Trumpower*
*Associate General Counsel*
*HBK Investments L.P.*
*300 Crescent Court, Suite 700*
*Dallas, Texas 75201*
*Phone: (214) 758-6508*
*Fax: (214) 979-8308*
*itrumpower@hbk.com*

-----Original Message-----
**From:** Jon Mosle
**Sent:** Tuesday, June 15, 2004 9:02 AM
**To:** Ian Trumpower
**Cc:** Kim Rozman
**Subject:** FW:

-----Original Message-----
**From:** Tom Waugh
**Sent:** Monday, June 14, 2004 5:45 PM
**To:** Jon Mosle
**Cc:** Jeff Estes
**Subject:** FW:

-----Original Message-----
**From:** Andrew Fineberg [mailto:afineberg@mcfco.com]
**Sent:** Monday, June 14, 2004 2:37 PM
**Cc:** Christopher Aguilar; Ted Mitchell; aowen@mcfco.com
**Subject:**

Attached is a letter from our General Counsel for which we need your signature to acknowledge your receipt.  The letter provides our interpretation of Rule 10b5-1 of the Exchange Act of 1934 stating that knowledge of a PIPE is considered material non-public information.

You probably have received similar letters from other firms marketing PIPEs. As you will see after reading the letter, your signature is only to confirm your receipt, not to bind you to any interpretation or any action surrounding this rule.

Our firm requires that the letter be printed, signed and returned either via fax, electronic mail (scanned and converted to .pdf format), or postal mail before June 28, 2004. After that date, we will be disallowed from discussing new PIPE opportunities until a signed copy has been sent back to us.

Please feel free to call Arnie, Ted or myself or our General Counsel, Chris Aguilar directly at 415-248-5634 if

you have any questions or concerns.

We greatly appreciate your cooperation, and look forward to showing you new investment opportunities in the future.

Best Regards,
Andrew Fineberg


Andrew Fineberg
Private Placement Group
MERRIMAN CURHAN FORD & CO.
afineberg@merrimanco.com
office: 415-262-1333
cell: 415-516-8897
fax 415-248-5692
trading: 800-909-7897

DISCLAIMER: Please click on this link for disclaimer and other important information relating to this message (http://www.merrimanco.com/MCF/emaildisclaimer.php)

Confidential Treatment Requested by K&L Gates

# EXHIBIT Y

**From:**      Robert Raich <rraich@spiegelsohmer.com>
**Sent:**      Tuesday, June 29, 2004 1:03 PM
**To:**        dgoldman@intasys.com
**Subject:**   Re: New Equity URGENT - YOUR APPROVAL REQUIRED

---

Dave,

As discussed, I agree with the contents of your e-mail of June 28, 2004 at 3:52 p.m.

Robert Raich


------------------------------------------------------------------------------------------------
                                        NOTE

Ce message est légalement privilégié. S'il vous est parvenu par erreur,  veuillez nous le retourner à nos frais.

This message is legally privileged. If received in error please return at our cost.
------------------------------------------------------------------------------------------------


>>> "David Goldman" <dgoldman@intasys.com> 6/28/2004 3:51:17 PM >>>

We are nearing completion of negotiation of the new equity raise. The
definitive agreement is not completed yet but discussions with our counsel
and that of the investors has resulted in substantially all of the terms and
conditions reflecting those approved by the board. One last issue being
addressed is that of penalties should, in effect, the company neglect to
carry out all measures with respect to registration filings which, should we
screw up, would result in a cashless exercise option with respect to
warrants (repeat - this is only if we screw-up). This is subject to
clarifying that this is not inconsistent with OSC regulations that may
preclude any reference to cashless exercise.

We have also reworked the penalty issue for failing to register within 120
days such that the company would be subject to a maximum penalty of 5%
payable either in cash or shares at our option at 1% per month.

Note: with respect to registration: We are nearing completion of filing for
the 105,000 MAXIM warrants and, based on closing this equity raise prior to
month's end, will piggyback the registration of the new equity/warrants (as
well as warrants currently issued to Merriman Curhan Ford) with this filing.

While the board had indicated that we raise $15 million, we may be slightly
oversubscribed at about $17 million (final numbers not available). This is
about 1.5 million shares at $10.85 if we include today's price plus 600,000
warrants at about $15.68 if incl. today's price. In addition to receiving
your approval for the equity could you please approve this increased amount
so that we do not have to put anyone on allocation?

DG0000872

Today, after much discussion, Guy spoke to Mark Cuban about this equity raise and whether or not he would be interested in participating. As anticipated he initially "flew off the handle" and said he would sell his shares (recognizing that he was not able to do anything until we announce the equity) but then asked to see the terms and conditions which we have arranged for him to receive from one of the participating investor groups with which he has dealt in the past.

With your approval, we would expect to close at the close of business either today or tomorrow depending on concluding the agreement.

Guy and Dave

DG0000873